**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| STUDENTS FOR JUSTICE IN PALESTINE AT PITT, <br><br> *Plaintiff,* <br><br> v. <br><br> UNIVERSITY OF PITTSBURGH; JOAN GABEL, MARLIN NABORS, KARIN ASHER, DaVAUGHN VINCENT-BRYAN, MATTHEW LANDY, and JAMEY MENTZER, all in their official and individual capacities, <br><br> *Defendants.* | CIVIL ACTION NO. _____ |

## VERIFIED COMPLAINT

1.      Defendants, University of Pittsburgh ("Pitt" or "University") and its individual defendant officials, have over the past year systematically interfered with and censored peaceful, First-Amendment-protected political expression attempted by Plaintiff, Students for Justice in Palestine at Pitt ("SJP-Pitt").  SJP-Pitt, until recently a University-registered student organization, increased its on-campus advocacy to decry Israel's escalation of military operations in Gaza, and the United States' failure to do more to stop the conflict.  SJP-Pitt hosted and cosponsored numerous educational events, initiated and supported peaceful demonstrations, and broadcast its message over social media.

2.      Since Spring 2024, Defendants singled out SJP-Pitt in multiple ways:

(a)      From at least April 2024, Defendants have included an "alert" on an internal database cautioning users to subject SJP-Pitt to heightened scrutiny. Other

1

student groups advocating on the Middle Eastern conflict, including ones linked to threats, are not similarly flagged.

(b)     Beginning last Fall, Defendants invoked vague or non-existent University rules and guidelines to force peaceful demonstrations involving SJP-Pitt to move off campus.

(c)     In December, Defendants attempted to shut down an SJP-Pitt library study group because members wore pro-Palestinian symbols, like keffiyehs and draped Palestinian flags, and adorned their laptops and backpacks with small political signs, in a non-disruptive, silent display of political expression.

(d)     This past January, Defendants forced SJP-Pitt to rename an event to, allegedly, avoid offending people, and then relocated the event at the last minute to a less desirable venue.

(e)     Also this past January, Defendants initiated disciplinary action seeking to suspend SJP-Pitt's university registration over the passive library display, alleging vaguely that SJP-Pitt disregarded directives and violated unidentified rules and policies.  Those proceedings remain unresolved.

(f)     On March 18, Defendants placed SJP-Pitt on temporary and indefinite suspension, significantly curtailing its ability to continue on-campus activism. The suspension, which is still in place, was not issued in response to SJP-Pitt's expression in the library, but to a February 4 open letter signed by SJP-Pitt and 72 other university and community groups criticizing Pitt's disciplinary actions, including the misconduct proceedings.

     (g)     On March 19, Pitt threatened SJP-Pitt with additional discipline for promoting an off-campus demonstration against the resumption of the war in Gaza.

     (h)     On April 8, Pitt reinstated the disciplinary charges over the library study-in, and added new charges over the February 4 open letter. Those proceedings are just beginning, but SJP remains on interim suspension.

3.     Throughout its year of harassment, Pitt has failed to link SJP-Pitt's alleged misconduct with specific University rules, policies or guidelines. Defendants have repeatedly invoked the mantra that SJP-Pitt is engaged in an "event in a non-reservable space," but Pitt has no definition of "event," and the so-called non-reservable spaces they have identified are either reservable, open to all students, or First-Amendment-protected public forums where the University's power to suppress political expression is limited. The First Amendment protected the students who wore black armbands to school in a silent protest against the Vietnam War[1] and the Black civil rights demonstrators who were arrested for silently protesting discrimination in a segregated library.[2] As the U.S. Court of Appeals for the Third Circuit noted recently, these are "[p]aradigms of protected conduct-based speech."[3] The First Amendment protects SJP-Pitt's expression, including peaceful outdoor demonstrations in public forums, non-disruptive and silent political expression in the library, open letters to campus administrators criticizing their treatment of SJP, and social media posts promoting both on- and off-campus demonstrations.

4.     Pitt has transgressed clear First Amendment boundaries by 1) initiating meritless disciplinary proceedings against SJP-Pitt and threatening suspension over silent political expression in the library; 2) suspending SJP-Pitt for sharing an open, community letter criticizing

---

[1] *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969).
[2] *See Brown v. Louisiana,* 383 U.S. 131, 141-42 (1966).
[3] *Falcone v. Dickstein*, 92 F.4th 193, 206 n.9 (3d Cir. 2024); *see also B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 308 (3d Cir. 2013) (citing *Tinker*, *supra*, and its progeny).

the University's treatment of SJP-Pitt; 3) using intimidation to silence SJP-Pitt's off-campus speech; and 4) relocating away from campus three peaceful demonstrations involving SJP-Pitt. Pitt's actions have irreparably harmed, and continue to irreparably harm, SJP-Pitt's First Amendment rights to expression and assembly. "[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools,"[4] and this Court's emergent injunctive relief is needed to safeguard SJP-Pitt's First Amendment rights.

## I.    JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367. Declaratory relief is authorized by 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57. Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

6.    This Court has personal jurisdiction over Defendants, all of whom are located and/or work in the Western District of Pennsylvania.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants are located in this District and the events or omissions giving rise to this suit occurred, and are occurring, in Pittsburgh.

## II.    PARTIES

8.    Plaintiff, Students for Justice in Palestine at Pitt ("SJP-Pitt"), is an unincorporated association of likeminded students attending the University of Pittsburgh who are committed to raising demands for freedom, justice, and equality for the Palestinian people. It is one of about 350 chapters of the national Students for Justice in Palestine organization. On March 18, 2025, the University suspended SJP-Pitt's club registration and directed "a cessation of organizational operations." Ex. 26. On or about March 29, 2025, the group changed its name from "Students for

---

[4] *Healy v. James*, 408 U.S. 169, 180 (1972) (citation omitted).

Justice in Palestine at Pitt" to "Students for Justice in Palestine—Pittsburgh" in order to operate as an unincorporated association that is not a University registered student organization.[5]

9.      According to SJP-Pitt's constitution, filed with the University, the group's purpose is "to provide the Pitt community with a better understanding of the Palestinian-Israeli conflict through advocacy, awareness, and charity in the hopes of attaining peace in the region and freedom for Palestinians."  And the constitution identifies the following activities:

> This group will organize events throughout the year such as hosting speakers, movie showings, cultural festivals, and fundraisers in order to educate and raise awareness regarding the issues in the Palestinian region. This group will also participate in events promoting peace and justice in coordination with other Palestinian solidarity organizations within the Pittsburgh area. This group may also organize petitions and pass out leaflets with the intent of educating the public.

10.      Pitt is established by Pennsylvania law as an instrumentality of the Commonwealth to serve as a state-related university in the higher education system. *See* 24 Pa. Stat. Ann. § 2510-201, *et seq*.  As a state-related university, it is subject to the Constitution of the United States, including but not limited to the First and Fourteenth Amendments.  Pitt is responsible, as an organizational entity, for the actions and harms alleged in this lawsuit because all acts were committed, directed, or ratified by official policy makers with authority to bind the University.

11.      Defendant Joan Gabel serves as the Chancellor for the University of Pittsburgh. She was at all times hereafter mentioned acting under color of state law.  Chancellor Gabel is sued in her individual and official capacities.

---

[5] The parties to this litigation agreed during pre-filing discussions that Plaintiff's new name was acceptable during the suspension period because it does not imply University endorsement. Plaintiff changed its social-media handle accordingly, from "@sjp_pitt" to "@sjp_pgh." This document henceforth will refer to the Pittsburgh-based chapter simply as "SJP-Pitt" since the University still refers to the group as such.

12.    Defendant Marlin Nabors is the Associate Vice Provost and Dean of Students for the University of Pittsburgh.  At all times hereinafter mentioned, he was operating under color of state law.  He is sued in his individual and official capacities.

13.    Defendant Karin Asher is the Assistant Dean of Student Engagement and Professional Development at the University of Pittsburgh.  She was at all times hereafter mentioned acting under color of state law.  Dr. Asher is sued in her individual and official capacities.

14.    Defendant DaVaughn Vincent-Bryan is Pitt's Director of Involvement and Student Unions. At all times hereinafter mentioned, he was operating under color of state law.  He is sued in his individual and official capacities.

15.    Defendant Matthew Landy is the Director of Student Conduct at the University of Pittsburgh.  At all times hereinafter mentioned, he was operating under color of state law.  He is sued in his individual and official capacities.

16.    Defendant Jamey Mentzer is the Associate Director of Student Conduct at the University of Pittsburgh.  At all times hereinafter mentioned, he was operating under color of state law.  He is sued in his individual and official capacities.

## III.    FACTUAL BACKGROUND

### A.  SJP-Pitt's Activity at Pitt Increased After October 7, 2023

17.    SJP-Pitt has been a "registered student organization" at Pitt since at least 2009.

18.    Organizations enjoy many benefits from registered status. *See* Ex. 1. University of Pittsburgh, Student Organization Resource Center (SORC), Privileges of Registration (available at https://www.studentaffairs.pitt.edu/student-organization-resource-center/start-new-student-organization/registration-guidelines).  Privileges of club registration include access to university

facilities, equipment and services; funding and eligibility to collect dues and host fundraising events; eligibility to be listed in university publications, participate in university activities, use university spaces to host various programs, including guest speakers, panel discussions, and rallies; permission to distribute literature and organizational materials on campus, including through university mail; eligibility to post informational materials on university controlled bulletin boards; and other services and supports.

19.     While SJP-Pitt has long been a registered university organization, it was largely dormant immediately prior to October 7, 2023, when Israel began to retaliate against and attack Palestinians living in Gaza over a Hamas attack that left more than one thousand Israelis dead. Shortly thereafter, more students joined SJP-Pitt, new board members were added, and it became a more visible presence on Pitt's campus, in the surrounding community, and on social media.

20.     For the remainder of the 2023-24 school year and the fall semester of the 2024-25 year, SJP-Pitt sponsored, co-sponsored, or promoted peaceful demonstrations on or near the campus to raise awareness of the Palestinian peoples' suffering, sponsored six on-campus speaker events and many more educational events, and maintained a vibrant social-media presence that commented on topical news and promoted events in support of the Palestinian people.

21.     Throughout this period, SJP-Pitt decried violence against Pitt students.  For example, in response to an August 30, 2024 criminal assault by a 52-year-old man on two Jewish Pitt students near the campus in the Oakland neighborhood, the organization posted the following social-media statement on September 1:

> Students for Justice in Palestine at the University of Pittsburgh unequivocally condemns the act of violence that took place on Friday, August 30 against two Jewish students.  We wholly reject all forms of hate, including antisemitism, Islamophobia, anti-Palestinian racism, and white supremacy, and denounce the misappropriation of Palestinian symbols by individuals unaffiliated with the movement for a liberated Palestine.  We reaffirm that the University of Pittsburgh

campus should be an inclusive and safe space for students of all backgrounds. Our thoughts are with the students harmed by this attack, and we wish them a safe and speedy recovery.

Ex. 2.

**B. SJP-Pitt's Increased Visibility Attracted Opposition and Hostile Threats from Opposing Pitt-Sponsored Student Groups and External Organizations.**

22.    During the summer of 2024, Congress and other political leaders began pressing universities to curtail students' pro-Palestine activism on campus. Contentious hearings in the U.S. House of Representatives led to the resignation of two major universities' presidents, who were accused of not taking sufficient measures to address anti-Semitism on campus, including for not punishing pro-Palestinian student demonstrators more harshly. *See* Katherine Knot, et al, *College Leaders Testify on Capitol Hill*, INSIDE HIGHER ED (May 23, 2024), https://www.insidehighered.com/news/government/2024/05/23/live-congress-grills-ucla-rutgers-northwestern-leaders.

23.    SJP-Pitt's activism attracted hostility and counter demonstrations, mostly from two other University-registered student organizations: Students Supporting Israel ("SSI") and Student Coalition for Israel at Pitt ("SCIP").

24.    At the beginning of the 2024-25 school year, verbal attacks on SJP-Pitt increased on campus, on social media, and in the press.

25.    In early October, for instance, SSI collaborated with a non-university organization, Betar USA, on an Instagram post and Change.org petition urging Pitt to ban SJP-Pitt from campus. Ex. 3. The messages claimed SJP-Pitt supports terrorism, promotes violence, and intimated that SJP-Pitt instigated "3 assaults on Jewish [Pitt] students." *Id*. Fliers posted on utility poles and on University-property claimed "SJP supports terrorism". Ex. 4.

26.　　Around this time, Betar USA posted messages on its Instagram account specifically targeting SJP-Pitt.[6] One message stated that Betar was "recruiting…in Pittsburgh" and invited sympathizers to join them "on campus." Ex. 3. The message continued, "@sjp_pitt our director @the_urbanwarrior looks forward to giving you a beeper." The "beeper" reference was viewed by many as a thinly veiled death threat because it alluded to a September 17 Israeli attack that killed at least 37 people and wounded nearly 3,000 in Lebanon by detonating beepers it had distributed to people, including civilians and children.[7] Upon information and belief, Instagram temporarily banned Betar USA over the threats to SJP-Pitt.

27.　　On October 24, a person subsequently identified as a member of SCIP's executive board, placed a note on a former SJP-Pitt board leader's car, saying, "Sinwar is dead you MF! Israel Will Always Be. Fuck you! Jew hating BITCH." Ex. 5.　Upon information and belief, Pitt investigated but declined to take disciplinary action against the individual or SCIP.

**C. A Year Ago, Pitt Flagged All SJP-Pitt Event Applications for Elevated Scrutiny**

28.　　A Pitt computer system tracking events sponsored by registered student organizations includes an internal "alert" for SJP-Pitt. Ex. 6.　The alert, which is not viewable publicly, reads as follow: "Internal Communication　Students for Justice in Palestine."　The note accompanying that entry reads, "do not make late requests for this group without consulting a pro staff.　Event description is VERY important with this group due to ongoing protests and demonstrations."　A screenshot of the alert is below.

---

[6] *See* Will Oremus, *A militant Zionist group threatens activists online with a 'deport list'*, WASH. POST (Mar. 29, 2025), available at https://www.washingtonpost.com/technology/2025/03/29/zionist-palestinians-deportations-x/.
[7] *See* Amnesty International, *Lebanon: Establish international investigation into deadly attacks using exploding portable devices* (Sept. 20, 2024), https://www.amnesty.org/en/latest/news/2024/09/lebanon-establish-international-investigation-into-deadly-attacks-using-exploding-portable-devices/.



29. This alert has been affixed to SJP-Pitt's database entry since at least April 2024. It was in effect as late as April 8, 2025.

30. Upon information and belief, very few registered student organizations have such an alert affixed to their entry in the events database. SSI and SCIP do not.

**D. Pitt Suppresses SJP-Pitt's Campus Demonstrations**

31. Meanwhile, as these attacks on SJP-Pitt by University-sponsored student organizations and outside entities were unfolding, Pitt began a series of actions that interfered with SJP-Pitt's operations and stifled their political expression.

32. In September and October, 2024, Defendants disrupted and then relocated three peaceful demonstrations involving SJP-Pitt from outdoor on-campus spaces to off-campus locations. The forced relocations moved protesters further away from their intended audience, namely, members of the Pitt community. SJP-Pitt sponsored only one of the three demonstrations, and merely promoted and joined the other two rallies.

33. For instance, on September 24, 2024, the Assistant Dean of Student Engagement and Professional Development, Defendant Karin Asher, emailed SJP-Pitt leaders asserting that

even though SJP-Pitt was not the "event organizer[]" of a demonstration advertised for the next day, entitled "Urgent Protest: Hands Off Gaza and Lebanon," "as a registered student organization, it is [SJP-Pitt's] obligation to uphold University policies and guidelines when [SJP-Pitt] engage[s] with events." Ex. 7(Asher 9/24/24 17:56 email). Asher confusingly wrote that the space on the lawn in front of the Cathedral of Learning ("Cathedral") was "non-reservable space," but noted that SJP-Pitt had not made a reservation. *Id*.

34.     The next day, September 25, Pitt Police forced about 100 students and non-students engaged in a peaceful demonstration outside the Cathedral to move off campus, across the street to Schenley Plaza, a City of Pittsburgh owned public forum. The relocation limited SJP-Pitt members' and others' ability to communicate their message to Pitt students and faculty. The Schenley Plaza area is further removed from where Pitt students and faculty typically congregate and pass.

35.     On October 7, Asher sent another email threatening SJP-Pitt leaders with sanctions for unspecified failures to comply with university policies in announcing events for later in the week. *See* Ex. 8 (Asher 10/07/24 21:48).

36.     On October 9, Pitt police ordered about 50 people at an SJP-Pitt co-sponsored rally outside the William Pitt Student Union ("WPU") to relocate across the street to non-Pitt property, at the Soldiers and Sailors Memorial Hall & Museum. The rally on the plaza outside the WPU was peaceful and not disrupting class or interfering with ingress or egress at the building. Yet again, the off-campus space afforded SJP-Pitt less opportunities to interact with the intended audience, Pitt community members.

37.     On October 10, Asher directed that a peaceful, educational "teach in," organized by a community group but promoted and attended by SJP-Pitt members, must move off campus,

from the Cathedral lawn across the street to Schenley Plaza.  Asher simply declared that they were holding an "event" in a "non-reservable" portion of the lawn, even though that area is regularly used for small demonstrations. Relocating the teach-in from campus interfered with SJP-Pitt students' and other participants' ability to communicate their message to Pitt community members, again.

### E. Pitt Employs a Vague, Ill-Defined, Standardless System to Regulate Expression in the University's Public Spaces

38.     Defendant Asher, and other Pitt officials, have repeatedly invoked the phrase, an "event in a non-reservable space," to decree political expression illegal.  She used the phrase to justify relocating two of the three disrupted fall 2024 demonstrations, *supra*, and again in attempting to shut down the library study-in, *infra*.

39.     But Pitt has failed to identify any rule or policy that defines an "event."  In an effort to justify its restriction, the University has directed SJP-Pitt to its "Demonstration and Protest Guidelines," which vaguely define "demonstration" by stating "[a] demonstration includes any organized public gathering or activity expressing support for or opposition to an issue, person, group, idea or policy." Ex. 9. In effect, that is a definition of a First-Amendment-protected activity. Thus, to the extent Pitt uses "event" as a proxy for demonstration, it is saying First Amendment protected expressive activities are prohibited in certain spaces.

40.     But all expression cannot be banned from the spaces where Pitt and Asher have applied the "no-event" label. The protests discussed above occurred on sidewalks and sizeable grassy areas outside the Cathedral, or on the plaza outside the WPU, both of which are at least designated public forums if not traditional public forums protected by the First Amendment. Regardless of the type of public forum, government agencies' ability to ban peaceful, non-disruptive expressive activities is sharply limited. In the case of the library, discussed *infra*, the

government cannot ban all expression, especially passive displays on clothing and belongings, even in non-public forums.

41.     While government agencies can, and most do, establish permitting systems to regulate expression in public forums, Pitt has not identified any such system.  The aforementioned demonstration guidelines simply state that the "University maintains the right to regulate and monitor the time, place and manner of any on-campus demonstrations as may be necessary to help ensure the safety and well-being of community members and the orderly conduct of classes and other functions of the University." *Id*.   These guidelines contain no standards to guide University regulators or members of the University community who must follow Pitt's rules.  They do not specify how many people, engaged in what activities, in what particular locations, and under which other important contextual factors constitute a "demonstration."  They do not identify which public spaces at the university are "non-reservable."  The University has a system for clubs to reserve spaces, but it is insufficiently precise or comprehensive to pass constitutional muster for a demonstration permitting system.[8]

42.     In sum, Defendants cannot simply declare, *ipse dixit*, that various spaces on Pitt's campus, including traditional and designated public forums, are speech-free zones. Moreover, regulating expressive activities under any system that confers standardless discretion violates the

---

[8] University policy states that "[m]any campus spaces are available for student organizations and University departments to reserve for planned events, including demonstrations." *Id*. at 2 ¶ 1.  The policy asserts vaguely that these areas include "student union spaces, academic building rooms, outdoor plazas, and lawn spaces."  The policy then merely references "[r]eservation procedures [that] vary by building…," and tells Pitt community members that "[i]f you cannot locate a space you are interested in, please reach out to the Student Union Operations team for assistance." *Id.*  The policy directs students seeking to make a reservation to the "EMS system," *id*., which stands for Event Management System. The EMS system webpage states that it "is to be used for reserving rooms in the William Pitt Union (WPU), O'Hara Student Center (OSC), Campus Recreation facilities, Schenley Quad, Towers Patio and tabling, and other designated academic buildings during evening hours. The room reservation system provides an online means for reserving and viewing student organizations' and Student Affairs' room reservations across campus." *See Event Planning Resources, About Event Management System*, UNIVERSITY OF PITTSBURGH, https://www.studentaffairs.pitt.edu/campus-programs/event-planning-resources (last accessed Apr. 14, 2025).

First Amendment. *See*, *e.g.*, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992). Such systems are forbidden because they enable arbitrary and viewpoint discriminatory enforcement.  Pitt has previously allowed demonstrations in the same locations as those denied to SJP-Pitt, raising the specter of viewpoint censorship.

43.     In addition to the University's unreasonable, unnecessary and viewpoint-based suppression of the on-campus demonstrations involving SJP-Pitt, other University officials harassed and erected obstacles to a peaceful educational and cultural event sponsored by SJP-Pitt. Early in the fall of 2024, SJP-Pitt and another Pitt-registered student group, Jewish Students' Bund, applied to hold an "Anti-Zionist Kabbalat Shabbat" at the "Global Hub," which is affiliated with the University's Center for International Studies ("UCIS").

44.     A Pitt official, UCIS's Interim Director, Dr. Allyson Delnore, asked SJP-Pitt to "reframe the title and description of the event to emphasize solidarity and community building around support for Palestine (or some other formulation that is more meaningful to you)." Ex. 10, at 16 (parenthetical in original) (Delnore 11/12/24 19:14 email).

45.      SJP-Pitt leaders responded with an email offering to re-title and reframe the event as follows: "Title: Non-Zionist Shabbat Description: As we honor the enduring resilience of the Palestinian people, join SJP and Jewish Students' Bund for a potluck and an evening of reflection, prayer and conversation.  This is a space to build community with other non-zionist and anti-zionist Jews, and we welcome all community members regardless of their religious affiliation." *Id.*, at 12 (SJP-Pitt 12/22/24 1:16 email).

46.     On January 2, 2025, Delnore responded by thanking SJP-Pitt for "continuing to think with us through this planning process" and to alert SJP-Pitt that "*Promotion of the event will*

*be largely done through your organizations' social media or other channels; you are free to frame the event as you wish.*" *Id.*, at 11 (Delnore 1/02/25 11:55 email) (emphasis added).

47.     However, on January 13, Delnore abruptly changed her position, indicating that SJP-Pitt's framing of the event as "Anti-Zionist Shabbat" made it unsuitable for the Hub. *Id.*, at 9-10 (Delnore 1/13/25 12:53 email). SJP-Pitt's president responded to express surprise, quoting back Delnore's language from the January 2 email advising that SJP-Pitt was "free to frame the event as [they] wish." *Id.* at 8.

48.     Two days later, SJP-Pitt received an email from Pitt advising that the Hub reservation was canceled for the following reason: "[g]iven that the venue for this event has changed, we are cancelling the reservation in the Global Hub." Ex. 11 (Global Hub 1/15/25 09:22 email). At this point, SJP-Pitt was re-booked to hold the event at the WPU.

49.     When SJP-Pitt leaders finally met with Delnore, they were surprised that she did not mention concerns about promotional language, but instead cited lack of space to justify the move.

50.     Pitt's last-minute relocation of the event, on pretextual grounds, interfered with and obstructed SJP-Pitt's event. The cancellation of the event at the Hub demonstrates Pitt officials' antipathy to SJP-Pitt's message, in this case an "Anti-Zionist Shabbat." Although the event did proceed at the WPU, that venue was less desirable and the last-minute location change caused difficulties for SJP-Pitt's organizing.

**F. Pitt's Standardless Discretion Enables Viewpoint Censorship**

51.     Students in the past have conducted protests on the Cathedral lawn, and the building's main entrance stairs, approximately where the University directed SJP-Pitt and others to vacate and relocate off campus. Upon information and belief, participants in these demonstrations were not punished.

52.     For instance, on October 7, 2022, approximately 100 students entered a "closed-off section" inside the Cathedral to protest the University's failure to protect a sexual assault reported the preceding day. *See* Ex. 12-13. Alexandra Ross, '*We demand change': Students protest sexual assault on campus*, THE PITT NEWS (Oct. 7, 2022) (available at https://pittnews.com/article/175808/featured/we-demand-change-students-protest-sexual-assault-on-campus/); Emma Folts, *Fed up with Red Zone sexual assaults, Pitt students demand safety measures,* PUBLIC SOURCE (Oct. 7, 2022) (available at https://www.publicsource.org/red-zone-sexual-violence-university-pittsburgh-pitt-assault-cathedral-learning-protest/).     Pitt Police eventually removed the protesters to outside the building, but they remained on the Cathedral's steps and in its vicinity. *Id*.  Instead of being sanctioned or moved off campus for being an "event in a non-reservable space," the demonstration elicited a commitment from a Pitt associate dean to meet with the group to hear their concerns. *Id*.

**G.  SJP-Pitt's December 2024 Library "Study-In"**

53.     Early Monday morning, December 9, Pitt students, including SJP-Pitt members, took unoccupied seats at a half-dozen tables on the Hillman Library's first floor to form a study group. The group maintained this space for approximately four days, studying for final-exams, except for a few hours when Asher evicted them.

54.     Anywhere between 5 and 30 students used the study area at any given time during the four days.  Many of the students were SJP-Pitt members, but they did not exclude others.

55.     Throughout this period, there was plenty of room for other students to sit and study, either in this area, with the group, or elsewhere in the library, where the group of SJP-Pitt members would be out of sight.

56.     During the four days, SJP-Pitt members did not chant, sing, picket, leaflet, solicit, proselytize other students or library staff, or in any way disrupt library operations. At no point during the four days did SJP-Pitt members block or otherwise interfere with any person's ability to enter or exit any University property or to study.  The SJP-Pitt members studied and behaved like countless other students who visit the premises to study, because that is what they were doing.

57.     The students did, however, use their study session to convey a political and cultural message in support of the Palestinian people. Many of the students wore keffiyehs, a traditional Arab scarf or headscarf, often black and white, that has become a symbol of Palestinian identity and resistance.[9] Other students draped the red, white, green and black Palestinian flag over their shoulders.

58.     Many of the students affixed little Palestinian flags or ordinary 8.5" x 11" sheets of paper bearing printed political messages on their laptop computers. Messages included "Arms Embargo Now," "Pitt Tuition $$$ Funds Occupation," "No food has entered North Gaza for 66 days," "Free Palestine," "There are No Universities Left in Gaza," "Lift the Siege on Gaza Now," and "Hands off Palestine." Ex. 14. All of these messages are First Amendment protected speech.

59.     The students merely engaged in silent, largely symbolic, expression, as is their right under the First Amendment to the U.S. Constitution and rulings of the U.S. Supreme Court.  *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969) (extending First Amendment protections to students' wearing of black armbands in class to protest the Vietnam War).  Just as Louisiana could not prosecute Black civil rights activists for a peaceful, non-disruptive demonstration against race discrimination in a public library, *see Brown v. Louisiana*,

---

[9] Sara, *What does the Palestinian keffiyeh symbolize?*, HIRBAWI KUFIYA (Aug. 9, 2023), https://kufiya.org/what-does-the-palestinian-keffiyeh-symbolize/.

383 U.S. 131 (1966), Pitt cannot sanction passive, non-disruptive pro-Palestine demonstrators for their silent political displays at Hillman Library.

60.    On Monday, December 9, the group's first morning in the library, the students wrote messages on library-provided whiteboards.  For example, one of the whiteboards had information taken directly from a student's class notes.  It read, "429 days of GENOCIDE," "186,000+ KILLED 1/3 women + children," "86% of Gazans face crisis-level hunger," "Highest # of child amputees per capita," "87% of schools targeted by Israeli airstrikes," "All hospitals rendered fully or partially inoperable," and "Nowhere in Gaza is safe."  Ex.  14. Other messages written by SJP-Pitt's members on the whiteboards had study notes unrelated to the Palestinian-Israeli conflict, including math equations and scientific jargon.

61.    Other student study groups use identical whiteboards to display organizational messages, such as one by a Pitt sorority. Ex. 15.  The sorority's display, which was photographed at Hillman Library on Wednesday, December 11 at 3:07 a.m., says "Kappa Delta, 24 hour Hillman Challenge, hours left: 16."

62.    The two respective groups' whiteboards are identically sized and displayed; the one difference being what they say, an impermissible reason to censor one and not the other.  The respective whiteboards are depicted below:

 

63.     Despite the non-disruptive nature of SJP's study event, by 9:00 a.m., on Monday morning at least two armed Pitt Police officers arrived to monitor students. They walked among the tables where the students sat, making their presence known.

64.     Armed police, including Pitt Police, are a rarity inside the library, but throughout the four-day study-in, an armed officer regularly monitored the students, either sitting at a nearby desk or observing through glass on the floor above.

65.      At about 10:00 a.m. on Monday, Defendant DaVaughn Vincent-Bryan, Pitt's Director of Involvement and Student Unions, approached the students to advise them that they were having, to use the recurring phrase, an impermissible "event in a non-reservable space."  He pointed to their signage as an indication that they were having an "event."  The students disagreed.

66.     Shortly thereafter, Defendant Asher arrived, joined by three armed Pitt police officers.  Asher reiterated that the students were conducting an impermissible "event in a non-reservable space."

67.    Hillman Library does have spaces that students and others can reserve, to study or for events, but not on the first-floor common area where SJP-Pitt and other students assembled because it is open to all on a first come, first served basis. That space is therefore only non-reservable in the sense that there is no requirement that one needs to have a reservation in order to individually or collectively study in that area.  Groups of students cannot "reserve" a table to the exclusion of others, but they can take whatever tables are available at the time.   And that is precisely what these students did.

68.    Defendant Asher raised several arguments about why the SJP-Pitt-affiliated study group's conduct did not conform to the University or the Library rules.  She said that the whiteboard was facing the "wrong direction," objecting that it should face inward towards the table. The students complied by repositioning it. Asher claimed that the writing on the whiteboard was not related to the students' studies, but a student pointed out that the content was copied directly from her class notes, and that other boards had mathematical and scientific equations written on them.  Asher also claimed that Palestinian flags and political signs were lying on the tables impermissibly since University property cannot be used to prop up such signage.  The students responded by draping the flags over their shoulders and affixing all loose signs to their laptop covers or personal belongings so that they were no longer resting on University property. Prof. Ruth Mostern, a Pitt faculty member who was in the area, argued with Asher, telling her that the students had complied with all of Asher's directives.

69.    Despite the students' responsiveness to the alleged problems Asher identified, Asher nonetheless demanded that the students clear the area.  When they did not leave promptly, she demanded that they hand over IDs to the Pitt Police.  Pitt's Student Code of Conduct makes

refusal to produce an ID a sanctionable violation.  The Pitt Police officers told students they would probably go to jail if they did not produce IDs.

70.     At this point, the students left the library.  After they left, library staff cleaned the entire area and removed the whiteboards.

71.     The students returned later in the afternoon on December 9.  Minus the whiteboards, they remained in the area to study and silently express their political message, through Thursday, December 12, when the fall semester exam period ended.

72.     Two email exchanges between SJP-Pitt and University officials, during the four-day study-in, highlight Defendants' inability to identify any University rule or policy allegedly violated by SJP-Pitt.

73.     On Monday evening, December 9, Asher sent SJP-Pitt leaders an email chastising them for holding an "event" in a "non-reservable space," and advising them that "holding a similar event tomorrow or on additional days will result in immediate referral to the Student Conduct process for individuals involved as well as your student organization." Ex. 16 (Asher 12/09/24 22:51 email).  She pointed to "several relevant guidelines and policies," none of which address the students' conduct.

74.     The first of the three policies identified by Asher, the "Student Code of Conduct," has a provision that failure "without just cause" to comply with "lawful" requests by university officials is sanctionable,[10] but as Prof. Mostern observed, the students complied with all of Asher's requests that morning, lawfulness notwithstanding, except that they did not leave until threatened

---

[10] Ex. 17, at 19. *University of Pittsburgh Student Code of Conduct*, Division of Student Affairs, Ch 4, no. 36 (Aug. 19, 2023),
https://www.studentaffairs.pitt.edu/sites/default/files/assets/Student%20Code%20of%20Conduct%20_Published.pdf
("Fails without just cause to comply with the lawful direction of a University official, or other lawful authority having just cause and acting in the performance of their duties and authority.")

with police action. Even though the students complied with the request to leave, it was an unlawful request because it violated the First Amendment.

75.    The second Asher-identified policy was the "On Campus Demonstration and Protest Guidelines," discussed at ¶¶ 39-41, *supra*.  It states that "[m]any campus spaces are available for student organizations and University departments to reserve for planned events, including demonstrations," but nowhere is "event" defined.  Ex. 9, at 2. But the students did not "reserve" library space; they merely took unoccupied seats at empty tables, which is consistent with the library's first-floor operations. Notably, even if the students were having a demonstration, they complied with all requirements.  They did not block passage, interfere with other patrons, disrupt the educational process, use indoor sound amplification, talk loudly, cause harm to persons or property, threaten others, attach signs to university property or furniture (they corrected that the first day when told to do so), and erected no tents.  *Id.*

76.    The third Asher-identified policy, "Student Organization Event Planning Guidelines," neither defines "event" nor applies to students gathering in a non-disruptive study group at the library while silently displaying political messages. *See* Ex. 18.

77.    The next day, December 10, an SJP-Pitt co-president responded to Asher's email and asked for clarification "to ensure that SJP continues to fully understand and comply with University policies."  Ex. 16, at 1.  Specifically, he asked Asher to

> kindly clarify what distinguishes students studying from 'staging an event,' and what constitutes an event more broadly?  Does this distinction hinge on the scheduling of a specific time? I have reviewed the University's Free Speech and event planning guidelines but remain unable to locate a precise definition; thus, I would appreciate it if you could share the document or policy that explicitly outlines these definitions and criteria.  Understanding these nuances will help us ensure that our social media activities align with University policies moving forward.

*Id.*

78.     Asher did not respond for nearly 48 hours, until Wednesday night, December 11. Once more, she failed to identify a policy or guideline that defines "event." She just said events are "generally characterized" by several activities, including planning, organization with a specific purpose, and may include signage, tabling, or announcements of the purpose of the gathering. *Id*. Planning and organizing are inherent in convening any study group. The passive display of political messages, by itself, cannot render the activity illegal or make it an "event."

79.     In another email exchange, Hillman University Librarian and Director, Kornelia Tancheva, sent an email to SJP-Pitt officers near the end of the study period, on Thursday afternoon, December 12, regarding the ongoing "study-in." Ex. 19 (Tancheva 12/12/24 12:21 email). Dr. Tancheva stated that there had been "multiple warnings and requests by Library staff and others to comply with University policy…." *Id*. At this point, she referenced a new rule or guideline that SJP-Pitt was allegedly violating, the Library Space Use Policy. *See* Ex. 20. That policy simply says the library is "reserved for academic-related purposes only. Activities not directly related to academics and library services, programs, and expertise are not allowed. These include, but are not limited to various tabling, signage, or posters [sic] requests that do not meet the above criteria." *Id.*

80.     Since Pitt is a state actor, all University policies, including the library policy, must be applied consistent with the U.S. Constitution, and specifically the First Amendment. Students have a right to express their political views in schools, so long as they do not cause a substantial and material disruption. As with *Tinker*'s black armband, worn in school to protest the Vietnam war, SJP-Pitt students' silent expressions of support for Palestine were not disruptive and, thus, constitutionally protected.

81.    Even if the University could bar all symbolic, silent, non-disruptive study groups with signage or posters from the public library areas, it must do so in a content and viewpoint neutral manner. The University cannot allow the sorority to maintain a group study session with signage and posters, but bar SJP-Pitt from doing likewise.

82.    During the four days of study, the only disruption in the Hillman Library was caused by Pitt staff, especially Asher, and the unusual presence of armed Pitt Police officers.

**H. Pitt Moves to Suspend SJP-Pitt's Organizational Privileges**

83.    On January 16, 2025, Pitt's Director of Student Conduct, Defendant Matthew Landy, notified SJP that Pitt had initiated "Level II" disciplinary proceedings against them.  Ex. 21.  Level II is the most serious infraction level, involving an "alleged Violation of the *Code* where a Respondent may receive a Sanction up to and including Disciplinary Dismissal."  *See* Ex. 17, at 21.  Defendant Vincent-Bryan initiated the disciplinary charges against SJP.

84.    The notice vaguely described the offending conduct as, "[w]e have reason to believe that your Registered Student Organization may have been involved in an incident or series of incidents that occurred beginning December 9, 2024."  Ex. 21.  The notice did not cite any rule (in the Student Code of Conduct or otherwise), guideline, or policy that SJP-Pitt allegedly violated. Nor did the notice describe the allegedly offending conduct.

85.    On January 22, Landy conducted a remote preliminary "Disciplinary Conference" with SJP-Pitt's co-presidents.  During the meeting, Landy "shared" from his computer, i.e., displayed on the screen for the co-presidents to view, pages from a document that seemed to describe the incident spawning the charges, the rules SJP-Pitt allegedly violated, and the proposed discipline.  Landy refused to send the students the document he was sharing on his screen, and also told them they could not take screen shots of what he posted.

86.     Landy also told the co-presidents that they would need to submit all questions they planned to ask at the hearing in advance.  The students, knowing this was not standard procedure used at previous hearings, questioned Landy, who could not identify any rule justifying that requirement and claimed that the Code only outlined procedures in "broad strokes."   Landy admitted this procedure departed from past practice.

87.     On January 23, Landy sent the SJP-Pitt students an email that identified two rules SJP-Pitt allegedly violated:

> 19. Violates or assists in the Violation of any policy, procedure or guideline of the University including, but not limited to the following:
>
>> k. Any other policy, procedure, or guideline of the University whether or not listed in the Code; and
>
> 36. Fails without just cause to comply with the lawful direction of a University official, or other lawful authority having just cause and acting in the performance of their duties and authority.

Ex. 22 (Landy 01/23/25 16:27 email).

88.     Landy never shared Pitt's description of the allegedly offending SJP-Pitt conduct, which the students requested multiple times before the hearing.  Pitt eventually relented, allowing Defendant Mentzer to display the write up on his screen, who told SJP-Pitt leaders they could not take a screen shot but could only write down what they were seeing.

89.     The alleged rule violations are so vague and broad that they could encompass any conduct, including constitutionally protected activity.  They also fail to give adequate notice of the alleged misconduct, making presentation of a defense difficult, if not impossible.  Landy did not identify the "policy, procedure or guideline" in Rule 19.k. that SJP-Pitt allegedly violated, or the "lawful direction of a University authority" at issue in the alleged Rule 36 violation.

90.     The students advised Landy that SJP-Pitt would not waive the hearing, admit the "general nature of the charge," or accept the sanctions. Rather, SJP-Pitt denied the charges and requested a full hearing, which was scheduled for February 4.

91.     On January 28, SJP-Pitt submitted their witness list, identifying three Pitt faculty.

92.     Pitt did not share with SJP-Pitt a "hearing binder" containing the University's evidence against SJP-Pitt until 55 minutes before the February 4 hearing.  SJP's co-presidents could neither download nor print the documents in the "hearing binder."

93.     Shortly before the hearing, Pitt notified SJP-Pitt that Pitt's "confidentiality requirements" applied to the virtual hearing, so SJP-Pitt was forbidden to discuss, copy, or share any materials presented at the hearing; record the hearing; or share the Zoom invitation with anyone else.  Ex. 23 (Player 01/31/25 13:28 email).  The email also directed that any notes taken during the hearing must be destroyed at the conclusion.  *Id.*

**I.  Pitt's February 4 Disciplinary Hearing Against SJP-Pitt**

94.     SJP-Pitt's disciplinary hearing occurred remotely on February 4, 2025, before a three-member hearing panel.

95.     No allegation was raised during the hearing that SJP-Pitt caused a disruption in the library or in any way interfered with any students' ability to study or staff members' ability to work.

96.     The hearing focused only on whether the students had engaged in an illegal "event" in a "non-reservable space."

97.     A Pitt faculty librarian whose office was in the library testified that during the times he was present, including the critical Monday morning hours of December 9 and again on Wednesday, December 11, the only disruption was caused by Defendant Asher and the unusual

armed-police presence.  The students wore keffiyehs and flags, displayed signs, and had political information on the whiteboards, but they were not disrupting other students or staff.

98.    He also testified to regularly observing similar study groups that displayed a whiteboard proclaiming the group's name and other messages, often by University Greek organizations.  He did not observe the students with SJP-Pitt violate any Pitt rules or policies that he was aware of.

99.    Also testifying for SJP-Pitt was Professor Ruth Mostern.  She was familiar with SJP-Pitt because she was the faculty advisor for Jewish Students' Bund, a registered student organization aligned with SJP-Pitt's politics on Palestine.

100.    Prof. Mostern testified that she was present during much of the confrontation with Asher on Monday morning, December 9. Mostern's testimony was similar to that of the first witness, namely, that the students were not causing any disruption and that the study group looked and behaved like many other study groups she had observed over the years, except that they displayed political messages and symbols. Mostern also testified that some messages on the whiteboards were similar to the information she teaches in class.

101.    Prof. Mostern also testified that the students complied with every demand made by Defendants Asher and Vincent-Bryan, except initially to vacate the library.  The students repositioned the whiteboards.  They removed flags and papers with political messages from the tables and ensured that they were affixed only to their laptops, displayed on personal possessions such as book bags, or worn as clothing.  She also testified that she did not observe the students engage in any sanctionable conduct that violated any University rule or policy known to her.

102.    Prof. Mostern testified that when she checked in on the students the following three days, they were studious and non-disruptive.  There were fewer students and no whiteboards, but

the students continued to wear keffiyehs and flags, and display political messages on small signs taped to laptops. They were studying for finals.  The scene looked like many other library study groups she has observed over the years, except that more political messages were visible.

103.    The University did not produce any witnesses to counter SJP-Pitt's presentation.

104.    To date, the charges remain outstanding and unresolved: Pitt has never issued a decision.  Upon information and belief, hearing panels usually issue decisions within a month.

105.    No Pitt official advised the students that they should not have any contact with members of the hearing panel.

**J.    The "Open Letter" Condemning Pitt's Suppression of Pro-Palestinian Voices**

106.    On Tuesday night, February 4, 2025, following the disciplinary hearing, SJP-Pitt sent an email to about 20 Pitt administrators and University departments with the subject, "Open Letter Condemning the University of Pittsburgh's Suppression of Pro-Palestinian Voices." Ex. 24 (SJP-Pitt 02/04/25 21:52 email).  The email's recipients were selected because they might impact Pitt's ongoing retaliation against SJP-Pitt.  Recipients included the three administrators who served on that afternoon's hearing panel.

107.    SJP-Pitt had solicited signatures from 27 other Pitt-related organizations and 46 community groups supportive of SJP-Pitt, all of whom signed onto the letter.[11]

108.    The Open Letter, on behalf of the organizations, "condem[ed] the selective repression of Students for Justice in Palestine (SJP) at the University of Pittsburgh. As the only Palestinian cultural and advocacy organization on campus—led by Palestinian, Arab, and Muslim students—SJP is being unfairly targeted with heightened scrutiny and politically driven

---

[11] SJP discovered that one group, University of Pittsburgh School of Law, had not actually authorized participation. A faculty member had submitted paperwork signing on to the letter, mistakenly appearing to be signing on behalf of the Law School when they intended to join individually.  SJP subsequently removed the Law School as a signatory on the publicly facing copies of the letter posted on their social media.

disciplinary action." *Id*. The letter contrasted Pitt's "political suppression" of SJP-Pitt with that of "pro-Israel advocacy organizations," including SSI's collaboration with Betar USA, *see* ¶¶ 23 - 27, *supra*, which had issued the "beeper" threats against SJP-Pitt. The signatories' demands were that Pitt dismiss the disciplinary charges against SJP-Pitt, apply university conduct policies more transparently and equitably, and end suppression of pro-Palestinian advocacy on campus.

109.    The letter contained no threatening, coercive or intimidating language, but merely stated the signatories' position opposing Pitt's disciplinary, and other repressive, actions against SJP-Pitt. The letter was not sent to the hearing officers *ex parte* or covertly.

110.    The letter did not provoke material and substantial disruption on campus.

111.    Pitt did not respond to the letter. At least not for 43 days.

**K. Pitt Suspends SJP-Pitt in Retaliation for the Open Letter**

112.    As of March 18, Pitt's hearing panel still had not issued a decision, despite the passage of six weeks.

113.    On March 18, however, Defendant Marlin Nabors, the Associate Vice Provost and Dean of Students, notified SJP-Pitt officers that the University was placing the organization on "interim suspension." Ex. 25 (Nabors 03/18/25 09:16 email). The email alleged that SJP-Pitt had "improperly engaged in communications to members of the Conduct Hearing Board during their deliberations following the February 4, 2025 Level II Conduct Hearing." *Id*. The letter did not identify the conduct at issue, but the only possible SJP advocacy was the open letter, and Pitt's lawyers subsequently acknowledged that the February 4 letter was the focus.

114.    Nabors' letter noted that SJP's alleged misconduct gave "rise to a number of significant consequences" for SJP-Pitt. *Id*. First, there was the potential for additional misconduct charges. Second, the group would be placed on interim suspension. And third, Nabors alleged

29

that their actions had "irreparably compromise[d] the integrity and credibility of the current conduct proceeding," requiring the University to start the process anew. *Id.*

115.    Later that day, Pitt Associate Director of Student Conduct, Defendant Jamey Mentzer, sent a letter formally notifying SJP-Pitt that the University had placed it on "Interim Suspension of Registration from the University of Pittsburgh, effective immediately." Ex. 26. The letter stated that Pitt had "received information that individuals acting on behalf of Students for Justice in Palestine at Pitt [] engaged in conduct that may have violated the Student Code of Conduct." *Id.*   The letter continued: "Specifically, that among other things, you improperly engaged in communications to members of the Conduct Hearing Board during their deliberations following your February 4, 2025, Level II Conduct Hearing.  As set forth in the Code, interference with the conduct process, which includes any action designed or with the potential to influence or intimidate any person who is participating in a student conduct proceeding, constitutes a serious violation." *Id.*

116.    Under Pitt's broad reading of its Code of Conduct, any SJP-Pitt criticism of the proceeding could be construed as possibly influencing the proceedings.  This would encompass not only the open letter, but other constitutionally protected acts such as SJP-Pitt criticizing the proceedings in a news interview, published op-ed, off-campus demonstration, or social media post.

117.    Consequences of the interim suspension were harsh: "A cessation of organizational operations or use of university resources to advance the mission of the organization.  This includes but is not limited to, requesting event space, requesting funds, facilitating any events or hosting anything that [sic] be construed as an event, including co-sponsorship." *Id.*

118.    Suspension of registration deprives SJP-Pitt of various benefits, including funding, access to University space, and other school supports.  *See* Ex. 1.  The interim suspension is also

indefinite, and can extend until the University determines whether to sanction the organization through its disciplinary process.

119.    Suspension of SJP-Pitt's status as a registered student organization does not, and legally cannot, restrict all of SJP-Pitt's free-speech rights, most of which exist independent of the benefits conferred by University registration.

### L. Pitt Threatens SJP-Pitt For Off-Campus Free-Speech Activities

120.    On March 19, the day after Pitt suspended SJP-Pitt, Defendant Mentzer sent another letter, this time threatening SJP-Pitt with "additional charges" because SJP-Pitt had allegedly failed to heed the March 18 letter, which had "instructed [SJP-Pitt] to cease operations including co-sponsorships." Ex. 27.  The March 19 letter described the offending conduct as follows: "We have been made aware that after the interim suspension of registration was already in place, SJP-Pitt actively posted, advertised and promoted specific gatherings or protests on their social media." *Id.*

121.    In the only possible social media post at issue, SJP-Pitt had shared on Instagram a non-Pitt group's post about an "emergency protest," to be held on Saturday, March 22, in an off-campus space, Schenley Plaza.  *See* Ex. 28.  The activity of posting on social media generally, and specifically providing information about an off-campus protest organized by community groups, has nothing to do with University recognition of the club.  The post constitutes off-campus political speech that enjoys maximal First Amendment protection.  *See*, *e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189-190 (2021) (schools "will have a heavy burden" to justify censoring students' "political or religious speech that occurs outside school . . . ."); *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 247 (3d Cir. 2010) ("Public universities have significantly less leeway in regulating student speech than public elementary or high schools.").

122.    Pitt may be able to deny SJP-Pitt registered organizational status, but it cannot forbid either the organization or its members to exercise their First Amendment right to free

expression.  Non-registered organizations, the status SJP-Pitt found itself in after the suspension, have the same free-speech rights as any other group or individuals in the community.

**M. SJP-Pitt's Lawyers Send Letter to Pitt**

123.    On March 21, 2025, SJP-Pitt's lawyers sent a letter to Pitt Chancellor, Defendant Joan Gabel, requesting that the University "immediately rescind both its March 18 decision to suspend SJP[-Pitt]'s student group registration and its March 19 threat of additional disciplinary sanctions for continuing to engage in constitutionally protected political speech unrelated to formal organizational recognition." Ex. 29.  Pitt, through its lawyers, responded timely, but the dispute remains unresolved.  Gabel has the authority to terminate SJP-Pitt's suspension and halt Pitt's harassment of the group.

**N.  Pitt Resurrects Disciplinary Proceedings Against SJP-Pitt**

124.    On April 8, 2025, Defendant Mentzer sent SJP-Pitt's co-presidents a fourth letter, this time to re-initiate Level II conduct proceedings. Ex. 30. In that communication, Mentzer provided a list of alleged violations of the Student Code of Conduct corresponding to Pitt's three prior letters.

125.    Allegations "relating to conduct and events at the Hillman Library in December 2024" involve the following provisions:

> 19. Violates or assists in the Violation of any policy, procedure or guideline of the University including, but not limited to the following: k. Any other policy, procedure, or guideline of the University whether or not listed in the Code

> 36. Fails without just cause to comply with the lawful direction of a University official, or other lawful authority having just cause and acting in the performance of their duties and authority.

*Id.*

126.    Allegations "relating to actions taken during the board hearing process" involve the following provisions:

> 35. Falsifies information or records submitted to a University official or office.

42. Intimidates, coerces, influences, or attempts to do the same against a person who is participating or has participated in any University process or proceeding.

43. Disrupts or interferes with the conduct process.

*Id.*

127.    Allegations "relating to actions taken in violation of the March 18, 2025 interim suspension" involve the following provision:

36. Fails without just cause to comply with the lawful direction of a University official, or other lawful authority having just cause and acting in the performance of their duties and authority.

*Id.*

128.    Mentzer's April 8 letter did not provide any further information about SJP-Pitt's "conduct and events" or "actions taken" that allegedly supported Pitt's charges. It just notified SJP-Pitt's co-presidents that a "Disciplinary Conference" was scheduled for Friday, April 11, 2025.

129.    The University did not present any evidence to support its new accusations or justify the continued use of the disciplinary process against SJP-Pitt.

130.    On April 14, 2025, Defendant Mentzer sent SJP-Pitt's co-presidents a notice of the options for resolution, which included a recommended sanction of, "Termination of Registration with the ability to reapply for reinstatement after two (2) years." Ex. 31.

**O. SJP-Pitt Has Suffered and Continues to Suffer Ongoing Irreparable Harms**

131.    SJP-Pitt has suffered, and continues to suffer, ongoing irreparable harm for which there is no adequate remedy at law.

132.    Defendants disrupted three on-campus demonstrations involving SJP-Pitt in September and October, 2024, without just cause and based on the "event in a non-reservable space" pretext, ordering the events off campus.  The off-campus sites were less visible and accessible to Pitt students and staff, the intended targets of SJP-Pitt's messaging.

133.    In December 2024, Asher had no cause to order students, some of whom were associated with SJP-Pitt, to leave the library for a silent, non-disruptive display of political messages.  While the students returned a few hours later, they were prevented from communicating their message during that interruption.

134.    The disciplinary charges, filed on January 16, have had, and continue to have, a chilling effect on SJP-Pitt's right to free expression.  During the spring 2025 semester, SJP-Pitt has hosted only a few general body meetings and the Anti-Zionist Shabbat—which was impeded by Pitt's evasive and restrictive administrative response. *See* ¶¶ 43-50, *supra*.  In contrast, SJP-Pitt organized or co-sponsored at least twenty-one on-campus events in the preceding year.

135.    Event planning and preparation regularly take months.   The initiation of disciplinary proceedings, near the start of the spring semester, and the panel's failure to render a timely decision, for nearly two months after the hearing, have effectively prevented and discouraged SJP-Pitt from planning any events for the past two-plus months; why do the work and go to the trouble if Pitt might suspend SJP-Pitt before the event occurs.

136.    Mentzer's March 18, 2025, suspension of SJP-Pitt's registered organization status, in retaliation for its February 4 open letter on behalf of 73 groups, has deprived SJP-Pitt of financial support, access to indoor and outdoor University spaces for educational programming like lectures and teach-ins, ability to use campus mail and bulletin boards available to registered organizations, and opportunities to spread their message by co-sponsoring on-campus events, including jointly with other University organizations.

137.    SJP-Pitt was scheduled to co-host with another student organization an art demonstration outside the William Pitt Union on April 3 and 4, but the loss of registration precluded them from conducting the program.  The co-sponsor of that demonstration, an allied

student group, also withdrew for fear that the University might retaliate against it, resulting in the event's last-minute cancellation.

138.    The SJP-Pitt registration suspension is ongoing and indefinite.

139.    SJP-Pitt would normally be gearing up now to plan a full slate of events, teach-ins or demonstrations for the fall 2025 semester. It is precluded from doing so by the suspension. Unless, the suspension is lifted quickly, SJP-Pitt will not be able to engage in the planning and work necessary to put on educational and political events on campus early in the fall 2025 semester.

140.    After receiving Mentzer's March 19 letter, SJP-Pitt did not post on what is typically an active social media account.  SJP-Pitt resumed posting only after it secured counsel, who warned the University that the directive was unconstitutional.  But SJP-Pitt has remained cautious, and posted less frequently, for fear of further retaliation from Pitt.

### IV.    CLAIMS

#### A.  Count I – (Library Study-In) – Violation of the First Amendment to the U.S Constitution – Against All Defendants

141.    Plaintiff incorporates by reference the allegations of the preceding paragraphs as though set forth at length herein, and in the following claims paragraphs.

142.    The initiation and prosecution of disciplinary charges against SJP-Pitt for a non-disruptive, silent, symbolic group study session violates the First and Fourteenth Amendments in that a) it violates the holding and reasoning of *Tinker v. Des Moines School Board* and *Brown v. Louisiana*, *supra*, which established that such non-disruptive speech in school classrooms or public libraries is constitutionally protected; b) it bars expressive conduct based on undefined, unwritten and standardless prohibitions on speech that allow school administrators discretion to pick and choose which speech they will allow; and c) it constitutes content and viewpoint based

discrimination because Pitt allows Greek organizations and others to conduct collective studying with posters and signs, but not SJP-Pitt.

### Count II – (Organization Suspension in Retaliation for Open Letter) - Violation of the First Amendment to the U.S Constitution – Against All Defendants

143.    The temporary but indefinite suspension imposed on SJP-Pitt by Defendants violates the First and Fourteenth Amendments in that a) it punishes SJP-Pitt for constitutionally protected political speech criticizing Pitt's treatment of the organization, including its initiation of meritless disciplinary charges, without sufficient cause; b) it retaliates against SJP-Pitt for its criticism of the university; and c) it is based on an overbroad and vague rule that could proscribe any criticism of the hearing process and disciplinary charges.

### Count III – (Interference with Demonstrations and Events) - Violation of the First Amendment to the U.S Constitution – Against All Defendants

144.    Defendants' continuing pattern and practice of hindering, obstructing, harassing and suppressing SJP-Pitt sponsored or promoted demonstrations or educational programs on campus, such as the Anti-Zionist Shabbat, violates the First Amendment in that a) it proscribes speech in public forums in a manner that is not narrowly tailored and is without substantial government justification; b) it is viewpoint- and content-based because Pitt has allowed other groups to demonstrate in the area without adverse consequences; and c) it is based on vague and standardless rules.

### Count IV – (Threatened Retaliation for Off-Campus Speech) - Violation of the First Amendment to the U.S Constitution – Against All Defendants

145.    Defendants' prohibition of SJP-Pitt's promotion of off-campus events after it was suspended violates the First and Fourteenth Amendments because SJP-Pitt has a right to engage in political advocacy, on campus and even more so off-campus, regardless of its University-registration status.

## V.    PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Plaintiff respectfully requests the following:

(a)    An order declaring that Defendants have violated SJP-Pitt's rights under the First Amendment to the United States Constitution to free expression, to wit,

i.   By initiating the disciplinary process, and subsequently filing baseless disciplinary charges, against SJP-Pitt for engaging in non-disruptive silent political expression, namely, the December 2024 Hillman Library study-in;

ii.  By suspending SJP-Pitt in retaliation for engaging in constitutionally protected criticism of the University, namely, sending the Open Letter to Pitt officials criticizing their treatment of pro-Palestinian activists and the initiation of meritless disciplinary charges;

iii. By interfering with SJP-Pitt's lawful on-campus demonstrations and educational/cultural events, including in outdoor public spaces; and

iv.  By threatening SJP-Pitt with additional disciplinary charges for engaging in protected off-campus expressive activities that are unrelated to the group's status as a registered student organization.

(b)    An order preliminarily, and thereafter permanently, enjoining Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, from

i.   Continuing with the disciplinary proceedings against SJP-Pitt's that are based on its constitutionally protected expressive activities during the December 2024 Hillman Library study-in (charges resurrected by Pitt on April 8, 2025), for the February 4 open letter, and for promoting off-campus demonstrations, as

identified in Mentzer's March 19 letter;

ii.  Maintaining SJP-Pitt's interim suspension;

iii.  Continuing to apply a vague, standardless and content-based permitting system to disrupt and interfere with peaceful campus demonstrations in public outdoor spaces, and educational and cultural events; and

iv.  Maintaining any threats of disciplinary action against SJP-Pitt for engaging in off-campus expressive activities.

(c)  Entry of judgment for Plaintiff against Defendants for compensatory and/or nominal damages for the violation of Plaintiff's rights under the U.S. Constitution in an amount to be determined by the Court;

(d)  An award from Defendants to Plaintiff of reasonable attorneys' fees and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988; and

(e)  Such further and different relief as is just and proper.

Dated: April 15, 2025　　　　　　　Respectfully Submitted,

By:　　*/s/ Witold J. Walczak*
　　　　Witold J. Walczak
　　　　PA Bar No. 62976
　　　　ACLU OF PENNSYLVANIA
　　　　P.O. Box 23058
　　　　Pittsburgh, PA 15222
　　　　P: 412-681-7864
　　　　F: 267-573-3054
　　　　vwalczak@aclupa.org

　　　　Solomon Furious Worlds
　　　　PA Bar No. 333677
　　　　Kirsten M. Hanlon*
　　　　PA Bar No. 336365
　　　　ACLU OF PENNSYLVANIA

P.O. Box 60173
Philadelphia, PA 19102
P: 215-592-1513
F: 267-573-3054
sfworlds@aclupa.org
khanlon@aclupa.org

Jules Lobel, Esq.
NY Bar No. 1262732
P.O. Box 81918
Pittsburgh, PA 15217
juleslobel73@gmail.com

*\* Pro hac vice application forthcoming*

*Counsel for Plaintiff*

## VERIFICATIONS

      We declare under penalty of perjury under the laws of the United States of America that the foregoing paragraphs of the Verified Complaint are, to the best of our knowledge and belief, true and correct.[12]

/s/ ████████████

President, SJP-Pitt

/s/ ████████████

President, SJP-Pitt

---

[12]  Because SJP has faced hostility from third-parties, including a thinly veiled death threat from Betar USA, based on its political statements in support of Palestine, see supra ¶¶ 22-27, Plaintiff redacted its co-presidents' names in the public filing of this Complaint. Plaintiff plans to file a motion to file under seal the unredacted copy of this document. Defendants take no position on the motion.