**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

———————————————————
                                                              )
**STUDENTS FOR JUSTICE IN**              )
**PALESTINE AT PITT,**                           )
                                                              )
                                     *Plaintiff,*              )
       **v.**                                                  )
                                                              )            **CIVIL ACTION NO. 2:25-cv-00524**
**UNIVERSITY OF PITTSBURGH;**             )
**JOAN GABEL, MARLIN NABORS,**        )
**KARIN ASHER, DaVAUGHN**               )
**VINCENT-BRYAN, MATTHEW**            )
**LANDY, and JAMEY MENTZER,**         )
**all in their official and individual**          )
**capacities,**                                            )
                                                              )
                                     *Defendants.*          )
———————————————————)


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................................1

FACTUAL BACKGROUND ........................................................................................ 2

ARGUMENT ................................................................................................................. 5

    **I.**    **SJP-Pitt Is Likely to Succeed on the Merits of Its Claims.** ............................ 6

      *A.*    *Pitt's Initiation and Execution of the Disciplinary Process Against SJP-Pitt Violates the* Tinker *Line of Cases Protecting Peaceful, Non-Disruptive Symbolic Speech in a School or Library Setting.*............................................................... 8

      *B.*    *Pitt's Decision to Impose an Indefinite, Interim Suspension in Retaliation for SJP-Pitt Sending a Public Open Letter Signed by Numerous Campus and Community Organizations to Various University Officials Criticizing Pitt's Disciplinary Process Violates the First Amendment.* ............................ 13

            1.    Punishing SJP-Pitt for its Message Violates the First Amendment.......... 13

            2.    The Indefinite, Interim Suspension Constitutes Illegal Retaliation. ......... 16

      *C.*    *Pitt's Obstruction and Suppression of SJP-Pitt's Demonstrations and Other Events on Campus Violates the First Amendment.* ................................. 17

            1.    Pitt's Standardless Rules About Events on Campus Are Unreasonable Restrictions on SJP-Pitt's Free Speech Rights........................................... 18

            2.    Defendants' Targeted Restrictions on SJP-Pitt's Events and Demonstrations Constitute Viewpoint Discrimination. ........................... 23

      *D.*    *Pitt Impermissibly Attempted to Regulate SJP-Pitt's Off-Campus Speech.* .......... 25

    **II.**    **SJP-Pitt Will Suffer Irreparable Harm Without Preliminary Injunctive Relief.**.. 26

    **III.**    **Pitt Will Suffer No Irreparable Harm If This Preliminary Injunctive Relief Issues.** ....................................................................................................... 27

    **IV.**    **Granting Preliminary Injunctive Relief Will Serve the Public Interest.** ............... 28

**CONCLUSION** ........................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*,
   418 F.3d 600 (6th Cir. 2005) ................................................................. 22

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*,
   39 F.4th 95 (3d Cir. 2022) ......................................................... passim

*Arnett v. Kennedy*,
   416 U.S. 134 (1974) ............................................................................ 20

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
   725 F.3d 293 (3d Cir. 2013) ................................................................... 8

*B.L v. Mahanoy Area Sch. Dist.*,
   964 F.3d 170 (3d Cir. 2020), *aff'd but criticized on other grounds*, 594 U.S. 180 (2021) ......... 9

*Boardley v. U.S. Dep't of the Interior*,
   615 F.3d 508 (D.C. Cir. 2010) ............................................................ 22

*Bridges v. California*,
   314 U.S. 252 (1941) ............................................................................ 15

*Brister v. Faulkner*,
   214 F.3d 675 (5th Cir. 2000) ................................................................ 17

*Brown v. Louisiana*,
   383 U.S. 131 (1966) ............................................................ 8, 9, 10, 11

*Buck v. Stankovic*,
   485 F. Supp. 2d 576 (M.D. Pa. 2007) .................................................. 28

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,
   561 U.S. 661 (2010) ............................................................................ 11

*Circle Schs. v. Pappert*,
   381 F.3d 172 (3d Cir. 2004) ................................................................ 26

*CISPES v. F.B.I.*,
   770 F.2d 468 (5th Cir. 1985) ................................................................ 21

*City of Lakewood v. Plain Dealer Pub. Co.*,
   486 U.S. 750 (1988) ............................................................................ 18

*Clark v. Cmty. for Creative Non–Violence*,
   468 U.S. 288 (1984) ............................................................................ 18

*Council of Alt. Pol. Parties v. Hooks*,
   121 F.3d 876 (3d Cir. 1997) ................................................................ 28

*Cox v. City of Charleston*,
   416 F.3d 281 (4th Cir. 2005) ................................................................ 22

*Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*,
   975 F.3d 300 (3d Cir. 2020) ................................................................ 29

*Diener v. Reed*,
   232 F. Supp. 2d 362 (M.D. Pa. 2002) .................................................. 17

*Eichenlaub v. Twp. of Indiana*,
   385 F.3d 274 (3d Cir. 2004) ................................................................ 13

*Elliott v. Kiesewetter*,
   98 F.3d 47 (3d Cir. 1996) .................................................................... 29

*Elrod v. Burns*,
    427 U.S. 347 (1976); .................................................................................. 27

*Falcone v. Dickstein*,
    92 F.4th 193 (3d Cir. 2024) ....................................................................... 8

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ........................................................................... passim

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ................................................................................. 18

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991) ............................................................................... 14

*Grossman v. City of Portland*,
    33 F.3d 1200 (9th Cir. 1994) ................................................................... 22

*Healy v. James*,
    408 U.S. 169 (1972) ................................................................................... 6

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) ............................................................................ 7, 23

*In re Kendall*,
    712 F.3d 814 (3d Cir. 2013) ..................................................................... 15

*Int'l Soc. for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*,
    691 F.2d 155 (3d Cir. 1982) ..................................................................... 10

*J.S. ex rel Snyder v. Blue Mt. Sch. Dist.*,
    650 F.3d 915 (3d Cir. 2011) ................................................................... 7, 9

*Knowles v. City of Waco*,
    462 F.3d 430 (5th Cir. 2006) ................................................................... 22

*Kreimer v. Bureau of Police*,
    958 F.2d 1242 (3d Cir. 1992) ................................................................ 9, 10

*Landmark Commc'ns, Inc. v. Virginia*,
    435 U.S. 829 (1978) ................................................................................. 15

*Mahanoy Area Sch. Dist. v. B.L.*,
    594 U.S. 180 (2021) ................................................................................. 25

*McCauley v. Univ. of the Virgin Islands*,
    618 F.3d 232 (3d Cir. 2010) ................................................................ 7, 25

*McCutcheon v. Fed. Elec. Comm'n*,
    572 U.S. 185 (2014) ................................................................................... 6

*McGlone v. Bell*,
    681 F.3d 718 (6th Cir. 2012) .............................................................. 17, 22

*Melrose, Inc. v. City of Pittsburgh*,
    613 F.3d 380 (3d Cir. 2010) ..................................................................... 20

*Minn. Voters All. v. Mansky*,
    585 U.S. 1 (2018) ............................................................................... 15, 19

*Munroe v. Cent. Bucks Sch. Dist.*,
    805 F.3d 454 (3d Cir. 2015) ..................................................................... 13

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ................................................................................. 26

*Palardy v. Twp. of Millburn*,
    906 F.3d 76 (3d Cir. 2018) ....................................................................... 16

iii

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
   460 U.S. 37 (1983)......................................................................................... 23

*Phillips v. Borough of Keyport,*
   107 F.3d 164 (3d Cir. 1997) (en banc).......................................................... 6

*Pickering v. Bd. of Educ.,*
   391 U.S. 563 (1968)......................................................................................... 6

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth.,*
   653 F.3d 290 (3d Cir. 2011)................................................................. 23, 25

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)................................................................................. 11, 18

*Roberts v. Haragan,*
   346 F. Supp. 2d 853 (N.D. Tex. 2004) ....................................................... 22

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995)....................................................................................... 27

*Santopietro v. Howell,*
   73 F.4th 1016 (9th Cir. 2023) ....................................................................... 21

*Saxe v. State Coll. Area Sch. Dist.,*
   240 F.3d 200 (3d Cir. 2001)........................................................................... 9

*Shuttlesworth v. City of Birmingham,*
   394 U.S. 147 (1969)....................................................................................... 22

*Simms v. Dist. of Columbia,*
   872 F. Supp. 2d 90 (D.D.C. 2012) ............................................................... 28

*Smith v. Exec. Dir. of the Ind. War Mems. Comm'n,*
   742 F.3d 282 (7th Cir. 2014) ....................................................................... 21

*Snyder v. Phelps,*
   562 U.S. 443 (2011) ...................................................................................... 13

*Startzell v. City of Phila.,*
   533 F.3d 183 (3d Cir. 2008)......................................................................... 18

*Sullivan v. City of Augusta,*
   511 F.3d 16 (1st Cir. 2007)........................................................................... 22

*Temple Univ. v. White,*
   941 F.2d 201 (3d Cir. 1991).......................................................................... 29

*Thomas v. Chi. Park Dist.,*
   534 U.S. 316 (2002)....................................................................................... 19

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969)................................................................................. 8, 10

*United States v. Marcavage,*
   609 F.3d 264 (3d Cir. 2010)........................................................................... 8

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000)......................................................................................... 6

*Widmar v. Vincent,*
   454 U.S. 263 (1981)....................................................................................... 11

**Other Authorities**

University of Pittsburgh Student Affairs Department,
   *Event Planning Checklist* (last visited Apr. 7, 2025), available at
   https://freespeech.pitt.edu/sites/default/files/Final_FreeSpeechWebsite_Checklist.pdf. ......... 22

## INTRODUCTION

In response to the October 7, 2023, Hamas-led attack on Israel and the subsequent Israeli military assault on Palestinians in Gaza, likeminded students at the University of Pittsburgh ("Pitt") mobilized to raise awareness of the Palestinian peoples' suffering and educate their peers about the conflict. These students reinvigorated the long-registered student organization, Students for Justice in Palestine at Pitt ("SJP-Pitt"), to host and cosponsor numerous demonstrations and educational events on or near Pitt's campus. But as SJP-Pitt's voice grew louder, Pitt engaged in a course of conduct to single-out and silence SJP-Pitt. The events underlying SJP-Pitt's claims—*i.e.*, targeting SJP-Pitt for disciplinary action for engaging in a non-disruptive study-in at a campus library, suspending SJP-Pitt's status as a registered student organization because it engaged with other campus and non-campus organizations to criticize Pitt's initiation and handling of that disciplinary process, and threatening SJP-Pitt with further discipline for engaging in off-campus advocacy during its suspension—comprise the culmination of this endeavor.

Pitt's actions violate SJP-Pitt's First Amendment rights to free speech and to be free from retaliation as a result of that speech. SJP-Pitt has suffered, and will continue to suffer, irreparable harm if Pitt's restrictions continue throughout these proceedings. The equities and public interest also favor restoring SJP-Pitt's freedom of expression for the remainder of these proceedings because Pitt's interest in suppressing constitutionally protected expression is virtually non-existent whereas the public interest will be served by upholding the Constitution and allowing SJP-Pitt to engage in time-sensitive political advocacy about the ongoing humanitarian crisis unfolding in Palestine.

For these reasons, SJP-Pitt respectfully asks this Court to preliminarily enjoin Pitt from 1) continuing its suspension of SJP-Pitt as a registered student organization; 2) continuing with the

recently resurrected disciplinary proceedings, now related to both the library study-in and the open letter; 3) threatening SJP-Pitt with punishment for the exercise of the organization's off-campus speech; and 4) preventing the organization from organizing demonstrations and other on-campus activities based on vague, overbroad regulations applied in a content-based and viewpoint discriminatory manner.

## FACTUAL BACKGROUND

SJP-Pitt is a coalition of student activists at Pitt committed to highlighting demands for freedom, justice, and equality for the Palestinian people through peaceful means. Verified Compl. ¶¶ 8-9, 21. Corresponding with the escalation of Israeli military operations in Gaza, SJP-Pitt increased its on-campus advocacy by hosting and cosponsoring numerous events in the 2023-24 school year and fall 2024 semester. *Id.* at ¶¶ 19-20.

In response to SJP-Pitt's increased advocacy, Pitt administrators took steps to silence SJP-Pitt. *Id.* at ¶¶ 28-37, 43-49. For example, during the fall 2024 semester, Pitt administrators relocated three on-campus demonstrations involving SJP-Pitt to less-visible off-campus locations. *Id.* at ¶¶ 31-37. They also forced SJP-Pitt to rename a cosponsored "Anti-Zionist Kabbalat Shabbat" event to obstruct its political message, used a different title—Student-organized Shabbat—to alter the message on University calendars, and forced its relocation with less than twenty-four hours' notice. *Id.* at ¶¶ 43-49 Pitt did not cite any applicable Student Code of Conduct provision or university guideline to justify these actions. *Id.* Throughout this time, and since at least April 2024, an internal "alert" has appeared in Pitt's computer system tracking events promoted by registered student organizations. *Id.* at ¶¶ 28-30. The alert instructs Pitt employees "not [to] make late requests for this group without consulting a pro[fessional] staff" and checking SJP-Pitt's "[e]vent description[s] is VERY important…due to ongoing protests and demonstrations." *Id.*

During that same time period, SJP-Pitt began to face hostility and criticism from pro-Israel Pitt-sponsored organizations, as well as unaffiliated entities with whom these Pitt groups associated.  *Id.* at ¶¶ 22-27. This hostility rose to the level of a thinly-veiled bomb threat posted on Instagram by an off-campus organization named Betar USA, shortly before its executive director was expected to visit campus for a recruitment effort. *Id.* To SJP-Pitt's knowledge, the Pitt organizations that associate with Betar USA have not been sanctioned or threatened with sanctions, harassed in a similar fashion to SJP-Pitt, or labeled with an alert in the events-tracking database.

Pitt escalated its efforts to hinder SJP-Pitt's advocacy at the beginning of the spring 2025 semester. In mid-January, Pitt initiated disciplinary proceedings against SJP-Pitt because its members participated in a non-disruptive study-in at Hillman Library—an activity that other student organizations have engaged in without consequence—from December 9-12, 2024. *Id.* at ¶¶ 53-71, 83-84. The difference between the SJP-Pitt-promoted library group study session and one conducted during the same time period by another student organization was that SJP-Pitt's included political messages displayed on clothing, university-issued white boards, and personal belongings. *Id.* at ¶¶ 61-62. The students who joined the SJP-Pitt-promoted study-in wore readily recognizable political symbols, like the keffiyeh or a draped Palestinian flag, or displayed small signs or little flags bearing political messages on and near their laptops, but caused no disruption to other students or library operations and complied with all instructions from Pitt administrators on-site with regard to how to conduct their study-in to conform to Pitt's rules and regulations. *Id.* at ¶¶ 53-71, 97-102.

Despite several requests for clarification from SJP-Pitt during the study-in and disciplinary process, Defendants could not identify any specific "policy, procedure or guideline"

that SJP-Pitt allegedly violated. *Id.* at ¶¶ 72-79, 83-89. At the disciplinary hearing, SJP-Pitt presented uncontroverted testimony that the study-in did not cause any disruption to other students or library operations. *Id.* at ¶¶ 94-103. A Pitt faculty librarian testified that the only disruption he witnessed was caused by Defendant Karin Asher and the unusual armed-police presence. *Id.* Likewise, Professor Ruth Mostern testified that the students did not cause any disruption and complied with every demand made by Pitt administrators, except to vacate the library. *Id.* These witnesses also testified that they regularly observed similar study groups in Hillman Library, which were not comparably regulated by Pitt officials. *Id.* Indeed, a Greek sorority held an extended group study-in at the same area of the library at the same time, displaying a whiteboard with organizational material written on it. *Id.* at ¶¶ 61-62. To SJP-Pitt's knowledge, that organization has not been subjected to any discipline.

On the evening after its February 4 disciplinary hearing, SJP-Pitt published and circulated an open letter, signed by SJP-Pitt and 73 other university and community groups, to a variety of Pitt administrators, including the officials who served as the Hearing Officers. *Id.* at ¶¶ 106-07. That open letter, which was not sent *ex parte*, criticized Pitt's effort to suppress SJP-Pitt's speech through the disciplinary process and expressed frustration with the lack of transparency in that process. *Id.* at ¶¶ 108-11. The letter contained no threats and no coercive statements, but simply articulated the opinion of the undersigned organizations. Pitt did not respond to or acknowledge receipt of that letter for six weeks. *Id.* Nor did the hearing panel render its decision during that time period. *Id.* at ¶ 112.

On March 18, 2025, Pitt administrators informed SJP-Pitt that it had been placed on interim suspension of its status as a registered student organization because of SJP-Pitt's allegedly improper communications with members of the conduct hearing board, *i.e.*, the

transmission of the open letter criticizing Pitt. *Id.* at ¶¶ 113-15. While assessing how to respond to its unexpected suspension, SJP-Pitt attempted to continue its advocacy as an unaffiliated organization by promoting an off-campus community event hosted by a third-party via social media. *Id.* at ¶¶ 120-22. In response, Pitt sent SJP-Pitt another letter on March 19, 2025, warning SJP-Pitt that such off-campus expression could result in further disciplinary action. *Id.*[1] On April 10, Pitt reinstituted the disciplinary proceedings, adding new misconduct allegations involving the open letter and SJP-Pitt's social media activity to the previously issued allegations related to the library study-in. *Id.* at ¶¶ 124-29

Pitt's targeted threats and disciplinary actions against SJP-Pitt are depriving SJP-Pitt of the benefits of university registration—including funding, access to Pitt's facilities, and use of Pitt's communication channels—as well as chilling SJP-Pitt's expression on and off campus for fear of further retaliation. *Id.* at ¶¶ 130-39. Because of its suspended status, SJP-Pitt is unable to plan or host events to bring awareness to the time-sensitive developments in the war in Gaza, including organizing events for the fall 2025 semester, which need to be planned ahead of time to procure rooms, speakers, and funds. *Id.* And due to Pitt's threats to further discipline SJP-Pitt for off-campus activities, it is chilled from even advocating or supporting allied organizations unaffiliated with Pitt. *Id.*

## ARGUMENT

Pitt's actions to discipline SJP-Pitt for engaging in constitutionally-protected expression violate SJP-Pitt's rights under the First Amendment because it unreasonably restricts the group's freedom to engage in core political speech, constitutes content-based and viewpoint

---

[1] On or about March 29, 2025, Plaintiff changed its name, at Pitt's request, from SJP-Pitt to SJP-Pittsburgh in order to operate as a non-Pitt-registered student organization. It also changed its social media handle from "@sjp_pitt" to "@sjp_pgh." Plaintiff may revert to SJP-Pitt based on outcome in this case.

discrimination, and has a chilling effect on its willingness to express views not sanctioned by Pitt officials' interpretation of its unwritten, vague, and standardless rules. This Court should grant the requested preliminary injunctive relief because SJP-Pitt has shown that it is likely to succeed on the merits of its First Amendment claims, Pitt's restrictions have and will continue to cause irreparable injury to SJP-Pitt, Pitt will suffer no harm if the preliminary injunctive relief issues, and the requested relief will further the public interest in facilitating free political expression about a matter of great public concern. *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022) (listing preliminary injunction factors).

## I.      SJP-Pitt Is Likely to Succeed on the Merits of Its Claims.

Free and unhindered debate on matters of public importance, such as SJP-Pitt's advocacy in solidarity with the Palestinian people during Israel's military assault, is "the core value of the Free Speech Clause of the First Amendment." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968); *see also McCutcheon v. Fed. Elec. Comm'n*, 572 U.S. 185, 203 (2014) ("The First Amendment safeguards an individual's right to participate in the public debate through political expression and political association."). In First Amendment cases, the defendant bears the burden of proving the constitutionality of its restrictions on speech. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). Thus, once SJP-Pitt has shown a restraint on its free expression, the burden shifts to Defendants to articulate the reasons for the restraint and to justify the restraint under the relevant First Amendment standard. *Phillips v. Borough of Keyport*, 107 F.3d 164, 172-73 (3d Cir. 1997) (en banc).

Universities are not "immune from the sweep of the First Amendment," and there is "no room for the view that…First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972). Instead,

"[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *J.S. ex rel Snyder v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 926 (3d Cir. 2011) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). And, indeed, university students have more protection than do secondary school students. *See McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 247 (3d Cir. 2010) ("Public universities have significantly less leeway in regulating student speech than public elementary or high schools."). As a public university, Pitt "may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829–830 (1995)).

Defendants' ongoing interference in SJP-Pitt's speech, assembly, and petitioning activities violates the First Amendment in several ways. First, its decision to single out SJP-Pitt for disciplinary proceedings following the non-disruptive December 2024 study-in unreasonably restricted SJP-Pitt's free speech rights, and discriminated against SJP-Pitt based on the content of the organization's speech. Second, Defendants imposed the interim suspension on SJP-Pitt in a content-based and viewpoint-discriminatory manner, in retaliation for SJP-Pitt's exercise of its constitutionally-protected right to engage in political speech—namely, organizing over 70 school and community groups to send an open letter to Pitt leadership criticizing the University's harassment of SJP-Pitt. Third, Defendants' impenetrable event-approval procedures, which they apply arbitrarily and discriminatorily to free-speech activities in public forums and other university spaces, are unconstitutionally vague and overbroad, and have been applied in a viewpoint discriminatory manner. Finally, Pitt's threats to further sanction SJP-Pitt for engaging in free-speech activities independent of official university-registered status, including for off-campus speech, is an abject First Amendment violation. Absent preliminary injunctive relief

from this Court, all of these actions will curtail SJP's free speech activities, have an ongoing

chilling effect on SJP-Pitt's freedom of expression, and will preclude SJP-Pitt from planning

future events and fulfilling its organizational mission.

      **A.**      ***Pitt's Initiation and Execution of the Disciplinary Process Against SJP-Pitt Violates the* Tinker *Line of Cases Protecting Peaceful, Non-Disruptive Symbolic Speech in a School or Library Setting.***

      Students have a right to engage in silent expressive conduct, in secondary schools and

even more so in public higher education institutions, and the SJP-Pitt students' keffiyehs, flags,

and small political signs on laptop computers are simply a variation on *Tinkers*' black armbands

opposing the Vietnam War.  *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503,

505-06 (1969) (protecting students' wearing of black armbands to protest the Vietnam War).

The students' silent expression of political views in a library, absent violation of any clear rule, is

akin to the silent library sit-in protesting discrimination,which the Supreme Court protected in

*Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966) (protecting individuals' peaceful sit-in at a

public library to protest its unconstitutional segregation policy). The U.S. Court of Appeals for

the Third Circuit recently characterized both types of political expression as "[p]aradigms of

protected conduct-based speech." *Falcone v. Dickstein*, 92 F.4th 193, 206 n.9 (3d Cir. 2024);

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 308 (3d Cir. 2013) (citing *Tinker*,

*supra*, and its progeny).

      In *Tinker*, the Supreme Court held that school officials cannot punish students for "a

silent, passive expression of opinion, unaccompanied by any disorder or disturbance,"

notwithstanding their fear of disturbance or a "desire to avoid the discomfort and unpleasantness

that always accompany an unpopular viewpoint." 393 U.S. at 508-10; *see also United States v.*

*Marcavage*, 609 F.3d 264, 282, 282 n.13 (3d Cir. 2010) (noting that a "hecklers veto," which

restricts speech "based on its perception that the speech will spark fear among or disturb its

audience" is an impermissible content-based regulation) (citing *Brown*, 383 U.S. at 133 n.1).

Indeed, the Supreme Court and the Third Circuit have already affirmed that a non-disruptive sit-in at a public library is a protected form of expression. *Brown*, 383 U.S. at 141-43; *see also Kreimer v. Bureau of Police*, 958 F.2d 1242, 1247, 1261-62 (3d Cir. 1992) (explaining that a public library must "permit the public to exercise rights that are consistent with the nature of the Library" as opposed to disruptive activities such as "following patrons and talking loudly").

The Third Circuit recently expounded on the meaning and significance of *Tinker*: "Without 'a *specific* showing of constitutionally valid reasons to regulate their speech,' then, 'students are entitled to freedom of expression,' and cannot be punished for 'expressions of feelings with which [school officials] do not wish to contend.'" *B.L v. Mahanoy Area Sch. Dist.*, 964 F.3d 170, 177 (3d Cir. 2020), *aff'd but criticized on other grounds*, 594 U.S. 180 (2021) (emphasis added) (quoting *Tinker*, 393 U.S. at 511). The *Tinker* Court recognized a "narrow exception" providing that "school officials may regulate speech that 'would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,"'" but only if they can show "*a specific and significant fear of disruption*." *Id.* at 177-78 (emphasis added) (internal citations omitted); *see also J.S. ex rel Snyder*, 650 F.3d at 926; *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001). Defendants have proffered nothing even close to meeting that standard.

Pitt's decision to initiate the disciplinary charges against SJP-Pitt for peacefully, silently and symbolically protesting at the library is governed by *Tinker* and *Brown*. SJP-Pitt's display of flags, keffiyehs, and small signs affixed to laptop computers, expressing support for the Palestinian people in the Hillman Library, constituted non-disruptive expressive conduct protected by the First Amendment. The participating students exercised their free-speech rights

in a manner "consistent with the nature of the Library," since they were studying for final exams while displaying these political symbols. *Kreimer*, 958 F.2d at 1262; *see also Int'l Soc. for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 161 (3d Cir. 1982) ("[C]ivil rights protesters may keep a silent vigil in a [] library, although they may not deliver a speech in the reading room.") (citing *Brown*, 383 U.S. at 142).

Two eyewitnesses, both Pitt professors, testified at the disciplinary hearing that the study-in was indeed a silent expression of political views that caused no disruption to other students' studying in the library or library operations. Verified Compl. ¶¶ 97-102.  Here, just as in *Tinker*, SJP-Pitt "may not be confined to the expression of those sentiments that are officially approved," and its peaceful advocacy cannot be prohibited where it "caused discussion outside of the classrooms, but no interference with work and no disorder." *Tinker*, 393 U.S. at 511-14. Both this case and *Tinker* involve protests against war that took place in otherwise academic contexts, *i.e.*, a library and classroom. And as in *Tinker¸* SJP-Pitt's expression did not cause a material and substantial disruption. Defendants have never claimed that SJP-Pitt's study-in was disruptive, did not charge them with disruption or disorderly conduct, and failed to controvert the testimony of SJP-Pitt's faculty witnesses at the disciplinary hearing. Verified Compl. ¶¶ 95, 103. Unlike in *Brown* where the government accused the civil rights activists of violating the state's breach of peace statute, Defendants have not and seemingly cannot identify a Pitt rule, policy, or guideline that SJP-Pitt allegedly violated. *See* 383 U.S. at 138. Instead, Pitt attempts to justify its initiation of the disciplinary process against SJP-Pitt for the study-in by claiming it constituted an "event in a non-reservable space." Verified Compl. ¶¶ 65-73, 96.

Defendants' attempted punishment of SJP-Pitt's study-in not only violates *Tinker* but constitutes unlawful content-based discrimination. Discrimination against speech because of its

message is presumed to be unconstitutional. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163

(2015) ("[A] government . . . 'has no power to restrict expression because of its message, its

ideas, its subject matter, or its content.'") (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92,

95 (1972)). When a university opens its facilities for use by student groups, it cannot exclude

groups because of the content or viewpoint of their speech. *See Widmar v. Vincent*, 454 U.S. 263,

273-76 (1981); *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661,

684-85 (2010).

      Here, by initiating and prosecuting disciplinary charges against SJP-Pitt, Pitt clearly

violates this core First Amendment content-neutrality command. At the same time that SJP-Pitt

was conducting its study-in on the first floor of the Hillman Library, another group of students

affiliated with a Pitt student organization—the Kappa Delta sorority—held a study session at the

Hillman Library with the same sized and shaped, university-supplied whiteboard, simply

displaying a different message. Verified Compl. ¶¶ 97-102, 61-62. Because space on the first

floor of the library is available on a first-come, first served basis, the sorority members could not

have made a reservation if they tried, but Pitt administrators nonetheless allowed them to study

together. *Id.* at ¶ 67. To SJP-Pitt's knowledge, this organization was not sanctioned or otherwise

disturbed or warned by Pitt officials for their study session. The only distinguishing feature

between the two study groups is the messages they displayed. That is the essence of content-

based discrimination.

      Defendants' discriminatory enforcement of their fabricated prohibition on "events in a

non-reservable space" demonstrates the harm that can result when officials invoke vague,

standardless policies as "a pretext for pursuing those engaged in lawful, constitutionally

protected exercise of their fundamental rights," *Brown*, 383 U.S. at 143, and "a means of

suppressing a particular point of view." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992). The purported unwritten, undefined restriction on "events in a non-reservable space" provides Pitt administrators with the unbridled discretion to censor disfavored speech prohibited by the First Amendment. *Id.* at 132-33; *see also* Section C.2. *infra*. There are no Pitt regulations setting forth either what constitutes an "event" or which spaces are "non-reservable," thereby allowing Pitt to deploy the substantively empty phrase to censor speech at whim and in a viewpoint discriminatory fashion. Verified Compl. ¶¶ 39-41.

Even if some spaces in Hillman Library are clearly off limits—*i.e.*, non-reservable—for group studying with a message (such as administrators' offices or special areas reserved for sensitive collections), the common, open, public area on the first floor is not such a space. That area is not "non-reservable" in the way that Defendant Asher and the disciplinary proceeding used that term. No reservation is necessary, or even available, for groups of students to organize study sessions on the open first floor of the Hillman Library. Indeed, the tables on that floor are available on a first come, first served basis, as opposed to specially designated rooms in other areas of the library which can be reserved. *Id.* at ¶ 67. It is therefore only "non-reservable" in the sense that there is no requirement that one needs to have a reservation to individually or collectively study in that area, and that groups of students cannot "reserve" a table to the *exclusion* of others, but can take whatever tables are available at the time.

SJP-Pitt members participated in a silent, non-disruptive expression of their solidarity with the Palestinian people while doing just what Hillman Library is designed to facilitate: studying. SJP-Pitt's non-disruptive, silent political displays in an area of study are protected in the same way as *Tinker's* armband, so Defendants' pretextual application of an unwritten,

overbroad prohibition on "events in a non-reservable space" violates SJP-Pitt's free speech rights. Therefore, SJP-Pitt is likely to succeed on the merits of this claim.

   **B.**  ***Pitt's Decision to Impose an Indefinite, Interim Suspension in Retaliation for SJP-Pitt Sending a Public Open Letter Signed by Numerous Campus and Community Organizations to Various University Officials Criticizing Pitt's Disciplinary Process Violates the First Amendment.***

   **1. Punishing SJP-Pitt for its Message Violates the First Amendment.**

Pitt's placement of SJP-Pitt on interim suspension over an open letter, signed by over 70 university and community organizations, constitutes impermissible punishment for the content of SJP-Pitt's protected speech. SJP-Pitt's statements criticizing Pitt for unfairly targeting SJP-Pitt with "heightened scrutiny and politically driven disciplinary actions" in the open letter, Verified Compl., Ex. 24, at 1, were protected speech under the First Amendment to the U.S. Constitution. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (citations omitted); *see also, e.g.*, *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282-83 (3d Cir. 2004) ("[E]xcept for certain narrow categories deemed unworthy of full First Amendment protection—such as obscenity, 'fighting words' and libel—all speech is protected by the First Amendment."). First Amendment protections are especially robust when the regulated speech criticizes government action, such as SJP-Pitt's criticisms of Pitt's decision to single-out SJP-Pitt for disciplinary action. *See Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 473 (3d Cir. 2015) ("[S]peech involving government impropriety occupies the highest rung of First Amendment protection").

Pitt has alleged, vaguely, that the open letter improperly attempted to influence the hearing panel,[2] but it has failed to show that the correspondence posed a clear and present danger to the integrity of the proceedings, or even how public advocacy criticizing the entire process could rise to that level. The Supreme Court has held that punishment for speech that publicly comments on a pending judicial (or in this case a quasi-judicial) process can only be upheld if there is "a showing of 'clear and present danger' that a malfunction in the [] justice system will be caused." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1070-71 (1991). Pitt's regulation and its application to this case fail that test.

The rule Pitt relies on to suspend SJP-Pitt is overbroad, and as applied to SJP-Pitt's conduct is plainly unconstitutional. Conduct Rule 42 provides that a student who "[i]ntimidates, coerces, influences, or attempts to do the same against a person who is participating or has participated in any University process or proceeding" may be sanctioned. Verified Compl., Ex. 17, at 20. While narrowly interpreting what constitutes intimidating and coercive conduct to include only unprotected speech, like true threats or clear and present danger, would satisfy the First Amendment, Pitt's interpretation is far broader. Pitt claims that SJP-Pitt illegally "influenced" the panel, by sending the open letter, but they do not provide an iota of evidence to meet their burden of proof and persuasion. The Rule's use of this undefined term, therefore, "carries with it [t]he opportunity for abuse" since the enforcing official "may shape his [own]

---

[2] What Pitt is referring to is not a "falsification," but an inadvertent error in which a Pitt Law School faculty member mistakenly joined the entire Law School instead of just themselves as an individual. Verified Compl. ¶ 107 n.11. As soon as SJP-Pitt realized this error, they removed the Law School as an organizational signer from all publicly facing social media. *Id.* Pitt cannot possibly justify organizational suspension over such an innocent mistake, especially one occasioned by a third party. And Pitt would be hard-pressed to claim this error materially impacted the process because it did not even mention the matter on March 18, when it initially imposed the suspension notice. Verified Compl. ¶¶ 113-15.

14

views" on what constitutes a violation. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 4 (2018) (internal citations omitted). The point of most political expression is to influence others, and the Supreme Court has already ruled that criticizing an adjudicative tribunal cannot be, without something more, illegal.  *See Bridges v. California*, 314 U.S. 252, 270 (1941) (explaining that "shielding judges from published criticism" cannot justify "an enforced silence, however limited"); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 844 (1978) (noting that speech about ongoing judicial proceedings cannot be restricted without proof of "a clear and present danger to the administration of justice"); *In re Kendall*, 712 F.3d 814, 825 (3d Cir. 2013) (same).

Here there can be no dispute that the open letter did not attempt to intimidate, coerce or threaten any person. The students sent an "open letter," signed onto by an impressive array of University and community organizations, criticizing the entire disciplinary process. Verified Compl. ¶¶ 106-09. This was not delivered secretly, or *ex parte*, to the hearing officers. *Id.* The letter was sent openly to University administrators involved with SJP-Pitt who seemingly have authority over their fate, including the hearing officers, and was advertised publicly on SJP-Pitt's social media. *Id.* While critical of Pitt's disciplinary process, the open letter was non-threatening and non-coercive. *Id.* SJP-Pitt and its cosignatories primarily intended to condemn Pitt's course of conduct. *Id.* The letter concluded by demanding that Pitt not only terminate the disciplinary process, but institute more transparency and cease its overall interference with pro-Palestinian voices on campus.  Verified Compl., Ex. 24, at 2.

If University officials prosecuting the matter against SJP-Pitt believed the letter made points incorrectly or inappropriately, like any opposing party in litigation, they could have delivered their own letter to the hearing officers refuting points they disagreed with.  But Pitt's overly-broad interpretation of their conduct rule as prohibiting SJP-Pitt from publicly criticizing

the disciplinary proceedings during their pendency because they "might influence" the panel would encompass Op-Eds, off-campus political demonstrations, social-media postings, or any public criticism of the process and proceedings that might come to the panel hearing officers' attention. That is overbroad. The cases cited above foreclose Pitt from penalizing such plainly protected speech.

**2.  The Indefinite, Interim Suspension Constitutes Illegal Retaliation.**

Defendants' interim and indefinite suspension of SJP-Pitt also constitutes impermissible retaliation for the exercise of SJP-Pitt's First Amendment rights because (1) the statements in the open letter criticizing Pitt's harassment of SJP, including the meritless disciplinary charges, were constitutionally-protected criticism of government officials; (2) Pitt's decision to place SJP-Pitt on interim suspension for an indeterminate period of time would deter another registered student organization of ordinary firmness from engaging in similar speech; and (3) Pitt imposed the interim suspension based on SJP-Pitt's statements in the open letter. *See Palardy v. Twp. of Millburn*, 906 F.3d 76, 80–81 (3d Cir. 2018) (describing retaliation test).

As discussed in the preceding section, the open letter is constitutionally-protected political speech.  The suspension has closed off opportunities for SJP-Pitt's political advocacy on campus, including preventing them from staging the April 3-4 art demonstration outside the William Pitt Student Union ("WPU"). Verified Compl. ¶ 136. Lest there be doubt that a suspension chills other organizations of ordinary firmness, the event co-sponsoring group's withdrawal from holding the same art demonstration over fears of Pitt retaliation against them is proof positive. *Id.* Finally, while Pitt's suspension letter is vague about what conduct they are prosecuting for improperly influencing and disrupting a university process, the open letter is the only SJP-Pitt action Pitt has identified, and thus the nexus between the expressive activity and

the retaliation is clear.  Consequently, Pitt's interim suspension meets the test for illegal

retaliation.

Moreover, there is evidence here that the suspension was pretextual. SJP-Pitt sent the open

letter to Pitt officials mere hours after the conclusion of the disciplinary hearing. Pitt did not

respond to the open letter for 43 days. *Id.* at ¶ 111. The University obviously did not feel that

there was any compelling reason to sanction the group for six weeks after the open letter was

sent. That the University—for no apparent reason—waited so long while the hearing officers did

not render any determination, suggests that the suspension was pretextual, and actually not based

on the open letter at all.

C.    ***Pitt's Obstruction and Suppression of SJP-Pitt's Demonstrations and Other
      Events on Campus Violates the First Amendment.***

Since April 2024, Defendants have unreasonably restricted SJP-Pitt's free-speech rights

by suppressing SJP-Pitt-affiliated demonstrations and events on campus by subjecting them to

heightened scrutiny and moving them off campus. Verified Compl. ¶¶ 28-52. The Supreme

Court has recognized that "the campus of a public university, at least for its students, possesses

many of the characteristics of a public forum." *Widmar*, 454 U.S. at 267 n.5. Although the Third

Circuit has not yet ruled on the issue, several U.S. Courts of Appeals have held that university

property contiguous with an urban sidewalk—like Pitt's campus—is a traditional public forum.

*See, e.g.*, *McGlone v. Bell*, 681 F.3d 718, 732 (6th Cir. 2012); *Brister v. Faulkner*, 214 F.3d 675,

683 (5th Cir. 2000).[3] Because Pitt's campus is a public forum, the University cannot outright

prohibit demonstrations or other on-campus speech activities, but can only regulate such

---

[3] Even if parts of Pitt's campus are *limited* public forums, the outcome would not change because
the Third Circuit applies the same test for speech restrictions in a traditional public forum and a
limited public forum, if, as here, that restriction is content-based or if the restricted activities are
consistent with those generally permitted in that forum. *See Diener v. Reed*, 232 F. Supp. 2d 362,
376 (M.D. Pa. 2002) (citing *Kreimer*, 958 F.2d at 1262).

activities in a content-neutral manner based on clearly written standards. *Frisby v. Schultz*, 487

U.S. 474, 481-82 (1988); *Forsyth Cnty.*, 505 U.S. at 130-31; *Reed*, 576 U.S. at 163. While Pitt

has some vague space-reservation system, it does not have a clear permitting process bound by

the requisite objective standards and procedural protections.

> 1. **Pitt's Standardless Rules About Events on Campus Are Unreasonable Restrictions on SJP-Pitt's Free Speech Rights.**

Defendants' *de facto* prohibition on "events in non-reservable spaces" violates the First

Amendment because it allows Pitt administrators unbridled discretion to decide whether to allow

students to gather on campus without reserving space in advance, requires even small groups of

students to register for any use of campus property, and imposes a potentially prohibitive

advance-notice requirement on those seeking to use campus spaces to demonstrate on time-

sensitive current events. The Supreme Court has held that government policies requiring

permission to engage in the exercise of First Amendment freedoms in a public forum are subject

to a "heavy presumption" against their validity. *Forsyth Cnty.*, 505 U.S. at 130-31.

The First Amendment requires that prior-approval policies regulating speech on public

property must "not delegate overly broad licensing discretion to a government official," must be

valid time, place, and manner restrictions, must be content-neutral, and must be narrowly tailored

to serve a significant governmental interest. *Id.* at 130; *see also Clark v. Cmty. for Creative Non–*

*Violence*, 468 U.S. 288, 293 (1984); *Startzell v. City of Phila.*, 533 F.3d 183, 198 (3d Cir. 2008).

These limits serve to protect against standardless policies' "potential for becoming a means of

suppressing a particular point of view." *Forsyth Cnty.*, 505 U.S. at 130-31; *see also City of*

*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) ("[U]nbridled discretion in the

hands of a government official . . . may result in censorship."); *Amalgamated Transit Union Loc.*

*85*, 39 F.4th at 108-09 (noting that overly discretionary standards create a danger of improper application).

Defendants' prohibition on "events in non-reservable spaces" fails this test for multiple reasons. Any governmental regulation of speech must be based on clearly articulated, defined, and objective standards that limit government officials' decision-making discretion. *See*, *e.g.*, *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323-24 (2002). The Demonstration and Protest Guidelines, which Pitt most frequently cites for its assertion that SJP-Pitt cannot host an "event" in a "non-reservable space," Verified Compl. ¶¶ 38-39, 73-75, provides a vague and overbroad definition of "demonstration."[4] Such a broadly defined term lacks the "'narrowly drawn, reasonable and definite standards,' guiding the hand" of Pitt administrators who encounter a student gathering in a space that has not—or cannot—be reserved. *Forsyth Cnty.*, 505 U.S. at 133 (internal citations omitted). Therefore, the decision of whether or not to invoke the claimed prohibition on "events in a non-reservable space" to shut down a student gathering "is left to the whim of the administrator." *Id.*; *see also Mansky*, 585 U.S. at 4 (internal citations omitted) (invalidating a political apparel ban because the enforcing official had discretion to define "what counts as 'political.'").

The unbridled discretion does not end there. Besides articulating conduct standards— such as not disrupting the educational process, infringing rights of others, or violating applicable laws—the Demonstration and Protest Guidelines simply state that the "University maintains the right to regulate and monitor the time, place and manner of any on-campus demonstrations as

---

[4] *See Id.*, Ex. 9, at 1 ("A demonstration includes any organized public gathering or activity expressing support for or opposition to an issue, person, group, idea or policy."). Defendants seem to use the term "event" interchangeably with "demonstration," as Pitt has been unable to produce any another definition of "event."

may be necessary to help ensure the safety and well-being of community members and the orderly conduct of classes and other functions of the University." *Id.*, Ex. 9, at 1. Neither the Demonstration and Protest Guidelines, Event Planning Guidelines, or the 2024-25 Registered Student Organizations Handbook identify the criteria for granting a space reservation request. The Demonstration and Protest Guidelines merely provide a list of "note[s]" to consider "[f]or any demonstrations on University property, *reserved or otherwise*." *Id.* at 2-3 (emphasis added). The notes simply state that "[m]any campus spaces are available for student organizations and University departments to reserve for planned events, including demonstrations." *Id.*

Pitt's reservation of the right to impose restrictions deemed necessary to serve broad interests in safety, well-being, and order does not sufficiently constrain administrators' discretion. *See Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 392 (3d Cir. 2010) ("Permitting schemes under which decision makers are 'guided only by their own ideas of public welfare, peace, safety, health, decency, good order, morals or convenience' have been rejected."). Pitt has no discernible standards about precisely what types of activities, involving how many participants, in which public spaces constitute an event or demonstration that fall under Defendants' *de facto* prohibition on "events in non-reservable spaces." Absent "narrowly drawn, reasonable and definite standards" to guide Pitt's regulation of expressive activities in public spaces, the system is facially unconstitutional and cannot be applied in a content-neutral manner, as administrators must reference the content of students' expression to determine whether it adequately promotes safety, well-being, and order. *Forsyth Cnty.*, 505 U.S. at 133.[5]

---

[5] Although the Guidelines assert that "Nothing in these guidelines should be construed to restrict activity protected under the First Amendment," Verified Compl., Ex. 9, at 4, Defendants' application of the guidelines in their *de facto* permitting system ignores this well-intentioned statement. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 229 (1974) (Marshall, J., dissenting) (explaining that a similar disclaimer in a statute restating well-settled constitutional principles

Defendants have deployed their standardless system several times to curtail SJP-Pitt's constitutionally-protected expressive activities and to suspend the organization's operations. The standardless regulation of students' free expression in various public spaces at the University allows Pitt to do exactly what the First Amendment prohibits, namely, "suppressing a particular point of view." *Forsyth Cnty.*, 505 U.S. at 130-31. For example, Defendants placed an internal "alert" on its computer system that elevates the scrutiny Pitt gives all SJP-Pitt activities and events. Verified Compl. ¶¶ 28-30 ; *see also* Section C.2. *infra*. This note appears to add criteria for approval of SJP-Pitt's space reservations that are not applied to other registered student organizations. Pitt's markedly less-restrictive treatment of a student protest about an on-campus sexual assault in 2022, organized days prior on a social media platform and permitted to take place on the Cathedral Lawn, demonstrates that Pitt administrators adjust the registration requirement's criteria depending on the message students seek to express. Verified Compl. ¶¶ 51-52; *see also* Section C.2. *infra*.

Beyond the unconstitutional delegation of discretion to Pitt officials, the prohibition unreasonably burdens the expression of small groups and imposes an illegal advance notice requirement. As noted above, Pitt's Demonstration and Protest Guidelines do not specify the circumstances under which space reservation is required. They could, therefore, be read as requiring space reservation for any type of gathering on campus—even by individuals or small groups. Courts have consistently rejected such a requirement as insufficiently narrowly tailored. *See*, *e.g.*, *Santopietro v. Howell*, 73 F.4th 1016, 1023 (9th Cir. 2023).[6]

---

"has not given the statute a limiting construction but merely repeated the obvious"); *CISPES v. F.B.I.*, 770 F.2d 468, 474 (5th Cir. 1985) (such a clause "cannot substantively operate to save an otherwise invalid statute.").

[6] *See also Smith v. Exec. Dir. of the Ind. War Mems. Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) ("Requirements that small groups obtain a permit to gather in a traditional public forum

Relevant Pitt guidelines also set deadlines for submission of space reservation requests, requiring thirty-days advance notice for events on the Cathedral Lawn.[7] Such advance notice requirements are unconstitutional because they impose an unduly restrictive burden on expressive activities. *See*, *e.g.*, *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012) (holding a university's fourteen-business-day advance notice requirement for approval of an on-campus speaker too restrictive).[8] These constitutional concerns are heightened where, as here, speakers seek to engage in time-sensitive expression. *See Grossman*, 33 F.3d at 1206 (invalidating an advance notice requirement because it prohibited "[s]pontaneous expression, which is often the most effective kind of expression"); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) ("[T]iming is of the essence in politics . . . . when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all"). Requiring SJP-Pitt to reserve space weeks in advance of its on-campus expressive activities precludes demonstrations

---

frequently fail the narrow-tailoring requirement."); *Boardley v. U.S. Dep't of the Interior*, 615 F.3d 508, 520-21 (D.C. Cir. 2010) (striking down permit scheme that applied to small groups); *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) (same); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) (same); *Cox v. City of Charleston*, 416 F.3d 281, 283-84 (4th Cir. 2005) (same).

[7] *See* University of Pittsburgh Student Affairs Department, *Event Planning Checklist* (last visited Apr. 7, 2025), available at https://freespeech.pitt.edu/sites/default/files/Final_FreeSpeechWebsite_Checklist.pdf. (noting that the Cathedral Lawn can be reserved through the Event Management System ("EMS")).

[8] *See also Sullivan v. City of Augusta*, 511 F.3d 16, 38-40 (1st Cir. 2007) (striking down a thirty-day notice requirement for parades on city streets); *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994) (holding a seven-day notice requirement for every demonstration in a public forum too restrictive); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 868-69 (N.D. Tex. 2004) (invalidating a two-business-day advance notice requirement for students to speak in designated campus areas).

responding to late-breaking news from the war in Gaza or decrying some action Pitt has taken, like suspending a student group.[9]

### 2. Defendants' Targeted Restrictions on SJP-Pitt's Events and Demonstrations Constitute Viewpoint Discrimination.

Pitt's repeated obstruction and suppression of SJP-Pitt's relatively small demonstrations on campus, compared to its treatment of a prior, more sizeable demonstration, demonstrates viewpoint discrimination that violates the First Amendment. As a public institution, Pitt "may not discriminate against speech based on the ideas or opinions it conveys." *Iancu*, 588 U.S. at 393; *see also* Section I.A. *supra*. "Viewpoint discrimination is anathema to free expression . . . if the government allows speech on a certain subject, it must accept all viewpoints on the subject . . . even those that it disfavors or that are unpopular." *Pittsburgh League of Young Voters Educ. Fund v. Port Auth.* , 653 F.3d 290, 296 (3d Cir. 2011) (internal citations omitted); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 55 (1983) ("When speakers and subjects are similarly situated, the State may not pick and choose."). Even when offered a nondiscriminatory rationale for a government entity's restriction on speech, courts may still find viewpoint discrimination if (1) there are statements by government officials on the reasons for an action which indicate an improper motive, or (2) "the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted." *Pittsburgh League of Young Voters*, 653 F.3d at 296 (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004).

Pitt's viewpoint discrimination is evident from how the university has handled similar situations involving different messengers.  For instance, Pitt officials created an internal "alert"

---

[9] Pitt did, in fact, interfere with SJP-Pitt's attempt to host an "Urgent Protest" in the wake of Israel's beeper attack on Lebanon, a time-sensitive event effectively precluded by the advance-notice requirement. Verified Compl. ¶¶ 34-35.

in its events database, which is not publicly viewable, for all SJP-Pitt proposals. *See* Verified

Compl. at ¶¶ 28-30. This alert has been in place since at least April 2024 and was present as late

as April 8, 2025. *Id.* The note accompanying the alert reads, "do not make late requests for this

group without consulting a pro staff.  Event description is VERY important with this group due

to ongoing protests and demonstrations."  *Id.* Similarly situated student organizations with

opposing viewpoints on Israel's military actions in Palestine and ties to Betar USA, such as

Students Supporting Israel ("SSI") and Student Coalition for Israel at Pitt ("SCIP"), do not have

such an alert in the Pitt events database. *Id.*

Furthermore, in November 2024, a Pitt official asked SJP-Pitt to "reframe the title and

description" of its proposed "Anti-Zionist Shabbat" event. *Id.* at ¶¶ 43-50. After SJP-Pitt

proposed the title of "Non-Zionist Shabbat" and a description emphasizing that it "welcome[s]

all community members regardless of affiliation," the Pitt official initially stated that the event's

title in Pitt's communication channels would be "Student-organized Shabbat" and later followed

up to relocate the event as it was unsuitable for the Global Hub space. *Id.* These statements by

Pitt officials that proposals for SJP-Pitt events should be subject to heightened review and its

Anti-Zionist framing of an event as unsuitable for Pitt-affiliation are direct evidence of

Defendants' viewpoint discrimination against SJP-Pitt.

Most significantly, however, in contrast to Pitt's relocation of three SJP-Pitt

demonstrations on the Cathedral Lawn and WPU, Verified Compl. ¶¶ 32-37,[10]  on October 7,

2022, Pitt allowed approximately 100 students to gather outside the Cathedral of Learning to

protest Pitt's failure to protect its students from a sexual assault reported the preceding day. *Id.* at

---

[10] Defendants relocated SJP-Pitt-affiliated rallies on September 25 outside the Cathedral of
Learning and October 9 outside the WPU, as well as an October 10 SJP-promoted teach-in event
outside the Cathedral to off-campus locations. Verified Compl. ¶¶ 31-37.

¶¶ 51-52. Some protesters even entered a closed-off section inside the Cathedral that had been reserved for a homecoming event, and were eventually removed outside the building by Pitt Police. *Id.* Rather than insisting that the protest move off campus, or initiating disciplinary action against protestors, Pitt rewarded them by holding a town hall-style meeting and setting up an additional meeting with an associate dean to address the students' concerns. *Id.* This comparison demonstrates viewpoint discrimination because, although Defendants stated that they rejected SJP-Pitt's demonstrations because it was an "event in a non-reservable space," the October 7, 2022, demonstration "possessing the same characteristic [was] accepted." *Pittsburgh League of Young Voters*, 653 F.3d at 296.

### D.     Pitt Impermissibly Attempted to Regulate SJP-Pitt's Off-Campus Speech.

Pitt's March 19 Letter threatening to sanction SJP-Pitt for off-campus political speech is a patent First Amendment violation. In *Mahanoy Area Sch. Dist. v. B.L.*, the Supreme Court held that schools have little leeway to regulate off-campus speech, noting that "courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." 594 U.S. 180, 189-90 (2021). The Court noted that, in cases involving "political or religious speech that occurs outside school . . . , the school will have a heavy burden to justify intervention." *Id.* at 190. Moreover, "[p]ublic universities have significantly less leeway in regulating student speech than public elementary or high schools." *McCauley*, 618 F.3d at 247.

SJP-Pitt's expression of support for an off-campus event on Saturday, March 22, 2025, is well beyond Pitt's regulatory authority. Regardless of whether SJP-Pitt is under interim suspension or can benefit from formal organizational recognition, both the organization and its members still maintain free-speech rights on campus and, even more so, off campus. Their

ongoing political advocacy enjoys maximal First Amendment protection and is completely separate from any benefits conferred by University student organization registration.

Pitt's attempt to stifle SJP-Pitt's core political speech by threatening further disciplinary conduct has already had a profound chilling effect. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024) ("[A] government entity's 'threat of invoking legal sanctions…' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment.") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *Circle Schs. v. Pappert*, 381 F.3d 172, 181 (3d Cir. 2004) ("'[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.'") (quoting *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996)). For example, in the weeks following the March 19 Letter, SJP-Pitt silenced its social media presence and refrained from sharing information about upcoming community events promoting cultural awareness and solidarity with the Palestinian people. Verified Compl. ¶ 139. Upon advice of counsel, SJP-Pitt resumed its social media activities under a different username that makes clear it is unaffiliated with Pitt: Students for Justice in Palestine—Pittsburgh (@sjp_pgh). *Id.* at ¶¶ 8, 139. Even under this new name, SJP-Pitt has continued to seek legal advice about the risk of retaliatory disciplinary action while engaging in protected off-campus expression. *Id.* at ¶ 139. For these reasons, SJP-Pitt is likely to succeed on the merits of its claim that Pitt's threatened disciplinary action, intended to censor SJP-Pitt's expression outside the scope of Pitt's regulatory authority, is an egregious violation of the First Amendment.

## II.   SJP-Pitt Will Suffer Irreparable Harm Without Preliminary Injunctive Relief.

Pitt's interference with SJP-Pitt's on- and off-campus demonstrations, educational events, and social-media advocacy constitutes ongoing irreparable harm. As the Supreme Court has

noted, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *see also Amalgamated Transit Union Loc. 85*, 39 F.4th at 107-08 ("The First Amendment protects that speech, so curtailing it inflicts an irreparable injury."). Violation of the right to speak on matters of public concern is undeniably irreparable harm because "[t]he timeliness of political speech is particularly important." *Elrod*, 427 U.S. at 374 n.29.

Absent preliminary relief from this Court, SJP-Pitt's interim suspension deprives it of various advocacy opportunities that are available only to registered university organizations, such as the art demonstration outside the WPU that SJP-Pitt was already forced to cancel. *See* Verified Compl. ¶¶ 135-36. Pitt's vague threat of additional disciplinary action over even off-campus activities chills SJP-Pitt's advocacy, especially on social media and in the press, as they have no idea if and when any criticism of Pitt will elicit additional repercussions. *Id.* at ¶ 139. And, generally speaking, most of SJP-Pitt's public advocacy is time sensitive, *i.e.*, it is responsive to Israel's ongoing military assault against Palestinians in Gaza, actions by the U.S. government viewed as damaging to Palestinians, and Pitt's repression of SJP-Pitt and other pro-Palestinian voices.

### III.   Pitt Will Suffer No Irreparable Harm If This Preliminary Injunctive Relief Issues.

The potential harm to Pitt is significantly less than the harm from Pitt's violation of SJP-Pitt's First Amendment rights. Granting SJP-Pitt's preliminary request for reinstatement as a registered student organization will not materially harm Pitt. Providing financial support and access to University facilities does not imply Pitt endorsement.[11] Moreover, Pitt waited six

---

[11] *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834-35, 841-42 (1995) (finding that lending the same amount of funding and the same access to university facilities to

weeks before imposing any discipline in response to SJP-Pitt's Open Letter, undermining any claim to harm. Verified Compl. ¶ 111. Enjoining Pitt from threatening or initiating further application of the Student Code of Conduct to SJP-Pitt in a discriminatory manner simply requires Pitt to uphold its constitutional obligation to regulate speech in a viewpoint-neutral manner. And enjoining Pitt from threatening additional discipline for activities that students enjoy under the First Amendment, regardless of the benefits conferred by club registration, simply honors Pitt's existing constitutional duties.  The government "suffers no legitimate harm from not enforcing an unconstitutional policy." *Amalgamated Transit Union Loc. 85*, 39 F.4th at 109. Accommodating free expression—even controversial, unpopular, or downright offensive expression—does not constitute irreparable harm. Accordingly, the balance of hardships favors granting preliminary injunctive relief.

**IV.    Granting Preliminary Injunctive Relief Will Serve the Public Interest.**

The public interest strongly favors upholding SJP-Pitt's right to express solidarity with the Palestinian people, educate fellow students on issues of cultural and political importance, and share their perspective as the leading organization on campus that advocates for Palestine and Palestinians right to self-determination. *See Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 883-84 (3d Cir. 1997) ("In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights . . . .").  Protecting constitutional rights is always in the public interest. *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012); *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586-87 (M.D. Pa. 2007). Moreover, "the public interest does not suffer by enforcing the First Amendment's protection against restrictions on

---

any particular club does not suggest that the university in question adopts, endorses, condones, or in any other way supports the speech or actions of the registered student organization receiving such benefits).

speech." *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir. 2020). "There is a strong public interest in upholding the requirements of the First Amendment. And, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Amalgamated Transit Union Loc. 85*, 39 F.4th at 109 (quotation marks and citations omitted).

## CONCLUSION

For the foregoing reasons, SJP-Pitt respectfully requests that this Court grant the requested preliminary injunctive relief.[12]

Dated: April 15, 2025                    Respectfully Submitted,

                    By: */s/ Witold J. Walczak*

                    Witold J. Walczak
                    PA Bar No. 62976
                    ACLU OF PENNSYLVANIA
                    P.O. Box 23058
                    Pittsburgh, PA 15222
                    P: 412-681-7864
                    F: 267-573-3054
                    vwalczak@aclupa.org

                    Solomon Furious Worlds
                    PA Bar No. 333677
                    Kirsten M. Hanlon*
                    PA Bar No. 336365
                    ACLU OF PENNSYLVANIA
                    P.O. Box 60173
                    Philadelphia, PA 19102
                    P: 215-592-1513
                    F: 267-573-3054
                    sfworlds@aclupa.org

---

[12] Because this is a non-commercial case involving purely injunctive relief, and the balance of hardships favors SJP-Pitt, the Fed. R. Civ. P. 65(c) security bond requirement should be waived. *See Elliott v. Kiesewetter*, 98 F.3d 47, 59-60 (3d Cir. 1996); *Temple Univ. v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991).

khanlon@aclupa.org

Jules Lobel, Esq.
NY Bar No. 1262732
P.O. Box 81918
Pittsburgh, PA 15217
juleslobel73@gmail.com

*\* Pro hac vice application forthcoming*

*Counsel for Plaintiff*