**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STUDENTS FOR JUSTICE IN PALESTINE AT PITT,** | |
| *Plaintiff*, | |
| **v.** | **CIVIL ACTION NO. 2:25-CV-00524** |
| **UNIVERSITY OF PITTSBURGH; JOAN GABEL, MARLIN NABORS, KARIN ASHER, DaVAUGHN VINCENT-BRYAN, MATTHEW LANDY, and JAMEY MENTZER, all in their official and individual** capacities**,** | **Judge J. Nicholas Ranjan** |
| *Defendants.* | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

Plaintiff Students for Justice in Palestine at Pitt filed suit to address violations of its First Amendment rights over actions taken by the University of Pittsburgh to punish the group for its protected political advocacy.  Since Spring 2024, University scrutiny of SJP-Pitt's events, enabled by the University's vague and overbroad policies, has resulted in censorship of SJP-Pitt's protected speech on an issue of critical importance to the group: the treatment of Palestinians in Gaza and the United States' inaction on this issue.  Compl. ¶ 1.  As on-campus advocacy regarding Israel's assault on Palestinians throughout Palestine intensified, the University's interference with and censorship of SJP-Pitt's protected political expression escalated, culminating in disciplinary proceedings against SJP-Pitt and the group's interim suspension.  Compl. ¶¶ 2-4.

The parties' efforts to engage in expedited discovery before the Court's hearing on SJP-Pitt's motion for a preliminary injunction have stalled over two issues.  First, the University disputes SJP-Pitt's claim of First Amendment privilege over certain sensitive organizational documents and communications, despite the fact that these documents are immaterial, irrelevant, and unnecessary to resolve SJP-Pitt's claims against the University.  Second, the University seeks to review emails and associated documents shielded by the attorney-client privilege and work product doctrine, even though the University law professor serving as counsel in this matter had a reasonable expectation of privacy that the University would not access these materials except in limited circumstances, none of which apply.

These privilege issues implicate significant privacy interests for both SJP-Pitt and the organization's counsel.  Accordingly, SJP-Pitt hereby moves for a protective order barring the discovery of or access to the privileged materials under Federal Rule of Civil Procedure 26(c) and this Court's inherent authority.

## BACKGROUND

In response to several of the University's discovery requests, SJP-Pitt asserted that certain responsive documents and communications were privileged under the First Amendment, withheld these materials from production, and identified them in a privilege log.  Exs. A-B. These documents include internal SJP-Pitt communications, communication with allied University students, groups, and faculty who are not members of SJP-Pitt, correspondence with allied individuals and groups not affiliated with the University, and SJP-Pitt work plans, meeting agendas, strategy documents, and notes.  The University contests SJP-Pitt's assertion of the privilege.

In responding to SJP-Pitt's requests for production, the University's production included e-mails and documents from the University email of Jules Lobel, Esq., who is a long-time, tenured University law professor and counsel to SJP-Pitt on this matter.  On May 20, 2025, University counsel reported to SJP-Pitt that they discovered emails, exchanged between Professor Lobel and SJP-Pitt and amongst SJP-Pitt's counsel, and believed they had a right to review them because they were on Professor Lobel's University email.  Ex. C.  The University segregated the communications but took the position that these communications were nonprivileged.  *Id.*  On May 22, 2025, SJP-Pitt's counsel claimed in a letter that the segregated e-mails were protected by attorney-client privilege or as attorney work-product, and also asserted privilege over several items included in the University's first production.  Ex. D.

Upon further review, there are approximately 286 emails in Professor Lobel's University email related to this matter, roughly 85% of which are privileged and fall into several categories. Ex. F, Lobel Decl. ¶¶ 17-22.  First, approximately 65% of the emails occurred between Professor Lobel and co-counsel and implicate attorney work-product, due to the contents of the emails

themselves, the attachments thereto, or both. *Id.* ¶ 18. Of these, a portion are administrative emails related to work product which may not constitute work product—i.e., setting up meetings and dividing up work—and these emails are not relevant to the matter. *Id.* Second, approximately 10% of the emails involve attorney-client privileged emails forwarded to Professor Lobel or reporting to Professor Lobel on attorney-client privileged conversations, some of which also attach protected work product. *Id.* ¶ 20. Finally, approximately 5% of the emails pertain to witness statements, constituting protected work product. *Id.* ¶ 21. The remaining 15% are not privileged as they include third parties or involve court notices or documents. *Id.* ¶ 19.

On May 22, 2025, the parties met and conferred about both issues, but were unable to resolve them. The Court held a status conference on May 27, 2025 in response to the parties' alert. SJP-Pitt now moves for a protective order barring discovery of these privileged communications and documents.

## STANDARD OF REVIEW

To protect a party or person from annoyance, embarrassment, oppression, or undue burden or expenses, a court may issue a protective order barring or limiting certain discovery under Federal Rule of Civil Procedure 26(c). Rule 26(c) "reposes broad discretion in the district court to issue a variety of orders for the protection of the parties and witnesses in the discovery process." *Rodgers v. U.S. Steel Corp.*, 536 F.2d 1001, 1006 n.12 (3d Cir. 1976). A party seeking a protective order under Rule 26 must establish "good cause" to justify the order by showing that "disclosure will work a clearly defined and serious injury to the party seeking closure," which must be shown with specificity. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994); *see also Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) (describing list of factors to consider for good cause which are neither mandatory nor

exhaustive).  The court then "must balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled" on a case-by-case basis. *Pansy*, 23 F.3d at 787, 789.

Courts may also issue protective orders as to documents obtained outside the context of formal discovery and the bounds of Rule 26 under their inherent authority to "remedy litigation practices that threaten judicial integrity."  *In re Shell Oil Refinery*, 143 F.R.D. 105, 108 (E.D. La. 1992); *see also Burt Hill, Inc. v. Hassan*, No. Civ.A. 09-1285, 2010 WL 419433, at *5 (W.D. Pa. Jan. 29, 2010) (explaining that inherent authority includes ability to exclude documents obtained outside of discovery).

## ARGUMENT

SJP-Pitt seeks a protective order barring discovery of the organization's internal communications and documents, its privileged communications with counsel, and its counsel's work product.  Because good cause exists that disclosure of the requested documents and communications will result in serious injury to SJP-Pitt and the gravity of this injury far outweighs the university's need for the information, this Court should issue a protective order barring discovery as to these materials under Rule 26(c) or its inherent authority.

### I.    A Protective Order is Justified as to SJP-Pitt's Internal Communications and Documents Because They are Privileged under the First Amendment.

SJP-Pitt can establish both the existence and applicability of a First Amendment privilege here, which also satisfies Rule 26's "good cause" standard for issuance of a protective order because disclosure of the requested discovery would infringe on its members' associational rights and privacy interests.  Disclosure of SJP-Pitt's internal communications, correspondence with allied groups and individuals both within and beyond the University, and organizational work plans, meeting agendas, operational and strategy documents, notes, or any other documents

4

or communications which would reveal members' or supporters' identities would result in a serious chilling effect on the associational rights of the organization and its membership, while serving no legitimate purpose in the litigation. Nor can the University show that the requested documents are highly relevant to overcome the privilege.[1]

### A. A Qualified Privilege Exists under the First Amendment.

In recognition of the tension that can arise between the legal process and rights protected by the First Amendment, courts recognize privileges against compelled disclosures that would infringe on First Amendment rights. This includes discovery requests that intrude upon the freedom of association. *Fraternal Ord. of Police Pa. Lodge v. Twp. Of Springfield*, 668 F. Supp. 3d 375, 386 (E.D. Pa. 2023) ("*FOP*"). In *NAACP v. Alabama*, the Supreme Court recognized that organizations engaged in advocacy may withhold information on members where disclosure would intruded on the "freedom to associate and privacy in one's association." 357 U.S. 449, 462 (1958)). The Court explained that "[i]nviolability of privacy in group association may in many circumstances be *indispensable* to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* On that basis, the Court concluded that an order compelling the NAACP to produce its membership lists in a civil suit was likely a substantial restraint on the freedom of association. *Id.* The Court then balanced this harm against the state's interest in obtaining the information, requiring the state to establish a compelling need for the documents. *Id.* at 463. Because the membership lists did not have a substantial bearing on any claim, the Court held that "immunity" from state scrutiny of the protected information was

---

[1] If this Court determines that the privilege does not apply or has been overcome, SJP-Pitt respectfully requests that this Court issue a protective order permitting designation of documents that identify members of SJP-Pitt, or other allied groups or individuals, whose associations with SJP-Pitt are unknown to the University be made available to the University's counsel only.

warranted and reversed a judgment of civil contempt for non-production.  *Id.*  *NAACP* established existence of a qualified privilege against discovery where the information sought would tread on protected associational rights.

Following *NAACP*, other courts have recognized the chilling effect on groups' abilities to engage in expressive activities that could result from compelled disclosure.  Beyond membership rolls, the privilege extends to a group's lobbying efforts and "ability to communicate among themselves," *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 489-90 (10th Cir. 2011), communications with strategic partners that could "risk[] revealing the viewpoints, political associations, and strategy of such partners," *Democratic Nat'l Comm. v. Ariz. Sec'y of State's Office*, No. CV-16-01065-PHX-DLR, 2017 WL 3149914, at *2-3 (D. Ariz. July 25, 2017), and internal communications and deliberations, *FOP*, 668 F. Supp. 3d at 388-89; *DeGregory v. Att'y Gen. of State of N.H.*, 383 U.S. 825, 827-29 (1966) (holding that the First Amendment protects an individual's  right to refuse to disclose internal deliberations of a political organization in which they participated); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1142 (9th Cir. 2009) ("Implicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private.").

While the U.S. Court of Appeals for the Third Circuit has no binding precedent applying *NAACP*, many other circuits have recognized an associational privilege under the First Amendment that shields an organization's internal documents and communications.[2]  Moreover,

---

[2] *See, e.g.*, *In re Motor Fuel*, 641 F.3d at 488; *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139 (9th Cir. 2009); *Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989); *United States v. Citizens State Bank*, 612 F.2d 1091, 1094 (8th Cir. 1980); *Int'l Union, UAW v. Nat'l Right to Work Legal Defense & Ed. Found.*, 590 F.2d 1139, 1152 (D.C. Cir. 1978); *Familias Unidas v. Briscoe*, 544 F.2d 182, 192 (5th Cir. 1976).

the Third Circuit has recognized other qualified privileges related to the First Amendment, so

there is no principled reason to treat the freedom of association differently.  For instance, as in

*NAACP*, the Third Circuit has employed a burden-shifting approach to protect journalists'

confidential sources and unpublished materials by balancing "on one hand the policies which

give rise to the privilege . . . against the need for the evidence sought."  *Riley v. City of Chester*,

612 F.2d 708, 715-16 (3d Cir. 1979); *see also United States v. Cuthbertson*, 630 F.2d 139, 147

(3d Cir. 1980) ("*Cuthbertson I*") (recognizing privilege over journalists' unpublished materials).

District courts in this Circuit have recognized the existence of a First Amendment privilege

where discovery infringes a group's associational rights, relying on *NAACP*, and also applying a

burden-shifting framework.  *See FOP*, 668 F. Supp. 3d at 385-86; *see also Knaupf v. Unite Here

Loc. 100*, No. 14-6915, 2015 WL 7451190, at *5 (D.N.J. Nov. 23, 2015); *Killion v. Franklin

Reg'l Sch. Dist.*, No. 99-CV-731, 2001 WL 1561837, at *1 (W.D. Pa. Apr. 11, 2001).

SJP-Pitt's assertion of a privilege grounded in a First Amendment right to associational

freedom is well-founded.

### B.  The Requested Discovery is Privileged under the First Amendment.

SJP-Pitt may invoke privilege over materials sought in discovery by establishing that

their compelled disclosure would intrude on rights protected by the First Amendment and harm

SJP-Pitt.  The privilege applies here because the disputed discovery encroaches on SJP-Pitt's

associational rights and Defendants cannot show sufficient need for the materials to overcome it.

SJP-Pitt can establish that the constitutional privilege applies to the disputed discovery

under the applicable burden-shifting framework.  This Court should follow the Eastern District's

analysis in *FOP*, which aligns with the burden-shifting framework employed by the Supreme

Court in *NAACP* and the Third Circuit in *Riley*.  *Riley*, 612 F.2d at 716 (after party invokes a

privilege "grounded in constitutional policy," the burden shifts to the party seeking disclosure to

7

establish a "demonstrated, specific need for evidence" to overcome the privilege) (quoting in part *United States v. Nixon*, 418 U.S. 683, 713 (1974)). In *FOP*, the court required the party claiming the privilege to first demonstrate that enforcement of the discovery requests would result in "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." 668 F. Supp. 3d at 386 (quoting *Perry*, 591 F.3d at 1140). The burden then shifted to the party requesting discovery to show it "has a sufficiently compelling need for the information that outweighs the other party's interest in keeping it private." *Id.* (quoting *In re Motor Fuel*, 641 F.3d at 492 n.15). For a request to be "related to a compelling governmental interest," the party seeking the discovery must show that the information sought is "*highly relevant* to the claims or defenses in the litigation," which is "a more demanding standard of relevance" than under Federal Rule of Civil Procedure 26(b)(1). *Id.* at 386-87 (quoting *Perry*, 591 F.3d at 1141) (emphasis in original).

Enforcement of the discovery requests would result in the requisite harm to SJP-Pitt and its membership's associational interests. To meet this burden, a party "does not need to prove to a certainty" that the disclosure would result in chilling, but that there is an objectively reasonable probability of that effect. *Pulte Home Corp. v. Montgomery Cnty., Md.*, No. GJH-14-3955, 2017 WL 1104670, at *4 (D. Md. Mar. 24, 2017); *cf. Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021) ("Exacting scrutiny is triggered by 'state action which *may* have the effect of curtailing the freedom to associate,' and by the '*possible* deterrent effect' of disclosure.") (quoting *NAACP*, 357 U.S. at 460-61) (emphasis in original)).

Compelled disclosure of SJP-Pitt's protected communications and internal strategic documents would create a serious likelihood of chilling the associational rights of both SJP-Pitt

and its membership.  The group's internal communications include information on advocacy activity, like event planning, speech writing, and operational logistics, and the group's unfiltered opinions on upcoming events and University dynamics, which were shared with an expectation that the discussions and deliberations would remain private.  Ex. E ¶¶ 7-10.  If the group knew communications could be disclosed, participants would be less likely to speak freely and critically.  *Id.* ¶ 15.  These communications also involve officers of SJP-Pitt who have not publicly affiliated themselves with the group, and members who do not wish to be identified to the University or public because of antipathy and hostility toward individuals who support Palestine or criticize Israel.  *Id.* ¶¶ 14-20.  Unnecessarily exposing the identities and communications of SJP-Pitt's members would likely have a negative impact on member recruitment.  *Id.* ¶ 21.

SJP-Pitt also fears other harms from disclosure that would chill its protected advocacy activities.  SJP-Pitt has already been subjected to public threats of violence, and has serious concerns that disclosure of these documents will lead to additional threats.  *Id.* ¶¶ 25-27.  SJP-Pitt also is concerned about the doxing of its members, which can impose them to real harms, which could discourage others from joining SJP-Pitt.  *Id.*  Moreover, SJP-Pitt fears disclosure could trigger further surveillance by the University, trigger additional disciplinary action and harassment against the organization and its members, or result in further disclosure of this information to actors who are intent on penalizing pro-Palestinian advocates.  *Id.* ¶¶ 22-24, 28-33.  These concerns are magnified by the federal government's targeting of non-U.S.-citizen pro-Palestine students, including for student visa consequences.  *Id.* ¶¶ 36-37.  Disclosure of the privileged communications also would expose the identities of students, student groups, and faculty unaffiliated with SJP-Pitt but who support, collaborate with, or are sympathetic to the

organization. *Id.* ¶ 35.

All of these harms could chill member participation and recruitment, diminish effective advocacy, and limit SJP-Pitt's ability to associate with other allied individuals and groups. Similar harms have been considered sufficient to invoke the First Amendment privilege. *Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960) (past harassment and threats, as well as fear of community hostility resulting from affiliation, could cause withdrawal of current members and dissuade potential members); *AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 177 (D.C. Cir. 2003) (characterizing "evidence presented in cases involving groups whose members had been subjected to violence, economic reprisals, and police or private harassment" as "compelling" factor in favor of privilege); *FOP*, 668 F. Supp. 3d at 387 (where members would be "less willing to engage in communications' in the future for fear their 'private thoughts'" on effective advocacy "may be disclosed," party had established that a chilling effect) (quoting declarations); *Pulte*, 2017 WL 1104670, at *8 (recognizing privilege on basis that associational rights are chilled where "a person who belongs to a group that is required to disclose its internal communications in civil litigation may decide that the invasiveness of the disclosure outweighs the benefit of belonging to or participating in the group"). The identified harms—fear of retaliation, threats of physical violence, and harassment from the University, Pitt community members, private actors, and government officials, as well as a chilling effect on membership and participation—justify SJP-Pitt's invocation of the First Amendment privilege.

Furthermore, SJP-Pitt's decision to file suit to vindicate its First Amendment speech rights does not negate its ability to assert the privilege. Other courts have recognized that the mere action of filing suit will not waive the privilege. The Fifth Circuit expressly rejected a party's attempt to distinguish *NAACP* from circumstances where the party claiming the privilege

was also the plaintiff. *Familias Unidas v. Briscoe*, 544 F.2d 182, 192 (5th Cir. 1976). The Fifth

Circuit observed that requiring a party to "forfeit that which they seek to protect . . . would be an

abdication by the federal court of not only its federal stature, but its judicial robes as well." *Id.*

A district court has similarly rejected the invitation to conclude the privilege was waived where a

plaintiff was attempting to use the First Amendment "as both a sword and a shield" in a case

where a plaintiff-organization had brought a disparate impact claim and the defense sought

access to the organization's internal studies, analyses, and data on minority voters. *Democratic*

*Nat'l Comm. v. Ariz. Sec'y of State's Office*, No. CV-16-01065-PHX-DLR, 2017 WL 3149914,

at *4 (D. Ariz. July 25, 2017). In doing so, the court noted that requiring organizations to

"forfeit their First Amendment associational rights" to challenge other legal violations would

chill the groups' litigation. *Id.*

Requiring SJP-Pitt to give up its First Amendment associational rights to vindicate its

free speech rights would disincentivize future litigants from bringing such suits, so a finding of

waiver of the privilege here is unwarranted.

### C. The University's Purported Need for the Information Does not Outweigh SJP-Pitt's Privacy Interests.

The University cannot meet its burden of establishing a substantial need for the

privileged documents in defending against SJP-Pitt's constitutional challenges because the

documents have little relevance to resolution of the core legal issues.

To balance one party's claims of First Amendment privilege against the other party's

interest in disclosure, courts assess the importance of the information sought to the legal issues at

hand and whether there are less intrusive means to obtain the information. A party seeking

disclosure must meet its burden to overcome the privilege in order for a court to even order in

camera review. *Cuthbertson I*, 630 F.2d at 148; *Doe v. Kohn Nast & Graf, P.C.*, 853 F. Supp.

11

147, 149 (E.D. Pa. 1994) (noting no in camera review unless threshold requirements satisfied by party seeking disclosure).  To overcome the privilege, a party bears the burden to establish that the "materiality, relevance and necessity" of the information sought outweighs the deterrent effect on First Amendment rights.  *Riley*, 612 F.2d at 716.

Courts assessing claims of First Amendment privilege place great importance on the relevance of the documents to the legal claims.  For instance, the Third Circuit has explained that it was "[o]f *most* significance" that "information sought to be disclosed appears to have *only marginal* relevance" when resolving a privilege claim.  *Riley*, 612 F.2d at 718 (emphasis added); *see United States v. Cuthbertson*, 651 F.2d 189, 196 (3d Cir. 1981) ("*Cuthbertson II*") (in criminal case, requiring a party to show that information sought is "crucial" to the claim). *See also Perry*, 591 F.3d at 1140-41 (discussing the factors to be balanced in analyzing a privilege claim under the First Amendment, including "the centrality of the information sought to the issues in the case" and "the existence of less intrusive means of obtaining the information"); *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 455 (D.D.C. 2002) (considering whether discovery sought went "to the heart of the lawsuit").

The University cannot overcome SJP-Pitt's invocation of the privilege because the requested documents are not relevant to any of the issues before the Court.  *FOP*, 668 F. Supp. 3d at 398 (concluding that "substantial need" had not been demonstrated for internal communications because viewpoint discrimination, overbreadth, and vagueness challenges turned on the court's interpretation of the text of the challenged resolution and challenger's views had "no bearing" on court's interpretation).  SJP-Pitt challenges the University's punishment of the organization by reliance on vague and overbroad policies, which enabled arbitrary and discriminatory enforcement.  Pl.'s Prelim. Inj. Br., ECF No. 4, at 11-12, 14-15.

Whether the relevant University policies are vague and overbroad is a legal issue, the resolution of which turns on this Court's interpretation of the policies themselves. SJP-Pitt's understanding of the policies is not relevant. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000) (considering whether a statute provided "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" but not analyzing whether or how *challengers* understood statute); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137-38 (3d Cir. 1992) (analyzing whether a "reasonable, ordinary person using his common sense and general knowledge" in assessing vagueness claim, without inquiring as to challenger's understanding). Similarly, whether the University has any authority to regulate SJP-Pitt's off-campus speech is a legal question, on which the materials sought have no bearing. Pl.'s Prelim. Inj. Br. at 25-26.

Even where SJP-Pitt's free speech claims against the University implicate issues of both fact and law, SJP-Pitt's internal communications and documents still have no relevance. SJP-Pitt argues that a stricter standard than *Tinker v. Des Moines* governs in the post-secondary context. But even under the *Tinker* standard, the University's response to the study-in violated the First Amendment unless the University had evidence at the time of the alleged violations that the students' silent, expressive conduct—signs on laptops and keffiyehs and flags draped on the students—would cause a "material and substantial" disruption. 393 U.S. 503, 509 (1969); *see also* Pl.'s Prelim. Inj. Br. at 8-10. Similarly, whether the University violated the First Amendment by placing SJP-Pitt on an interim suspension following the open letter turns on whether it had evidence that a "clear and present danger" that SJP-Pitt's letter would cause a "malfunction" in the disciplinary process. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1070-71 (1991). As to both the study-in and the open letter, the relevant information to assessing SJP-Pitt's First Amendment claims is limited to the information within the University's possession,

custody, and control when it acted—i.e., the evidence it relied on in disciplining SJP-Pitt, including the letter itself.  Pl.'s Prelim. Inj. Br. at 16; *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) ("Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented post hoc in response to litigation.'" (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996))).   Likewise, SJP-Pitt's internal communications and documents also have no bearing on whether the University engaged in viewpoint discrimination, which turns on a comparison between the University's treatment of SJP-Pitt and its treatment of similar situations involving other speakers.  Pl.'s Prelim. Inj. Br. at 23-25.  Thus, the only evidence relevant to resolving SJP-Pitt's free speech claims is the evidence that the University possessed at the time it initiated the disciplinary proceedings and imposed the interim suspension.

Even if the evidence is relevant, its value is only marginal and fails to meet the heightened standard required to overcome SJP-Pitt's First Amendment privilege against compelled disclosure.  *Riley* requires a showing of both relevance and necessity to overcome the privilege.  612 F.2d at 716; *see also FOP*, 668 F. Supp. 3d at 396 (noting there is "no reason to believe a court would need to delve into the sincerity" of speaker's message and determining party failed to show a "substantial need" to overcome associational privilege); *Altemose Const. Co. v. Bldg. & Const. Trades Council of Phila.*, 443 F. Supp 489, 492 (E.D. Pa. 1977) (concluding that discovery was not warranted where party had not shown a "particularized need" for the materials and had not demonstrated "that the information could not be secured from alternatives sources").  In establishing necessity, a party "must show that they exhausted other means of obtaining the information" and the material must "provide a source of crucial information going to the heart of the claim."  *Riley*, 612 F.2d at 717.  As discussed above, the

materials do not provide crucial information, nor is that information central to the litigation. Discovery of these materials should therefore be barred.

Because the University cannot show that the discovery sought is material, relevant, and necessary, the University cannot overcome SJP-Pitt's claim of privilege and good cause has been established for issuance of a protective order.

## II.    A Protective Order Barring Access to Professor Lobel's University Emails is Justified Because They are Privileged.

This Court should also issue a protective order barring access to certain of Professor Lobel's University emails.  Disclosure of these documents will violate both SJP-Pitt and counsel's privacy interests, as the vast majority of the communications and documents involve privileged attorney-client communications or protected work product and these privileges have <u>not</u> been waived.  Issuing a protective order barring review of these documents promotes fair litigation practices and the integrity of the judicial process.

### A.  The Communications and Documents at Issue are Privileged.

SJP-Pitt seeks a protective order as to Professor Lobel's University emails involving communications with SJP-Pitt, or between counsel on this matter, as both categories of documents are privileged.  Whether documents are subject to privilege is committed to the court's discretion.  *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 477 n.16 (3d Cir. 1998).

### 1.  Emails Containing SJP-Pitt Communications

Approximately 10% of the communications at issue are shielded by attorney-client privilege and this privilege should be preserved by issuance of a protective order.  Attorney-client privilege protects confidential communications between clients and their attorneys.  The privilege attaches to communications which satisfy the following elements: It applies only to (1) communications (2) made between privileged persons (i.e., clients, attorney(s), and agents) (3) in

15

confidence (4) for the purpose of obtaining or providing legal assistance for the client. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007). Here, the emails contain communications between SJP-Pitt and counsel from the ACLU of Pennsylvania, which were made in confidence for the purpose of obtaining or providing legal assistance in this matter. These communications are therefore protected by attorney-client privilege.

### 2. Communications and Documents Exchanged Between Counsel

The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects work product prepared in anticipation of litigation. Materials are subject to work product protection where they are prepared in anticipation of litigation and by or for the attorney of the party claiming the privilege. *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir. 2003). The work product protection can be overcome if another party shows a substantial need of the materials and cannot obtain a substantial equivalent without undue hardship. Fed. R. Civ. P. 26(b)(3). Even where the protection is overcome, a court still must protect against "disclosure of the mental impressions, conclusions, opinions, or legal theories" of an attorney concerning the litigation, also referred to as "core" or "opinion" work product which enjoys near absolute protection. *In re Cendant*, 343 F.3d at 663. This protection promotes the adversary system "by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Westinghouse Elec. Corp. v. Republic of Phil*, 951 F.2d 1414, 1428 (3d Cir. 1991).

Here, it is indisputable that the communications and documents exchanged exclusively between counsel—excepting the administrative emails which are irrelevant—constitute protected work product as they are materials prepared by counsel in anticipation of litigation and contain counsels' mental impressions, opinions, theories, and strategies.

### B.  Professor Lobel's Use of his University Email Did Not Constitute a Disclosure, Inadvertent or Otherwise, That Waives the Privileges.

As to both the attorney-client privilege and work product doctrine, the real subject of this discovery dispute is not the applicability of the privilege but whether it has been waived.  Here, the mere use of a professor's University email does not constitute a disclosure which might arguably waive the privilege; but, even if using the email system was a disclosure, it is inadvertent and does not meet the requirements for a waiver of the applicable privileges.

Attorney-client privilege is held by the client, *see Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 90 (3d Cir. 1992), and SJP-Pitt has not waived the privilege intentionally.  SJP-Pitt used its non-University email when contacting counsel and never directly emailed anything regarding the present lawsuit to Professor Lobel's University email.  *See In re Teleglobe*, 493 F.3d at 361 (disclosure by client waives privilege when client signals intent not to keep communications secret).  Therefore, there is no indication that SJP-Pitt intended to disclose their confidential communications to the University.

Nor do communications among counsel involving Professor Lobel's University email constitute a disclosure that could waive the privilege.  First, there was no affirmative action here, as in typical cases addressing inadvertent disclosure of documents, such as by delivering or turning over a document to University administrators.  As the Supreme Court suggested when analyzing the application of third-party voluntary exposure doctrine to cell-site location information, there is no "affirmative act" of disclosure on the part of an email user to some entity who might technically own the email.  *See Carpenter v. United States*, 585 U.S. 296, 315 (2018) (no voluntary disclosure of location information through mere cell phone use because that information "is not truly 'shared' as one normally understands the term").  Sending privileged communications and work product evinces only an affirmative intent by counsel to disclose

17

those materials to co-counsel, *not* to the University.

Second, Professor Lobel had a reasonable expectation of privacy that, under University policies, his emails would remain private and not be reviewed and disclosed by administrators. University Policy AO 10, titled "Access to and Use of University Computing Resources," informs users that "[i]n the normal course of events, Data transferred across PittNet and stored on University Computing Resources is not subject to surveillance." Ex. 3 to Lobel Decl. The policy continues that the University "may need to or be legally required to access information stored on those resources," meaning that Professor Lobel has a reasonable expectation of privacy that his emails would not be surveilled or accessed unless the University "need[ed] to" or is "legally required" to do so. *Id.* The policy outlines "certain limited circumstances" where the University or others could access Professor Lobel's data, none of which apply. *Id.* The University was not assessing his compliance with University policies when it accessed the materials, nor was it responding to a subpoena, court order, or search warrant: it was responding to a discovery request by a party with access to said emails. The University was not engaging in technical or security maintenance and troubleshooting. Nor has Professor Lobel separated from the University, died, become incapacitated, become involved in an intellectual property dispute or a research integrity assessment.

Likewise, the "Computer Resources – Access and Use" policy in the Faculty Handbook contains no other notice as to how or when the University will access or monitor faculty emails. Ex. 2 to Lobel Decl. While use of a monitored email system or one where a university maintains sweeping rights to access communications could negate an expectation of privacy and weigh in favor of waiver, such circumstances are not present here. *Compare Eastman v. Thompson*, 594 F. Supp. 3d 1156, 1179-80 (C.D. Cal. 2022) (no waiver where policy created reasonable

expectation of privacy), *with Doe 1 v. George Wash. Univ.*, 480 F. Supp. 3d 224, 225-29 (D.D.C. 2020) (no expectation of privacy where policy specifically cautioned student had "no right of personal privacy" in system emails). Thus, Professor Lobel had a reasonable expectation of privacy under the University's policies, supporting a conclusion that, when he used his email, those emails would not be disclosed to University administrators.

Third, Professor Lobel's expectation of privacy in his use of the University email system is consistent with the practices of other law school faculty, including within Pitt Law School, supporting the conclusion that this use was not a disclosure to the University. Professor Lobel has used this email for 40 years in litigation to communicate with clients and co-counsel, without any objection or University assertion of a right to monitor or access his emails. Lobel Decl. ¶ 7. This use is consistent with the Law School's Faculty Handbook, which expressly authorizes use of School of Law resources to aid external service activity, even where litigation will entail "non-trivial" amounts of Law School support, without prior approval by the Dean. *Id.* ¶ 10; Ex. 4 to Lobel Decl. That law professors who run legal clinics at Pitt Law School also use their University emails to communicate with clients and others, with the expectation that such communications are confidential, is further evidence of the reasonableness of Professor Lobel's expectation of privacy. *Id.* ¶ 13. Moreover, Professor Lobel's use is consistent with professional norms, since prominent law professors from other law schools also use their university emails in such litigation, again strongly indicating this his use does not constitute a disclosure of the information contained therein.

Finally, strong public policy reasons support Plaintiff's position that Professor Lobel's use of his University email in this litigation does not constitute a disclosure. A federal court confronting a similar privilege question noted that "[l]aw professors across the country use their

19

university email accounts to communicate with clients, and reasonably expect privacy for those emails as part of their jobs," and held that a law professor's use of his university email in representing a client did not destroy attorney-client privilege. *Eastman*, 594 F. Supp. 3d at 1180. As in the *Eastman* case, a ruling here that Professor Lobel's emails with clients and co-counsel were "disclosed," thereby waiving the attorney-client and work-product privileges would have broader implications for law professors' legal practice nationwide. Such a conclusion would dramatically affect the University's own legal clinics, as professors and students involved in those various legal clinics use their Pitt emails in their communications with clients and other attorneys, as discussed above. A conclusion that there was no expectation of privacy in these communications, thereby waiving attorney-client and work product privileges, would dramatically threaten the clinics' current practice.

Accordingly, use of the University's email system does not constitute a disclosure that could waive the applicable privileges.

### C. Even if Professor Lobel's Email Use Constitutes a Disclosure, These Critical Privileges Have Not Been Waived.

Even if Professor Lobel's use of his Pitt email could be considered a disclosure of all his confidential information contained therein, it still would not constitute a waiver of the attorney-client and work product privileges under the Federal Rules and Third Circuit precedent.

To the extent that there was a disclosure here, it was certainly inadvertent. Under Third Circuit precedent, such inadvertent disclosures do not waive the applicable privileges. As to attorney-client privilege, courts consider whether an inadvertent disclosure by counsel can waive attorney-client privilege by balancing several factors: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosure, (4) any delay and measures

taken to rectify the disclosure, and (5) whether the overriding interests of justice would or would not be served by relieving the party of its errors. *See Nesselrotte v. Allegheny Energy, Inc.*, No. 06-01390, 2008 WL 11511505, at *2 (W.D. Pa. May 6, 2008). The touchstone of this inquiry is reasonableness. Gilson v. Pa. State Police, 175 F. Supp. 3d 528, 566 n.33 (W.D. Pa. 2016) (concluding that an involuntary disclosure had not waived privilege where court "does not conclude that the process used" by the lawyers "was so unreasonable that Defendants should be treated as relinquishing the protected status of the documents"). As to waiver of work product protections, disclosure alone does not necessarily waive the protection under Third Circuit precedent. If there is an inadvertent disclosure of attorney work product, courts are instructed to consider "whether the circumstances surrounding the disclosure evidenced conscious disregard of the possibility" that an adversary would obtain the protected materials to determine whether any privileges have been waived. *Westinghouse Elec. Co. v Republic of Phil.*, 951 F.2d 1414, 1431 (3d Cir. 1991). Several of the factors for assessing waiver of attorney-client privilege are also informative as to whether inadvertent disclosure waives work product protection due to the conscious disregard of possible disclosure.

First, Professor Lobel's use of his University email constituted sufficient precaution against inadvertent disclosure and does not evidence conscious disregard. As discussed above, Professor Lobel had a reasonable expectation of privacy under the terms of the University's policies, supporting a conclusion that he took reasonable precautions against inadvertent disclosure, rather than acted in conscious disregard of the possibility that an adversary would obtain the material. Use of his email was appropriately protective of the privileged information because there was no reason to believe that the University would access Professor Lobel's emails in this manner—especially since it is objectively reasonable to expect the University to follow its

21

own policies. This expectation was certainly not "so unreasonable," in light of the circumstances set forth above, to warrant a conclusion that either the attorney-client or work product privileges are waived. *Gilson*, 175 F. Supp. 3d at 566 n.33. This factor weighs in favor of non-waiver.

Second, as to the number of inadvertent disclosures, this factor weighs against a finding of inadvertent disclosure, let alone one resulting in waiver, because Professor Lobel voluntarily disclosed zero emails to the University. As previously discussed, the University accessed Professor Lobel's emails in a circumstance that was not clearly within the bounds of the University's applicable policies. Rather than the University receiving an inadvertent fax or erroneous production sent directly by Plaintiff's counsel, the University's acquisition of Professor Lobel's emails under these circumstances was more akin to rummaging around in Professor Lobel's private, digital briefcase without authorization. *See Perna v. Elec. Data Sys. Corp.*, 916 F. Supp. 388, 403 (D.N.J. 1995). Thus, it is questionable whether any inadvertent disclosures occurred. *Cf. Maldonado v. N.J. ex rel. Admin. Off. of Cts.-Prob. Div.*, 225 F.R.D. 120, 129 (D.N.J. 2004) (factor supported non-waiver where disclosure "was not inadvertent, but rather, unexplainable").

The remaining three factors that courts consider to determine whether an inadvertent disclosure waives privilege all weigh in favor of a non-waiver here. The extent of the disclosures here is significant: the attorney work product implicated provides a "blue-print" to the "thought processes and trial strategy" of counsel, *Maldonado*, 225 F.R.D. at 130, while the attorney-client communications also identify strategy between counsel and SJP-Pitt, *Sampson Fire Sales, Inc. v. Oaks*, 201 F.R.D. 351, 361 (M.D. Pa. 2001). SJP-Pitt took appropriate steps to rectify the disclosure once it became aware that University had accessed the protected materials: SJP-Pitt promptly claimed the materials as privileged and now moves for this protective order.

*Oaks*, 201 F.R.D. at 361 (non-waiver where counsel quickly and diligently attempted to rectify the issue, including with the court). Finally, the overriding interests of justice will favor a finding of non-waiver where a party takes reasonable precautions, *Maldonado*, 225 F.R.D. at 130, makes innocent mistakes, *Nesselrotte*, 2008 WL 11511505 at *4, or is unaware "they have sent the privileged communication *to* an adversary or *someone who would not be entitled to review it*," *Oaks*, 201 F.R.D. at 361 (emphasis added). Given Professor Lobel's objectively and subjectively reasonable expectation of privacy in his email, this factor also favors non-waiver.

Thus, neither the attorney-client privilege nor the work product protection have been waived as to materials on Professor Lobel's University email, and issuance of a protective order is warranted. *Cf. Oaks*, 201 F.R.D. at 362 (noting that it was "understandable how the defendants' lawyer could legitimately feel that the plaintiffs' attorney had waived" privileges via "negligent transmission" but ordering return and destruction of all privileged documents).

### D.  This Court May Issue a Protective Order Prohibiting Review of These Materials Pursuant to its Inherent Authority.

This case does not fall neatly within the bounds of Rule 26, as it does not concern an inadvertent production of emails in discovery from one party to another. Per the University's representation, it encountered these documents in the process of responding to Plaintiff's discovery requests, Ex. C, making entry of a protective order appropriate under Rule 26 because these materials are part of the formal discovery process. But to the extent these materials may fall outside of Rule 26, this Court also may issue a protective order under its inherent authority.

This Court possesses an inherent authority to issue orders to "remedy litigation practices that threaten judicial integrity." *In re Shell Oil Refinery*, 143 F.R.D. 105, 108 (E.D. La. 1992); *cf. Burt Hill*, 2010 WL 419433, at *5 (collecting cases). This includes ordering exclusion of documents that are obtained outside the context of formal discovery and the bounds of Rule 26.

*Id.*; *see also Lahr v. Fulbright & Jaworski, L.L.P.*, No. 3:94-CV-0981-D, 1996 WL 34393321, at

*3 (N.D. Tex. July 10, 1996)) (observing that court's inherent powers to remedy unfair litigation

practice and preserve judicial integrity are "broader in scope" than Rule 26); *SEC v. Brady*, 238

F.R.D. 429, 445 (N.D. Tex. 2006) (excluding proprietary documents obtained outside of

discovery under inherent authority).

      The circumstances surrounding the collection of Professor Lobel's emails raise

significant questions beyond whether his expectation of privacy was violated. During the

parties' meet and confer on May 22, 2025, counsel for the University asserted that the emails

already produced, some of which are privileged, did not come from Professor Lobel's email

account but from a search of a different custodian. Yet several items in the University's

production contradict this assertion. Lobel Decl. ¶¶ 24-33.[3] First, the production contained two

emails—UPITT_0004056 and UPITT_0004057—which concern a completely unrelated matter

where he is serving as counsel in a case now before the U.S. Supreme Court. These emails are

clearly nonresponsive to SJP-Pitt's discovery requests *and* should have been recognized as

privileged. Second, the University produced an email, UPITT_0002036, between Professor

Lobel and an individual not using a University email. While responsive, the only explanation for

this email was a review of materials where Professor Lobel was the custodian. Finally, the

production contained several emails involving only @aclupa.org participants and an associated

draft litigation document which also should have been recognized as privileged—

UPITT_0004059-66, UPITT_002074, UPITT_0002112-16—and *again* could have only come

from actual review of materials where Professor Lobel was the custodian. The production of

---

[3] SJP-Pitt is able to submit the items described here and in Professor Lobel's declaration directly
to the Court for in-camera review if necessary.

these documents undermines the assertion that only documents from custodians other than Professor Lobel were produced and casts a specter on whether the University's review already proceeded too far. *Burt Hill*, 2010 WL 419433, at *4 ("Turning to substantive law, there exists ample authority recognizing that, in reviewing Plaintiff's privileged and confidential documents, Defense counsel proceeded at their and their clients' peril."); *cf. Herman Goldner Co. v. Cimco Lewis Indus.*, No. 3501-2001, 2002 WL 1880733, at *1 (Pa. Comm. Pl. Jul. 19, 2002) ("[A]n attorney receiving confidential documents has ethical obligations that may surpass the limitations implicated by the attorney-client privilege and that apply regardless of whether the documents in question retain their privileged status.").

Issuance of a protective order pursuant to the Court's inherent authority is justified here to remedy unfair litigation practice and preserve judicial integrity, as the materials at issue are private materials accessed in an unauthorized manner, in violation of the reasonable privacy interests of SJP-Pitt and its counsel, and permitting the University any further access would place SJP-Pitt at an intolerable disadvantage. The rules of professional responsibility "do not exhaust the moral and ethical considerations" that should inform practitioners' conduct. *Burt Hill*, 2010 WL 419433, at *4. A protective order barring further review of Professor Lobel's emails is warranted because it advances the purposes underlying the applicable privileges and promotes fair litigation practice and judicial integrity.

## <u>CONCLUSION</u>

SJP-Pitt respectfully requests that this Court issue a protective order barring discovery of materials protected by First Amendment privilege and enjoining further review of Professor Lobel's emails under Rule 26(c) and this Court's inherent authority.

Dated: May 30, 2025                  Respectfully Submitted,

By:    */s/ Witold J. Walczak*
Witold J. Walczak
PA Bar No. 62976
Ali Szemanski
PA Bar No. 327769
ACLU OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
P: 412-681-7864
F: 267-573-3054
vwalczak@aclupa.org
aszemanski@aclupa.org

Solomon Furious Worlds
PA Bar No. 333677
Kirsten M. Hanlon*
PA Bar No. 336365
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
P: 215-592-1513
F: 267-573-3054
sfworlds@aclupa.org
khanlon@aclupa.org

Jules Lobel, Esq.
NY Bar No. 1262732
P.O. Box 81918
Pittsburgh, PA 15217
P: 412-334-1379
juleslobel73@gmail.com

*Pro hac vice*

*Counsel for Plaintiff*

26