# EXHIBIT 1

1

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA


    STUDENTS FOR JUSTICE IN
    PALESTINE AT PITT,
                   Plaintiff
       vs.                          Civil Action No. 25-524

    UNIVERSITY OF PITTSBURGH,
    et al.,
                   Defendants.

                           - - -


       Transcript of Video Status Conference on May 27, 2025, in
    the United States District Court, 700 Grant Street,
    Pittsburgh, PA 15219, before Honorable J. Nicholas Ranjan,
    United States District Judge.


    APPEARANCES:

       For the Plaintiff:      Witold J. Walczak, Esq.
                               Kirsten Marie Hanlon, Esq.
                               Ali N. Szemanski, Esq.
                               Solomon Furious Worlds, Esq.
                               Jules Lobel, Esq.


       For the Defendants:     Alexander Robert Bilus, Esq.
                               Joshua W.B. Richards, Esq.
                               Peter Nanov, Esq.

       Court Reporter:         Veronica R. Trettel, RMR, CRR
                               U.S. Courthouse
                               700 Grant Street
                               Suite 6260
                               Pittsburgh, Pennsylvania 15219




       Proceedings recorded by mechanical stenography;
25  transcript produced by computer-aided transcription.
```

P-R-O-C-E-E-D-I-N-G-S

Tuesday Afternoon, May 27, 2025

THE DEPUTY CLERK:  Good afternoon.  The United States District Court for the Western District of Pennsylvania is now in session.  The Honorable J. Nicholas Ranjan presiding.

The matter now before the Court is Students for Justice in Palestine at Pitt versus University of Pittsburgh, et al., case number 25cv524.

THE COURT:  All right.  Good afternoon, everyone.  We are here for a status conference in this case.  Why don't we start by having counsel enter their appearances.  We'll begin with counsel for the plaintiff.

MR. WALCZAK:  Good afternoon, Judge.  Vic Walczak, ACLU Pennsylvania on behalf of plaintiffs and I'll pass it over to Mr. Lobel.

THE COURT:  I think you are muted.

MR. LOBEL:  Jules Lobel, counsel for the plaintiffs.  Counsel for ACLU also.

THE COURT:  All right.  Great.  Good afternoon.

MR. WORLDS:  Good afternoon, Your Honor.  This is Solomon Furious Worlds, ACLU staff attorney, counsel for plaintiffs, and I'll pass it to Ali.

MS. SZEMANSKI:  Good afternoon, Your Honor.  Ali Szemanski, ACLU of Pennsylvania on behalf of plaintiff.

THE COURT:  All right.  Great.

1          MS. HANLON:  Kristen Hanlon, legal fellow at the ACLU

2    of Pennsylvania on behalf of plaintiff, and we have our legal

3    intern Aarti on screen with us as well.

4          THE COURT:  Okay.  All right.  Very good.  Welcome,

5    everyone.  From the defense side?

6          MR. BILUS:  Good afternoon, Your Honor.  This is

7    Sandy Bilus from Saul Ewing.  I'm joined by my colleagues Josh

8    Richards and Pete Nanov.

9          THE COURT:  All right.  Good afternoon to you.

10         So the purpose of this status conference is last week

11   I was alerted to several discovery disputes between the

12   parties.  Also some, I suppose, scheduling issues or

13   scheduling disputes that might bear or have some relation to

14   the discovery disputes as well.

15         When I received the email from counsel, I had my

16   courtroom deputy schedule this conference, and I believe he

17   communicated a message that my sense was that I -- and I think

18   we're probably going to have to push off the June 17th hearing

19   in light of the discovery disputes that were brought to my

20   attention.  It's not a final decision on that, but it seemed

21   like in light of those disputes, the depositions scheduled for

22   this week probably weren't going to happen, which would have a

23   ripple effect on the schedule.

24         So part of today's conference -- I certainly want to

25   hear from the parties as to any important information that

1    anyone wishes to share, but I think really I would like to

2    talk maybe about scheduling out, how to resolve the pending

3    disputes, and also what the date for the preliminary

4    injunction hearing, what makes sense in terms of how a date

5    for rescheduling that or if the parties believe that we can

6    keep the June 17th hearing date intact.

7          So maybe we'll start with the plaintiff.

8    Mr. Walczak, any thoughts as to any of the issues raised and

9    also scheduling ideas or proposals?

10         MR. WALCZAK:  Yes.  Thank you, Your Honor.  We think

11    the arguments raised by defendants on Mr. Label's email, and

12    on them even questioning the existence of a first amendment

13    privilege are pretty weak, but they have raised them

14    nonetheless and they need to be addressed, and, you know,

15    recognize that that's not going to occur immediately and

16    certainly not before Wednesday when -- well, Wednesday is now

17    tomorrow, when the depositions were supposed to take place.

18         We're still living in the world where our clients are

19    being irreparably harmed.  In affect, they have been hamstrung

20    since January.

21        I should advise Your Honor that in light of the

22    mediation following through on Wednesday, Pitt did hold a

23    second disciplinary hearing on Friday, and we expect a

24    decision within about 10 days, although my understanding is

25    that is typically how quickly they issue a decision or within

1    a couple of weeks.  The first time around where there was no

2    decision for six weeks was something unusual.

3            So we are expecting that that's going to, you know,

4    add some facts to this case, but the bottom line is we'd still

5    like to try to get this hearing in as soon as possible.

6            I mean, if there's any way that we can resolve those

7    disputes quickly, and we're certainly prepared to file motions

8    and briefs quickly for protective orders, or if there's -- if

9    the court has any availability before the 4th of July, that

10   would be great.

11           Our own internal schedules are much more complicated

12   for July, and all of that said, leaves aside an issue that was

13   raised by the defendants that plaintiffs don't see as a

14   particular issue, and that is whether or not the two

15   co-presidents for SJP from last, from the past year, one of

16   whom will continue this upcoming year, are out of the country

17   and will be until August, and whether or not they need to be

18   here for their depositions and for the court hearing, they

19   certainly can be available remotely for both of those, but,

20   you know, obviously it's up to the court how important their

21   in-person attendance at one or both of those is.  So that's I

22   think -- I don't know if Mr. Lobel has anything he wants to

23   add to that.

24           THE COURT:  Okay.  Mr. Lobel.

25           MR. LOBEL:  No, I don't have anything at this time.

1    I might want to say something about the defendant's position

2    on my emails, but that's later on.

3             THE COURT:  Okay.  Mr. Bilus, on your end?

4             MR. BILUS:  Yes, Your Honor.  I agree.  I think we

5    need briefing on the issue involving Professor Lobel's emails

6    and on the first amendment privilege that's been asserted.

7    We're happy to move that briefing along as quickly as you can

8    handle it.

9             But setting that aside, I think plaintiff's counsel

10   is correct in pointing out that we are interested in taking

11   the depositions and inhabiting the two co-presidents of the

12   plaintiff's organization appear live to testify at the

13   hearing.  We think we are entitled to cross-examine them live

14   in person.

15            And so, you know, it was their choice to bring this

16   lawsuit.  It's unfortunate that the hearing date that we all

17   picked apparently didn't work for them.  They decided to leave

18   the country, but if they are both back the beginning of

19   August, I would suggest that that's when we have the hearing

20   and move forward.

21            THE COURT:  Can I ask you all this.  Where we left it

22   last time at our last status conference, I think the thought

23   was no one was entirely sure whether or not the hearing, in

24   parentheses, would be an evidentiary hearing or a hearing, in

25   quotation marks, would be an evidentiary hearing or, rather,

1    attorney argument.

2            Is the defense's position that in the event it does

3    turn into an evidentiary hearing, you would want the

4    principals in person, is that it?

5            MR. BILUS:  Yes, Your Honor.

6            THE COURT:  Okay.  I will say this.  I have taken --

7    so with respect to depositions with people being out of the

8    country and this being on a short fuse, typically what I would

9    do in most cases where we talk about expedited discovery is to

10   just authorize Zoom or virtual depositions.

11           So to me, the deposition thing is not an issue here.

12   I would have the plaintiff's principals be available for

13   deposition remotely.

14           If it does turn out that there needs to be in-person

15   testimony at an evidentiary hearing or, rather, testimony at

16   an evidentiary hearing, my preference is for that testimony to

17   be live as opposed to being remote.  I think it's more

18   beneficial for me to have the individual witnesses there, and

19   I don't want there to be any technical issues as well.

20           But what, I'm sort of thinking out loud, one thought

21   would be we schedule -- we reschedule the hearing for maybe an

22   earlier date than August, with the understanding that there

23   might not be a need for those individuals to testify if we get

24   to the hearing, and then there is a need for those individuals

25   to testify, maybe we schedule another date for that testimony

1    to come in when those individuals are back in the country.  We

2    would delay things a little bit, but it would also not mean

3    that I would have to push off the entire thing until August,

4    and it turns out that we get to the hearing and it is just

5    purely legal argument.

6            Let me pause there as to that as an option.  Any

7    reactions to that?  And I would say this.  One of the reasons

8    I raise that is my August is a mess.  We're not -- if I'm

9    looking at a hearing in August, it would be August 25th week.

10   So we're talking about late August, and I could do dates in

11   July.  I can move things around to do some dates in July.  I

12   have a trial, a criminal trial, that if it ends up cancelling,

13   that would open also the June 30th week, but August -- if

14   we're looking at August, it's going to be later in August,

15   which I prefer not to wait that long.

16           MR. BILUS:  Your Honor -- sorry to jump in, Vic.  Do

17   you want to go first?

18           MR. WALCZAK:  I was going to say that I think it

19   makes sense, what you proposed, to have a tentative date

20   scheduled, and then if we get to that date and decide that no

21   live testimony is needed, we can go forward with it, and

22   otherwise, we can talk about finding a new date.

23           THE COURT:  Okay.  Thank you.

24           MR. WALCZAK:  So I think anything before the 4th of

25   July works.  I mean, I am actually out of the country.  So

1    that's on me, and if that's the only time the court can do it,

2    we may have to work around that, but that's the biggest trip

3    my wife and I have ever planned, and I'll be out from the 7th

4    to the 23rd of July.

5              THE COURT:  It's just tough for me to schedule.  So I

6    can't do the June 23rd week at all.  The June 30th week, I

7    have a criminal trial scheduled that I can't move, but again,

8    if that individual pleads guilty, then that will open up all

9    of those days.

10             I can certainly try to -- we can try to maybe double-

11   book during that June 30th week.  How does everybody look,

12   say, July 2nd?

13             MR. BILUS:  I'm open that day.

14             MR. WALCZAK:  We would be open as well.  I just --

15   just noting that we'll need to -- that we would need to have

16   enough time to brief and for Your Honor to decide the

17   discovery disputes to then enable the depositions before that.

18             So we're probably still looking at a similarly tight

19   schedule to the one we have now, except pushing it back by one

20   or two weeks.

21             MR. LOBEL:  Let me ask is the discovery dispute as to

22   my emails critical for the depositions?

23             MR. BILUS:  So we don't know what's in your emails.

24   I don't know that we can answer that.  We have segregated

25   them, like we said, have not reviewed them.  But so I think it

1    possibly could be critical to the depositions, yes.

2            THE COURT:  I do wonder, though, Mr. Walczak makes a

3    good point.  I mean, even if say we do July 2nd, some of these

4    issues are discovery issues here that have been raised are a

5    little bit thorny in the sense I'm going to need full briefing

6    and a proper record here, and it's already May 27th.  Hold on

7    one second.  I'm just looking at the calendar.

8            If everything is fully briefed by June 10th and I can

9    get a decision out that week or the week after, then I suppose

10   there would be enough time for the depositions and the

11   prehearing briefs, that would give everybody about 10 days to

12   two weeks prior to July 2nd.  How does that schedule look for

13   everybody here?

14           MR. WALCZAK:  Your Honor, I don't know, maybe it's

15   just because we're coming out of an Alien Enemies Act

16   litigation and the election.  I mean, that -- it sounds like a

17   luxury to have until June the 10th.  We were thinking we would

18   file our motion probably by the end of the week, if not

19   sooner.

20           We have all been doing lightning-pace briefing on so

21   many cases, it's really become almost the standard.  My staff

22   is not giving me the evil eye here, but they might be.

23           THE COURT:  That's great for me.  I mean, more time

24   for me I think would be better.

25           Mr. Bilus, on your end, could you -- I'm talking

about sort of the -- I'm not sure how we tee this up, I
suppose whether it be through motions for a protective order,
motions to compel, but I would need, obviously, full briefing
by both sides and then enough time to decide the issue.

MR. BILUS:  Just to make sure I understand, Your
Honor, are we trying to get this all done in time to then take
depositions and have a hearing July 2nd?  Is that -- I thought
Vic was just saying that that seemed too tight.  No?  Maybe I
misheard.

THE COURT:  My understanding would be that be would
the goal to get everything done, and then we would proceed on
July 2nd, but also proceed as if, you know, the two principals
would not be needed, and if it turns out they are needed,
we'll have to figure out another way to kind of get their
testimony in.

MR. BILUS:  I mean, the only thing that I know is on
my schedule and on Mr. Richards' schedule is the week of June
23rd, we're both unavailable for most of that week.

But before that, unless he jumps in and says
otherwise, I think we could get the briefing done.  We just
have to make sure we fit the depositions in around those,
avoiding those dates.

THE COURT:  Okay.

MR. WALCZAK:  If we filed this Friday, so this Friday
is the 30th, and I don't know how much time the defendants

would want, they could file before the 6th, that would give

Your Honor the following week.  We could schedule those

depositions and -- I assume we could schedule -- so we could

do them the week of the 16th, if that works for defendants and

for the Court.

        MR. RICHARDS:  I'll be traveling that week, Vic, but

if we can do all of these depositions by Zoom, since we are

going to be doing yours by Zoom, then that won't be an

impediment.

        MR. WALCZAK:  I'd prefer not to be deposed, Josh, but

that's fine.

        THE COURT:  Okay.  So why don't we plan on that then.

That makes sense.  So why don't we have -- and I guess another

question would be I don't want people maybe arguing past each

other.

        How do counsel envision both -- I suppose all of

these issues kind of playing out in terms of who is moving on

what?

        MR. BILUS:  We hadn't talked about who would be the

movant.  I think Vic offered to be that and said he could get

it done by Friday.  If that works, we're happy to be the

responding.

        MR. WALCZAK:  What about if we split them?

        MR. BILUS:  Sure, whatever makes sense to the court.

        THE COURT:  Okay.  That's fine by me.  I'm just

1    trying to think on the motion -- on the associational

2    prejudice, it probably makes sense for the plaintiff to move

3    first on that just because of the burden shifting, and on the

4    privilege one, I'm not sure it really matters or the

5    attorney-client privilege, I want to make sure if it matters

6    who moves on that.  So if the defense wants to move on that.

7         Although, I suppose it would be the -- I'm trying to

8    think who bears the burden on that one also in terms of

9    invoking attorney-client privilege in this scenario.

10        MR. WALCZAK:  Plaintiffs certainly have it on the

11   first amendment privilege.  That's clear.  And we'll have to

12   submit declarations along with our briefing.

13        THE COURT:  Okay.

14        MR. WALCZAK:  Ali was doing the research on the -- do

15   you have a sense of -- do we also have the burden on that,

16   Ali?

17        MS. SZEMANSKI:  Thank you.  If you assert the

18   privilege, then you would bear the burden.  So I think it

19   would be on both.

20        THE COURT:  Okay.  It might make sense then for

21   plaintiff -- that's my sense, too, for the plaintiff to move

22   on both those.

23        Are those related to two primary motions?  I know

24   there were some other issues raised in the emails as to the

25   deficiencies of certain productions which seem -- I'm not sure

those or rather that counsel had envisioned those ripening

into formal motions.

> To me, the big ones, the big legal issues are going to be on the two privilege issues.  I suppose you all could tee up the other discovery issues while you're at it if you think you need a ruling on any of those.

> MR. BILUS:  I'll say on the defendant's production, we did not intentionally withhold any responsive non-privileged documents.

> We're going to go back to make sure we didn't miss anything, and I think there were a couple of documents that may not have come through in the production because of a technical issue.  But we're going to produce anything we have that's responsive and non-privileged.

> On the plaintiff's side, there were two issues that we saw.  One was it sounds like there have been documents that have been deleted and we don't know a lot about the circumstances there.

> And then also, the plaintiff has objected to some of our discovery on the basis that the plaintiff's knowledge is at issue -- whether or not it's relevant basically.

> I don't know, Vic, if you have -- we don't know enough about the deletion issue to really yet to deal with that I think, but I think we're going to have to deal with it soon.

1          MR. WALCZAK:  Let me take the relevance issue first.

2     So I mean, it probably makes sense for us to fold that in.

3     And there's kind of two issues there, Your Honor.

4          One is that to analyze whether or not defendants

5     violated plaintiffs' first amendment rights, it's just not

6     relevant what plaintiffs may have known.  It's really about

7     the facts that were available to Pitt in making their

8     decisions.

9          And the other issue is we've said that Pitt's

10    policies are vague, and defendants say they need to question

11    plaintiffs about their understanding of the policies to see if

12    they're vague, but our understanding is that from a first

13    amendment perspective whether or not the policies are

14    unconstitutionally vague is an objective standard not a

15    subjective standard.  So those are not relevant.

16         But all of those get mixed in with the first

17    amendment privilege because to the extent that we sustain our

18    burden on saying that there's a first amendment privilege,

19    that doesn't mean that defendants absolutely cannot access

20    those emails.  It creates a heightened relevance test.  So

21    kind of relevance, plus need there.  So I think, you know, it

22    probably makes sense for us to fold all of those relevance

23    issues into one motion.

24         And on the Signal chats, I mean, I need to check with

25    the Secretary of Defense, but I'm pretty sure that those are

gone, and we're talking about the critical time periods here

were in the fall and winter, long before the students had any

expectation that they were going to be in litigation or that

there were going to be any difficulties, and to somehow create

a system that even in situations where there's the remotest

chance of litigation, you have to set your Signal settings to

never delete would completely defeat the purpose of the Signal

chat.  And I don't know technologically whether there's a way

to retrieve deleted emails.  The last time we looked, I think

it was about a year ago, and at that point, there was not a

way to retrieve deleted Signal chats, which is why I think the

Department of Defense is probably using them now.

THE COURT:  Okay.  Well, why don't we do this.  Maybe

not to overcomplicate things, why don't the plaintiffs file a

motion and supporting brief on May 30th, so this Friday,

raising whatever issues -- I think most of them, it sounds

like, are on the plaintiffs' side at this point, and then just

make a modification -- or I don't know if the defense can

maybe file a response, say, June 4th, so it would be

Wednesday.

And then if to the extent there are any kind of

affirmative disputes that the defense wants to raise, you can

do a combined response/motion, and then I'd give both sides an

opportunity on June 6th to file any optional replies if

there's any clean-up from whatever is filed, and then I'll be

1    fully briefed June 6th.  I'll try to decide the issue

2    hopefully the next -- by the following week here.

3              That will give everybody enough time to make the

4    appropriate productions and take depositions hopefully during

5    that June 16th week, and then we can be ready to go -- I think

6    I said July 2nd.

7              If counsel is okay with this, I would prefer July

8    3rd, and that's because we might be able to get that criminal

9    trial done in three days and not totally mess up the schedule

10   if that thing goes forward.

11             Is July 3rd also acceptable to counsel here?  At a

12   minimum, maybe the jury is out by the 3rd and I'll have some

13   breathing room there.

14             MR. WALCZAK:  That works for plaintiffs.

15             THE COURT:  Okay.  Thanks.

16             For the defense, July 3rd?

17             MR. BILUS:  That works for me, Your Honor.

18             Josh?

19             MR. RICHARDS:  Yes.

20             THE COURT:  Okay.  Great.  Before we sort of log off

21   here, I was thinking about the attorney-client privilege issue

22   a little bit, and I did have a similar question to what

23   Mr. Lobel raised, just thinking about whether or not any of

24   those documents -- you know, whether or not there's a way to

25   punt that issue, I suppose, and whether I know those documents

1  are really going to be all that critical for the preliminary

2  injunction hearing, and I understand that it's tough to gauge

3  that at this point because the defense doesn't know what is in

4  those documents.

5  I mean, I don't know if there's a way in which there

6  could be some kind of 502 non-waiver agreement or some type of

7  agreement whereby there could be a review by -- you know,

8  whether it's Mr. Lobel or somebody else as to those documents

9  so that we can maybe short-circuit the attorney-client

10  privilege issue at all.

11  I'm just kind of thinking out loud, but I'm not

12  sure -- it's going to be maybe a lot of effort and work, and

13  at the end of the day, I'm not sure how much of it will matter

14  here for purposes of the preliminary injunction hearing.

15  Any thoughts or reactions to that?

16  MR. LOBEL:  Yes, Your Honor, I have a few thoughts.

17  The first is almost all of these documents are documents

18  between myself and other legal counsel on the team, and

19  they -- the problem is they involve strategy tactics.  Some of

20  them are with the clients, but they're not about facts

21  involving the study, and I had no notion that there was a

22  study going on.  I first learned about this a few months

23  later.

24  So they were -- none of the emails had anything to do

25  with the facts in dispute involving the suspension or

1    discipline of SJP.  That's the first thing.

2          The second thing is we have gotten some documents in

3    discovery, and those documents are quite peculiar.  Two of the

4    documents that we have gotten, we've only gotten a handful of

5    discovery which we asked for e-mails sent by the defendants

6    having to do with these incidents or emails that involved or

7    mentioned SJP sent by the defendants.

8          Two of the documents are emails between myself and

9    another lawyer and a legal team involving a case that's now

10   before the Supreme Court that I'm counsel on and has nothing

11   to do with Palestine, with SJP, with Pitt.  How those were

12   produced to us suggests that there's something awry with the

13   defendant's searching of emails involving me.

14         Then the third thing I would just say is that for

15   40 years that I've been at Pitt, I've done numerous public

16   interest litigation, and I've won two distinguished faculty

17   awards in my public interest litigation.  Pitt recognizes

18   this, that this is part of my professional responsibilities

19   and obligations or my duties, and I've never been questioned

20   whatsoever on emails, and the emails between me and legal

21   counsel on dozens of cases have never been the subject of

22   surveillance, to my knowledge, unless Pitt has been doing it

23   unbeknownst to me over these years.

24         So I doubt they're relevant.  I doubt that they have

25   anything to do with the facts of this case, and I think they

1    raise core client-attorney and legal team privileges that I

2    don't understand really why they're making this a major issue.

3            THE COURT:  Can I ask you, if you are comfortable

4    answering, I mean to me, is there not a conflict of interest

5    on your part?

6            I mean, I don't know if you are a full-time professor

7    at Pitt.  Can you sort of represent this group against Pitt in

8    litigation, and I'm always sort of raising it, too, because I

9    don't want there to be a motion to disqualify here that's

10   raised, and I don't know if Pitt allows its professors to

11   engage in legal assistance to its students.

12           You are in a little bit of a unique situation here,

13   at least from where I'm sitting, and I don't know if there's a

14   situation where maybe it's not an issue, there's mutual, you

15   know, waivers here, but that to me is also maybe an ancillary

16   issue here, but an important one I guess.

17           MR. LOBEL:  Thank you very much, Your Honor, for

18   raising that.  I raised the same question and I was troubled

19   by that problem.

20           So I went to two people who I thought might have some

21   answers on it.  I went to the dean of the law school, and I

22   asked him did he see a problem in this.  And I asked our

23   ethics professor.  I, by the way, am a full-time chair

24   professor.  So it's not like this is a part-time gig that I

25   have.

1          THE COURT:  Right.

2          MR. LOBEL:  So, and I think it's a significant

3    problem.  And I also raised it with the student -- you know,

4    with my co-counsel, and the ethics -- none of the people I

5    raised it with said it was an insurmountable or significant

6    problem, and that the students are aware, my clients are aware

7    that I work for Pitt.

8          Pitt does not put any restrictions -- has not put any

9    restrictions on me in terms of who I represent as a pro bono

10   matter.  I'm not using my Pitt address.  I shouldn't have used

11   my Pitt email.  But on the court records, I created another

12   email for just that purpose.

13         So I think it's fair to raise that question, but I

14   thought I answered it to my satisfaction if it went ahead, but

15   if Your Honor feels differently, I would be happy to try to

16   brief it.

17         THE COURT:  Yeah, I'm not sure it's really an issue

18   for me as opposed for you and I guess the university, and I

19   guess it becomes an issue for me if I receive a motion to

20   disqualify or something, then it becomes I think a matter for

21   me to address.

22         But if it's something that's lurking there, I don't

23   want a situation where I did get a motion to disqualify and it

24   would further upset the schedule here.  So I thought I would

25   mention it while we're talking about the privilege issues.

1          MR. LOBEL:  Thank you, Your Honor, for raising it.

2          THE COURT:  Okay.  The defense, any reaction to any

3   of that?  Again, I think it started with me trying to come up

4   with a way through this issue if we can avoid getting into the

5   nitty gritty, and I don't know exactly if there is a way from

6   a review perspective to look at what's important for purposes

7   of this hearing and then try to table some of the more thorny

8   issues until we really need to address them.

9          MR. BILUS:  Your Honor, I think it's a valiant

10  effort.  I don't know how we could do a review for relevance

11  to the hearing in this situation, but I mean, I think

12  Professor Lobel has addressed some of the merits of the

13  privilege argument.

14          I'm not going to respond to all of those right now.

15  I think we need briefing on it, which is what we were talking

16  about doing.  I do think it's a problem for him to use his

17  university email system -- account on the university's system

18  when representing clients against the university, and I think

19  he recognized that it was -- he just said he shouldn't have

20  used it and that he created a separate email for those

21  purposes.

22          So I do think there's an issue here.  Whether it's

23  wrapped up in a conflict of interest issue, we haven't moved

24  to disqualify him.  I don't know that we will or will not.

25  Right now we're just trying to get, you know, get the

1    documents that we think we need to defend our clients.

2         THE COURT:  Can I ask you, do you have a sense as to

3    quantity of the documents?  I mean, how many documents are we

4    talking about?

5         MR. BILUS:  I do not know, Your Honor.  I've tried to

6    avoid knowing too much about them.  I know we have them.

7         MR. WALCZAK:  There's a lot, Your Honor.  I think

8    there's -- and I don't know whether anybody on my team has

9    gone back and counted how many emails there are, but there are

10   a lot of emails in sort of mid March, after the interim

11   suspension went in, which is when our activity picked up,

12   until probably for six weeks after that, and including just

13   really in-depth discussions of strategy, tactics.  I'm sure

14   that addresses what we might perceive as vulnerability.

15        To the extent that counsel is able to access those

16   emails, it really is like, you know, somebody dropping off the

17   Eagles' playbook on Monday and the Steelers having all week to

18   check it out before playing their game on Sunday, you know,

19   and querying whether they need to, whether it's appropriate, I

20   certainly think it would give them an unfair advantage to have

21   access to those emails.

22        Jules, anything else you want to say?

23        THE COURT:  Can I ask?  So this is a little bit

24   unusual, right?  So usually when you have someone invoking the

25   privilege, they have custody and control over the documents,

right, and then they log the documents on a privilege log.  So

then it becomes a little bit easier for the other side to see

whether there's a challenge associated with that, and then it

also becomes easier for the court to decide the issue here.

There's a little bit concern, as we have been

talking, if I get these motions and briefing on this, I just

won't have enough information to really resolve -- I mean, I

could resolve it, I suppose, at the highest conceptual level

whether a -- whether these Pitt internal policies waive any

attorney-client privilege, but I'm not sure that might

necessarily resolve the dispute.

And so I'm wondering now, just thinking about it, is

there no -- would there be any objection, I suppose, to the

defense turning over that email account or that drive to the

plaintiffs and the plaintiffs creating a log, a basic

privilege log of those documents.  You know, maybe like 99

percent of them are going to be privileged.  Maybe there are

some that aren't.  Maybe there's a lot that are non-responsive

as well.  But at least then we'd have a log and we'd have an

understanding at a more granular document level as opposed to,

you know, this sort of esoteric level of whether or not

Mr. Lobel was -- how he was acting in the capacity at the

time.

Any thoughts or responses to that?

MR. BILUS:  Your Honor, we have custody and control

of these documents.  I think resolving the high-level question
of whether or not there's any privilege, whether it can be
there was a privilege at the outset and it's been waived or
whether there was no privilege at all because of the method of
communication, I think that would go a long way to resolving
the issue for the whole batch of documents.

We could then review them, just like we have the
other email accounts that we have reviewed, and produce what
is responsive to their requests and go forward.  I don't know
that it needs to be a document-by-document decision when it
is -- when the issue is does the fact that we have custody and
control of these documents mean -- means that there's no
privilege here?

And there very well could be documents which if they
were originally in their hands would not be privileged, right,
maybe an email between Professor Lobel and some third party.

But here, as long as we deal with the high-level
question, we could then see, we could review them and produce
whatever is responsive.

THE COURT:  I mean, I guess what happens if I find
that there is not a waiver of privilege here?

MR. BILUS:  Good question.  So we produce them -- we
would give them custody of the documents, and then they could
review and produce any non-privileged documents.

THE COURT:  Okay.  I just wonder then if we're at

1    step one, why don't I make that the first step I guess.  Do

2    you have an objection to just disclosing them, I suppose, in

3    the first instance because they're in your custody and

4    control?

5         MR. WALCZAK:  Wouldn't they then have to review them,

6    Your Honor?  We have -- you know, we appreciate them

7    segregating it, but it is a little more complicated.

8         But for them to even segregate -- I mean, we really

9    don't want people reviewing those, certainly if the court is

10   going to rule that they don't have a right to do so.

11        I'm pretty sure we have -- Mr. Lobel should have that

12   on his drive.  I'm pretty sure that the vast majority of those

13   emails would have cc'd the rest of the legal team or been to

14   the rest of the legal team.  So there's the attorney work

15   product.

16        I think there's only a small number of emails likely

17   that were Mr. Lobel and the clients.  Really most of this is

18   going to be work product, but I think a cataloging of our own

19   emails would disclose the emails that are at issue.

20        MR. LOBEL:  Your Honor, I think a possible

21   alternative which would serve the same purpose is I would be

22   willing to go through all of the emails about this case and do

23   a declaration, which would give you an idea of the nature of

24   these -- you know, the categories of the emails that are

25   involved.

1          THE COURT:  Okay.  I think that would be helpful.  I

2     think I do need more of an granular sense of the documents.

3     Maybe not, you know, document by document, and I'm resisting

4     the idea that the documents themselves be produced to me for

5     an in-camera review which, to begin with, if it sounds like

6     it's a voluminous number, I'm not going to have the time to do

7     it, but separately, I think if they do involve a lot of legal

8     strategy, I don't really want to see that as well.

9          So I do think it's helpful maybe as part of the

10    motion to have some kind of declaration to give a more

11    specific description, I suppose, of documents and categories

12    of documents.  At least then we'll -- I think it probably

13    would be helpful, too, for the defense, both sides have a

14    better sense as to what we're talking about and I'll have a

15    better sense before I make a decision.

16         And then I guess I'll kind of wait and see, and if I

17    do feel like I need more information of the documents, I guess

18    I'll let you all know after I get the briefing.

19         Okay.  Thank you.  I appreciate it.  All right.  Is

20    there anything else that we should talk about while I have

21    everybody on the line?  I think we're all set with respect to

22    the schedule here.  Then hopefully that will be able to

23    resolve these issues.

24         One question, I suppose.  If Pitt does reach a

25    decision on the -- with respect to the disciplinary hearing, I

1    suppose that could have a material impact here on the pending

2    motion here, I suppose, if they lift the suspension I guess.

3         MR. WALCZAK:  If they lift the suspension, then we

4    don't need the preliminary injunction.  We could probably

5    convert all this to summary judgment and really relax.

6         So I mean, but at this point, we certainly don't know

7    what the recommendation or what the result is going to be of

8    that.

9         THE COURT:  Mr. Bilus, do you have a sense as to

10   timing I guess?

11        MR. BILUS:  Not really, Your Honor.  We've talked to

12   our client about that to get a sense, and I don't think they

13   have a certain date that they knew something was going to

14   happen or be decided by.  I know that the hearing panel is

15   working on it.  That's all I know.

16        THE COURT:  Okay.  So they're not waiting on this

17   case.

18        MR. BILUS:  No, they're moving forward.

19        THE COURT:  Okay.  All right.  Thank you.  I

20   appreciate it.

21        Okay.  So with that, anything anyone wants to raise

22   here?  I'll get an order out and we can memorialize what we

23   talked about here with respect to the schedule, but anything

24   else?

25        MR. WALCZAK:  I think, Your Honor, we're going to

need just a couple of other dates.  So the statement of

undisputed facts.  I mean, we had it two weeks before the

hearing initially.  There's also -- Pitt is supposed to file

an opposition to the PI motion.

At this point we have not seen anything from the

university, and given that there's now more time, we would ask

whether Pitt could respond more than eight days before the

hearing.

And then the other date linked to the hearing is

prehearing statements which we had five days before the

hearing.  So I think except for the PI -- except for the PI

response, you know, I think given the still constricted

schedule, I think all of those are going to have to be fairly

or at least the statement of facts and undisputed facts in the

prehearing statements are going to have to be pretty close to

the hearing date.

THE COURT:  What if we had the prehearing statements

and the statement of facts due June 30th -- so that's the

Monday of the hearing week -- and then have Pitt's response to

the preliminary injunction motion be due June 20th?  Does that

work for everybody?

MR. RICHARDS:  Your Honor, I'm sorry.  I'm just

trying to think through something and I think I'm not smart

enough to figure this out here.  It's a little bit of a logic

game.

1          If we can agree on the joint statement of facts, then
2     we will know we don't need to have a hearing, right?  I mean,
3     isn't that the way that this is going to work?
4          THE COURT:  I suppose -- you mean an evidentiary
5     hearing?
6          MR. RICHARDS:  Correct.
7          THE COURT:  Yeah, I would think so.  That's a good
8     point.  So are you suggesting a --
9          MR. RICHARDS:  I'm not sure what I'm suggesting.  I
10    think that that's important, but I'm not sure why.
11         MR. WALCZAK:  So I think Mr. Richards is right, but
12    based on what Mr. Bilus said before and based on what we're
13    seeing now, I am also more skeptical that we're going to be
14    able to agree on all of the facts.
15         MR. BILUS:  I wouldn't be surprised if we have a
16    statement of undisputed facts but also some disputed facts,
17    right?
18         MR. WALCZAK:  Yes.  So I think we'll be able to
19    narrow what we have to present evidence on, but I don't think
20    we're going to be able to avoid that completely -- just a
21    sneaking suspicion.
22         THE COURT:  Okay.
23         MR. BILUS:  As far as our opposition goes, I'm not
24    sure why we would need to file it by the 20th given that we're
25    going to be doing hopefully the depositions, I'd like to be

1    able to have those done before we have to do that brief.

2            Could it not be due on -- at the same time as the

3    statement of undisputed facts?  We can then work in the

4    undisputed facts into our brief.

5            THE COURT:  Okay.  I'm fine with that.

6            Mr. Walczak, on your end?

7            MR. WALCZAK:  Just -- you know, I mean, ordinarily

8    there would be some response I think filed and giving us a bit

9    of a preview on what their defenses are going to be here.

10           So I think giving us a little bit more time than I

11   mean June 30th, that gives us like five or six days.  That's

12   even less than we were going to have now.  Right now we're

13   going to have eight days.

14           THE COURT:  How about a week prior, so June 26th, and

15   then the defense, instead of a -- if you want to do a response

16   or have a prehearing brief, I suppose, be your response, then

17   that will give everybody -- the plaintiff at least a week,

18   give me a week with everything?

19           MR. BILUS:  We can make that work.

20           THE COURT:  Okay.  So I'll modify it.  So the

21   prehearing brief, the defendants' response to the extent it's

22   already incorporated in the prehearing brief, and then the

23   statement of -- joint statement of facts all be due June 26th,

24   which would be a week prior to the July 3rd hearing.  Okay.

25           MR. RICHARDS:  Your Honor, I figured out why the

1   joint statement was bugging me.  If Mr. Walczak is right and

2   we have significant disputed facts, then we're not going to

3   have the hearing, right, that week.  We are going to be

4   pushing it out until the witnesses can attend.

5           So I think what I'm suggesting is that maybe the

6   parties will meet and confer again with respect to dates and

7   maybe that will alleviate a little bit of this compression if

8   we're not going to be going forward with the hearing on the

9   30th -- I'm sorry, the 3rd.

10          THE COURT:  Okay.  I think it's a good idea.  I mean,

11  if there's a mutual agreement based on your meet and confer

12  and what the joint -- and the joint statement of facts looks

13  like, it's going to be somewhat pointless to have the hearing

14  on July 3rd, then I agree, I think it makes sense to confer on

15  that and let everybody know and let me know, and then we can

16  look at an alternative date.

17          If it turns out that there are disputes, some

18  disputes of fact and a lot of agreement on other facts, then

19  maybe we can at that point play it by ear and see if we can

20  still proceed on July 3rd.

21          Okay.  All right.  Thank you.  Anything else from the

22  defendants?  Mr. Bilus, anything else on your end?

23          MR. BILUS:  Nothing, Your Honor.  Thank you.

24          THE COURT:  Okay.  Thank you, everyone.  I appreciate

25  it.  I will get a scheduling order out memorializing what we

1    talked about and then we'll plan on seeing everybody July 3rd,

2    unless something changes between now and then.  All right.

3    Take care.  Thank you.

4              MR. BILUS:  Thank you, Your Honor.

5              MR. WALCZAK:  Thank you, Your Honor.

6              (The hearing concluded at 2:56 p.m.)

7                     C E R T I F I C A T E

8              I, VERONICA R. TRETTEL, RMR, CRR, certify that
     the foregoing is a correct transcript from the record of
9    proceedings in the above-entitled case.

10

11    __\s\ Veronica R. Trettel_____        05/29/2025_____
     VERONICA R. TRETTEL, RMR, CRR          Date of Certification
12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25