1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


STUDENTS FOR JUSTICE IN
PALESTINE AT PITT,
   Plaintiff
 vs.        Civil Action No. 25-524

UNIVERSITY OF PITTSBURGH,
et al.,
   Defendants.

- - -


 Transcript of Video Status Conference on May 27, 2025, in the United States District Court, 700 Grant Street, Pittsburgh, PA 15219, before Honorable J. Nicholas Ranjan, United States District Judge.


APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Witold J. Walczak, Esq. |
| | Kirsten Marie Hanlon, Esq. |
| | Ali N. Szemanski, Esq. |
| | Solomon Furious Worlds, Esq. |
| | Jules Lobel, Esq. |
| For the Defendants: | Alexander Robert Bilus, Esq. |
| | Joshua W.B. Richards, Esq. |
| | Peter Nanov, Esq. |
| Court Reporter: | Veronica R. Trettel, RMR, CRR |
| | U.S. Courthouse |
| | 700 Grant Street |
| | Suite 6260 |
| | Pittsburgh, Pennsylvania 15219 |


 Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

**2**

P-R-O-C-E-E-D-I-N-G-S

Tuesday Afternoon, May 27, 2025

THE DEPUTY CLERK:  Good afternoon.  The United States District Court for the Western District of Pennsylvania is now in session.  The Honorable J. Nicholas Ranjan presiding.

The matter now before the Court is Students for Justice in Palestine at Pitt versus University of Pittsburgh, et al., case number 25cv524.

THE COURT:  All right.  Good afternoon, everyone.  We are here for a status conference in this case.  Why don't we start by having counsel enter their appearances.  We'll begin with counsel for the plaintiff.

MR. WALCZAK:  Good afternoon, Judge.  Vic Walczak, ACLU Pennsylvania on behalf of plaintiffs and I'll pass it over to Mr. Lobel.

THE COURT:  I think you are muted.

MR. LOBEL:  Jules Lobel, counsel for the plaintiffs.  Counsel for ACLU also.

THE COURT:  All right.  Great.  Good afternoon.

MR. WORLDS:  Good afternoon, Your Honor.  This is Solomon Furious Worlds, ACLU staff attorney, counsel for plaintiffs, and I'll pass it to Ali.

MS. SZEMANSKI:  Good afternoon, Your Honor.  Ali Szemanski, ACLU of Pennsylvania on behalf of plaintiff.

THE COURT:  All right.  Great.

MS. HANLON:  Kristen Hanlon, legal fellow at the ACLU of Pennsylvania on behalf of plaintiff, and we have our legal intern Aarti on screen with us as well.

THE COURT:  Okay.  All right.  Very good.  Welcome, everyone.  From the defense side?

MR. BILUS:  Good afternoon, Your Honor.  This is Sandy Bilus from Saul Ewing.  I'm joined by my colleagues Josh Richards and Pete Nanov.

THE COURT:  All right.  Good afternoon to you.

So the purpose of this status conference is last week I was alerted to several discovery disputes between the parties.  Also some, I suppose, scheduling issues or scheduling disputes that might bear or have some relation to the discovery disputes as well.

When I received the email from counsel, I had my courtroom deputy schedule this conference, and I believe he communicated a message that my sense was that I -- and I think we're probably going to have to push off the June 17th hearing in light of the discovery disputes that were brought to my attention.  It's not a final decision on that, but it seemed like in light of those disputes, the depositions scheduled for this week probably weren't going to happen, which would have a ripple effect on the schedule.

So part of today's conference -- I certainly want to hear from the parties as to any important information that

**4**

anyone wishes to share, but I think really I would like to talk maybe about scheduling out, how to resolve the pending disputes, and also what the date for the preliminary injunction hearing, what makes sense in terms of how a date for rescheduling that or if the parties believe that we can keep the June 17th hearing date intact.

So maybe we'll start with the plaintiff. Mr. Walczak, any thoughts as to any of the issues raised and also scheduling ideas or proposals?

MR. WALCZAK:  Yes.  Thank you, Your Honor.  We think the arguments raised by defendants on Mr. Label's email, and on them even questioning the existence of a first amendment privilege are pretty weak, but they have raised them nonetheless and they need to be addressed, and, you know, recognize that that's not going to occur immediately and certainly not before Wednesday when -- well, Wednesday is now tomorrow, when the depositions were supposed to take place.

We're still living in the world where our clients are being irreparably harmed.  In affect, they have been hamstrung since January.

I should advise Your Honor that in light of the mediation following through on Wednesday, Pitt did hold a second disciplinary hearing on Friday, and we expect a decision within about 10 days, although my understanding is that is typically how quickly they issue a decision or within

a couple of weeks.  The first time around where there was no decision for six weeks was something unusual.

So we are expecting that that's going to, you know, add some facts to this case, but the bottom line is we'd still like to try to get this hearing in as soon as possible.

I mean, if there's any way that we can resolve those disputes quickly, and we're certainly prepared to file motions and briefs quickly for protective orders, or if there's -- if the court has any availability before the 4th of July, that would be great.

Our own internal schedules are much more complicated for July, and all of that said, leaves aside an issue that was raised by the defendants that plaintiffs don't see as a particular issue, and that is whether or not the two co-presidents for SJP from last, from the past year, one of whom will continue this upcoming year, are out of the country and will be until August, and whether or not they need to be here for their depositions and for the court hearing, they certainly can be available remotely for both of those, but, you know, obviously it's up to the court how important their in-person attendance at one or both of those is.  So that's I think -- I don't know if Mr. Lobel has anything he wants to add to that.

THE COURT:  Okay.  Mr. Lobel.

MR. LOBEL:  No, I don't have anything at this time.

**6**

I might want to say something about the defendant's position on my emails, but that's later on.

THE COURT:  Okay.  Mr. Bilus, on your end?

MR. BILUS:  Yes, Your Honor.  I agree.  I think we need briefing on the issue involving Professor Lobel's emails and on the first amendment privilege that's been asserted. We're happy to move that briefing along as quickly as you can handle it.

But setting that aside, I think plaintiff's counsel is correct in pointing out that we are interested in taking the depositions and inhabiting the two co-presidents of the plaintiff's organization appear live to testify at the hearing.  We think we are entitled to cross-examine them live in person.

And so, you know, it was their choice to bring this lawsuit.  It's unfortunate that the hearing date that we all picked apparently didn't work for them.  They decided to leave the country, but if they are both back the beginning of August, I would suggest that that's when we have the hearing and move forward.

THE COURT:  Can I ask you all this.  Where we left it last time at our last status conference, I think the thought was no one was entirely sure whether or not the hearing, in parentheses, would be an evidentiary hearing or a hearing, in quotation marks, would be an evidentiary hearing or, rather,

**7**

attorney argument.

Is the defense's position that in the event it does turn into an evidentiary hearing, you would want the principals in person, is that it?

MR. BILUS:  Yes, Your Honor.

THE COURT:  Okay.  I will say this.  I have taken -- so with respect to depositions with people being out of the country and this being on a short fuse, typically what I would do in most cases where we talk about expedited discovery is to just authorize Zoom or virtual depositions.

So to me, the deposition thing is not an issue here. I would have the plaintiff's principals be available for deposition remotely.

If it does turn out that there needs to be in-person testimony at an evidentiary hearing or, rather, testimony at an evidentiary hearing, my preference is for that testimony to be live as opposed to being remote.  I think it's more beneficial for me to have the individual witnesses there, and I don't want there to be any technical issues as well.

But what, I'm sort of thinking out loud, one thought would be we schedule -- we reschedule the hearing for maybe an earlier date than August, with the understanding that there might not be a need for those individuals to testify if we get to the hearing, and then there is a need for those individuals to testify, maybe we schedule another date for that testimony

8

to come in when those individuals are back in the country.  We would delay things a little bit, but it would also not mean that I would have to push off the entire thing until August, and it turns out that we get to the hearing and it is just purely legal argument.

Let me pause there as to that as an option.  Any reactions to that?  And I would say this.  One of the reasons I raise that is my August is a mess.  We're not -- if I'm looking at a hearing in August, it would be August 25th week.  So we're talking about late August, and I could do dates in July.  I can move things around to do some dates in July.  I have a trial, a criminal trial, that if it ends up cancelling, that would open also the June 30th week, but August -- if we're looking at August, it's going to be later in August, which I prefer not to wait that long.

MR. BILUS:  Your Honor -- sorry to jump in, Vic.  Do you want to go first?

MR. WALCZAK:  I was going to say that I think it makes sense, what you proposed, to have a tentative date scheduled, and then if we get to that date and decide that no live testimony is needed, we can go forward with it, and otherwise, we can talk about finding a new date.

THE COURT:  Okay.  Thank you.

MR. WALCZAK:  So I think anything before the 4th of July works.  I mean, I am actually out of the country.  So

**9**

that's on me, and if that's the only time the court can do it, we may have to work around that, but that's the biggest trip my wife and I have ever planned, and I'll be out from the 7th to the 23rd of July.

THE COURT:  It's just tough for me to schedule.  So I can't do the June 23rd week at all.  The June 30th week, I have a criminal trial scheduled that I can't move, but again, if that individual pleads guilty, then that will open up all of those days.

I can certainly try to -- we can try to maybe double-book during that June 30th week.  How does everybody look, say, July 2nd?

MR. BILUS:  I'm open that day.

MR. WALCZAK:  We would be open as well.  I just -- just noting that we'll need to -- that we would need to have enough time to brief and for Your Honor to decide the discovery disputes to then enable the depositions before that.

So we're probably still looking at a similarly tight schedule to the one we have now, except pushing it back by one or two weeks.

MR. LOBEL:  Let me ask is the discovery dispute as to my emails critical for the depositions?

MR. BILUS:  So we don't know what's in your emails. I don't know that we can answer that.  We have segregated them, like we said, have not reviewed them.  But so I think it

possibly could be critical to the depositions, yes.

THE COURT:  I do wonder, though, Mr. Walczak makes a good point.  I mean, even if say we do July 2nd, some of these issues are discovery issues here that have been raised are a little bit thorny in the sense I'm going to need full briefing and a proper record here, and it's already May 27th.  Hold on one second.  I'm just looking at the calendar.

If everything is fully briefed by June 10th and I can get a decision out that week or the week after, then I suppose there would be enough time for the depositions and the prehearing briefs, that would give everybody about 10 days to two weeks prior to July 2nd.  How does that schedule look for everybody here?

MR. WALCZAK:  Your Honor, I don't know, maybe it's just because we're coming out of an Alien Enemies Act litigation and the election.  I mean, that -- it sounds like a luxury to have until June the 10th.  We were thinking we would file our motion probably by the end of the week, if not sooner.

We have all been doing lightning-pace briefing on so many cases, it's really become almost the standard.  My staff is not giving me the evil eye here, but they might be.

THE COURT:  That's great for me.  I mean, more time for me I think would be better.

Mr. Bilus, on your end, could you -- I'm talking

about sort of the -- I'm not sure how we tee this up, I suppose whether it be through motions for a protective order, motions to compel, but I would need, obviously, full briefing by both sides and then enough time to decide the issue.

MR. BILUS:  Just to make sure I understand, Your Honor, are we trying to get this all done in time to then take depositions and have a hearing July 2nd?  Is that -- I thought Vic was just saying that that seemed too tight.  No?  Maybe I misheard.

THE COURT:  My understanding would be that be would the goal to get everything done, and then we would proceed on July 2nd, but also proceed as if, you know, the two principals would not be needed, and if it turns out they are needed, we'll have to figure out another way to kind of get their testimony in.

MR. BILUS:  I mean, the only thing that I know is on my schedule and on Mr. Richards' schedule is the week of June 23rd, we're both unavailable for most of that week.

But before that, unless he jumps in and says otherwise, I think we could get the briefing done.  We just have to make sure we fit the depositions in around those, avoiding those dates.

THE COURT:  Okay.

MR. WALCZAK:  If we filed this Friday, so this Friday is the 30th, and I don't know how much time the defendants

**12**

would want, they could file before the 6th, that would give Your Honor the following week.  We could schedule those depositions and -- I assume we could schedule -- so we could do them the week of the 16th, if that works for defendants and for the Court.

MR. RICHARDS:  I'll be traveling that week, Vic, but if we can do all of these depositions by Zoom, since we are going to be doing yours by Zoom, then that won't be an impediment.

MR. WALCZAK:  I'd prefer not to be deposed, Josh, but that's fine.

THE COURT:  Okay.  So why don't we plan on that then. That makes sense.  So why don't we have -- and I guess another question would be I don't want people maybe arguing past each other.

How do counsel envision both -- I suppose all of these issues kind of playing out in terms of who is moving on what?

MR. BILUS:  We hadn't talked about who would be the movant.  I think Vic offered to be that and said he could get it done by Friday.  If that works, we're happy to be the responding.

MR. WALCZAK:  What about if we split them?

MR. BILUS:  Sure, whatever makes sense to the court.

THE COURT:  Okay.  That's fine by me.  I'm just

trying to think on the motion -- on the associational prejudice, it probably makes sense for the plaintiff to move first on that just because of the burden shifting, and on the privilege one, I'm not sure it really matters or the attorney-client privilege, I want to make sure if it matters who moves on that.  So if the defense wants to move on that.

Although, I suppose it would be the -- I'm trying to think who bears the burden on that one also in terms of invoking attorney-client privilege in this scenario.

MR. WALCZAK:  Plaintiffs certainly have it on the first amendment privilege.  That's clear.  And we'll have to submit declarations along with our briefing.

THE COURT:  Okay.

MR. WALCZAK:  Ali was doing the research on the -- do you have a sense of -- do we also have the burden on that, Ali?

MS. SZEMANSKI:  Thank you.  If you assert the privilege, then you would bear the burden.  So I think it would be on both.

THE COURT:  Okay.  It might make sense then for plaintiff -- that's my sense, too, for the plaintiff to move on both those.

Are those related to two primary motions?  I know there were some other issues raised in the emails as to the deficiencies of certain productions which seem -- I'm not sure

**14**

those or rather that counsel had envisioned those ripening into formal motions.

To me, the big ones, the big legal issues are going to be on the two privilege issues.  I suppose you all could tee up the other discovery issues while you're at it if you think you need a ruling on any of those.

MR. BILUS:  I'll say on the defendant's production, we did not intentionally withhold any responsive non-privileged documents.

We're going to go back to make sure we didn't miss anything, and I think there were a couple of documents that may not have come through in the production because of a technical issue.  But we're going to produce anything we have that's responsive and non-privileged.

On the plaintiff's side, there were two issues that we saw.  One was it sounds like there have been documents that have been deleted and we don't know a lot about the circumstances there.

And then also, the plaintiff has objected to some of our discovery on the basis that the plaintiff's knowledge is at issue -- whether or not it's relevant basically.

I don't know, Vic, if you have -- we don't know enough about the deletion issue to really yet to deal with that I think, but I think we're going to have to deal with it soon.

MR. WALCZAK:  Let me take the relevance issue first. So I mean, it probably makes sense for us to fold that in. And there's kind of two issues there, Your Honor.

One is that to analyze whether or not defendants violated plaintiffs' first amendment rights, it's just not relevant what plaintiffs may have known.  It's really about the facts that were available to Pitt in making their decisions.

And the other issue is we've said that Pitt's policies are vague, and defendants say they need to question plaintiffs about their understanding of the policies to see if they're vague, but our understanding is that from a first amendment perspective whether or not the policies are unconstitutionally vague is an objective standard not a subjective standard.  So those are not relevant.

But all of those get mixed in with the first amendment privilege because to the extent that we sustain our burden on saying that there's a first amendment privilege, that doesn't mean that defendants absolutely cannot access those emails.  It creates a heightened relevance test.  So kind of relevance, plus need there.  So I think, you know, it probably makes sense for us to fold all of those relevance issues into one motion.

And on the Signal chats, I mean, I need to check with the Secretary of Defense, but I'm pretty sure that those are

**16**

gone, and we're talking about the critical time periods here were in the fall and winter, long before the students had any expectation that they were going to be in litigation or that there were going to be any difficulties, and to somehow create a system that even in situations where there's the remotest chance of litigation, you have to set your Signal settings to never delete would completely defeat the purpose of the Signal chat.  And I don't know technologically whether there's a way to retrieve deleted emails.  The last time we looked, I think it was about a year ago, and at that point, there was not a way to retrieve deleted Signal chats, which is why I think the Department of Defense is probably using them now.

THE COURT:  Okay.  Well, why don't we do this.  Maybe not to overcomplicate things, why don't the plaintiffs file a motion and supporting brief on May 30th, so this Friday, raising whatever issues -- I think most of them, it sounds like, are on the plaintiffs' side at this point, and then just make a modification -- or I don't know if the defense can maybe file a response, say, June 4th, so it would be Wednesday.

And then if to the extent there are any kind of affirmative disputes that the defense wants to raise, you can do a combined response/motion, and then I'd give both sides an opportunity on June 6th to file any optional replies if there's any clean-up from whatever is filed, and then I'll be

fully briefed June 6th.  I'll try to decide the issue hopefully the next -- by the following week here.

That will give everybody enough time to make the appropriate productions and take depositions hopefully during that June 16th week, and then we can be ready to go -- I think I said July 2nd.

If counsel is okay with this, I would prefer July 3rd, and that's because we might be able to get that criminal trial done in three days and not totally mess up the schedule if that thing goes forward.

Is July 3rd also acceptable to counsel here?  At a minimum, maybe the jury is out by the 3rd and I'll have some breathing room there.

MR. WALCZAK:  That works for plaintiffs.

THE COURT:  Okay.  Thanks.

For the defense, July 3rd?

MR. BILUS:  That works for me, Your Honor.

Josh?

MR. RICHARDS:  Yes.

THE COURT:  Okay.  Great.  Before we sort of log off here, I was thinking about the attorney-client privilege issue a little bit, and I did have a similar question to what Mr. Lobel raised, just thinking about whether or not any of those documents -- you know, whether or not there's a way to punt that issue, I suppose, and whether I know those documents

are really going to be all that critical for the preliminary injunction hearing, and I understand that it's tough to gauge that at this point because the defense doesn't know what is in those documents.

I mean, I don't know if there's a way in which there could be some kind of 502 non-waiver agreement or some type of agreement whereby there could be a review by -- you know, whether it's Mr. Lobel or somebody else as to those documents so that we can maybe short-circuit the attorney-client privilege issue at all.

I'm just kind of thinking out loud, but I'm not sure -- it's going to be maybe a lot of effort and work, and at the end of the day, I'm not sure how much of it will matter here for purposes of the preliminary injunction hearing.

Any thoughts or reactions to that?

MR. LOBEL:  Yes, Your Honor, I have a few thoughts. The first is almost all of these documents are documents between myself and other legal counsel on the team, and they -- the problem is they involve strategy tactics.  Some of them are with the clients, but they're not about facts involving the study, and I had no notion that there was a study going on.  I first learned about this a few months later.

So they were -- none of the emails had anything to do with the facts in dispute involving the suspension or

discipline of SJP.  That's the first thing.

The second thing is we have gotten some documents in discovery, and those documents are quite peculiar.  Two of the documents that we have gotten, we've only gotten a handful of discovery which we asked for e-mails sent by the defendants having to do with these incidents or emails that involved or mentioned SJP sent by the defendants.

Two of the documents are emails between myself and another lawyer and a legal team involving a case that's now before the Supreme Court that I'm counsel on and has nothing to do with Palestine, with SJP, with Pitt.  How those were produced to us suggests that there's something awry with the defendant's searching of emails involving me.

Then the third thing I would just say is that for 40 years that I've been at Pitt, I've done numerous public interest litigation, and I've won two distinguished faculty awards in my public interest litigation.  Pitt recognizes this, that this is part of my professional responsibilities and obligations or my duties, and I've never been questioned whatsoever on emails, and the emails between me and legal counsel on dozens of cases have never been the subject of surveillance, to my knowledge, unless Pitt has been doing it unbeknownst to me over these years.

So I doubt they're relevant.  I doubt that they have anything to do with the facts of this case, and I think they

raise core client-attorney and legal team privileges that I don't understand really why they're making this a major issue.

THE COURT:  Can I ask you, if you are comfortable answering, I mean to me, is there not a conflict of interest on your part?

I mean, I don't know if you are a full-time professor at Pitt.  Can you sort of represent this group against Pitt in litigation, and I'm always sort of raising it, too, because I don't want there to be a motion to disqualify here that's raised, and I don't know if Pitt allows its professors to engage in legal assistance to its students.

You are in a little bit of a unique situation here, at least from where I'm sitting, and I don't know if there's a situation where maybe it's not an issue, there's mutual, you know, waivers here, but that to me is also maybe an ancillary issue here, but an important one I guess.

MR. LOBEL:  Thank you very much, Your Honor, for raising that.  I raised the same question and I was troubled by that problem.

So I went to two people who I thought might have some answers on it.  I went to the dean of the law school, and I asked him did he see a problem in this.  And I asked our ethics professor.  I, by the way, am a full-time chair professor.  So it's not like this is a part-time gig that I have.

21

THE COURT:  Right.

MR. LOBEL:  So, and I think it's a significant problem.  And I also raised it with the student -- you know, with my co-counsel, and the ethics -- none of the people I raised it with said it was an insurmountable or significant problem, and that the students are aware, my clients are aware that I work for Pitt.

Pitt does not put any restrictions -- has not put any restrictions on me in terms of who I represent as a pro bono matter.  I'm not using my Pitt address.  I shouldn't have used my Pitt email.  But on the court records, I created another email for just that purpose.

So I think it's fair to raise that question, but I thought I answered it to my satisfaction if it went ahead, but if Your Honor feels differently, I would be happy to try to brief it.

THE COURT:  Yeah, I'm not sure it's really an issue for me as opposed for you and I guess the university, and I guess it becomes an issue for me if I receive a motion to disqualify or something, then it becomes I think a matter for me to address.

But if it's something that's lurking there, I don't want a situation where I did get a motion to disqualify and it would further upset the schedule here.  So I thought I would mention it while we're talking about the privilege issues.

MR. LOBEL:  Thank you, Your Honor, for raising it.

THE COURT:  Okay.  The defense, any reaction to any of that?  Again, I think it started with me trying to come up with a way through this issue if we can avoid getting into the nitty gritty, and I don't know exactly if there is a way from a review perspective to look at what's important for purposes of this hearing and then try to table some of the more thorny issues until we really need to address them.

MR. BILUS:  Your Honor, I think it's a valiant effort.  I don't know how we could do a review for relevance to the hearing in this situation, but I mean, I think Professor Lobel has addressed some of the merits of the privilege argument.

I'm not going to respond to all of those right now. I think we need briefing on it, which is what we were talking about doing.  I do think it's a problem for him to use his university email system -- account on the university's system when representing clients against the university, and I think he recognized that it was -- he just said he shouldn't have used it and that he created a separate email for those purposes.

So I do think there's an issue here.  Whether it's wrapped up in a conflict of interest issue, we haven't moved to disqualify him.  I don't know that we will or will not. Right now we're just trying to get, you know, get the

documents that we think we need to defend our clients.

THE COURT:  Can I ask you, do you have a sense as to quantity of the documents?  I mean, how many documents are we talking about?

MR. BILUS:  I do not know, Your Honor.  I've tried to avoid knowing too much about them.  I know we have them.

MR. WALCZAK:  There's a lot, Your Honor.  I think there's -- and I don't know whether anybody on my team has gone back and counted how many emails there are, but there are a lot of emails in sort of mid March, after the interim suspension went in, which is when our activity picked up, until probably for six weeks after that, and including just really in-depth discussions of strategy, tactics.  I'm sure that addresses what we might perceive as vulnerability.

To the extent that counsel is able to access those emails, it really is like, you know, somebody dropping off the Eagles' playbook on Monday and the Steelers having all week to check it out before playing their game on Sunday, you know, and querying whether they need to, whether it's appropriate, I certainly think it would give them an unfair advantage to have access to those emails.

Jules, anything else you want to say?

THE COURT:  Can I ask?  So this is a little bit unusual, right?  So usually when you have someone invoking the privilege, they have custody and control over the documents,

right, and then they log the documents on a privilege log.  So then it becomes a little bit easier for the other side to see whether there's a challenge associated with that, and then it also becomes easier for the court to decide the issue here.

There's a little bit concern, as we have been talking, if I get these motions and briefing on this, I just won't have enough information to really resolve -- I mean, I could resolve it, I suppose, at the highest conceptual level whether a -- whether these Pitt internal policies waive any attorney-client privilege, but I'm not sure that might necessarily resolve the dispute.

And so I'm wondering now, just thinking about it, is there no -- would there be any objection, I suppose, to the defense turning over that email account or that drive to the plaintiffs and the plaintiffs creating a log, a basic privilege log of those documents.  You know, maybe like 99 percent of them are going to be privileged.  Maybe there are some that aren't.  Maybe there's a lot that are non-responsive as well.  But at least then we'd have a log and we'd have an understanding at a more granular document level as opposed to, you know, this sort of esoteric level of whether or not Mr. Lobel was -- how he was acting in the capacity at the time.

Any thoughts or responses to that?

MR. BILUS:  Your Honor, we have custody and control

of these documents.  I think resolving the high-level question of whether or not there's any privilege, whether it can be there was a privilege at the outset and it's been waived or whether there was no privilege at all because of the method of communication, I think that would go a long way to resolving the issue for the whole batch of documents.

We could then review them, just like we have the other email accounts that we have reviewed, and produce what is responsive to their requests and go forward.  I don't know that it needs to be a document-by-document decision when it is -- when the issue is does the fact that we have custody and control of these documents mean -- means that there's no privilege here?

And there very well could be documents which if they were originally in their hands would not be privileged, right, maybe an email between Professor Lobel and some third party.

But here, as long as we deal with the high-level question, we could then see, we could review them and produce whatever is responsive.

THE COURT:  I mean, I guess what happens if I find that there is not a waiver of privilege here?

MR. BILUS:  Good question.  So we produce them -- we would give them custody of the documents, and then they could review and produce any non-privileged documents.

THE COURT:  Okay.  I just wonder then if we're at

step one, why don't I make that the first step I guess.  Do you have an objection to just disclosing them, I suppose, in the first instance because they're in your custody and control?

MR. WALCZAK:  Wouldn't they then have to review them, Your Honor?  We have -- you know, we appreciate them segregating it, but it is a little more complicated.

But for them to even segregate -- I mean, we really don't want people reviewing those, certainly if the court is going to rule that they don't have a right to do so.

I'm pretty sure we have -- Mr. Lobel should have that on his drive.  I'm pretty sure that the vast majority of those emails would have cc'd the rest of the legal team or been to the rest of the legal team.  So there's the attorney work product.

I think there's only a small number of emails likely that were Mr. Lobel and the clients.  Really most of this is going to be work product, but I think a cataloging of our own emails would disclose the emails that are at issue.

MR. LOBEL:  Your Honor, I think a possible alternative which would serve the same purpose is I would be willing to go through all of the emails about this case and do a declaration, which would give you an idea of the nature of these -- you know, the categories of the emails that are involved.

THE COURT:  Okay.  I think that would be helpful.  I think I do need more of an granular sense of the documents. Maybe not, you know, document by document, and I'm resisting the idea that the documents themselves be produced to me for an in-camera review which, to begin with, if it sounds like it's a voluminous number, I'm not going to have the time to do it, but separately, I think if they do involve a lot of legal strategy, I don't really want to see that as well.

So I do think it's helpful maybe as part of the motion to have some kind of declaration to give a more specific description, I suppose, of documents and categories of documents.  At least then we'll -- I think it probably would be helpful, too, for the defense, both sides have a better sense as to what we're talking about and I'll have a better sense before I make a decision.

And then I guess I'll kind of wait and see, and if I do feel like I need more information of the documents, I guess I'll let you all know after I get the briefing.

Okay.  Thank you.  I appreciate it.  All right.  Is there anything else that we should talk about while I have everybody on the line?  I think we're all set with respect to the schedule here.  Then hopefully that will be able to resolve these issues.

One question, I suppose.  If Pitt does reach a decision on the -- with respect to the disciplinary hearing, I

suppose that could have a material impact here on the pending motion here, I suppose, if they lift the suspension I guess.

MR. WALCZAK:  If they lift the suspension, then we don't need the preliminary injunction.  We could probably convert all this to summary judgment and really relax.

So I mean, but at this point, we certainly don't know what the recommendation or what the result is going to be of that.

THE COURT:  Mr. Bilus, do you have a sense as to timing I guess?

MR. BILUS:  Not really, Your Honor.  We've talked to our client about that to get a sense, and I don't think they have a certain date that they knew something was going to happen or be decided by.  I know that the hearing panel is working on it.  That's all I know.

THE COURT:  Okay.  So they're not waiting on this case.

MR. BILUS:  No, they're moving forward.

THE COURT:  Okay.  All right.  Thank you.  I appreciate it.

Okay.  So with that, anything anyone wants to raise here?  I'll get an order out and we can memorialize what we talked about here with respect to the schedule, but anything else?

MR. WALCZAK:  I think, Your Honor, we're going to

need just a couple of other dates.  So the statement of undisputed facts.  I mean, we had it two weeks before the hearing initially.  There's also -- Pitt is supposed to file an opposition to the PI motion.

At this point we have not seen anything from the university, and given that there's now more time, we would ask whether Pitt could respond more than eight days before the hearing.

And then the other date linked to the hearing is prehearing statements which we had five days before the hearing.  So I think except for the PI -- except for the PI response, you know, I think given the still constricted schedule, I think all of those are going to have to be fairly or at least the statement of facts and undisputed facts in the prehearing statements are going to have to be pretty close to the hearing date.

THE COURT:  What if we had the prehearing statements and the statement of facts due June 30th -- so that's the Monday of the hearing week -- and then have Pitt's response to the preliminary injunction motion be due June 20th?  Does that work for everybody?

MR. RICHARDS:  Your Honor, I'm sorry.  I'm just trying to think through something and I think I'm not smart enough to figure this out here.  It's a little bit of a logic game.

30

If we can agree on the joint statement of facts, then we will know we don't need to have a hearing, right?  I mean, isn't that the way that this is going to work?

THE COURT:  I suppose -- you mean an evidentiary hearing?

MR. RICHARDS:  Correct.

THE COURT:  Yeah, I would think so.  That's a good point.  So are you suggesting a --

MR. RICHARDS:  I'm not sure what I'm suggesting.  I think that that's important, but I'm not sure why.

MR. WALCZAK:  So I think Mr. Richards is right, but based on what Mr. Bilus said before and based on what we're seeing now, I am also more skeptical that we're going to be able to agree on all of the facts.

MR. BILUS:  I wouldn't be surprised if we have a statement of undisputed facts but also some disputed facts, right?

MR. WALCZAK:  Yes.  So I think we'll be able to narrow what we have to present evidence on, but I don't think we're going to be able to avoid that completely -- just a sneaking suspicion.

THE COURT:  Okay.

MR. BILUS:  As far as our opposition goes, I'm not sure why we would need to file it by the 20th given that we're going to be doing hopefully the depositions, I'd like to be

able to have those done before we have to do that brief.

Could it not be due on -- at the same time as the statement of undisputed facts? We can then work in the undisputed facts into our brief.

THE COURT: Okay. I'm fine with that.

Mr. Walczak, on your end?

MR. WALCZAK: Just -- you know, I mean, ordinarily there would be some response I think filed and giving us a bit of a preview on what their defenses are going to be here.

So I think giving us a little bit more time than I mean June 30th, that gives us like five or six days. That's even less than we were going to have now. Right now we're going to have eight days.

THE COURT: How about a week prior, so June 26th, and then the defense, instead of a -- if you want to do a response or have a prehearing brief, I suppose, be your response, then that will give everybody -- the plaintiff at least a week, give me a week with everything?

MR. BILUS: We can make that work.

THE COURT: Okay. So I'll modify it. So the prehearing brief, the defendants' response to the extent it's already incorporated in the prehearing brief, and then the statement of -- joint statement of facts all be due June 26th, which would be a week prior to the July 3rd hearing. Okay.

MR. RICHARDS: Your Honor, I figured out why the

joint statement was bugging me.  If Mr. Walczak is right and we have significant disputed facts, then we're not going to have the hearing, right, that week.  We are going to be pushing it out until the witnesses can attend.

So I think what I'm suggesting is that maybe the parties will meet and confer again with respect to dates and maybe that will alleviate a little bit of this compression if we're not going to be going forward with the hearing on the 30th -- I'm sorry, the 3rd.

THE COURT:  Okay.  I think it's a good idea.  I mean, if there's a mutual agreement based on your meet and confer and what the joint -- and the joint statement of facts looks like, it's going to be somewhat pointless to have the hearing on July 3rd, then I agree, I think it makes sense to confer on that and let everybody know and let me know, and then we can look at an alternative date.

If it turns out that there are disputes, some disputes of fact and a lot of agreement on other facts, then maybe we can at that point play it by ear and see if we can still proceed on July 3rd.

Okay.  All right.  Thank you.  Anything else from the defendants?  Mr. Bilus, anything else on your end?

MR. BILUS:  Nothing, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you, everyone.  I appreciate it.  I will get a scheduling order out memorializing what we

talked about and then we'll plan on seeing everybody July 3rd, unless something changes between now and then.  All right. Take care.  Thank you.

MR. BILUS:  Thank you, Your Honor.

MR. WALCZAK:  Thank you, Your Honor.

(The hearing concluded at 2:56 p.m.)

<u>C E R T I F I C A T E</u>

I, VERONICA R. TRETTEL, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.


_\s\ Veronica R. Trettel_____          05/29/2025_____
VERONICA R. TRETTEL, RMR, CRR          Date of Certification
Official Court Reporter