# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **STUDENTS FOR JUSTICE IN PALESTINE AT PITT,** ) ) ) ) | |
| *Plaintiff*, ) | |
| v. ) | **CIVIL ACTION NO. 2:25-cv-00524** |
| ) | |
| **UNIVERSITY OF PITTSBURGH; JOAN GABEL, MARLIN NABORS, KARIN ASHER, DaVAUGHN VINCENT-BRYAN, MATTHEW LANDY,** and **JAMEY MENTZER,** all in their official and individual capacities, ) ) ) ) ) ) ) ) | **Judge J. Nicholas Ranjan** |
| *Defendants*. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S REVISED
MOTION FOR PRELIMINARY INJUNCTION**

i

## Table of Contents

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

ARGUMENT ....................................................................................................... 8

I.    SJP-Pitt Is Likely to Succeed on the Merits of Its Claim that Pitt's Punishment Violated the First Amendment Right to Freedom of Expression................................................................. 8

   A.   Pitt's Content-Based Punishment of SJP-Pitt Fails Strict Scrutiny Because the Open Letter Did Not Present a Clear and Present Danger to the Disciplinary Process. ................... 8

B.    Pitt's Six-Month Suspension of SJP-Pitt on a Pretextual Charge of Attempting to Influence the Hearing Officers Constitutes Retaliation for SJP's On-Campus Advocacy. ...... 15

II.   SJP-Pitt Will Suffer Irreparable Harm Without Preliminary Injunctive Relief................. 20

III.   Defendants Will Suffer No Irreparable Harm If Preliminary Injunctive Relief Is Granted 20

IV.   Granting Preliminary Injunctive Relief Will Serve the Public Interest ......................... 21

CONCLUSION.................................................................................................... 21

## INTRODUCTION

This case involves the University of Pittsburgh and its officials' (collectively "Pitt" or "University") efforts to sanction and silence Plaintiff Students for Justice in Palestine at Pitt ("SJP-Pitt") through university disciplinary proceedings. The issues for this Court to decide in this preliminary injunction motion have narrowed considerably from Plaintiff's first preliminary injunction motion (ECF No. 3) because those disciplinary proceedings have concluded. Pitt either dismissed or imposed a reprimand on SJP-Pitt for the initial charges related to the December study-in at Hillman Library and the charges involving SJP-Pitt's social media promotion of an off-campus event. But Pitt imposed a six-month suspension on SJP-Pitt, which will be in effect during the first month of the 2025-26 academic year.

SJP-Pitt's suspension is now based on a February 5, 2025, letter ("Open Letter") that was signed by more than 70 university and community organizations. The Open Letter criticized the University's disciplinary charges against SJP and its antagonism toward the organization. SJP-Pitt sent the Open Letter via email to approximately twenty University administrators, including the hearing officers assessing the disciplinary charges against SJP-Pitt for the Hillman study-in. Although Pitt claims that the Open Letter, along with statements made by SJP leaders at the February 4, 2025, disciplinary hearing, violated rules prohibiting any attempt to "influence" hearing participants or interfere with or disrupt the disciplinary process, there is no evidence that the Open Letter actually harmed or was likely to harm the disciplinary process.

The sole issues for this Court to decide now are whether suspending SJP-Pitt for criticizing Pitt's disciplinary process in an Open Letter shared with disciplinary hearing officers, among others, violates SJP's free-speech rights under the First Amendment, and if so, whether the suspension is causing SJP-Pitt irreparable harm by preventing it from recruiting and engaging students in its advocacy during the crucial first month of the upcoming academic year. While

1

SJP-Pitt is also challenging the constitutionality of the reprimands and other actions, those actions are not causing SJP-Pitt to suffer immediate, irreparable harm, and are thus not the subject of SJP-Pitt's preliminary injunction motion.

This Court should enjoin Pitt from enforcing the six-month suspension because it violates SJP-Pitt's First Amendment rights. Pitt's claim that the Open Letter violated university rules because it had the potential to influence hearing officers fails to meet the stringent First Amendment standard applied to content-based restrictions on speech. Pitt does not have a compelling interest in prohibiting speech that attempts to influence participants in a disciplinary hearing unless it poses a clear and present danger of harm to the disciplinary process. Here, there is no reasonable basis to believe that the Open Letter posed any harm to the hearing process, nor any evidence that it did.

But even if SJP-Pitt's actions in circulating the Open Letter were not constitutionally-protected, Pitt's punishment should nonetheless be enjoined because it constitutes retaliation for SJP-Pitt's expressive activity. It is no secret that advocacy on behalf of Palestinian human rights and against the Gaza war is controversial. Pitt has repeatedly attempted to silence, sideline or punish SJP-Pitt's speech. Pitt's suspension of SJP-Pitt over the Open Letter simply represents its latest attempt to stop SJP-Pitt from expressing its controversial message.

If Pitt's unconstitutional punishment is not lifted before August 18—Pitt's "Welcome Week"—SJP-Pitt will suffer irreparable harm. In addition to the chilling effect caused by the suspension, SJP-Pitt will be precluded from operating during Welcome Week, the time when new students learn about the various registered student organizations at Pitt and how they can get involved. SJP-Pitt will also be unable to hold any events on campus during the first month of the school year. This will hamper SJP-Pitt's recruitment efforts and prevent the organization from

engaging in protected expressive activity in the limited public forum that exists for Pitt student groups. Because the six-month suspension violates SJP-Pitt's First Amendment free-speech rights and is causing irreparable harm, this Court should grant SJP-Pitt's motion for preliminary injunction and order Pitt to lift the suspension.

## FACTUAL BACKGROUND

SJP-Pitt is a student organization at the University of Pittsburgh whose purpose and mission is to advocate for justice for the Palestinian people. In response to that advocacy, the University has sought to repress and punish SJP-Pitt's expressive activity. For example, Pitt attempted to prevent SJP-Pitt demonstrations from taking place on campus in the fall of 2024 even though a key administrator admitted that the University had previously allowed other demonstrations to use that campus space, *see* Exhibit 1 (Asher Message) at UPITT_0001163; Exhibit 2 (Panzella Email) at UPITT_0001170-72; it hindered SJP-Pitt from organizing an Anti-Zionist Shabbat event by requiring the organization to change the message, title, and location of the event, *see* Exhibit 3 (Shabbat Relocation Emails) at UPITT_0000954-64; and it sought to shut down and prohibit a symbolically expressive study-in attended by SJP-Pitt members in Hillman Library in December 2024, which two university disciplinary hearing panels have now found was non-disruptive and did not violate any university policy, *see* Exhibit 4 (First Hearing Draft Findings); Exhibit 5 (Second Hearing Findings) at UPITT_0014049-53.

Pitt's harassment of and retaliation against SJP-Pitt for its protected speech intensified in January 2025 when the University brought disciplinary charges against the organization for its role in a December 2024 study-in. Those charges were heard by a three-person panel on February 4, 2025. At the end of the hearing, SJP-Pitt's representatives presented closing arguments urging the panel to find for SJP-Pitt and to think carefully about their decision because people, including lawyers, were watching. Exhibit 6 (Nabors Dep.) at 19:16-20:14;

3

Exhibit 7 (Tuscano Dep.) at 37:21-39:17. Later that day, SJP-Pitt emailed to approximately twenty University administrators—including the Chancellor, Provost, Vice Provost, various Deans, and the three hearing officers—an Open Letter signed by approximately 70 university and community organizations, calling on University officials to drop the charges against SJP-Pitt and to change their antagonistic policies toward the organization. *See* Exhibit 8 (Open Letter) at UPITT_0000527-33.

Immediately after the February 4 hearing ended, the three hearing officers met and worked on a draft recommendation setting forth various reasons for dismissing the charges against SJP-Pitt. Ex. 7 (Tuscano Dep.) at 42:1-14; 45:12-48:9. At that time, the hearing officers were not satisfied that the University had adequately proven that SJP-Pitt committed a violation of the Student Code of Conduct. *Id.* at 32:12-33:4; *see also* Ex. 4. Indeed, the moderator of the panel, Defendant Matt Landy, questioned whether the university officials in charge of prosecuting the charges really believed that there had been "a violation" of the rules. Exhibit 9 (Landy Supervision Notes) at UPITT_0001856

On February 5, one of the hearing officers wrote to Defendant Landy, objecting to SJP-Pitt's emailing him the Open Letter and to some of the group's comments at the hearing. Exhibit 10 (Scott Email) at UPITT_0013854. Neither he nor the other hearing officers said they were influenced by the Open Letter in the slightest, and none felt that the hearing process was compromised and should be terminated as a result. *See* Exhibit 11 (Nabors Call Notes) at UPITT_0002439-40; Ex. 7 (Tuscano Dep.) at 57:14-59:21; 66:1-13; 71:20-72:12. The hearing officers did not discuss the Open Letter in their deliberations on February 5. *Id.* at 53:3-21; 57:14-59:21; 66:1-13.

Nonetheless, on February 6, Defendant Nabors told the hearing officers to stop any further work on deciding the matter. *See* Exhibit 12 (Nabors/Hearing Officers Email Chain) at UPITT_0014034-35. He shut down the process based on the email from one of the hearing officers about the Open Letter, but did not consult any of the hearing officers before doing so, *see* Ex. 6 (Nabors Dep.) at 98:3-14. Nabors acknowledged that the Open Letter introduced no new argument or information not presented at the hearing, that there was no written rule against such communications, and that he did not know whether the students were told that such communications were prohibited when they were advised of the numerous rules governing the hearing process. *See id.* at 61:17-63:9; 84:16-88:6; 126:24-130:4. When Defendant Nabors later conducted brief telephone interviews with each hearing officer, they denied that the Open Letter influenced their deliberations. Ex. 11; Ex. 6 (Nabors' Dep.) at 112:2-114:12.

Approximately five weeks later, on March 18, Defendant Nabors imposed an interim suspension of SJP-Pitt's status as a registered student organization because of SJP-Pitt's allegedly improper communications with members of the conduct hearing board in transmitting the Open Letter and the statements it made at the closing arguments at the February 4 hearing. During the interim suspension, Pitt did not communicate with the hearing officers or SJP-Pitt about the status of the conduct process, despite outreach from both entities. Ex. 6 (Nabors Dep.) at 116:6-117:24; Ex. 12; Exhibit 13 (SJP-Pitt Outreach) at UPITT_0001113. Defendant Nabors did attend near-daily meetings, however, with his supervisor, Vice Provost Carla Panzella, to discuss the SJP-Pitt conduct process. Such frequent meetings with senior officials to discuss disciplinary proceedings were unusual. Ex. 6 (Nabors Dep.) at 70:22-71:14; 72:24-73:3.

On April 8, Defendant Mentzer instituted new charges against SJP-Pitt. Exhibit 14 (New Charges) at UPITT_0002149-50. The first set of charges reiterated the original disciplinary

charges related to organizing the Hillman study-in. *Id.* The second set of charges asserted that by sending the Open Letter and making arguments at the first disciplinary hearing, SJP-Pitt violated Pitt's Student Code of Conduct Rules 42 and 43, which provide that:

> A Violation is committed when a Student or a Registered Student Organization: ...
>
> 42. Intimidates, coerces, influences, or attempts to do the same against a person who is participating or has participated in any University process or proceeding.
>
> 43. Disrupts or interferes with the conduct process.

*Id.* The University also charged SJP-Pitt with improperly promoting an off-campus event hosted by a third party on social media after its interim suspension. *Id.*

To SJP-Pitt's knowledge, Pitt has not sanctioned any of the many students who emailed University officials, including hearing moderator Defendant Landy, "forceful and demanding" criticisms of the hearing process and demanded that the charges against SJP-Pitt be dropped. *See* Ex. 8, at UPITT_0001856; *see also, e.g.*, Exhibit 15 (Student Criticism) at UPITT_0001783-84, Exhibit 16 (Student Criticism) at UPITT_0001518. Nor have they charged the Pitt Student Governing Board, which sent emails to several participants, including Vice Provost Panzella, the ultimate decision maker, criticizing the charges against SJP-Pitt. *See* Exhibit 17 (SGB Criticism) at UPITT_0002354-56.

On April 15, SJP-Pitt commenced this lawsuit against Defendants for violating the group's First Amendment rights. ECF No. 1. SJP-Pitt sought a preliminary injunction lifting the interim suspension, as well as prohibiting Pitt from continuing its disciplinary hearing against SJP-Pitt and from using vague, overbroad, and non-existent rules to interfere with the organization's protected activities. ECF No. 3.

On May 23, Pitt held a second disciplinary hearing with three new hearing officers. Pitt also took the unprecedented step of appointing an external moderator to facilitate this hearing. Ex. 6 (Nabors Dep.) at 63:10-67:13. On May 27, 2025, the hearing officers submitted their conduct board recommendation form to Pitt. Ex. 5. Notably, the hearing officers found no "violations to library space usage," the basis of the first charge related to the Hillman Library study-in. *Id.*

On June 18, Pitt informed SJP-Pitt that it was found "not responsible" for organizing the study-in. Exhibit 18 (Second Hearing Outcome). SJP-Pitt received reprimands for failure to obey administrators' orders (related to the study-in) and for its social media activity subsequent to the interim suspension. *Id.* Pitt suspended SJP-Pitt for six months—until September 18—for sending the Open Letter to the hearing officers. *Id.*

The weeks leading up to September 18 are critical to SJP-Pitt's advocacy and long-term sustainability because new and returning students are often most eager and willing to join organizations and engage in expressive activities during Welcome Week and the first few weeks of the semester. Exhibit 19 (SJP-Pitt Decl.) at ¶¶ 13-17. SJP-Pitt recruited many new members during the first few weeks of the fall 2024 semester and held a number of expressive events. *Id.* at ¶¶ 18-19. Because of its suspended status, SJP-Pitt will be precluded from recruiting new student members during Welcome Week or scheduling educational or political events during the critical period between August 18 and September 18. *Id.* at ¶ 20. It will also forego the possibility of hosting two of its biweekly general body meetings during the first month, and sponsoring educational events and initiatives to mobilize and energize new members. *Id.* SJP-Pitt's ongoing suspension also deprives the group of the benefits of university registration for the first month—including funding, access to Pitt's facilities, and use of Pitt's communication

channels—as well as chilling SJP-Pitt's expression on and off campus for fear of further

retaliation. *Id.* at ¶ 11-12; Ex. 6 (Nabors Dep.) at 48:3-50:9.

## ARGUMENT

Pitt's suspension of SJP-Pitt violates the First Amendment because it was not narrowly

tailored to Pitt's compelling interest in preventing harm to the disciplinary process and was

imposed in retaliation for and to chill SJP-Pitt's speech. This Court should grant the requested

preliminary injunctive relief because SJP-Pitt has shown that it is likely to succeed on the merits

of its First Amendment claims, Pitt's restrictions have and will continue to cause irreparable

injury to SJP-Pitt, Pitt will suffer no harm if the preliminary injunctive relief issues, and the

requested relief will further the public interest in facilitating free political expression about a

matter of great public concern. *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny

Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022) (listing preliminary injunction factors).

**I.      SJP-Pitt Is Likely to Succeed on the Merits of Its Claim that Pitt's Punishment
Violated the First Amendment Right to Freedom of Expression.**

**A.      Pitt's Content-Based Punishment of SJP-Pitt Fails Strict Scrutiny Because the
Open Letter Did Not Present a Clear and Present Danger to the Disciplinary
Process.**

Proscriptions on speech based on the content of the message expressed are presumptively

unconstitutional. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Rule 42, which prohibits

actual or attempted influence of a disciplinary hearing participant, is content-based because it

applies only to speech designed to influence a participant, not any other speech directed at

participants. *See Doe v. Schorn*, 711 F. Supp. 3d 375, 404 (E.D. Pa. 2024) (prohibiting disclosure

of information related to complaints or proceedings unless discipline resulted was content-

based). Here, a group that emailed hearing officers to ask a question about the process or

contacted a participant about an unrelated matter would not be subject to discipline, yet SJP-

Pitt's Open Letter resulted in a suspension because it criticized the disciplinary process. Such a content-based rule is subject to strict scrutiny. *Reed*, 576 U.S. at 163-64. The rule does not meet that exacting standard because it is not narrowly tailored to Pitt's interest in preventing a clear and present danger of harm to its disciplinary process. *See Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010).

      *1.*     *Pitt Cannot Establish that SJP-Pitt's Actions Presented a Clear and Present Danger to the Administration of Justice.*

The Supreme Court and this circuit have held that speech criticizing judicial or administrative proceedings cannot be punished unless the government demonstrates a compelling interest that the speech presents a clear and present danger of serious, imminent harm to the administration of justice, and the proscription is narrowly tailored. *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 844 (1978); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1070-71 (1991) (punishment for speech about pending judicial proceeding upheld only if there is "showing of 'clear and present danger' that a malfunction in the [] justice system **will** be caused" by speech at issue) (emphasis added); *Wood v. Georgia*, 370 U.S. 375 (1962) (applying same "clear and present danger [standard] to the proceedings of the court and grand jury" to determine whether First Amendment protects speakers); *Bridges v. California*, 314 U.S. 252, 270 (1941) (explaining that "shielding judges from published criticism" cannot justify "an enforced silence, however limited"). "'[S]peech [critical of the judicial process] cannot be punished when the purpose [of the punishment] is simply 'to protect the court as a mythical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which[,] in a democracy[,] other public servants are exposed.'" *Stilp*, 613 F.3d at 411 (quoting *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 842 (1978)); *see In re Kendall*, 712 F.3d 814, 825 (3d Cir. 2013) (applying the clear and present danger test).

The danger cannot be merely possible, theoretical, or even likely. Rather, Pitt must show that the danger was actual and imminent. As the *Landmark* Court noted:

> What emerges from these cases [*Bridges*, *Pennekamp*, *Craig*, and *Wood*] is the 'working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished,' and that a 'solidity of evidence' is necessary to make the requisite showing of imminence. 'The danger must not be remote or even probable; it must immediately imperil.'

435 U.S. at 844-54 (internal citations omitted). The Court recognized that breaching the confidentiality of a judicial conduct inquiry posed "some risk of injury" to the administration of justice, but held that was insufficient because the "test requires that the danger be 'clear and present,' and in our view the risk here falls far short of that requirement." *Id.* at 845; *see In Re Kendall*, 712 F.3d at 828 (to transgress threshold of clear and present danger, speech must "constitute an imminent, *not merely a likely*, threat to the administration of justice") (quoting *Craig v. Harney*, 331 U.S. 367, 376 (1947) (emphasis added). The court should not defer to the government's articulation of the danger, but must "make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance." *Landmark*, 435 U.S. at 843.

Pitt cannot and does not even attempt to meet this test. It does not claim, nor could it, that the Open Letter contained any threat or intimidation. Pitt instead relies on Rule 42's prohibition on "attempts" to "influence" a participant in a hearing process. As Defendant Nabors repeatedly explained, it was not that the Open Letter actually influenced any of the hearing officers—indeed they all stated that it did not—but rather that the Open Letter represented an "attempt" or the "potential" to influence the hearing officers regardless of any actual impact that was the gravamen of the charge. Ex. 6 (Nabors Dep.) at 91:8-95:14.

As the case law demonstrates, a mere desire to avoid speech that has the potential to influence a hearing is not sufficiently compelling to restrict otherwise protected speech. *See Scott*

*v. Flowers*, 910 F.2d 201, 212–13 (5th Cir. 1990) (government must show "precisely how" justice of the peace's open letter criticizing justice system "would impede the goals of promoting an efficient and impartial judiciary"); *Providence J. Co. v. Newton*, 723 F. Supp. 846, 855-56, 859 (D.R.I. 1989) ("in the absence of a showing of 'actual interference' with the fair administration of justice," speaker with "personal stake" in outcome "is empowered by the First Amendment to comment publicly on the precise matter that is the subject of a pending investigatory proceeding"). Pitt openly bases its punishment of SJP-Pitt on even less of a showing than what the Supreme Court and this circuit have held does not meet the clear and present danger test. Pitt does not claim, much less provide any evidence, that it was "probable" or "likely" that the Open Letter would influence the hearing officers. Rather, Pitt argues that the Open Letter could be punished because it had the "potential" to influence the hearing officers. Ex. 6 (Nabors Dep.) at 95:1-14. Under longstanding precedent, that is not a compelling reason to prohibit SJP-Pitt's speech.

Pitt's attempt to justify the charges on Rule 43's prohibition of disruption or interference with the conduct process—whether based on the Open Letter or statements the SJP-Pitt leaders made in their closing arguments—fares no better. The Open Letter, which was issued after the hearing concluded, could not be said to have imminently disrupted or interfered with the conduct hearing process except in the most theoretical manner. As Nabors conceded, no new evidence or arguments were made by the Open Letter that had not already been made by SJP-Pitt at the hearing, Ex. 6 (Nabors Dep.) at 84:16-88:6, and interference or disruption must mean something more than criticism of the process. *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 193 (2021) (showing of disruption requires "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").

The SJP-Pitt leaders' statements in the closing argument are also clearly protected speech that did not disrupt or interfere with the conduct process. Despite Pitt's vague implication that they constituted threats because the students said lawyers were working with them and that the hearing officers should reach a decision carefully, Ex. 6 (Nabors Dep.) at 19:16-20:14, those statements do not constitute true threats such that they are removed from the protection of the First Amendment. *See Counterman v. Colorado*, 600 U.S. 66, 113 (2023) ("[T]rue threats of violence" is a "very narrow" class of unprotected speech). And even assuming that the SJP-Pitt leaders' statements could be construed as a threat to litigate if SJP-Pitt were sanctioned, threats to file a lawsuit are protected speech. *See Hankin Family P'ship v. Upper Merion Tp.*, No. 01–1622, 2012 WL 43599, at *18 n. 24 (E.D. Pa. Jan. 6, 2012) (even in midst of ongoing judicial proceedings, sending demand letter threatening legal action "involves protected conduct" under "the First Amendment"); *Gifford v. Atchison, Topeka and Santa Fe Ry. Co.*, 685 F.2d 1149, 1156 n.3 (9th Cir.1982) ("We see no legal distinction to be made between the filing of a charge which is clearly protected, [citation omitted], and threatening to file a charge.").

It strains credulity for Pitt to charge a student organization with disrupting or interfering with the hearing process based on its arguments it made during the hearing when, as Nabors admits, they were afforded an opportunity to make a closing statement for the very purpose of influencing the hearing officers. Ex. 6 (Nabors Dep.) at 27:2-17; 86:2-21. Pitt's contradictory actions—allowing SJP-Pitt to present an argument at the disciplinary hearing but then punishing the organization for attempting to influence hearing participants with its argument—demonstrate the absence of any legitimate, much less compelling, interest, in punishing SJP-Pitt for its speech.

       2.     *Pitt's Punishment of SJP-Pitt Is Not Narrowly Tailored to Pitt's Interest in Avoiding Serious, Imminent Harm to the Administration of Justice.*

Even if Pitt has a compelling interest in enforcing Rules 42 and 43, Pitt's suspension of SJP was not narrowly tailored because there is no evidence that the Open Letter had *any* effect on the process, much less that the letter presented a clear and present danger that it would unduly influence the hearing officers' deliberations. *See First Amend. Coal. v. Jud. Inquiry & Rev. Bd.*, 784 F.2d 467, 478 (3d Cir. 1986) (en banc) (prohibition on witness disclosing his own testimony was not narrowly tailored because it prohibited witness from speech on information obtained beyond proceedings); *Stilp*, 613 F.3d at 414-15 (prohibition on person disclosing that he filed a complaint not narrowly tailored to interest in preventing harm by wrongful filings); *Caribbean Int'l News Corp. v. Fuentes Agostini*, 12 F. Supp. 2d 206, 219–20 (D.P.R. 1998) (statute that criminalized influencing a judge was not narrowly tailored because it did not require that influence be corrupt or improper).

The rule prohibiting **any** communication which attempts to influence **any** participant in **any** university process, is both patently overbroad and as this case illustrates, has the potential to sweep within its ambit even speech provided at a disciplinary hearing itself if, at the "whim of the administrator," it is determined to be problematic. *Forsyth Cnty.*, *v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (internal citations omitted). Since most speech is designed to influence others, the rule could be used to sanction op-eds by student organizations in the school newspaper or demonstrations that criticize a disciplinary procedure if designed to influence anyone participating in that procedure.

A critical danger of such standardless, overbroad, and not narrowly-tailored rules is their "potential for becoming a means of suppressing a particular point of view." *Forsyth Cnty.*, 505 U.S. at 130-31; *see City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) ("[U]nbridled discretion in the hands of a government official . . . may result in censorship.");

13

*Amalgamated Transit Union Loc.*, 39 F.4th at 108-09 (noting that overly discretionary standards create a danger of improper application). The University's enforcement of Rule 42's prohibition of any "attempt to influence" hearing participants illustrates the danger of "the opportunity for abuse" since the enforcing official "may shape his [own] views" on what constitutes a violation. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 4 (2018) (internal citations omitted).

A court may invalidate a statute for vagueness or for overbreadth even if it is possible the statute may be applied lawfully in some circumstances. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). Courts are more likely to find a school disciplinary policy is "substantially overbroad" if it is unevenly or "unfair[ly] appli[ed]," or if the policy gives officials "standardless discretion to punish particular forms of slightly or moderately disruptive speech." *R.L. v. Cent. York Sch. Dist.*, 183 F. Supp. 3d 625, 645-46 (M.D. Pa. 2016).    Here, the first hearing panel draft recommendation expressed concern about the University's "inconsistent enforcement of policies," which "raise questions about bias and selective adjudication" in the charges brought against SJP before that panel's deliberations were abruptly halted by Defendant Nabors. Ex. 4. Indeed, the moderator of the panel (who clearly was a "participant in the proceeding") and other university officials received numerous emails criticizing the disciplinary proceedings, including from the Student Government Board, and the University did not seek to sanction any of these emailers, nor even respond to them explaining that attempts to influence the process were not permitted. *See* Ex. 9; see also, e.g., Ex. 17; Ex. 16; Ex. 15. None of the other student organizations that signed onto the Open Letter were sanctioned in any way or even warned that what they had done was improper. The only group disciplined was SJP-Pitt.[1]

---

[1] Perhaps recognizing the overbreadth in the rule, Defendant Nabors attempted to cabin the rule in his deposition to interpret it as only applying to emails directed at the three hearing officers themselves. Ex. 6 (Nabors Dep.) at 88:24-92:12. But the rule refers to any "person who is

Punishing SJP-Pitt for the Open Letter and hearing arguments did not further Pitt's compelling interest in avoiding harm to or disruption of its disciplinary process because the Open Letter did not present a clear and present danger to that process. Further, Pitt's proscription on influencing or attempting to influence any hearing process participant is overbroad because it is not limited to influence that is improper or corrupt. Accordingly, its suspension of SJP-Pitt for the Open Letter and hearing arguments violated the First Amendment.

### B. Pitt's Six-Month Suspension of SJP-Pitt on a Pretextual Charge of Attempting to Influence the Hearing Officers Constitutes Retaliation for SJP's On-Campus Advocacy.

SJP-Pitt is likely to prevail on its retaliation claim because (1) SJP-Pitt's study-in at the Hillman Library and Open Letter were First Amendment-protected activities; (2) Pitt's filing of disciplinary charges and subsequent suspension of SJP-Pitt for six months would deter a student organization of ordinary firmness from engaging in similar speech; and (3) Pitt filed the disciplinary charges and imposed the six-month suspension because of SJP-Pitt's constitutionally protected activities. *See Palardy v. Twp. of Millburn*, 906 F.3d 76, 80–81 (3d Cir. 2018) (describing retaliation test); *Farrell v. Planters Lifesavers Co.*, 206 F. 3d 271, 279 (3d Cir. 2000).

#### 1.    *SJP-Pitt Engaged in Constitutionally-Protected Activities*

SJP-Pitt engaged in a series of constitutionally-protected activities that Pitt was antagonistic to and sought to prevent, culminating in the Hillman library study-in and Open Letter criticizing the disciplinary process. As SJP-Pitt argued in its initial preliminary injunction motion, that non-disruptive symbolic study-in was protected speech under Supreme Court and

---

participating or has participated in any University process or proceeding" not just the hearing officers. Pitt has no rule prohibiting communications to hearing officers, and Nabors also charged that the statements SJP made at the hearing were attempts to influence the hearing officers.

Third Circuit precedent, most notably *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), and Pitt's attempt to punish the organization was content-based in that another organization engaged in similar activity at the same time in the library without any disciplinary or other consequences. *See* ECF No. 4, at 8-13.

      2.     *The Disciplinary Charges and Six-Month Suspension Constitute an Actionable Adverse Impact.*

Pitt's six-month suspension of SJP-Pitt for its Open Letter would objectively chill SJP-Pitt from engaging in protected speech. Other courts have held that similar actions against student organizations constitute an adverse impact for retaliation purposes. *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 868 (9th Cir. 2016) (suspension of collection and remittance of student activity fee had adverse impact on student organization); *Young Am.'s Found. v. Stenger*, No. 3:20-CV-822, 2025 WL 874840, at *17 (N.D.N.Y. Mar. 20, 2025) (one-year suspension of student organization from booking table spots and rooms for events "would prevent the student organization from exercising protected speech in those manners" even if suspension were "practically unenforced"). The six-month suspension not only has the actual effect of restricting SJP-Pitt's expressive activities, including tabling at the fall semester activities fair, holding bi-monthly general board meetings, and restarting its Liberation School programming, see Ex. 19 ¶ 20, but it has a chilling effect on SJP-Pitt's and other student organizations' freedom to engage in expressive activities in the future.

      3.     *Pitt Imposed the Six-Month Suspension in Retaliation for SJP-Pitt's Expressive Activities.*

It is undisputed that Pitt suspended SJP-Pitt for six months for sending the Open Letter. That alone is sufficient to establish retaliation because the Open Letter was constitutionally-protected. But even if Pitt's six-month suspension of SJP-Pitt for sending the Open Letter to the hearing officers were narrowly tailored to its compelling interest in preventing a clear and

present danger to the disciplinary proceeding, the evidence strongly indicates that the Open Letter charge was a pretext, and the real reason for the suspension was due to SJP-Pitt's speech in support of Palestinian human rights and related expressive activities, in particular its participation in the Hillman Library study-in. *See Reilly v. City of Atl. City*, 532 F.3d 216, 232 (3d Cir. 2008) ("Where a plaintiff claims that the stated grounds for his/her discipline were a pretext for the discipline imposed … the court considers all of the speech that the plaintiff alleges is protected[.]").

Pitt repeatedly interfered with SJP-Pitt's expressive activities over the course of the 2024-25 academic year, relocating on-campus demonstrations to less-visible off-campus locations and forcing SJP-Pitt to rename a cosponsored "Anti-Zionist Kabbalat Shabbat" event due to Pitt's concern over the political nature of SJP-Pitt's message. *See* Ex. 3; *see also* Exhibit 20 (Shabbat Event Controversy) at UPITT_0002197-201; Exhibit 21 (Study-In and Shabbat Event Controversy) at UPITT_0001393-405; Exhibit 22 (Shabbat Event Internal Controversy) at UPITT_0002224-29. After SJP-Pitt's involvement in the study-in, the University filed disciplinary charges against the group for holding an "event" in a "non-reservable" library space and failing to comply with Pitt administrators' directions, notwithstanding the fact that no disciplinary charges were filed against a sorority that held a library study-in during the same time period.

It was only when University officials realized that it might prove impossible to punish SJP-Pitt for the study-in that they decided to charge the group with the Open Letter violation. By the time Pitt decided to charge SJP-Pitt in connection with the Open Letter:

- The February 4 disciplinary panel had tentatively concluded that the University had not submitted sufficient evidence to prove the charges against SJP, noting what appeared to be "inconsistent enforcement of policies," which "raise questions about bias and selective adjudication." Ex. 4 at 6; Ex. 7 (Tuscano Dep.) at 42:18-43:16.

- Defendant Landy, the February 4 hearing moderator, had concluded in an internal memorandum that he was "not positive that Karin, DeVaughn and David [the university officials in charge of prosecuting the case against SJP-Pitt] are convinced that this is a violation and that may have come through during the hearing." Ex. 9.

- Defendant Nabors had "pause[d]" the disciplinary process on February 6, prior to the hearing panel's final recommendation. Ex. 12. He did so ostensibly on the basis of an email from one of the hearing officers, who wrote to Landy objecting to the Open Letter and the statements SJP-Pitt leaders made at the hearing. Ex. 10; Ex. 6 (Nabors Dep.) at 107:1-109:18. But when Nabors interviewed the three hearing panelists four days later, on February 10, they all told him that they were not influenced by the Open Letter. *See* Ex. 11; Ex. 6 (Nabors Dep.) at 112:2-114:12. None suggested that the disciplinary hearing process should be halted, and one specifically objected to the university official's decision to halt the decision-making. Ex. 7 (Tuscano Dep.) at 71:20-72:12.

- The two key university officials addressing the SJP-Pitt disciplinary matter had met almost every day to discuss the situation, a frequency of meetings which Nabors had never experienced before. Ex. 6 (Nabors Dep.) at 70:22-71:14; 72:24-73:3.

There was also immense outside pressure on the University to sanction SJP-Pitt for its role in the Hillman study-in. Ex. 21. It was not until March 18 that Defendant Mentzer informed SJP-Pitt that the first hearing process regarding the study-in was terminated, and that SJP-Pitt would instead be suspended on an interim basis for improper communications with the hearing officers, with new charges filed against the group. Exhibit 23 (March 18 Letter to SJP-Pitt) at UPITT_0002866-67.

After the second disciplinary hearing on May 23, 2025, the new hearing officers rejected the primary charge related to the study-in, finding that SJP-Pitt was not responsible for violating any University policy for engaging in the study-in. Ex. 5. The panel did, however, find SJP-Pitt responsible for engaging in communications attempting to influence the panel and for disrupting or interfering with the conduct process. *Id.* Vice Provost Panzella affirmed that finding and imposed a sanction consisting of a six-month suspension. *See* Ex. 18.

This Circuit has held that temporal proximity and a history of antagonism against the plaintiff can serve as a basis for finding that the defendant's proffered reason for the adverse

action is pretextual and that the real cause of the adverse action is the plaintiff's protected activities, but that courts will look at the total record to determine causation. *Farrell*, 206 F.3d at 280-281. Here, the temporal proximity of the termination of the first disciplinary proceeding to Pitt's suspension of SJP-Pitt (first interim and then for six months) based on the Open Letter supports the proposition that the real reason for Pitt's adverse action against SJP-Pitt was its expressive activities over the course of the fall 2024 and early spring 2025 semesters, most notably, that the Open Letter charge was only utilized once Pitt officials realized the weakness of the study-in charge and the flaws in the first disciplinary hearing. *See* Ex. 9. The history of antagonism of Pitt officials against SJP-Pitt for its protected activities, *see* ECF No. 1, at ¶¶ 28-82, also supports the conclusion that the suspension for the Open Letter was caused by Pitt's desire to silence SJP-Pitt. Finally, there is strong evidence to support the conclusion that the Open Letter charge was pretextual, as numerous other students and the SGB sent emails to "participants" in the disciplinary process criticizing Pitt's efforts to discipline SJP-Pitt for the study-in. *See* Ex. 9; *see also, e.g.*, Ex. 17; Ex. 16; Ex. 15. The evidence thus demonstrates that Pitt's basis for disciplining SJP-Pitt for the Open Letter was pretextual and was in fact intended to punish SJP-Pitt for its participation in the study-in and other expressive activities and to chill expression that Pitt deemed controversial.

Although the Court need not reach the retaliation claim if it decides that the suspension must be enjoined because both the Open Letter and SJP-Pitt's hearing arguments were protected speech, the retaliation claim is an alternative theory which explains what really happened here: Pitt seized on the Open Letter as a justification to punish SJP-Pitt for its controversial, but constitutionally-protected, speech. Pitt's actions are plainly intended to silence SJP-Pitt and other groups on campus that wish to speak out about Palestinian human rights or against the Gaza war.

## II.     SJP-Pitt Will Suffer Irreparable Harm Without Preliminary Injunctive Relief

As the Supreme Court has noted, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). In addition to experiencing the chilling effect that results from the punishment of protected speech, SJP-Pitt will be precluded from operating during Welcome Week, the time when new students learn about the various registered student organizations at Pitt and how they can get involved. *Factual Background* p. 7. SJP-Pitt will also be unable to hold any events on campus during the first month of the school year. *Id.* This will hamper SJP-Pitt's recruitment efforts and prevent the organization from engaging in protected expressive activity *Id.* SJP-Pitt will thus suffer irreparable harm if the suspension is not enjoined.

## III.     Defendants Will Suffer No Irreparable Harm If Preliminary Injunctive Relief Is Granted

The potential harm to Pitt is significantly less than the harm from Pitt's violation of SJP-Pitt's First Amendment rights. Granting SJP-Pitt's preliminary request for reinstatement as a registered student organization will not materially harm Pitt. Providing financial support and access to University facilities does not imply Pitt endorsement and allowing SJP-Pitt to operate between August 18 and September 18 will not seriously harm the University. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834-35, 841-42 (1995) (finding that lending the same amount of funding and the same access to university facilities to any particular club does not suggest that the university in question adopts, endorses, condones, or in any other way supports the speech or actions of the registered student organization receiving such benefits). Accommodating free expression—even controversial, unpopular, or downright offensive expression—does not constitute irreparable harm. *Amalgamated Transit Union Loc. 85*, 39 F.4th at 109 (government "suffers no legitimate harm from not enforcing an unconstitutional policy."). Accordingly, the balance of hardships favors granting preliminary injunctive relief.

**IV.    Granting Preliminary Injunctive Relief Will Serve the Public Interest**

The public interest strongly favors upholding SJP-Pitt's right to advocate on behalf of justice for the Palestinian people. *See Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 883-84 (3d Cir. 1997) ("In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights . . . ."). Protecting constitutional rights is always in the public interest. *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012); *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586-87 (M.D. Pa. 2007); *Amalgamated Transit Union Loc. 85*, 39 F.4th at 109.

## CONCLUSION

For the foregoing reasons, SJP-Pitt respectfully requests that this Court grant the requested preliminary injunctive relief.

Dated: July 11, 2025                    Respectfully Submitted,

                                        By: */s/ Witold J. Walczak*

                                        Witold J. Walczak
                                        PA Bar No. 62976
                                        Ali Szemanski
                                        PA Bar No. 327769
                                        ACLU OF PENNSYLVANIA
                                        P.O. Box 23058
                                        Pittsburgh, PA 15222
                                        P: 412-681-7864
                                        F: 267-573-3054
                                        vwalczak@aclupa.org
                                        aszemanski@aclupa.org

                                        Solomon Furious Worlds
                                        PA Bar No. 333677
                                        Kirsten M. Hanlon*

PA Bar No. 336365
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
P: 215-592-1513
F: 267-573-3054
sfworlds@aclupa.org
khanlon@aclupa.org

Jules Lobel, Esq.
NY Bar No. 1262732
P.O. Box 81918
Pittsburgh, PA 15217
juleslobel73@gmail.com

\* *Pro hac vice application forthcoming*

*Counsel for Plaintiff*