# Exhibit 6

Transcript of the Testimony of

# MARLIN NABORS

July 1, 2025

## STUDENTS FOR JUSTICE IN PALESTINE AT PITT  VS
## UNIVERSITY OF PITTSBURGH



**412-261-2323**
**depo@akf.com**
**www.akf.com**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 2:25-CV-00524


STUDENTS FOR JUSTICE IN            )
PALESTINE AT PITT,                 )
                                   )
          Plaintiff,               )
                                   )
     VS.                           )
                                   )
UNIVERSITY OF PITTSBURGH; JOAN     )
GABEL, MARLIN NABORS, KARIN        )
ASHER, DaVAUGHN VINCENT-BRYAN,     )
MATTHEW LANDY, and JAMEY MENTZER,  )
all in their official and          )
individual capacities,             )
                                   )
          Defendants.              )


DEPOSITION OF MARLIN NABORS
VIA VIDEOCONFERENCE


     DEPOSITION taken before me, Mary J. Carney, a
Notary Public within and for the Commonwealth of
Pennsylvania, via Zoom videoconference, beginning at
11:07 a.m. on July 1, 2025, pursuant to Notice and to
be used pursuant to the Federal Rules of Civil
Procedure in the aforesaid cause of action, pending
in the United States District Court for the Western
District of Pennsylvania.

                                                              2

1                      APPEARANCES

2

3            On Behalf of Plaintiff:

4            Witold J. Walczak, Esquire
             Ali Szemanski, Esquire
5            ACLU OF PENNSYLVANIA
             P.O. Box 23058
6            Pittsburgh, PA  15222
             412-681-7864
7            vwalczak@aclupa.org
             aszemanski@aclupa.org
8
             Solomon Furious Worlds, Esquire
9            Kirsten M. Hanlon, Esquire
             ACLU OF PENNSYLVANIA
10           P.O. Box 60173
             Philadelphia, PA  19102
11           215-592-1513
             sfworlds@aclupa.org
12           khanlon@aclupa.org

13

14           On Behalf of Defendants:

15           Alexander R. Bilus, Esquire
             SAUL EWING LLP
16           Centre Square West
             1500 Market Street, 38th Floor
17           Philadelphia, PA  19102-2186
             215-972-7777
18           alexander.bilus@saul.com

19

20           Also Present:

21           J. Nicole Rhodes, Esquire
             University of Pittsburgh

22

23

24

25

MARLIN NABORS  -  7/1/2025

19

1          Nabors 1. Just for clarity's sake, I'm

2          going to refer to this letter from here on

3          out as the Open Letter or the February 4

4          Open Letter.  Is that agreeable to you, Mr.

5          Nabors?

6               A.  You don't mean the letter that

7          we're looking at; you mean the previous

8          one?

9               Q.  Yes, yes, correct.  I'm just

10         looking for an easy handle to refer to that

11         letter.  So if I call it the Open Letter,

12         can we agree that I'm referring to what is

13         Nabors 2, the February 4 letter sent by SJP

14         with 70 signatories?

15              A.  Yes.

16              Q.  When you say on Nabors 1 that

17         additional conduct may have violated the

18         Student Code and is now triggering this

19         March 18 correspondence, is there any other

20         conduct that prompted this email?

21              A.  There was, yes.

22              Q.  What would that be?

23              A.  There were concerns with language

24         that representatives from SJP used during

25         the hearing to panelists.

MARLIN NABORS  -  7/1/2025

20

1          Q.  So language during the hearing.
2     Can you be more specific; what kind of
3     language?
4          A.  Panelists present for the hearing
5     described to me that members or the
6     students representing SJP made comments --
7     I'm paraphrasing their paraphrasing -- but
8     comments to the panelists that they should
9     be careful about their decision, that
10    people are watching, that they're working
11    with lawyers, so they should think
12    carefully about how they decide this. Those
13    were comments that panelists referenced as
14    concerning.
15         Q.  And do those comments go into the
16    decision that is communicated in this March
17    18 email?
18         A.  I'm sorry, can you ask that again?
19         Q.  Yeah, or, so as I said, this
20    doesn't specifically identify the
21    additional conduct, so I'm trying to
22    establish, you know, what conduct is at
23    issue.  So we've identified the Open
24    Letter, and then you said that there were
25    comments made during the hearing which you

MARLIN NABORS  -  7/1/2025

27

1      during the hearing.

2          Q.  You're not saying that students

3      can't make arguments about why the

4      university shouldn't punish them at one of

5      these hearings, are you?

6          A.  I guess I'm saying that what's --

7      what's the most accurate answer is to look

8      at the process that we lay out in terms of

9      questioning, statements, and closing

10     statements.  Everything that students are

11     allowed to do is laid out in that process.

12         Q.  And I'm not asking for the perfect

13     answer.  I'm asking whether or not the

14     process allows students to make arguments

15     about why they shouldn't be punished, for

16     instance, in a closing statement?

17         A.  Yes.

18         Q.  And is there a limit on the type of

19     arguments you can make in your closing

20     statement?

21         A.  Because we have policies that are

22     meant to address actions that could

23     potentially interfere with the process, I

24     believe that there are limits to how

25     students act, behave, speak, during the

MARLIN NABORS  -  7/1/2025

48

1    consequences for SJP of deregistration?

2         A.  Can you ask the question again?

3         Q.  Are you familiar with the

4    consequences that would befall SJP if they

5    were deregistered for two years or

6    deregistered at all, what are the

7    consequences for how they can operate?

8         A.  Yes.

9         Q.  And what are those consequences?

10        A.  Well, roughly that they're not

11   allowed to operate as a registered student

12   organization under our expectations and

13   privileges of registered student

14   organizations.

15        Q.  And would that include a loss of

16   University funding?

17        A.  It would preclude them from

18   receiving funding from the Student

19   Government Board.

20        Q.  And that could be $10,000 or more

21   per semester; is that right?

22        A.  I don't -- I don't have good

23   information about that.

24        Q.  And would deregistration deny them

25   access to use of any Pitt facilities for

MARLIN NABORS  -  7/1/2025

49

1       lectures, programs, presentations,

2       meetings, the like?

3           A.   Them, the organization?  Like,

4       please --

5           Q.   The organization, yeah.

6           A.   It would prevent, yes, it would

7       prevent the student organization from

8       reserving space.

9           Q.   And they would not allow them to

10      use any of the University's internal

11      communications channels?

12          A.   I don't -- I don't know what you

13      mean.

14          Q.   Neither do I.  Do you have internal

15      -- do you have internal communications

16      challenges?  Or channels?  Sorry.  Are

17      there like ListServes, for instance?  If

18      students want to make an announcement about

19      something going on, are there mediums

20      within the University to do that?

21          A.   There is -- students can have

22      posters approved. That's a -- that's a way

23      that students can, student groups can

24      advertise.

25          Q.   And those posters can be displayed

MARLIN NABORS  -  7/1/2025

50

1    where?

2          A.   I don't have exact places for you.

3    There are places around the University that

4    they can be. I just don't know the exact

5    locations.

6          Q.   And if a group is deregistered,

7    they can no longer display posters on

8    campus; is that right?

9          A.   Correct.

10         Q.   Okay.  Let's mark as Exhibit 5

11   Bates 2629. Showing you what's been marked

12   as Exhibit 5, do you recognize this

13   document?  I was going to say, if you need

14   to look at another part of it, just let us

15   know.

16         A.   Can you scroll, Ali, please?

17          Yes, I recognize this language, yes.

18         Q.   Have you seen this document before?

19         A.   So, yes.

20         Q.   What is it; what is this document?

21         A.   This, this looks like this was some

22   version of the opening sort of statement

23   that we planned to use for the hearing.

24         Q.   When you say we, who are you

25   referring to?

MARLIN NABORS  -  7/1/2025

61

1          that I made to hearings this, this semester

2          while I've been employed at Pitt.

3               Q.  Were there any changes made in

4          directions that the panel gave to the

5          parties in terms of dos and don'ts?

6               A.  Can you ask again?  I'm sorry.

7               Q.  Yeah.  So did you direct any

8          changes into what directions were given to

9          students appearing before a panel either

10         before, during, or after a proceeding?

11              A.  That, that is possible.  I -- I

12         think what I would need to do is to look at

13         the instructions that were given to

14         students before the February hearing and

15         before the May hearing.  I just, I don't

16         know for sure.

17              Q.  Do you know whether there was a

18         change that inserted language specifically

19         telling students that they could not

20         communicate with panel hearing officers

21         after the conclusion of the hearing?

22              A.  I don't -- I don't know for sure

23         that that was added.

24              Q.  And are you aware that that was not

25         something that was told to students

MARLIN NABORS - 7/1/2025

62

1        appearing before a panel prior to May?

2            A.  I can't answer that confidently.

3            Q.  Do you know whether the students

4        are told specifically, either in writing or

5        verbally at a hearing, that they should not

6        communicate directly with hearing officers

7        after the close of the proceedings?

8            A.  I don't know confidently that that

9        instruction is given.

10           Q.  So you're not aware that that

11       instruction is generally given?

12           A.  Correct.

13           Q.  And you're not aware that it was

14       given to the students on the February 4

15       hearing?

16           A.  Correct.

17           Q.  And you're not aware that it was

18       given to the students at the May 23

19       hearing?

20           A.  Correct.

21           Q.  Okay.  Well, let me ask you, you

22       were at that May 23 hearing.  Do you recall

23       that instruction being given to the SJP

24       students?

25           A.  I don't recall.  I would need to

MARLIN NABORS  -  7/1/2025

63

1    look back at the -- at the script.  I don't

2    recall that specifically.

3         Q.  And what we're talking about is

4    some kind of direction making clear that

5    communication with panel hearing officers

6    after the hearing is prohibited.  You don't

7    recall that?

8         A.  I -- I don't recall that coming up

9    at the hearing.

10        Q.  I note there was a Mr. Bruce Albert

11   who was, I think was he the hearing

12   manager?  What do you call Mr. Albert at

13   the May 23 hearing; what was his role?

14        A.  The hearing moderator.

15        Q.  What's the hearing moderator's

16   role?

17        A.  To lead the proceedings and ensure

18   that all relevant information is brought to

19   the panel.

20        Q.  What does the person in that role

21   do to ensure that all relevant information

22   is brought to the panel?  How do they do

23   that?

24        A.  Ask questions, clarify questions,

25   clarify process, ask for certain topics or

MARLIN NABORS  -  7/1/2025

64

1      areas not to be explored to keep things on

2      track.

3          Q.  So the moderator is an active

4      presence during the hearing?

5          A.  Yeah, yes.

6          Q.  And was Mr. Albert active during

7      the May 23 proceeding?

8          A.  I feel that's a little too broad

9      for me to answer that.

10          Q.  I note Mr. Albert is not a

11      University of Pittsburgh employee; is that

12      correct?

13          A.  Correct.

14          Q.  In any of the other 25 or so

15      proceedings that you've been involved in

16      since you started in January, has there

17      been a non-Pitt employee enlisted as

18      moderator?

19          A.  No.

20          Q.  Why did you -- why did -- were you

21      involved in the decision to select Mr.

22      Albert?

23          A.  I was not.

24          Q.  Who made that decision?

25          A.  That was a decision by the Vice

MARLIN NABORS  -  7/1/2025

65

 1     Provost.
 2              Q.  By Dr. Panzella?
 3              A.  Uh-huh.
 4              Q.  And you didn't -- have you ever
 5     asked her why she made that decision?
 6              A.  No.
 7              Q.  Was there any discussion about who
 8     would be the moderator?  Were you
 9     participating in any discussion about who
10     would be the moderator?
11              A.  I was not a participant in the --
12     well, I mean, yes, I was a participant in
13     the discussion about whether or not Matt
14     Landy, who is the Director of Student
15     Conduct, whether or not he should continue
16     in the role as moderator. That's the part
17     of the discussion that I was involved in.
18              Q.  So Mr. Landy was the moderator for
19     the February 4 discussion?
20              A.  Hearing, correct.
21              Q.  Right, sorry.  And what was the
22     discussion about whether he would continue
23     in that role on May 23 for the second
24     proceedings?
25                    MR. BILUS:  Again, to the extent

66

1        those discussions involve counsel, I would

2        object on the basis of privilege.  I don't

3        know if they did or not, but I'm just, if

4        that's calling for privileged information,

5        I would object.

6            Q.   What's your understanding of why

7        Mr. Landy did not continue as moderator for

8        the May 23 decision?  May 23 proceedings?

9        Sorry.

10           A.   I had a very limited role in that

11       conversation. I think that I may have said

12       to Dr. Panzella that if we were vacating

13       the original hearing, that we should, you

14       know, wipe everyone clean, including the

15       moderator.  And that's, that I believe was

16       the extent of my involvement in the

17       discussion.

18           Q.   You were not party to any

19       discussions about whether that moderator

20       should be a Pitt employee?

21           A.   No.

22           Q.   Are you aware of the University

23       ever using a non-Pitt employee as moderator

24       at a disciplinary panel?

25           A.   I mean, yes.  I mean, I am -- I

MARLIN NABORS - 7/1/2025

67

1      guess what's more accurate to say is that

2      I'm aware of this practice.  I don't have

3      any specific circumstance at Pitt that I

4      can point to.

5           Q.  Are you talking about practice at

6      Pitt or practice in the industry or what?

7           A.  Practice in -- practice in the

8      industry.

9           Q.  Are you aware of this practice at

10     Pitt outside of the May 23 hearing?

11          A.  I cannot reference any cases that I

12     have knowledge of that used an outside

13     hearing moderator.

14          Q.  Between February 4 and May 23 are

15     you aware of any changes in how panel

16     hearing officers are selected?

17          A.  I am not clear on how panelists

18     were selected for the February hearing.

19          Q.  Were you involved in panel

20     selection for May 23?

21          A.  That was Dr. Panzella and our

22     inside legal counsel.

23          Q.  They are the ones who selected the

24     panel members?

25          A.  I -- I think that I was involved in

MARLIN NABORS  -  7/1/2025

70

```
1      refer to them; what do you call them?
2            A.   Panelists.
3            Q.   I mean, are you aware of what, if
4      any, training panelists receive for this,
5      this role?
6            A.   At Pitt specifically I was not
7      involved in their training and I don't know
8      what training was offered to them.
9            Q.   Do you know what instructions they
10     have about what they should and shouldn't
11     do while they're deliberating on a matter?
12           A.   Sorry, can you ask that one more
13     time?
14           Q.   Are you aware whether the panelists
15     are given any instructions about, for
16     instance, not reading newspapers or opening
17     social media; are there any restrictions on
18     how panelists should comport themselves
19     while they are deliberating on a matter, on
20     a disciplinary matter?
21           A.   I'm not aware of any guidance.
22           Q.   All right.  Let's look at, let's
23     mark as Exhibit 6 Bates No. 2595.  Do you
24     see what's been marked as Exhibit 6 on the
25     screen, Mr. Nabors?
```

MARLIN NABORS  -  7/1/2025

71

1          A.   I do.

2          Q.   What is this?

3          A.   Looks like it's an email to my

4     executive assistant.

5          Q.   And this says that you'll be having

6     a 15-minute chat every morning with Carla

7     to check in about the SJP conduct process;

8     is that correct?

9          A.   That's right.

10          Q.   And did these 15-minute sessions

11     occur?

12          A.   Not every morning.

13          Q.   How often?

14          A.   I could not say.

15          Q.   Was anybody else part of these

16     discussions?

17          A.   Sometimes our -- Stan would be

18     involved.

19          Q.   But not always?

20          A.   But not always.

21          Q.   What did you talk about when Stan

22     was not there?

23          A.   It would be difficult for me to

24     make a meaningful distinction because I

25     don't -- his presence wasn't necessarily

MARLIN NABORS  -  7/1/2025

72

1        the thing that, that marked the

2        conversation for me, so I don't know if I

3        could accurately say.

4             Q.   In other proceedings you've,

5        conduct proceedings you've been involved

6        in, did you have regular meetings with Dr.

7        Panzella before those proceedings?

8             A.   It's not uncommon for Dr. Panzella

9        and I to talk about open conduct cases.

10            Q.   Is she involved in all conduct

11       cases?

12            A.   She requires updates and

13       information about conduct cases.

14            Q.   How often is she involved in

15       shaping what a conduct process can or

16       should look like?

17                 MR. BILUS:  Object to the form.

18            A.   I would say we pretty consistently

19       just try and use our process and stick to

20       what's in our policies and procedures.  So,

21       you know, my conversations with Dr.

22       Panzella about conduct cases are typically

23       updates.

24            Q.   Have you had another case in your

25       tenure at Pitt where you had nearly daily

73

1    meetings with Dr. Panzella about the

2    disciplinary proceedings?

3         A.   No.

4         Q.   Have you had any other proceedings

5    that went to a panel hearing during your

6    tenure at Pitt that involved discussions

7    with University counsel prior to the

8    hearing?

9         A.   Yes.

10        Q.   Out of the approximately dozen that

11   you've been involved in, what percentage of

12   those involved counsel, in your estimation?

13        A.   Half.

14        Q.   Let's mark as Exhibit 7 Bates

15   13886.  I'll show you what's been marked as

16   Exhibit 7.  Do you recognize this document?

17        A.   Sure, yes.

18        Q.   What is it?

19        A.   It looks like this is a page of the

20   information that was provided for the

21   hearing.

22        Q.   Does this go to the panel members?

23        A.   I don't know that confidently.  I

24   don't know what the -- what the -- what the

25   hearing moderator shared and what things --

MARLIN NABORS - 7/1/2025

84

1           Open Letter. Does that look right?

2                 A.   It does.

3                 Q.   And how if at all was this document

4           used during the hearing?

5                 A.   I believe we walked through

6           portions of this timeline with the panel.

7                 Q.   All right.  Sticking just with the

8           interference with the ongoing conduct

9           process, this that starts on Page 17, did

10          you walk the panel through, through these

11          pages?

12                A.   Page 17?

13                Q.   Yeah, let's start, yeah, let's

14          start with Page 17.  That would be easiest.

15                A.   I -- I believe we did.

16                Q.   Ali, can you enlarge that a little

17          bit?  My eyes aren't what they used to be.

18          So in that last bullet under February 4,

19          it says, "That evening, while the hearing

20          board was still deliberating, SJP

21          improperly communicated with and interfered

22          with the deliberations of the board via an

23          email attaching an Open Letter asserting

24          various new allegations and urging the

25          board to dismiss the conduct charges

85

1    against SJP."  Is that correct? Did I read

2    that correctly?

3         A.  Yes.

4         Q.  When you say -- did you write that?

5         A.  I don't recall.  I'm sure I was at

6    least a co-author.

7         Q.  You approved of this language?

8         A.  Yes.

9         Q.  Okay, when you say improperly

10   communicated, what was improper about it?

11        A.  That the communication was an

12   attempt to, to not only to continue to have

13   sort of hearing, sort of points and

14   processes outside of the hearing process,

15   but to influence the deliberations or the

16   decision of the board.

17        Q.  Is asking the panel to dismiss the

18   charges new information?

19        A.  No.

20        Q.  And that was the whole purpose of

21   or that's what I think the students hoped

22   would happen at the hearing; correct?

23             MR. BILUS:  Objection to the

24   form.

25        A.  I'm sorry, what do you want me to

MARLIN NABORS  -  7/1/2025

86

1    respond to?

2        Q.  Would you agree with me that the

3    students' argument at the first hearing was

4    to dismiss the charges against them;

5    correct?

6        A.  I wasn't at the first hearing.

7        Q.  But you're familiar with it?

8        A.  Sure.  Again, I would say in each

9    of the hearings, what we ask is for

10   students to respond to the allegations by

11   bringing forward statements and

12   information.

13       Q.  SJP's goal would have been to have

14   the panel dismiss the charges; correct?

15       A.  I'm -- I mean, I don't know how you

16   want me to respond to that, sir.

17       Q.  It would not be a surprise to the

18   panel members that SJP wanted them to

19   dismiss the charges; that's not new

20   information; correct?

21       A.  That's likely not new information.

22       Q.  When you say asserting various new

23   allegations, what are you referring to?

24   Would it help to look at the letter?

25       A.  Sure.

MARLIN NABORS  -  7/1/2025

87

1          Q.  Ali, can you put up, I think it's
2     Exhibit 2.
3     Is that large enough for you to see, Mr.
4     Nabors?
5          A.  It is.
6          Q.  You must be younger than me.
7     Definitely better eyes.
8          A.  And a bigger screen.
9          Q.  So again I'm asking, what are the
10    new allegations here?
11         A.  Can you scroll for me, Ali, please?
12     Okay, can you go back to the first page up
13    here?
14        I can't say with any confidence that
15    there's actually any new information
16    presented here.
17         Q.  Did you say you cannot say with
18    confidence?
19         A.  I cannot.
20         Q.  So all of this information may just
21    be a repeat of what was presented at the
22    hearing; is that right?
23         A.  Again, I wasn't there.
24         Q.  But you are a co-author of making
25    this allegation that these were new

MARLIN NABORS - 7/1/2025

88

1      allegations in the letter?

2           A.   Correct.

3           Q.   But now as you look at the letter,

4      you can't identify information that you

5      know to have been new?

6           A.   Correct.

7           Q.   Okay, let's go back to Exhibit 9.

8      Sorry, Ali. You probably didn't get this

9      training in law school, but you are doing a

10     very good job I will say.  Let's go to the

11     next, let's go to Page 18.  We were just

12     looking at 17.  Can you go to, I'm sorry,

13     go to Page 18.  Yeah.  Right, so we could

14     have looked at the letter here.  My bad,

15     okay.  Can you scroll down to the bottom of

16     the page?

17     So the first line there reads, "Attempting

18     to influence anyone involved in a conduct

19     proceeding outside of the context of the

20     hearing - particularly the board members -

21     fundamentally undermines the integrity of

22     the process."  Did I read that correctly?

23          A.   You did.

24          Q.   I want to understand what

25     attempting to influence anyone involved in

MARLIN NABORS - 7/1/2025

89

1          a conduct proceeding outside the context of

2          a hearing entails.  So in this case we had

3          an Open Letter that was sent to about 20

4          administrators; correct?

5                A.  Yes.

6                Q.  And included in that group of

7          administrators was the three hearing

8          officers; correct?

9                A.  Correct.

10               Q.  If -- was the problem or was the

11         violation here because those hearing

12         officers were included on that email?

13               A.  Yes.

14               Q.  So if they had sent that letter to

15         the administrators not including the

16         hearing officers, that would not have

17         constituted a violation?

18               A.  Correct.

19               Q.  What if they posted the letter on

20         social media in addition to sending it to

21         the administrators, would that have been a

22         violation?

23               A.  So again, I just want to be clear

24         that my role in this was to bring alleged

25         violations to the panel, and it's their

MARLIN NABORS - 7/1/2025

90

1       role to make a decision about whether or

2       not those policies were violated.  So can

3       you give me the question again with that

4       context in mind?

5           Q.  Yeah, so let me just back up.  So

6       may I assume when you decide whether to

7       bring charges, you apply, my term,

8       something like a probable cause standard,

9       that you believe there may be a violation;

10      is that fair?

11          A.  That's fair.

12          Q.  So in bringing these, I'm asking

13      you, trying to understand what attempting

14      to influence means. If the students, let's

15      say their intent was to influence the

16      process, they sent the exact same letter to

17      the administrators but not including the

18      hearing officers.  Would that have

19      triggered charges?

20          A.  I would not have individually made

21      the argument that that should result in

22      charges, no.

23          Q.  Let's say that that letter was then

24      also published on social media widely,

25      reshared by allied groups, and duplicated

MARLIN NABORS  -  7/1/2025

91

1        in the Pitt News, so it's widely available.

2         Would that have triggered charges?

3                    MR. BILUS:  Object to the form.

4         A.  The reason that this communication

5        triggered this alleged violation is because

6        it was communicated directly to the board

7        members.

8         Q.  If the, in the hypothetical I just

9        used involving letter to many other

10       administrators, social media distribution

11       and republication in the Pitt News, and it

12       is entirely likely that the hearing

13       officers or the panel members would have

14       seen that, that still, that wouldn't be a

15       violation?

16                   MR. BILUS:  Objection to the

17       form.

18        Q.  That would not have prompted you to

19       file charges?  Sorry.

20        A.  It would not have.

21        Q.  Even though the very same content

22       would have reached or likely reached the

23       panel members?

24                   MR. BILUS:  Object to the form.

25        A.  In this hypothetical situation?

MARLIN NABORS  -  7/1/2025

92

1        Q.  Yes.

2        A.  I would -- I would not have

3    advocated that we pursue charges under the

4    hypothetical that you're describing.

5        Q.  So that the sole problem here was

6    the fact that the panel hearing members

7    were directed or the panel members received

8    a copy of the letter directly from the

9    students?

10              MR. BILUS:  Object to the form.

11        A.  The problem was that the students

12    emailed the panelists directly.

13        Q.  So if the exact same letter made

14    its way to the panelists while they were

15    deliberating through some other means, that

16    would not have been a violation?  You, I'm

17    sorry, you would not have pressed charges

18    against SJP?

19        A.  Correct.

20        Q.  So the fact that they sent it to,

21    that SJP sent it directly to the panel

22    members, in your mind is that a -- is that

23    by itself a violation regardless of the

24    actual impact on the panel members?

25        A.  I believe that the attempt at

MARLIN NABORS - 7/1/2025

93

1       influence is a violation.

2           Q.   The attempt at influence by

3       communicating directly with the panel

4       members; correct?

5           A.   Correct.

6           Q.   But if they attempted to influence

7       by indirectly getting it to the panel

8       members, that would not be a violation?

9           A.   It would be if I could prove that

10      they indirectly attempted to get it to the

11      panelists.

12          Q.   You're not aware of any direction

13      to panelists to stay away from social media

14      or regular media or outside communications

15      during their deliberations; in other words,

16      they're not sequestered like a jury could

17      be?

18          A.   The panelists are not sequestered.

19          Q.   So would it still be a violation if

20      the students sent it directly to the panel

21      members but the panel members told you that

22      it did not impact their deliberations;

23      would that still be a violation?

24          A.   It's the attempt that's the

25      concern, sir.

MARLIN NABORS - 7/1/2025

94

1        Q.  So that the effect is irrelevant?

2        A.  Not irrelevant, but what's --

3   what's relevant for the charges is the

4   attempt.

5        Q.  And even if they did this, so let's

6   say that they -- let's go back to my

7   hypothetical, no direct communication.  If

8   you had evidence that their objective was

9   to have the panel dismiss the charges, then

10  you believe that would violate Pitt's Code

11  of Conduct as well?

12       A.  You have to -- I'm sorry, can you

13  give me a little more detail there?  Their

14  objective in doing what?

15       Q.  In exact same letter, did

16  everything that they did in this case

17  except they didn't include the panel

18  members.  But they went and said, yeah, we

19  hope that everybody looks at this letter

20  and that it results in a dismissal of our

21  charges. Violation or no violation?

22       A.  I would not have advocated for

23  charges in that circumstance.

24       Q.  Back on the bottom of Page 18, that

25  second sentence under that bullet point,

MARLIN NABORS  -  7/1/2025

95

1          "For this reason, the Code of Conduct

2          specifically forbids any action that could

3          potentially intimidate, coerce or influence

4          a witness or Hearing Officer."  Is that

5          correct?

6               A.  You read it correctly.

7               Q.  Yeah.  So that's where you say that

8          you don't have to have actual intimidation,

9          coercion or influence; it's just if there's

10         a potential for it; is that correct?

11              A.  Yeah, I, you know, I think that

12         we're playing a little bit of semantics

13         here between, you know, attempt and

14         potential, but, yeah.

15              Q.  Let's go to the next page, Ali,

16         Page 19.  So that that top bullet point,

17         the first sentence, the allegations in

18         SJP's Open Letter were generally untrue or

19         misleading and inflammatory.

20         Could you go back to the previous page,

21         Ali, to the Open Letter. And I'd like you

22         to identify what was

23         untrue, misleading, or inflammatory in that

24         letter?

25              A.  It is untrue that the

MARLIN NABORS - 7/1/2025

98

1    there.  So, I'm sorry, go to the bottom of
2    Page 19, Ali.
3        Under February 6 it says that at that
4    point you notified the board members to
5    pause their deliberations; is that right?
6        A.  Correct.
7        Q.  But you didn't talk to the panel
8    hearing members until February 10; is that
9    right?
10        A.  Correct.
11        Q.  So you made this determination to
12    stop the proceedings before you had their
13    input or views on the effect of the letter?
14        A.  Correct.
15        Q.  If you would scroll down a little
16    further, Ali.
17    There's, under February 8 it says, "SJP
18    further amplified the potential effects of
19    the Open Letter by posting a version of it
20    on their IG," I assume is Instagram; is
21    that right?
22        A.  Correct.
23        Q.  So this is then just putting up
24    their, the letter they sent on February 4
25    on social media; correct?

MARLIN NABORS - 7/1/2025

107

1        Q.   Is this the email from a panel

2    member that you've referenced previously

3    during this deposition as coming in and

4    complaining about the Open Letter?

5        A.   Yes.

6        Q.   To your knowledge, are there any

7    other written communications from board

8    members complaining about the Open Letter

9    or referencing the Open Letter at all?

10       A.   No.

11       Q.   Are there any other written

12   communications raising concerns about the

13   Open Letter?

14       A.   Not that I'm aware of.

15       Q.   Do you recall when you first saw

16   this email?

17       A.   I do not.

18       Q.   So the day after the hearing, the

19   day after the Open Letter would be February

20   the 5th.  Do you recall any discussions

21   about the Open Letter?

22       A.   Any discussions about the Open

23   Letter on, like, in general?

24       Q.   Any, anything related, any

25   discussions related to the Open Letter sent

MARLIN NABORS  -  7/1/2025

108

```
1          on the evening of February 4.

2               A.  Yes.

3               Q.  What discussions can you recall?

4               A.  I recall having a conversation with

5          Matt asking him if he had received this

6          communication. There were some

7          conversations with our legal counsel and a

8          conversation with Dr. Panzella as we tried

9          to determine how to respond.

10              Q.  What do you recall about your

11         conversation with Matt?

12              A.  Very little.  Only that I asked him

13         if he got this communication and if he

14         would forward it to me.

15              Q.  Did you talk about the substance of

16         the communication?

17              A.  Only to identify it.  Like, did you

18         get this communication from Carlton; can

19         you forward it to me.

20              Q.  What was your discussion with Dr.

21         Panzella about the email?

22              A.  About the -- whether or not this

23         would constitute a violation or not.

24              Q.  And who raised that question, you

25         or her?
```

MARLIN NABORS  -  7/1/2025

109

1           A.   I don't recall.  I mean, I don't
2      recall.
3           Q.   Did you think upon seeing this that
4      there may have been a problem with the Open
5      Letter?
6           A.   Yes.
7           Q.   What did you think the problem was?
8           A.   Well, my first reaction is that it
9      was highly unusual for students to
10     communicate directly with board members
11     outside of the hearing process, so that was
12     sort of my initial flag. And then it just
13     continued to evolve into questions about,
14     was this their intention to try and
15     influence them during deliberations. It
16     just, it just caused me to question what
17     the -- what their -- what the attempt was
18     here and what the potential impact was.
19          Q.   So on that, in the middle of the
20     second paragraph, Mr. Carlton says, "While
21     I personally believe it was inappropriate
22     to make veiled threats in attempt to sway
23     my decision, I did not allow it to impact
24     my role which, once again, was to evaluate
25     the evidence."  Did I read that correctly?

MARLIN NABORS - 7/1/2025

112

1    counsel.
2         Q.  All right, let's to back to Exhibit
3    14.  I show you what's marked as Exhibit
4    14.  Do you recognize this?
5         A.  I do.
6         Q.  What is it?
7         A.  This looks like my notes from my
8    conversations with the panelists.
9         Q.  And these conversations occurred on
10   February the 6th?
11        A.  I don't think that's the right
12   date.
13        Q.  I'm sorry.  February 10?
14        A.  That sounds better.
15        Q.  Okay.  And I believe you said you
16   spoke to each of them separately?
17        A.  I did.
18        Q.  And how long were those
19   conversations?
20        A.  Brief.  Maybe about 15 minutes.
21        Q.  Each?
22        A.  Yes.
23        Q.  And nobody else was party to those
24   calls besides you and the panel members?
25        A.  That's right.

MARLIN NABORS - 7/1/2025

113

1      Q.  Did somebody direct you to make
2   these calls or did you take, do it on your
3   own initiative?
4      A.  I don't think that either of those
5   is true.  I think there's a -- there's a
6   consensus building around this next step.
7      Q.  Next step being what?
8      A.  These interviewing the panelists.
9      Q.  Consensus among whom?
10     A.  Myself, Dr. Panzella, and our legal
11  counsel.
12     Q.  So there's consensus that you
13  should interview the panel members?
14     A.  So I think what I can say is that
15  after conversation with Dr. Panzella and
16  our legal counsel, this was the action that
17  I took.
18     Q.  And were these notes -- when did
19  you prepare these notes?
20     A.  These notes were written as the
21  conversations took place.
22     Q.  So they were -- the notes were
23  taken contemporaneously with the calls?
24     A.  Yes.
25          MR. BILUS:  Vic, did you say

MARLIN NABORS  -  7/1/2025

114

1    were or weren't?

2                    MR. WALCZAK:  Were.

3                    MR. BILUS:  Okay.

4        Q.  (BY MR. WALCZAK)  Yeah, just to be

5    clear, so these notes were prepared

6    contemporaneously with the conversations

7    you had with the panel members?

8        A.  Yes.

9        Q.  And in looking at them now, are

10   they accurate? Is there anything that you

11   would say is inaccurate?

12       A.  No.

13       Q.  All right, so we have a document

14   that's not marked.  Let's mark it here as

15   Exhibit 15.

16                   MS. SZEMANSKI:  Sorry, Vic, is

17   it the --

18                   MR. WALCZAK:  It's the February

19   4.

20                   MS. SZEMANSKI:  November 16?

21                   MR. WALCZAK:  No.

22                   MS. SZEMANSKI:  No.  Okay, I

23   think I know what you're talking about.

24                   MR. WALCZAK:  The recommendation

25   form.

MARLIN NABORS - 7/1/2025

115

```
 1              MS. SZEMANSKI:  Yeah, sorry.
 2         Q.  (BY MR. WALCZAK)  I show you what's
 3    marked as Exhibit 15.  Do you recognize
 4    this?  Ali can scroll down if you want.
 5         A.  I do not recognize this document.
 6         Q.  Have you ever seen it before?
 7         A.  No.
 8         Q.  Do you know what it is?
 9         A.  I think I know what the form is,
10    yes.
11         Q.  What is the form?
12         A.  A Conduct Board Recommendation
13    Form.
14         Q.  Would this be from the first panel?
15         A.  So I have not seen this, sir.
16         Q.  Were you aware it existed?
17         A.  No.
18         Q.  Has nobody mentioned to you the
19    existence of this document?
20         A.  Can you -- so I, can I read this?
21    Because I don't --
22         Q.  Sure, yeah.
23         A.  I don't think I have seen this.
24          Can you continue to scroll?  Can you
25    continue to scroll?  Can you continue to
```

MARLIN NABORS  -  7/1/2025

116

1    scroll, please?

2        No, no.

3        Q.  Go down to the last page and let

4    Mr. Nabors take a look at that.

5        A.  I have not seen this document.

6        Q.  Okay.  Let's mark as Exhibit 16

7    Bates 14034.  I show you what's marked as

8    Exhibit 16.  Do you recognize this?

9        A.  I do.

10        Q.  What is it?

11        A.  It's an email from one of the

12    panelists to me.

13        Q.  So this is dated February 24, so

14    this is two weeks after you spoke to the

15    panel members; is that right?

16        A.  Correct.

17        Q.  You spoke to them on February 10.

18    This is February the 24th.  Did you have

19    any communication with the panel members

20    between February 10 and February 24?

21        A.  Not that I can recall.

22        Q.  And did you respond to this email?

23        A.  I don't remember.

24        Q.  Is it possible you didn't respond

25    to it?

MARLIN NABORS  -  7/1/2025

117

1          A.  I -- I don't -- I don't remember.

2          Q.  Do you know if any of your --

3      you're one of, it looks like you and

4      Matthew Landy and the three panel members

5      are party to this.  Do you know whether Mr.

6      Landy responded to this?

7          A.  I am not -- I'm not aware.

8          Q.  Have you had any communication with

9      the first panel hearing members since

10     February the 10th?

11         A.  Have I had any communication with

12     panel members since February 10?

13         Q.  Yes.

14         A.  I think there was a final

15     communication where we told them that we

16     were vacating the hearing.

17         Q.  That went to them?

18         A.  Oh, actually I don't know that.  No

19     I don't know.  Maybe not.

20         Q.  You don't recall corresponding with

21     panel members about the status of the

22     hearing that they sat on?

23              MR. BILUS:  Object to the form.

24         A.  I don't recall any communication.

25         Q.  Okay, I'm skipping the next

MARLIN NABORS  -  7/1/2025

126

1          A.   Board members are typically the
2     panelists.
3          Q.   Okay.  So the next line is,
4     "Additional language that makes clear that
5     individual contact with board members will
6     result in charges."  What are you referring
7     to there?
8          A.   I believe that this was all things
9     in preparation for the new hearing.  So
10    this would have been referencing
11    instructions to the -- to students coming
12    to the -- to the second hearing.
13              MR. BILUS:  Vic, can I just jump
14    in. This looks like this all relates to the
15    stuff that we've already agreed to redact
16    as being unrelated down below.  We -- it
17    doesn't seem like this relates to this case
18    at all.
19              MR. WALCZAK:  Well, thanks,
20    Sandy, that's not what your witness just
21    testified to, so why don't you let me
22    continue with my questions.
23              MR. BILUS:  All right.
24         Q.   (BY MR. WALCZAK)  So after that
25    speaking objection, so you think this

MARLIN NABORS  -  7/1/2025

127

1          relates to the upcoming SJP proceeding

2          which was ultimately held on May 23?

3                    MR. BILUS:  Objection to form.

4               A.  I think that it is.

5               Q.  Okay.  And then the third line

6          there in that sort of second block is,

7          "Revisit the additional remote script

8          language we used and update."  What does

9          remote script language refer to?

10              A.  The instructions that the moderator

11         would give to people participating in a

12         remote hearing.

13              Q.  Why are you -- are you -- what's

14         the purpose of this email that you sent?

15         What were you hoping to accomplish here?

16              A.  We've been in conversation during

17         my entire time at Pitt about changes we

18         want to make to the process.  So this was

19         sort of a part of that conversation, but

20         then also trying to prepare information for

21         the -- for the new hearing moderator.

22              Q.  So these would be changes made

23         after the February 4 hearing and before the

24         May 23 hearing?

25              A.  I think that that's what I was

MARLIN NABORS  -  7/1/2025

128

1    asking him to consider.

2         Q.   And when you say no contact order

3    between board members, that would be to

4    articulate specifically that there should

5    be no contact by participants with the

6    board?

7         A.   I don't -- I don't know.  That

8    language doesn't make any sense to me,

9    because a no-contact order is a very

10   specific thing in our world, so I don't --

11   I don't understand this then.

12        Q.   What about the second one there,

13   make clear that individual contact with

14   board members will result in charges, why

15   are you suggesting that?

16        A.   We, after the experience with the

17   first board hearing, we were talking about

18   changes that we wanted to make broadly to

19   the process moving forward.

20        Q.   And is that to clarify because it

21   was unclear on February 4?

22        A.   I don't think that that's fair to

23   say.  I think what's fair to say is that we

24   were having conversations about changes

25   that we wanted to make to the process, ways

MARLIN NABORS - 7/1/2025

129

```
 1        that we wanted to improve the process.
 2            Q.  And how would that improve the
 3        process?
 4                MR. BILUS:  Can you all hear me?
 5                THE WITNESS:  Yes.
 6                MR. BILUS:  Okay.  I got kicked
 7        out. The storm that must have been coming
 8        through Pittsburgh has made its way to me,
 9        and it may be interfering with my internet.
10         But I'm back. Hopefully I won't get kicked
11        out again.
12            I don't know what the last couple, if
13        there were questions while I was paused?
14                MR. WALCZAK:  I asked how the
15        changes would improve the process, and
16        we're waiting for Mr. Nabors to answer.
17                MR. BILUS:  Okay.
18            Q.  (BY MR. WALCZAK)  Still thinking,
19        Mr. Nabors, or --
20            A.  I am.
21            I -- I would put this under the
22            category
23        of greater clarity helps to improve the
24        process.
25            Q.  Greater clarity for whom?
```

MARLIN NABORS - 7/1/2025

130

1          A.   For all involved.

2          Q.   Including the students being

3      brought up on conduct charges?

4          A.   Sure.

5          Q.   I have just a couple more

6      questions.  I know we're at 3:00.  So I've

7      seen a number of emails where you've been

8      invited to and seemingly attended events

9      with Jewish student leaders at the

10     University.  Is that true?

11         A.   Sure.

12         Q.   And it looks like there were some

13     in January, February, March.  I'm not sure

14     about April or May.  Actually April I'm not

15     sure.  But is this a -- is this something

16     that you and some of your colleagues do

17     regularly?

18              MR. BILUS:  Object to the form.

19         A.   I'm invited by students to attend

20     events pretty frequently.

21         Q.   Have you ever attended an event

22     with the Muslim Students Association?

23         A.   I've had meetings with the

24     leadership of the Muslim Student

25     Association.  I have not been invited to an