Exhibit 7

Transcript of the Testimony of

# JENNIFER TUSCANO

July 3, 2025

## STUDENTS FOR JUSTICE IN PALESTINE AT PITT  VS UNIVERSITY OF PITTSBURGH



**412-261-2323**
**depo@akf.com**
**www.akf.com**

JENNIFER TUSCANO  -  7/3/2025

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 2:25-CV-00524

STUDENTS FOR JUSTICE IN          )
PALESTINE AT PITT,               )
                                 )
        Plaintiff,               )
                                 )
    VS.                          )
                                 )
UNIVERSITY OF PITTSBURGH; JOAN   )
GABEL, MARLIN NABORS, KARIN      )
ASHER, DaVAUGHN VINCENT-BRYAN,   )
MATTHEW LANDY, and JAMEY MENTZER,)
all in their official and        )
individual capacities,           )
                                 )
        Defendants.              )


DEPOSITION OF JENNIFER TUSCANO
VIA VIDEOCONFERENCE


    DEPOSITION taken before me, Mary J. Carney, a
Notary Public within and for the Commonwealth of
Pennsylvania, via Zoom videoconference, beginning at
12:03 p.m. on July 3, 2025, pursuant to Notice and to
be used pursuant to the Federal Rules of Civil
Procedure in the aforesaid cause of action, pending
in the United States District Court for the Western
District of Pennsylvania.

JENNIFER TUSCANO  -  7/3/2025

```
                                                            2
 1                         APPEARANCES

 2

 3              On Behalf of Plaintiff:

 4              Solomon Furious Worlds, Esquire
                Kirsten M. Hanlon, Esquire
 5              ACLU OF PENNSYLVANIA
                P.O. Box 60173
 6              Philadelphia, PA  19102
                215-592-1513
 7              sfworlds@aclupa.org
                khanlon@aclupa.org
 8
                Witold J. Walczak, Esquire
 9              ACLU OF PENNSYLVANIA
                P.O. Box 23058
10              Pittsburgh, PA  15222
                412-681-7864
11              vwalczak@aclupa.org

12

13              On Behalf of Defendants:

14              Alexander R. Bilus, Esquire
                Mary Hutchings, Esquire
15              SAUL EWING LLP
                Centre Square West
16              1500 Market Street, 38th Floor
                Philadelphia, PA  19102-2186
17              215-972-7777
                alexander.bilus@saul.com
18              mary.hutchings@saul.com

19

20              Also Present:

21              J. Nicole Rhodes, Esquire
                University of Pittsburgh
22
                Emily Hoecker, Paralegal
23              ACLU of Pennsylvania

24

25
```

JENNIFER TUSCANO - 7/3/2025

32

1  questions. So this document is a little bit

2  longer, sorry. If you could also read this

3  one over, that would be great.  Thank you.

4       A.  You can scroll, Kirsten.  You can

5  scroll.  You can scroll.  You can scroll

6  for me.  You can scroll.  You can scroll.

7  You can scroll, Kirsten.  You can scroll.

8       I've completed reading this page, too,

9  Solomon.

10       Q.  Thank you, Jen.

11       A.  Yep.

12       Q.  Let's go back to your notes.

13       A.  Okay.

14       Q.  Which, Mary, I'm not sure if I

15  asked to mark this as Tuscano 2, but just

16  in case I hadn't.

17  The handwritten portion on the first page

18  in the top right, towards the bottom of

19  that handwritten portion I read something

20  that says, "Why is there a conduct

21  violation."  Do you see that?

22       Kirsten, could you highlight that?

23       A.  Yeah, oh, yep, gotcha.

24       Q.  What did you mean when you wrote

25  that?

JENNIFER TUSCANO - 7/3/2025

33

1          A.   That I didn't believe that the
2    complainant provided sufficient evidence or
3    information for me to determine whether a
4    conduct violation actually occurred.
5          Q.   Who --
6          A.   I'm sorry, say it again?
7          Q.   I'm sorry, I think when I moved my
8    papers it might have clogged my mic.  I
9    asked, who is the complainant?
10         A.   David and DaVaughn.
11         Q.   David Day?  David's last name I
12    believe is Day; correct, D-A-Y?
13         A.   I believe so.
14         Q.   I believe we're talking about the
15    same person, I just want to make sure.
16    Give me one moment, please.
17    I believe we are talking about the same
18    person, but for now we'll just keep
19    referring to this individual as David.
20         A.   Okay.
21         Q.   David and DaVaughn were the
22    complainants, and were they representing
23    themselves as the complainants, they as
24    individuals were complainants or --
25         A.   I don't know.

JENNIFER TUSCANO  -  7/3/2025

37

1          Q.  Were there differences between both

2     sides of the story?

3          A.  Yes.

4          Q.  What were those differences?

5          A.  The event or lack thereof event and

6     the perception based on both sides, how

7     they viewed it.

8          Q.  It's my understanding from your

9     notes that there wasn't clarity as to what

10    an event was; is that correct?

11         A.  Correct.

12              MR. BILUS:  Objection to form.

13    Go ahead.

14         Q.  Is that correct?

15         A.  Yes.

16         Q.  Per your reading of your notes?

17         A.  Yes.

18         Q.  And is that what you recall from

19    your own recollection?

20         A.  That is what I recall.

21         Q.  Did SJP present arguments during

22    the hearing? Did it argue on its own behalf

23    that it didn't -- you know, anything, did

24    it argue on its own behalf with regard to

25    its own side of the story?

JENNIFER TUSCANO  -  7/3/2025

38

1          A.  Yes.

2          Q.  Yes.  Did it argue why it should

3     not be found responsible for the charges

4     against it?

5          A.  Yes.

6          Q.  Do you remember those arguments?

7          A.  They believed that what occurred in

8     the library was not defined as an event or

9     that it violated library policy.

10          Q.  Did SJP mention that they felt

11     targeted by Pitt?

12          A.  Yes.

13          Q.  Did they say that they felt

14     targeted based on their political views?

15          A.  I don't remember.

16          Q.  Did SJP ever mention an

17     organization called Betar USA?

18          A.  I don't remember.

19          Q.  Do you remember SJP bringing up

20     anything about a bomb threat against the

21     organization?

22          A.  I don't remember.

23          Q.  Okay.  Did SJP argue that Pitt was

24     overly surveilling them?

25          A.  Yes.

JENNIFER TUSCANO - 7/3/2025

39

1          Q.  Did SJP argue that the policies
2     were perhaps inconsistent as applied to
3     them?
4          A.  Yes.
5          Q.  Did SJP argue that the policies
6     were vague or perhaps hard to understand?
7          A.  I don't remember.
8          Q.  Did SJP argue that the hearing and
9     charges set a dangerous precedent for free
10    speech?
11         A.  Yes.
12         Q.  Did SJP ask you to find them not
13    responsible for the charges?
14         A.  Yes.
15         Q.  Did they ask you to dismiss the
16    charges?
17         A.  I don't remember.
18         Q.  Were there any instructions to SJP
19    after the hearing from the University?  Do
20    you recall any instructions to SJP after
21    the hearing?
22         A.  I don't recall.
23         Q.  You don't recall.  I suppose I know
24    the answer here.  I initially asked from
25    Pitt, but did the panel give them any

JENNIFER TUSCANO - 7/3/2025

42

1          Q.  Did the panel ever get a chance to

2     meet?

3          A.  Yes.

4          Q.  When did the panel meet?

5          A.  Immediately following the hearing.

6          Q.  Like ten minutes following the

7     hearing or --

8          A.  Immediately following the hearing.

9          Q.  Less than ten minutes following?

10    Okay.

11         A.  Yeah, from what I can remember.

12         Q.  Okay.  What was that meeting like?

13         A.  The panelists discussed the

14    hearing.

15         Q.  Was there consensus early on?

16              MR. BILUS:  Objection to the

17    form.

18         Q.  Did the panel, did the panelists

19    ever reach consensus as to rationale or

20    conclusion?

21         A.  I don't believe we reached full

22    consensus.

23         Q.  It sounds like you believe there

24    may have been a partial consensus?

25         A.  I don't believe we completed our

JENNIFER TUSCANO - 7/3/2025

43

1    process before being notified to end our

2    process with the hearing.

3         Q.  During the discussions immediately

4    following that February 4 hearing, what was

5    your impression of the hearing?

6         A.  Can you repeat that first part,

7    Solomon?

8         Q.  During that immediate conversation

9    following the hearing, what was your

10   impression of the hearing?  How did you

11   express your thoughts about SJP's

12   disciplinary hearing?

13        A.  My initial thoughts were that the

14   complainants did not adequately provide

15   information or evidence related to a

16   library policy violation.

17        Q.  Had you been the only panelist, you

18   were the czar of the panel, you could have

19   decided right then and there in that

20   immediate moment, would you have found SJP

21   responsible?

22             MR. BILUS:  Object to the form.

23        Q.  Please answer the question.

24        A.  Can you repeat it for me, Solomon?

25        Q.  In the immediate aftermath, had you

JENNIFER TUSCANO  -  7/3/2025

44

```
 1        been the sole panelist, would you have --
 2        how would you have found for SJP,
 3        responsible or not responsible, with
 4        regards to the allegations?
 5                  MR. BILUS:  Object to the form.
 6        Q.  Please answer.
 7        A.  I can still answer?
 8        Q.  Yes.
 9        A.  I wouldn't -- I wouldn't say in the
10        immediate, Solomon, without reviewing my
11        notes post.  But if I were the only
12        panelist, I do believe I would have found
13        SJP not responsible for a policy violation.
14        Q.  Kirsten, could we look at the
15        recommendation form.
16         Jen, do you recognize this document?
17        A.  Yes.
18        Q.  Kirsten, could you quickly, not too
19        quickly, but with some pace scroll through
20        this document again just to show Jen that
21        this is the document she read not too long
22        ago.
23        And I'm sorry, Jen, I don't know that I
24        caught your pronouns at the beginning of
25        this. Do you use she/her pronouns?
```

JENNIFER TUSCANO  -  7/3/2025

45

1          A.   I do.

2          Q.   Excellent, thank you.  Just, you

3     understand this is the document you read

4     not too long ago, Jen?

5          A.   Yes.

6          Q.   Excellent, thank you.

7           Kirsten, you can go back to the top of

8           the

9     document. You said you recognize this

10          document?

11          A.   Yes.

12          Q.   What is this document?

13          A.   A Conduct Board Recommendation

14     Form.

15          Q.   When's the first time you saw this

16     document? Do you recall seeing this

17     document before today?

18          A.   I do.

19          Q.   Do you remember when that was?

20          A.   On a Zoom with the other panelists.

21          Q.   Do you know who made this document?

22          A.   One of the other panelists.

23          Q.   Do you recall which one?

24          A.   Zach Davis.

25          Q.   Zach Davis.  Is Zach Davis -- do

46

1          you know who the author is of this, of the

2          -- not the form aspect of the form, but the

3          entry, the entries as it were, do you know

4          who authored that?

5               A.  Do you mean the content?

6               Q.  That's the word I'm looking for.

7          Thank you.

8               A.  Zach Davis.

9               Q.  Zach.  Did Zach get your input

10         while authoring this?

11              A.  Yes.

12              Q.  How many panelists were there

13         during the February 4 hearing?

14              A.  Three including myself.

15              Q.  So it was you, Zach, and then who

16         was the third?

17              A.  Carlton Scott.

18              Q.  Carlton Scott.  Two first names.

19         Did Carlton also have a hand in drafting

20         this?

21              A.  Yes.

22              Q.  This document seems to be, seems to

23         be pretty far along in the drafting

24         process.  Where would you say this document

25         is in the drafting process?

JENNIFER TUSCANO  -  7/3/2025

47

1           MR. BILUS:  Object to the form.
2       Q.  Could you say?  Could you say where
3    this document is in the drafting process?
4       A.  Pretty far along.
5       Q.  That's a good answer.  Okay, so
6    just to recap, Zach was the one who was
7    actually typing into the document; correct?
8       A.  That is correct.
9       Q.  As he was typing into the document,
10   though, you and Carlton were weighing in;
11   is that correct?
12      A.  That is correct.
13      Q.  During that drafting process, was
14   it difficult to come to final language?
15   Well, was it difficult to come to the
16   language that ultimately we're reading
17   today?
18           MR. BILUS:  Object to the form.
19      A.  No.
20      Q.  Sandy said, "Object to the form,"
21   but, Jen, you just said, "No"; is that
22   correct?
23      A.  Correct.
24      Q.  Thank you.  Did the group discuss a
25   recommended outcome?

JENNIFER TUSCANO  -  7/3/2025

48

1          A.   Yes.

2          Q.   And all of this, the conversation,

3     the drafting, and the discussion of the

4     recommended outcome, that was all in the

5     immediate Zoom call after the February 4

6     hearing?  Or excuse me.  Was that all in

7     the immediate call after the February 4

8     hearing?

9          A.   Yes.

10          Q.   You said you discussed a

11     recommended outcome. What was that

12     discussion like?

13          A.   Discussion revolved around whether

14     there was an actual library policy

15     violation.  We discussed.

16          Q.   And --

17          A.   But did not finalize or generate a

18     recommendation from the panel.  We didn't

19     get to a conclusion from the panel.

20          Q.   You didn't get to a conclusion from

21     the panel. What was your view during that

22     discussion? Excuse me.  What was your view

23     during that discussion?

24          A.   Can you clarify?

25          Q.   What was your view during that

JENNIFER TUSCANO  -  7/3/2025

53

1    you say that that's probable?

2         A.   Yes.

3         Q.   Excellent.  Do you recall what a

4    meeting on the 5th would have been about?

5    Excuse me.  Please let me rephrase that

6    question.  Do you recall any specifics

7    about what a meeting on February 5 with the

8    panelists, what the contents of that

9    meeting would have been, what you would

10   have discussed with them?

11        A.   Yes.

12        Q.   Will you please describe it?

13        A.   Continued work on the conduct form

14   draft.

15        Q.   So the document that we marked as

16   3, the recommendation form, that is the

17   work of you, Zach, and Carlton in your

18   meetings immediately after the February 4

19   panel and then on a meeting that took place

20   on February 5; is that correct?

21        A.   Yes.

22        Q.   Excellent, thank you.  And thank

23   you for going along with me with that

24   email.

25   Kirsten, could you please present the Open

JENNIFER TUSCANO  -  7/3/2025

57

1          Jen, before you answer that question,

2     Kirsten, could you please pull up document

3     No. 6, which will remain document No. 6.

4          For you, Sandy, once I find it, it is

5     UPITT 2439.

6     And, Mary, could we please mark this as

7     Tuscano 6.  Thank you.  Jen, could you take

8     a moment and read over

9     this document, please?

10         A.  Yes.  You can scroll, Kirsten,

11    please.  You can scroll, please.

12         Q.  That's the document.  Thank you,

13    Kirsten.

14    We'll stay on this document for now.  But

15    talking about the Open Letter, did you get

16    a chance to speak with panelists about the

17    Open Letter before a University Dean or

18    someone from the administration reached out

19    to you about it?

20         A.  Yes.

21         Q.  What was that conversation like?

22         A.  Acknowledgment that we received it.

23         Q.  Acknowledged it.  Was there any

24    other kind of group reaction with regards

25    to the Open Letter?

58

1          A.  No.
2          Q.  Did the Open Letter influence at
3     all how you thought about the February 4
4     hearing?
5          A.  No.
6          Q.  Do you recall whether the letter,
7     whether Zach had any sort of strong, or had
8     any reaction, excuse me, at all, to the
9     Open Letter?
10          A.  I don't recall.
11          Q.  Do you recall if Carlton had any
12     reaction to the Open Letter?
13          A.  I don't recall.
14          Q.  You just read over Tuscano 6.  Am I
15     saying your last name correctly, Tuscano?
16          A.  Tuscano, "can" instead of "cahn".
17          Q.  Thank you.  It's not fun to hear
18     your name mispronounced the entire way, the
19     entire time. Tuscano, thank you.  Tuscano 6
20     -- I'm working on it -- you just read over
21     it.  Have you seen this document before?
22          A.  No.
23          Q.  No.  Do you know what it is,
24     though, from reading it?
25          A.  From the parts where it has my name

JENNIFER TUSCANO  -  7/3/2025

59

1        indicated, I recall those questions being

2        asked of me in a phone call by Marlin

3        Nabors.

4            Q.   Okay.  These are notes from Marlin

5        Nabors in conversations that he had with

6        you and conversations that he had with Zach

7        and Carlton.  The portions that are of

8        course yours, are they correct and accurate

9        to the best of your recollection?

10           A.   Yes, to the best of my

11       recollection.

12               MR. BILUS:  Object to the form.

13       Go ahead.

14           A.   Yes.

15           Q.   From what you've read, is the

16       content, does the content reflect the

17       conversations you had with Zach?

18           A.   Yes.

19           Q.   Does the content reflect what the

20       conversations you had with Carlton?

21           A.   Yes.

22           Q.   Excellent.

23            Kirsten, could you please go back to

24            the

25       Open Letter.  Kirsten, I'm sorry, let's go

JENNIFER TUSCANO - 7/3/2025

66

1          Q.  Excellent.  And the letter had no

2     bearing on your thoughts as to the February

3     4 panel; is that correct?

4                MR. BILUS:  Object to the form.

5          A.  That is correct.

6          Q.  You stated earlier that it hadn't

7     -- that it didn't change your views on the

8     February 4 panel; is that correct?

9          A.  Yes.

10         Q.  Do you recall it changing the views

11    of either of the other panelists, Carlton

12    or Zach?

13         A.  No.

14         Q.  Right after the February 4 panel

15    proceedings, you and the other panelists

16    you said met together to begin writing in

17    the recommendation form document that we

18    saw earlier; is that correct?

19         A.  Yes.

20         Q.  Was that meeting over Zoom?

21         A.  Yes.

22         Q.  And were all three of you writing

23    in the document at the same time?

24         A.  No.

25         Q.  Was the document, it was over Zoom,

JENNIFER TUSCANO - 7/3/2025

71

1          MR. BILUS:  Are you asking what
2      they said during the February 5 call or
3      meeting that they had or --
4          Q.  Yes.
5              MR. BILUS:  Or what they
6      thought?
7          Q.  I'm asking what they -- I'm asking
8      what they said.  I think that's a little
9      bit of semantics, but I'm asking what, what
10     they represented, what they -- I assume
11     what they said was what they thought, which
12     is why I think it's a little bit of
13     semantics there, but I'll rephrase the
14     question.  Did the panelists say that the
15     Open Letter, the other two panelists, did
16     they say that the Open Letter had no -- it
17     didn't change their view with regards to
18     the February 4 hearing?
19         A.  Correct, yes.
20         Q.  Okay, excellent.  Did any of the
21     panelists suggest pausing deliberations
22     because of the Open Letter?
23         A.  No.
24         Q.  Do you think that the process
25     should have been paused because of the Open

JENNIFER TUSCANO - 7/3/2025

72

1    Letter?

2       A.  No.

3       Q.  Do you recall whether Zach or

4    Carlton thought that the process should

5    have been paused because of the Open

6    Letter?

7       A.  I don't recall.

8       Q.  When Nabors emailed you on the 6th

9    asking you and Scott and Zach to pause

10   deliberations, was that the first time a

11   pause came up?

12      A.  Yes.

13      Q.  Did you work on it at all after --

14   excuse me -- did you work on the

15   recommendations, on that recommendation

16   form at all after receiving that email from

17   Nabors?

18      A.  No.

19      Q.  So that means starting on February

20   6, you stopped working on that

21   recommendation form; is that correct?

22      A.  Yes.

23      Q.  Kirsten, could you please pull up

24   the late February email.  And could you

25   also tell us what Bates number that is?