## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STUDENTS FOR JUSTICE IN PALESTINE AT PITT,<br><br>*Plaintiff,*<br><br>v.<br><br>UNIVERSITY OF PITTSBURGH, JOAN GABEL, MARLIN NABORS, KARIN ASHER, DaVAUGHN VINCENT-BRYAN, MATTHEW LANDY, and JAMEY MENTZER, all in their official and individual capacities,<br><br>*Defendants.* | CIVIL ACTION NO. 2:25-cv-00524-NR<br>Judge J. Nicholas Ranjan |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## REVISED MOTION FOR PRELIMINARY INJUNCTION

The only prospective harm alleged by Plaintiff Students for Justice in Palestine at Pitt's ("SJP") Revised Motion for Preliminary Injunction ("PI Motion") (Dkt. No. 45) is its current suspension. That suspension was issued after the Complaint in this case was filed and will conclude on September 18, 2025. As the only concrete prospective harm alleged by SJP, the current suspension – and more specifically the reason for the current suspension – is the only material issue before the Court as it considers SJP's request for an extraordinary remedy.

SJP's suspension is the sanction issued in connection with an "Open Letter" sent by SJP to the panel of administrators deciding whether SJP was responsible for a prior set of potential policy violations. PI Motion at ¶ 4. SJP argues that by suspending it for sending the Open Letter directly to the very administrators who would decide their case, Defendant University of Pittsburgh ("Pitt" or the "University") punished and retaliated against SJP in violation of its First Amendment rights.

But the facts demonstrate clearly that Pitt did not suspend SJP based merely on *what* it said – it was to *whom* it said those things that really mattered. SJP appears to agree, noting accurately in its Memorandum in Support of its Revised Motion for Preliminary Injunction (Dkt. No. 46-2) ("PI Memo") that "Pitt suspended SJP for six months – until September 18 – for sending the Open Letter *to the hearing officers*." PI Memo at 7 (emphasis added); *accord* Joint Statement of Undisputed Facts ("JSF") at 30. Put simply, just as extrajudicial expression to a jury to intimidate is not protected speech under the First Amendment, sending a letter SJP has conceded was "likely" to intimidate factfinding panel members is not protected speech, full stop. As a result, SJP is unlikely to succeed on the merits of any claim related to the current suspension.

SJP's argument that Pitt retaliated against it for sending the Open Letter fares no better. Attempting to interfere with an official proceeding is not protected activity for purpose of a

retaliation claim, but even if it were, SJP offers nothing more than speculation to support its argument that it was sanctioned because of its viewpoints rather than its conduct. This speculation is easily set aside when contrasted with SJP's admission that lacks any basis to believe that any person who adjudicated its case harbored any improper bias, or retaliated, against it. JSF at ¶ 56; Deposition of SJP Transcript ("SJP Dep."), attached hereto as Def. Ex. 20 at 115:18-116:21.

Nor are the policies at issue overbroad – they are instead sufficiently tailored to prevent parties to University proceedings from attempting to disrupt those proceedings or intimidate decisionmakers. And even if SJP could demonstrate that Pitt's rules were overbroad, the remedy for such a conclusion would not be to undo a sanction for the unprotected disruption of an official proceeding, it would be an order to cease unlawful enforcement of the rule and narrow the rule to make it lawful. In this way, even if SJP had a likelihood of success on the merits of its overbreadth challenge, SJP should not be granted the preliminary relief that it has asked the Court to award.

SJP fails on the other elements of the injunction standard as well. SJP cannot demonstrate imminent irreparable harm because (a) the nature of the harms on which it has actually presented evidence do not meet that bar; and (b) it has not shown it has any imminent attempt to engage in any activity it is precluded from by the suspension. The balance of the equities and the public interest also favor denial of the motion because the University should be permitted to pursue its goals of creating a suitable environment for education and protecting its conduct review proceedings from improper disruption or interference by the participants.

For its part, SJP generally measures its claims by the wrong standards and brushes aside concrete facts in favor of speculation. Neither approach is availing. Courts have never applied the "clear and present danger" standard relied on by SJP to attempts to intimidate decisionmakers in state proceedings. And vague gesturing at alleged ill intent on the part of the Defendants when the

record contains none cannot support a claim for relief, either: SJP does not and cannot reconcile its allegations of viewpoint discrimination and retaliation with its own testimony that it has no reason to suspect *any* of the administrators who decided violations harbored any bias against it.

This case is just beginning, and, if its claims survive a motion to dismiss, SJP will have a full opportunity to litigate the past.[1] But SJP has not shown that it is entitled to any preliminary injunctive relief for any imminent irreparable harm and the Court should deny its motion.

## I.    FACTUAL BACKGROUND

### A.  Pitt Fosters an Environment Supportive of Free Speech and Student Organizations

Pitt's Student Code of Conduct guarantees students' rights to: "speak, write, or print freely on any subject, and to sponsor speakers of their choice," and "engage in peaceful, orderly, and nondestructive picketing, protests, and demonstrations, to the extent they do not violate public law and do not interfere with the educational process or the rights of other members of the University." *See* Def. Ex. 5 at 8. Pitt encourages its students to form and participate in official Pitt-registered student organizations ("RSOs"). Declaration of C. Panzella, attached hereto as Def. Ex. 32 at ¶ 9. RSOs have privileges as a result of formal University registration that include among other things, funding support, the ability to reserve space on campus for events, and authorization to use "Pitt" and other University-identification descriptors in their names. Panzella Decl. at ¶ 15; JSF at ¶ 3.

### B.  Pitt Maintains a Conduct Review Process and has Policies that Protect its Integrity

Pitt maintains a conduct review process to determine violations of the Code of Conduct. Def. Ex. 5 at 21-30. To protect the integrity of that process, Pitt prohibits "[i]ntimidat[ion], coerc[ion], influence[], or attempts to do the same against a person who is participating or has

---

[1] SJP appears to have taken steps to prevent the Defendants from a full and fair opportunity to litigate this case, however, by destroying key evidence before the Defendants could see it. The Defendants intend to present this spoliation issue to the Court in due course.

participated in any University process or proceeding;" and "[d]isrupt[ion] or interfere[nce] with the conduct process." JSF at ¶¶ 7-8; Def. Ex. 5 at 20, ¶¶ 42-43.

### C. SJP's December 2024 Study-In Event

Since at least 2009, a group of Pitt students have maintained an organization named "Students for Justice in Palestine at Pitt." JSF at ¶ 1. From August 2024 through April 2025, SJP reserved campus space for no less than 43 events including various demonstrations, at least six speaker events, and "many more education events." *Id.* at ¶ 5. Before this year, the University had never charged SJP with any Code of Conduct Violations. Panzella Decl. at ¶ 26.

From December 9 to 12, 2024, SJP organized and conducted a self-described "Study-In" event that occurred in Pitt's Hillman Library (the "Library") that led to charges against SJP for violating the Code of Conduct. JSF at ¶ 11-12. SJP did not reserve any space to hold this event in the Library, and indeed could not have done so because the Library is a not a space that Pitt opens for demonstrations or other RSO events. Panzella Decl. at ¶ 22, 29. SJP used their "Study-In" "to convey a political and cultural message in support of the Palestinian people." Verified Complaint ("Compl.") at ¶ 57. SJP conveyed its message by taking over Library-owned whiteboards, putting up other signs and table tents conveying their political message, and draping full-sized flags over tables. *Id.* at 57-58; Panzella Decl. at ¶ 28. Belying the allegations in its Complaint that the Study-In was not disruptive, Compl. at ¶ 56, ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████ Def. Ex. 12.

It is revealing that SJP initially produced a version of Def. Ex. 12 that lacked any metadata or date information. When first asked about ██████████████ during deposition, SJP testified that Def. Ex. 12 reflected ██████████████████████████████████████



███████████████████████████████████████████████████

███████████████████████████ SJP Dep. at 138:10-139:15. When Defendants requested that *all*

versions of the document be produced with metadata, it became evident that ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ *Compare* SJP Dep. at 138:21-139:15 *and* Def. Ex. 12 *with* Def. Ex. 22. SJP's

representative's false testimony about ████████████████████████ is obviously concerning.

███████████████████████████████████████████████

███████████████████████████████████████████. Def. Ex. 12 ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ Def. Ex. 22, 30 ████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

**D. SJP's Policy-Violating Open Letter**

In January 2025, Pitt charged SJP with violating University policy in connection with the

Study-In. JSF at ¶ 12. As part of Pitt's conduct review process, Pitt convened a hearing at which

it would be determined whether SJP violated university policy regarding the Study-In. *Id.* at ¶ 13.

That hearing occurred on February 4, 2025. *Id.* at ¶ 14.

Defendant Matthew Landy, Pitt's Director of Student Conduct, moderated the hearing. JSF

at ¶ 15. A panel of three trained neutral hearing board officers (the "First Panel") heard the

arguments and evidence presented by both Pitt and SJP. *Id.* at ¶¶ 16, 19; Declaration of M. Nabors,

55948028.9

attached hereto as Def. Ex. 33, at ¶ 9; Declaration of J. Tuscano, attached hereto as Def. Ex. 35, at ¶¶ 4-5, 10; Declaration of C. Scott, attached hereto as Def. Ex. 36, at ¶¶ 4-6, 11; Declaration of Z. Davis, attached hereto as Def. Ex. 37, at ¶¶ 3-5, 10. The First Panel was to decide whether SJP violated Pitt policy and, if so, make recommendations about a sanction. JSF at ¶ 18. SJP has no basis to believe that any member of the First Panel had any improper bias against SJP, *id.* at ¶ 21, and has not alleged any wrongdoing by the First Panel. Compl. at *passim*.

During the first hearing, each side presented its case about the Study-In. JSF at ¶ 22-23. SJP heard Pitt's case against it, asked questions of Pitt, called its own witnesses, and presented its own argument. SJP Dep. at 18:20-19:22, 24:1-13. At the end of the hearing, the First Panel began its deliberations. JSF at ¶¶ 24-25. The First Panel did not finalize a conclusion and did not complete its deliberations that day. *Id.* at ¶ 26.

Later that night, while deliberations were pending, SJP emailed the members of the First Panel an "Open Letter" condemn[ing] the selective repression" and "suppression" of SJP and "demand[ing]" the "complete dismissal of all disciplinary proceedings against SJP" ("Open Letter"). JSF at ¶¶ 27, 29; Def. Ex. 4 at 1-2. SJP's Open Letter falsely stated that it was signed and supported by Pitt's own School of Law. Def. Ex. 4 at 2; Declaration of G. Dickinson, attached hereto as Def. Ex. 38 at ¶¶ 5-7. To underscore that point: SJP sent a letter to the First Panel stating that the proceeding was being condemned by an organ of the University itself, which, to a lay person, is comprised of lawyers. The objective appearance of that message was that Pitt's own lawyers – the lawyers of the Panel's employer – condemned the panel's work. SJP did this without the consent or actual support of the Law School. SJP did not contact Pitt's Law School to determine whether the Law School supported SJP's Open Letter. Dickinson Decl. at ¶¶ 5-6; SJP Dep. at 86:14-25.

6

SJP understood that the First Panel was responsible for making the decision about whether SJP would be found responsible for violating Pitt policy. SJP Dep. at 55:7-56:10. SJP also understood that the conduct hearing was concluded but that the First Panel had not yet issued its decision. JSF at ¶ 29. And SJP sent its Open Letter specifically to the First Panel members to get them to dismiss the disciplinary proceedings against SJP. SJP Dep. at 55:7-56:10. The parties are in agreement that an objective recipient of the Open Letter who is an employee of Pitt was likely to be intimidated by seeing that Open Letter was signed by Pitt's law school, and such sentiment could interfere with the conduct review process. SJP Dep. at 91:7-21.

All of the First Panel members received and reviewed SJP's Open Letter on the night of February 4, 2025. JSF at ¶ 30. Tuscano Decl. at ¶¶ 14-16; Scott Decl. at ¶¶ 17-19; Davis Decl. at ¶¶ 15-17. None of the First Panel members had ever before received a communication from a conduct hearing participant after a conduct hearing that demanded a conduct process be dismissed. Tuscano Decl. at ¶¶ 9, 26; Scott Decl. at ¶ 29; Davis Decl. at ¶ 25.

On February 5, 2025, one of the First Panel members sent Landy an email advising that, at the hearing and through the Open Letter, "SJP has at least twice attempted to influence my decision by implying any adverse decision would be due to a perceived anti-Palestinian bias instead of a careful consideration of the evidence presented" and that he believed "it was inappropriate [for SJP] to make veiled threats in attempt to sway my decision." Def. Ex. 40. Another panel member also found the Open Letter to be concerning because it introduced evidence not presented during the hearing. Davis Decl. at ¶ 19. The third member believed that, by sending its Open Letter, SJP was trying to influence her in her role as a panel member. Tuscano Decl. at ¶ 17-18.

Landy advised Defendant Marlin Nabors, Associate Vice Provost and Dean of Students, about the concerns. Nabors Decl. at ¶ 12. Nabors instructed the First Panel to pause its deliberations

because of "concerns raised regarding the potential of undue influence on the [P]anel." JSF at ¶ 35; Joint Exhibit 2. Nabors then interviewed the First Panel about the Open Letter and its impact. Nabors Decl. at ¶ 15; Tuscano Decl. at ¶ 27; Scott Decl. at ¶ 28. In those interviews, one member seemed uncomfortable about moving forward with the process, one member confirmed that the Open Letter came up during deliberations, and at least two members specifically asked questions about indemnification in the event that SJP filed a lawsuit against them. Nabors Decl. at ¶¶ 16-18. Based on those statements and the Open Letter itself, Nabors concluded that the conduct process had been disrupted and interfered with, and that the Open Letter was an improper attempt to influence and/or intimidate the First Panel. *Id.* at ¶¶ 16-19.

### E. SJP's Interim Suspension

On March 18, 2025, Nabors told SJP leadership that: (1) SJP had "improperly engaged in communications to members of the Conduct Hearing Board during their deliberations following the February 4, 2025 … Conduct Hearing;" (2) such communication was a violation of the Student Code of Conduct; (3) the then-pending charges arising from the Study-In would be re-initiated as a new proceeding due to SJP's action that "irreparably compromise[d] the integrity and credibility of the current conduct proceeding;" and (4) SJP would be receiving a notice of interim suspension. JSF at ¶ 38; Def. Ex. 7. On the same day, Defendant Jamey Mentzer, Associate Director of Student Conduct, advised SJP that it had "improperly engaged in communications to members of the [First Panel] during their deliberations following your February 4, 2025, Level II Conduct Hearing" and, consequently, SJP was being placed on interim suspension of registration. JSF at ¶ 39; Def. Ex. 8. SJP did not appeal the interim suspension. JSF at ¶¶ 40-41. The suspension applied only to SJP as an organization; it did not apply to the individual student members of SJP. Def. Ex. 8; Panzella Decl. at ¶ 41.

**F.  SJP's Current Suspension**

In April 2025, Pitt re-initiated disciplinary proceedings against SJP for the Study-In event and for sending its Open Letter to the members of the First Panel. JSF at ¶ 44. On May 23, 2025, Pitt convened a hearing on those charges. *Id*. at ¶¶ 44-47. Pitt enlisted a new panel of neutral hearing board officers (the "Second Panel") to hear arguments and evidence. JSF at ¶ 49.  The Second Panel consisted of three individuals employed by Pitt, but not employed within the Student Conduct Office. *Id.* at ¶ 52. None of the members of the Second Panel had any relationship with SJP prior to the hearing. *Id.* at ¶ 53.

As with the First Panel, this Second Panel was to decide whether SJP violated Pitt policy and, if so, make recommendations regarding any sanctions. *Id.* at ¶ 51. SJP has conceded it has no basis to believe that any member of the Second Panel had any improper bias against SJP, any basis to engage in viewpoint discrimination against SJP, or any reason to believe that the Second Panel engaged in any retaliation against SJP. JSF at ¶ 56; SJP Dep. at 115:18-116:21. SJP has not alleged any wrongdoing by the Second Panel. Compl. at *passim*. During the May 23, 2025 hearing, both sides presented their case to the Second Panel. JSF at ¶¶ 54-55. Other than arguments properly made during the conduct hearing, no Pitt administrator instructed any member of the Second Panel, or otherwise tried to influence or affect the Second Panel, as to how it should decide or evaluate the allegations against SJP. Declaration of L. Miller, attached hereto as Def. Ex. 41, at ¶27; Declaration of A. Ries, attached hereto as Def. Ex. 42, at ¶ 21; Declaration of S. Rothrock, attached hereto as Def. Ex. 43, at ¶ 21.

After deliberating, the Second Panel found, among other things, that by sending its Open Letter to the First Panel demanding that the case be dismissed before an outcome of the case was known, SJP had violated University policy prohibiting "[i]ntimidat[ion], coerc[ion], influenc[ing],

or attempt[ing] to do the same against a person who is participating or has participated in any University process or proceeding" and "[d]isrupt[ing] or interfere[ing] with the conduct process. JSF at ¶ 58; Pl. Ex. 5 to Plaintiff's PI Memo (ECF No. 46-8). The Second Panel recommended that SJP be sanctioned with suspension of registration until January 1, 2026. *Id.* at ¶ 60; Pl. Ex. 5 to Plaintiff's PI Memo. In reaching its conclusion, the Second Panel exercised its independent analysis and judgment based of the facts presented during the May 23, 2025 hearing. Miller Decl. at ¶ 26; Ries Decl. at ¶ 20; Rothrock Decl. at ¶ 20.

Following the Second Panel's finding, Pitt suspended SJP until September 18, 2025, giving credit for time on interim suspension, with the allowance that even while suspended, and after SJP completes educational conversations with University staff to discuss Pitt's expectations of its RSOs, SJP's leadership can meet and can plan and reserve space for campus events. JSF at ¶ 61; Pl. Ex. 18 to Plaintiff's PI Memo (ECF No. 46-21). SJP did not appeal the suspension. JSF at ¶¶ 62-63. At no time did Pitt charge or sanction SJP because of the political viewpoint that it, or its members, expressed. Panzella Decl. at ¶ 57.

## II.    ARGUMENT

### A.  The Court Lacks Jurisdiction to Award the Requested Relief.

SJP's PI Motion seeks relief unrelated to any claim currently alleged in its Complaint; consequently, this Court lacks jurisdiction to award that relief.

> [T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint. This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself… Absent that relationship or nexus, the district court lacks authority to grant the relief requested.

*Pacific Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631, 636 (9th Cir. 2015) (denying preliminary injunctive relief sought to curb alleged improper use of confidential information because that usage was not the subject of the underlying unfair trade practices claims).

"[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action." *Omega World Travel v. TWA*, 111 F.3d 14, 16 (4th Cir. 1997). "This is not an arbitrary distinction or a technicality; rather, the Court completely lacks jurisdiction over claims raised in a motion for injunctive relief where those matters are 'unrelated to the underlying complaint." *Galloway v. Walton*, No. 20-cv-611, 2021 WL 769294, at *2 (W.D. Pa. Feb. 8, 2021), *report and recommendation adopted*, No. 20-cv-611, 2021 WL 767665 (W.D. Pa. Feb. 26, 2021) (denying preliminary injunctive relief as to complaints about the plaintiff's incarceration because they were not related to the plaintiff's underlying civil rights claims) (internal quotations omitted).

Here, Count II of SJP's Complaint alleges claims and wrongdoing regarding the *interim* suspension. Compl. at ¶ 143. That interim suspension, however, terminated on June 18, 2025. In its PI Motion, SJP asks this Court to lift its current disciplinary suspension. That disciplinary suspension was the result of the recommendations by the Second Panel after the May 23, 2025 hearing. SJP has not alleged any claims or wrongdoing in its Complaint regarding the disciplinary suspension, the May 23, 2025 hearing, or the Second Panel. The relief sought by SJP, therefore, lacks a nexus to its claims, and this Court lacks jurisdiction to award the relief sought. *See Pacific Radiation*, 810 F.3d at 636; *Omega World*, 111 F.3d at 16. This is not a technicality to be glossed over; it is fatal to SJP's motion and the Court is constrained as a matter of law from proceeding any further in its analysis of SJP's requested relief. *See Galloway*, 2021 WL 769294 at *2. As a result, SJP's motion should be denied.

### B. SJP is Unlikely to Succeed on the Merits of its Claim.

Count II of SJP's Complaint is the only Count that concerns the Open Letter and resulting interim suspension, and is, therefore, the only arguably relevant Count to the PI Motion. In Count II of its Complaint, SJP has alleged that Pitt's interim suspension of SJP violates SJP's First

11

Amendment rights because it: (a) "punishes SJP for constitutionally protected political speech criticizing Pitt's treatment of the organization;" (b) "retaliates against SJP for its criticism of the University;" and (c) "is based on an overbroad and vague rule that could proscribe any criticism of the hearing process." Compl. at ¶ 143.

SJP is unlikely to prevail on this claim because (1) SJP cannot demonstrate that Pitt punished or retaliated against SJP for its criticism of the University; (2) Pitt's policies protecting the integrity of its conduct review process are not overbroad or vague; and (3) SJP's suspension does not violate the First Amendment.

### 1. Pitt did not Punish or Retaliate Against SJP for Constitutionally-Protected Speech.

In Count II, SJP has alleged "punishment" and "retaliation" theories of liability. These claims require proof of the same elements: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Noonan v. Kane*, 698 F. App'x 49, 52–53 (3d Cir. 2017) (quoting *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)). Here, SJP was not engaged in protected conduct, and there is no causal link between any constitutionally protected conduct and its suspension.

### a. SJP Was Not Engaged in Constitutionally Protected Conduct.

### i. Jury-Tampering is Not Constitutionally Protected Conduct.

"[T]he First Amendment clearly does not protect speech which interferes with the fair and unhindered administration of justice." *Laker Airways Ltd. v. Pan Am. World Airways, Inc.*, 604 F. Supp. 280, 288 (D.D.C. 1984). Speech knowingly made to factfinders outside of an official proceeding "with the intent to influence the outcome of a specific case" is not protected by the First Amendment. *Turney v. Pugh*, 400 F.3d 1197, 1202 (9th Cir. 2005). Speech knowingly

attempting to influence the decision of a factfinder upon an issue or matter pending before them is likewise not protected. *See United States v. Heicklen*, 858 F. Supp. 2d 256, 275 (S.D.N.Y. 2012).

> [F]reedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice. But it must not be allowed to divert [a] trial from the very purpose … to adjudicate controversies … in the calmness and solemnity of the courtroom according to legal procedures.

*Sheppard v. Maxwell*, 384 U.S. 333, 350–51, 86 S. Ct. 1507, 1516 (1966) (internal quotations omitted). "Due process demands that 'the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'" *United States v. Trump*, 88 F.4th 990, 1004 (D.C. Cir. 2023), *reh'g denied*, No. 23-3190, 2024 WL 252746 (D.C. Cir. Jan. 23, 2024) (quoting *Sheppard,* 384 U.S. at 351).

The fair and unhindered administration of justice is the reason for Pitt's Code of Conduct prohibition on "[i]ntimidat[ion], coerc[ion], influence[], or attempts to do the same against a person who is participating or has participated in any University process or proceeding;" and "[d]isrupt[ion] or interfere[nce] with the conduct process." JSF at ¶¶ 7-8; Def. Ex. 5 at 20, ¶¶ 42-43. "University administrators have the responsibility to control and regulate the conduct and behavior of students which tend to impede, obstruct or threaten the achievement of a University's educational goals." *Sill v. Pennsylvania State Univ.*, 318 F. Supp. 608, 615 (M.D. Pa. 1970), *aff'd*, 462 F.2d 463 (3d Cir. 1972). Here, SJP's Open Letter, sent to the First Panel serving as the jurors in the University's conduct review proceedings, and "***demand[ing]***" the "***complete dismissal of all disciplinary proceedings against SJP***" as part of an official state proceeding is indistinguishable from jury tampering. JSF at ¶ 27; Def. Ex. 4 at 1-2.

SJP has conceded that it (a) understood that the Panel was responsible for making the decision about whether SJP would be found responsible for violating Pitt policy, SJP Dep. at

55:22-56:7; and (2) sent its Open Letter specifically to the Panel members get them to dismiss the disciplinary proceedings against SJP, SJP Dep. at 55:7-56:10. SJP's Open Letter was not protected speech because it was knowingly made to finders of fact outside of an official proceeding, upon an issue or matter pending before them, "with the intent to influence the outcome of a specific case." *See Turney*, 400 F.3d at 1202; *Heicklen*, 858 F. Supp. 2d at 275; SJP Dep. at 55:7-56:10. SJP's Open Letter also was not protected speech because it "interfere[d] with the fair and unhindered administration of justice" by diverting the conduct hearing "from [its] very purpose . . . to adjudicate controversies . . . in the calmness and solemnity of the [hearing room] according to legal procedures" to induce a result beyond only the evidence and argument during the hearing. *Laker Airways*, 604 F. Supp. at 288; *Sheppard*, 384 U.S. at 350–51; *Trump*, 88 F.4th at 1004. SJP conceded this fact, noting that it sent the Open Letter to the First Panel members to get them to dismiss the charges and proceedings and that inclusion of the Law School could intimidate the panel. SJP Dep. at 55:7-56:10, 91:7-21.

### ii. SJP's "Clear and Present Danger" Argument Ignores the Facts and Misconstrues the Law.

SJP argues that its Open Letter was protected speech because it did not present a "clear and present danger" to the administration of justice. PI Memo at 8-12. But SJP's argument rests on two mistaken arguments: (1) that SJP's speech was like any other public comment criticizing the justice system; and (2) that SJP's Open Letter did not actually influence the First Panel. *See id.* But SJP's speech was different than public comment because it was directed at the very people who were deciding whether SJP had violated Pitt's policies, and it is the threat of improper influence that matters, not whether SJP actually succeeding in influencing the First Panel.

First, SJP's actions were not limited to public comment involving broad criticism of Pitt's University process. *See* PI Memo at 10-12. Had SJP intended to make such a "public" comment,

it could have simply posted the Open Letter on social media. It did so, but did not stop there, because that would not have accomplished SJP's intent. *See* JSF at ¶ 28. Instead, SJP sent its Open Letter, making new factual assertions with not opportunity for rebuttal, and demanding a particular outcome of the official University proceedings, directly to the (jury) Panel that was deciding that outcome. *See Turney*, 400 F.3d at 1202; *Heicklen*, 858 F. Supp. 2d at 275; *Laker Airways*, 604 F. Supp. at 288; *Sheppard*, 384 U.S. at 350–51; *Trump*, 88 F.4th at 1004.

Consequently, the "clear and present" danger test does not apply. As the Ninth Circuit ha observed, "[t]he Supreme Court has never applied any version of the clear and present danger test to communications made knowingly to jurors with the intent to influence the outcome of a specific case." *Turney*, 400 F.3d at 1203 (rejecting the application of the "*Bridges-Wood* line" of cases, relied upon by SJP here, to a matter involving jury-tampering). "On the contrary … the Court has expressly distinguished such communications from the speech it has protected under the First Amendment and as a general matter has demonstrated little tolerance for improper communications with jurors." *Id.* It is likewise persuasive that the Supreme Court has held in the criminal context that "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . ." *Remmer v. United States*, 347 U.S. 227, 229 (1954).

But even if the "clear and present danger" test did apply, SJP's argument that its Open Letter did not *actually* influence the hearing applies the wrong standard. *See* PI Memo at 9-10. It is the "*threat*" – *i.e.* potential to compromise – the administration of justice, not the *actual* compromise of the administration of justice, that renders speech unprotected. *In re Kendall*, 712 F.3d 814, 825 (3d Cir. 2013) (articulating the test as requiring a "an imminent, not merely a likely, ***threat*** to the administration of justice") (quoting *Craig v. Harney*, 331 U.S. 367, 376 (1947) (cited

by SJP). Indeed, if the test were *actual* effect on the administration of justice, there would be no need for the use of the word "danger." The test would be "whether the speech *did affect* the administration of justice." Under SJP's reductive theory, threatening a juror would be protected speech so long as the threats did not succeed in actually influencing the juror. This is, for obvious reasons, not a workable construct.

### iii. SJP's Other Arguments are Equally Unavailing.

SJP's argument that there was no written rule against such contact or that they were not specifically advised of such rule is simply untrue. The Code of Conduct provisions are clear, and when SJP's leadership sent the Open Letter they were familiar with the Code of Conduct. SJP Dep. at 93:4-11; Def. Ex. 5 at 20, ¶¶ 42-43. SJP has also argued that it cannot be punished for arguments made during the hearing, presumably referencing their threat to the First Panel that they should "think carefully about their decision because people, including lawyers, were watching." PI Memo at 3. But SJP's argument confuses what actually matters; once Defendants have shown that SJP acted in violation of a lawful policy by attempting to intimidate the First Panel through the Open Letter, the question of whether SJP *also* may have tried to intimidate the First Panel *during* the hearing (and whether that would be protected) is neither here nor there. In any case, SJP was not suspended by the University because of what SJP said during the hearing—it was suspended by the University because it sent the Open Letter to the First Panel. *See* PI Memo at 7; Nabors Decl. at ¶¶ 23-25, 30; Errata Sheet for M. Nabors Deposition, attached hereto as Def. Ex. 34.

### b. There Is No Causal Link Between Protected Speech and SJP's Suspension.

The facts of this matter demonstrate that SJP was not punished, or retaliated against, because of protected speech; SJP was suspended for directing its (unprotected) speech at the First Panel, in violation of the Code of Conduct. PI Memo at 7. SJP's Open Letter violated the Code of Conduct policies prohibiting (a) intimidation, coercion, and influence directed toward an

16

individual involved Pitt's conduct review process, and (b) interfering with and disrupting the conduct review process. SJP argues that its current suspension for sending the Open Letter to the First Panel was a "pretext" for actually suspending SJP for the Library Study-In. PI Memo at 16-17. They have no evidence to support this assertion. Charges against a student or RSO does not mean that the student or RSO will be sanctioned. With the exception of an interim sanction – which is no longer at issue here – the conduct hearing board determines whether a student or organization has violated the University's policies. JSF at ¶¶ 13-18, 44-51. Unlike the interim suspension, which was effective immediately, pending review by a conduct board, JSF at ¶ 38; Def. Ex. 7, the *current* suspension was the product of the second conduct review hearing and the determination of Second Panel, *id.*; JSF at ¶¶ 44-60. That Second Panel rejected one of the charges related to the Library Study-In, but found violations of policy related to the Open Letter and recommended the suspension. Ex. 5 to PI Memo (ECF No. 46-8). When Pitt Vice Provost Carla Panzella imposed the recommended but revised suspension, she did so solely on the basis of the findings related to the Open Letter. Ex. 18 to PI Memo at (ECF No. 46-21); JSF at ¶ 61.

Thus, to show "pretext," or any causal link for that matter, SJP must be able to show wrongdoing by the Second Panel. SJP, however, has not alleged any wrongdoing by the Second Panel. Compl. at *passim.* In fact, SJP has conceded that it has no reason to believe that the Second Panel engaged in any retaliation against SJP. JSF at ¶ 56; SJP Dep. at 115:18-116:21. The fact that the Second Panel rejected one of the Library Study-In charges, but nevertheless recommended SJP-Pitt's current suspension, and that suspension was imposed solely on the basis of the Open Letter, breaks the causal chain necessary for SJP's "pretext" argument, or any other causal link, to hold water. SJP, therefore, cannot prevail on its claims and this Court should deny SJP's Motion.

SJP has also argued that Pitt suspended SJP for the Open Letter only after it became clear

that the first hearing Panel would not sanction SJP for the Library Study-In. PI Memo at 17-18.
SJP has presented no evidence to support this argument; only speculation. SJP relies heavily on a
*tentative*, but *not final* conclusion that the Panel had reached. PI Memo at 17-18. SJP's argument
falls apart, however, because the decisionmaker for the interim suspension did not know about that
tentative conclusion. As SJP has pointed out, Nabors paused the Panel's deliberation, and Nabors
imposed the interim suspension. PI Memo at 5. Nabors, however: (a) ***did not know*** whether the
Panel had reached an opinion or decision on its findings; (b) ***did not know*** whether the Panel had
started drafting its findings or recommendation; and (c) ***had not seen*** the Panel's draft findings.
Nabors Dep. at 31:18-32:16. SJP does not, as a result, approach its burden to show such causation
by clear evidence, as it must to be awarded injunctive relief.

SJP has also argued that Pitt was under "immense outside pressure" "to sanction SJP for
its role in the [Library Study-In]." PI Memo at 18. Coupled with a full record of concrete facts in
the record about what happened and why and their lack of evidence about how any "public
pressure" impacted *the Panel that decided their case*, this "public pressure" argument is weak
sauce. Seemingly unsure of what nebulous argument may get the best traction, in the next breath
SJP decries the fact that it took five weeks after the Open Letter for Pitt to issue its suspension,
which would be a long time indeed to buck the alleged pressure. PI Memo at 5, 18. The time taken
instead reflects a reasoned and deliberate decision. Nabors Decl. at ¶ 28. Here again, the facts of
the case undermine the causal chain necessary for SJP's argument. SJP's "temporal proximity"
and "history of antagonism" arguments fail for the same reasons. In the span of August 2024 to
March 2025, SJP held almost 40 on-campus events. JSF at ¶ 5. And prior to the Library Study-In
Event, the University had never before charged SJP with any violation. Panzella Decl. at ¶ 26.

Last, SJP argues that others who contacted Pitt administrators to criticize the disciplinary

process against SJP were not punished and that this, somehow, demonstrates the causal link necessary for SJP's punishment and retaliation claims. PI Memo at 19. SJP's argument makes sense only if those other students or student groups were similarly situated; *i.e,* they sent criticisms of the disciplinary process and dismissal demands to their respective hearing panels outside the hearing process, which, notably, SJP has not shown. PI Memo at *passim*. SJP is accordingly unlikely to prevail on its punishment/ retaliation claims.

### 2. Pitt's Policy Protecting the Integrity of its Conduct Review Process is Neither Vague Nor Overbroad.

SJP also argues that its interim suspension is based on a "vague" and "overbroad" rule. PI Memo at 6, 12-16. Vagueness and overbreadth challenges, however, are two different things. SJP has muddled that distinction by misstating a principle that "[a] court may invalidate a statute ***for vagueness or for overbreadth*** even if it is possible the statute may be applied lawfully in some circumstances." PI Memo at 14 (emphasis added). While SJP names both claims, its allegation that the subject rule "could proscribe any criticism of the hearing process" suggests only an overbreadth challenge. *See* Compl. at ¶ 143.

A law affecting First Amendment rights is unconstitutionally vague on its face if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480 (2000). A facial vagueness challenge will succeed only on a showing that the law "is impermissibly vague in all of its applications." *Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 495, 102 S. Ct. 1186, 1191 (1982). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Ests.*, 455 U.S. at 495. Here, SJP has conceded that it violated Code of Conduct provisions at issue because it intended to influence the First Panel to

dismiss the disciplinary proceedings. SJP Dep. at 55:7-56:10. SJP, therefore, is precluded from arguing vagueness even if it had properly plead such a claim. *See Hoffman Ests.*, 455 U.S. at 495.

On the other hand, "the overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied." *United States v. Hansen*, 599 U.S. 762, 769 (2023). A restriction is overbroad "[i]f the challenger demonstrates that the statute 'prohibits a **substantial amount** of protected speech relative to its plainly legitimate sweep." *Id.* at 770 (internal quotations omitted) (emphasis added). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118 (1984). "Invalidation for overbreadth is strong medicine that is not to be casually employed," *United States v. Williams*, 553 U.S. 285, 293 (2008) (internal quotations omitted) (emphasis added), and should be used "sparingly and only as a last resort," *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14, 2234 (1988) (emphasis added). The policy at issue here states that:

> A Violation [of the Student Code of Conduct] is committed when a Student or [an RSO]: … [i]ntimidates, coerces, influences, or attempts to do the same against a person who is participating or has participated in any University process or proceeding; and/or [d]isrupts or interferes with the conduct process.

Def. Ex. 5 at 17-20 (¶¶ 42-43).

SJP argues that these rules "could be used to sanction op-eds by student organizations in the school newspaper or demonstrations that criticize a disciplinary procedure if designed to influence anyone participating in that procedure," P.I. Memo at 13, but ignores the fact that none of the individuals or student groups who allegedly sent "numerous emails criticizing the disciplinary proceedings" to Pitt administrators were disciplined by Pitt. *Id.* at 14. But of course SJP's ability to conceive an impermissible application is not sufficient to render the policies

overbroad, particularly where the majority of conduct prohibited by the rules is legitimate.

The Code of Conduct provisions are tailored to target a critical range of activity. The first provision applies only to speech that (a) is, or attempts to be, intimidating, coercive, or influential, and that (b) is specifically directed toward an individual involved the conduct review process, be that person an adjudicator, a witness, a presenter, or a party. Def. Ex. 5 at 17-20 (¶ 42). The second provision applies only to speech that interferes with, or disrupts, the conduct review process. *Id.* (¶ 43). Interference is "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others." INTERFERENCE, Black's Law Dictionary (12th ed. 2024). Disrupt means "to break apart," "to throw into disorder," or "to interrupt the normal course of." DISRUPT, Merriam-Webster Online Dictionary ([https://www.merriam-webster.com/dictionary/disrupt](https://www.merriam-webster.com/dictionary/disrupt)). The second provision, therefore, applies only to speech that obstructs or interrupts the normal course of, or throws into disorder, the conduct review process.

The rules at issue do not prohibit a student from standing on a street corner and proclaiming their disagreement with any particular aspect of Pitt's conduct review process. They do prohibit communications with conduct review process adjudicators outside the scope of the hearing process during deliberations that aim to influence, intimidate, and coerce those adjudicators by creating a sense of public pressure that those adjudicators capitulate to the speaker's demands regarding the outcome of that review process. The rules at issue do not prohibit an RSO from criticizing Pitt's administration of the conduct review in a newspaper article. They do prohibit a registered student organization from paying for an advertisement in a newspaper that is directed to the presenter of charges against that organization (in the conduct review process) and intimidates them. The rules at issue do not prohibit SJP from posting its Open Letter to its Instagram. They do prohibit SJP from sending its Open Letter, demanding the outcome of its conduct review process, to the

adjudicators of that review process during deliberations. The Student Code of Conduct rules at issue accordingly do not prohibit a substantial amount of protected speech relative to their plainly legitimate sweep. *See Hansen*, 599 U.S. at 770. It is worth noting that even if *one* of the policies at issue were overbroad, because the Second Panel found a violation of *both* policies, and recommended suspension on that basis, to grant the relief requested the Court would need to conclude that *both* policies are overbroad. *See* Ex. 5 to PI Memo (ECF No. 46-8). Accordingly, SJP is unlikely to prevail on its claim for overbreadth.[2]

### C. SJP Will Not Experience Imminent Irreparable Harm Without an Injunction.

"A finding of no irreparable harm is itself sufficient to uphold the district court's denial of a preliminary injunction as a proper exercise of discretion." *Oburn v. Shapp*, 521 F.2d 142, 150–51 (3d Cir. 1975). "Irreparable harm means that the moving party will be injured in such a way that adequate compensatory or other corrective relief will not be available at a later date in the ordinary course of litigation" *Trefelner*, 655 F. Supp. 2d at 596 (citing *Oburn*, at 151). "While other circuits relax the irreparable harm requirement in First Amendment cases, [the Third Circuit does not]." *Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 442 (3d Cir. 2003).

SJP relies on *Elrod v. Burns*, 427 U.S. 347, 373 (1976) to minimize its burden. *See* PI Memo at 20. "Nothing in that case[, however] suggests that the Court meant to do away with the traditional prerequisites for injunctive relief simply because First Amendment freedoms were

---

[2] It is unclear whether SJP's PI Memo presents an as-applied challenge. *See* PI Memo at 8-15 (arguing that Pitt's application of the Code of Conduct to SJP's Open Letter fails the strict scrutiny test because the subject rule is *not narrowly tailored* and was applied with *insufficient justification*). In its Complaint, however, SJP has not presented an as-applied challenge to its interim suspension arising from the Open Letter. *Compare* Compl. at ¶ 143 (alleging (a) "punishment," (b) "retaliation," and (c) facial overbreadth and vagueness claims) *with id.* at ¶ 144 (alleging that Pitt's "pattern" of action towards SJP "proscribes speech … in a manner that is *not narrowly tailored* and is *without substantial government justification*") (emphasis added). To the extent SJP is presenting a claim in its PI Memo that it has not asserted in its Complaint, the Court need not consider such argument. *See Pacific Radiation*, 810 F.3d at 636; *Omega World*, 111 F.3d at 16; *Galloway*, 2021 WL 769294 at *2. In any case, such a challenge would fail for the same reasons that SJP's overbreadth argument fails. And SJP's argument that Pitt's justification for the policies – protecting due process – is insufficient fails too because interfering with an official proceeding is not protected speech.

implicated." *Conchatta*, 83 F. App'x at 442. Even "plaintiffs who had shown a likelihood of success on the merits of their First Amendment claim would not be entitled to preliminary injunctive relief unless they could show a 'real or immediate' danger to their rights 'in the near future.'" *Id.* Here, SJP's single-paragraph argument fails because their claimed harm is not imminent. SJP primarily argues that it will not be able to participate in Welcome Week in August 2025 or hold events in early September 2025. PI Memo at 7-8, 20. SJP, however, did not have any events planned for the Fall 2025 semester, even before its suspension. SJP Dep. at 35:7-12 (Q: What events had SJP planned for this year prior to its suspension? A: Because SJP has been unsure about the status of the organization upon returning for the fall semester, nothing concretely has been planned."). The same is true since its interim suspension, despite the fact that SJP leadership continued to discuss SJP topics. *Id*. at 112:5-12. Even under the current suspension, SJP leadership has been allowed to meet to plan and reserve space for events once the suspension expires. JSF at ¶ 61. When asked in deposition, SJP offered no evidence that it has planned any events or activities in the immediate future. *See* Ex. 19 to PI Memo (ECF No. 46-22). Whatever the harm SJP claims it will suffer in the future, it is certainly not "imminent."

What's more, to the extent that the suspension has hindered SJP's ability to plan events for Welcome Week, that has already occurred, and cannot be the irreparable harm that SJP seeks to alleviate through its PI Motion. *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 530 (E.D. Pa. 2018) ("Simply put, a showing of past harm, without more, is insufficient to justify the issuance of a preliminary injunction…. 'A preliminary injunction cannot be issued based on past harm,' but is instead intended 'to prevent future irreparable harm." (quoting *Ali v. FCI Allenwood*, 2017 WL 3008545, at *2 (M.D. Pa. July 14, 2017)).

Even if SJP had established the harm it claims, it would not warrant a preliminary

injunction. SJP's suspension applies only to the organization; it does not apply to the individual students who are officers or members of SJP. Panzella Decl. at ¶ 56. As conceded by SJP, "[s]uspension of SJP's status as a registered student organization does not, and legally cannot, restrict all of SJP's free-speech rights, most of which exist independent of the benefits conferred by University registration." Compl. at ¶ 119. SJP's members are free to engage in any other campus activities, as is any other student. All that SJP has lost are the privileges of being an RSO, which do not "rise to the level of the deprivation of a right secured by the Constitution requiring judicial relief." *Sill*, 318 F. Supp. at 617.

SJP's "chill" argument is also meritless. It is entirely appropriate to "chill" speech that is intended to disrupt or interfere with the conduct process or that is intended to intimidate, coerce, or influence the conduct panel. Such speech is not constitutionally protected, so the University should be free to regulate it to protect the conduct process. If the University's enforcement of its policy results in people being "chilled" from engaging in improper conduct, then that is a good outcome and does not violate the First Amendment.

### D. The Balance of Equities Favors Denial of SJP's Motion.

Pitt would suffer irreparable harm if the Court grants SJP a preliminary injunction. Pitt has "the responsibility to control and regulate the conduct and behavior of students which tend to impede, obstruct or threaten the achievement of a University's educational goals" and "to create a suitable climate for study and to maintain appropriate discipline," *See Sill*, 318 F. Supp. at 615-16. The Supreme Court has "cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of school authorities which they review." *Christian Legal Soc'y Chapter of the Univ. of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 687 (2010). Pitt cannot do that if it is barred from enforcing its policies.

Granting SJP's Motion would also send a signal that would encourage other students and RSOs to (a) deliberately violate Pitt's policies and also (b) interfere with the conduct review process. Panzella Decl. at ¶ 62. Pitt's ability to regulate the conduct and behavior of its students and RSOs would be compromised and Pitt would lose its ability to create a suitable climate for education. *See Sill*, 318 F. Supp. at 615-16.

### E.  The Public Interest Favors Denial of SJP's Motion.

There is a strong public interest in Pitt's ability to fulfill its mission of education. Pitt's students have a right to receive their education free from disruption, impedance, or obstruction. *See Sill*, 318 F. Supp. at 615-16. And the University community has the right to have conduct review proceedings that are fair, neutral, and consistent with due process protections. Pitt's policies are designed to achieve these goals. The public interest and Pitt's students' interest, therefore, favor Pitt's ability to enforce its policies and protecting its conduct review proceedings from improper disruption or interference.

### III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court DENY Plaintiff's Motion for Preliminary Injunction.

55948028.9

Dated: July 31, 2025                    SAUL EWING LLP


                                        By: /s/ *Joshua W. B. Richards*

                                        Joshua W. B. Richards
                                        1500 Market Street
                                        Centre Square West, 38th Floor
                                        Philadelphia, PA 19102
                                        Phone: 215-972-7737
                                        Joshua.Richards@saul.com

                                        Alexander R. Bilus
                                        1500 Market Street
                                        Centre Square West, 38th Floor
                                        Philadelphia, PA 19102
                                        Phone: 215-972-7177
                                        Alexander.Bilus@saul.com

                                        Peter C. Nanov*
                                        1919 Pennsylvania Avenue, N.W.
                                        Suite 550
                                        Washington, D.C. 20006-3434
                                        Peter.Nanov@saul.com

                                        *admitted pro hac vice*

                                        *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Defendants' Opposition to Plaintiff's Motion for Protective Order was served via the Court's CM/ECF system on all counsel of record.

Dated: July 31, 2025                    _/s/ Joshua W. B. Richards_____
                                         Joshua W. B. Richards

55948028.9

**EXHIBIT TABLE OF CONTENTS**
**FOR DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**REVISED MOTION FOR PRELIMINARY INJUNCTION**

Please note that for consistency and ease of reference, Defendants have maintained their exhibit numbers for their Opposition Brief consistent with the exhibit numbers used in depositions. Consequently, the exhibit numbers are not completely sequential.

**Def. Exhibit 4**
Open Letter Email Sent By SJP February 4, 2025

**Def. Exhibit 5**
University of Pittsburgh Student Code of Conduct

**Def. Exhibit 7**
M. Nabors Email to SJP Notifying of Interim Suspension

**Def. Exhibit 8**
J. Mentzer Letter Notifying SJP of Interim Suspension

**Def. Exhibit 12**
SJP Script & Protocol Document

**Def. Exhibit 20**
Deposition of Students for Justice in Palestine

**Def. Exhibit 22**
P001067–P001068

**Def. Exhibit 30**
P001400-P001402

**Def. Exhibit 31**
Deposition of M. Nabors

**Def. Exhibit 32**
Declaration of C. Panzella

**Def. Exhibit 33**
Declaration of M. Nabors

**Def. Exhibit 34**
Errata Sheet for M. Nabors Deposition

**Def. Exhibit 35**
Declaration of J. Tuscano

**Def. Exhibit 36**
Declaration of C. Scott

**Def. Exhibit 37**
Declaration of Z. Davis

**Def. Exhibit 38**
Declaration of G. Dickinson

**Def. Exhibit 40**
UPITT_0013854

**Def. Exhibit 41**
Declaration of Lynn Miller

**Def. Exhibit 42**
Declaration of Amanda Ries

**Def. Exhibit 43**
Declaration of Summer Rothrock

55948028.9