# DEFENDANTS' EXHIBIT 32

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STUDENTS FOR JUSTICE IN PALESTINE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. 2:25-cv-00524-NR |
| UNIVERSITY OF PITTSBURGH, *et al.* | ) ) ) |
| Defendant. | ) ) |

### DECLARATION OF CARLA PANZELLA

I, Carla Panzella, do hereby state under oath as follows:

1. I am the Vice Provost for Student Affairs for the University of Pittsburgh ("Pitt").

2. I have held this position since June 2024.

3. In that capacity, I am responsible for the strategic leadership of the Division of Student Affairs, serving on the Chancellor's leadership team and the Provost's leadership cabinet providing high-level input, experience, and advocacy that contributes to student success, well-being, and an overall positive student experience.

4. From January 2024 to June 2024, I served as Interim Vice Provost; and prior to that, I served as Dean of Students since August 2021, and Associate Vice Provost and Dean of Students since December 2022.

5. As a result of these responsibilities, I am familiar with Pitt's various policies concerning student organizations and groups, as well as Pitt's disciplinary processes for such groups as well as students individually.

6. In total, I have over 20 years of experience in higher education student affairs.

7. I hold a PhD in higher education from Seton Hall University, an MA in organizational psychology and leadership from the Teacher College of Columbia University, and BS in psychology from Saint Peter's University.

**Pitt Policies Governing Student Organizations**

8. Pitt's Student Code of Conduct guarantees students' rights to: "speak, write, or print freely on any subject, and to sponsor speakers of their choice," and "engage in peaceful, orderly, and nondestructive picketing, protests, and demonstrations, to the extent they do not violate public law and do not interfere with the educational process or the rights of other members of the University." See Defendants' Exhibit 5 at 8.

9. Pitt encourages its students to form and participate in official University-recognized Registered Student Organizations ("RSOs").

10. All students and RSOs must adhere to the Student Code of Conduct ("Code of Conduct"). Defendants' Exhibit 5 at 6.

11. Students and RSOs who violate the Code will be subject to disciplinary action by the University when such conduct takes place on University Property or in the course of a University-sponsored or University-supervised activity. *Id*.

12. All RSOs must also adhere to the Pitt's Registered Student Organizations Handbook ("RSO Handbook"). Defendants' Exhibit 6.

13. Pursuant to the RSO Handbook, "Any violation of this Handbook may result in disciplinary action in accordance with the Student Code of Conduct." *Id*. at 5.

14. Pitt "reserve[s] the right to terminate [RSO] registration status" in the event that the RSO fails to comply with "the rules, regulations, policies, and procedures of the University of Pittsburgh as determined appropriate by University representatives." *Id*. at 14-15.

15. RSOs have privileges as a result of formal University registration that include among other things, funding support, the ability to reserve space on campus for events, and authorization to use "Pitt" and other University-identification descriptors in their names.

16. Provided that students and RSOs comply with all applicable Pitt policies, Pitt supports the rights of students and RSOs to engage in peaceful, orderly, and nondestructive demonstrations, while ensuring the safety and respect of all individuals.

17. Pitt maintains specific policies and guidelines concerning free speech, which are available for public review on Pitt's website at: https://freespeech.pitt.edu/policies-guidelines.

18. Pitt also maintains a specific guidelines for demonstrations and protest ("Demonstration Guidelines") that are available for public review at https://freespeech.pitt.edu/policies-guidelines/demonstration-and-protest-guidelines.

19. As stated in those Demonstration Guidelines: "Many Pitt campus spaces are available for student organizations and University departments to reserve for planned events, including demonstrations; these include, but are not limited to, student union spaces, academic building rooms, outdoor plazas, and lawn spaces;" Pitt, however, "maintains the right to regulate and monitor the time, place and manner of any on-campus demonstrations as may be necessary to help ensure the safety and well-being of community members and the orderly conduct of classes and other functions of the University" "[a]ny violation of [the Demonstration Guidelines] by a student or student organization may lead to a referral to the student conduct process;" "[n]othing in [the Demonstration Guidelines] should be construed to restrict activity protected under the First Amendment."

20. Pitt also maintains a Library Space Use Policy that is available for public review on Pitt's website at https://library.pitt.edu/library-space-use-policy.

3

21. As stated in that Policy: Pitt's Hillman Library is "reserved for academic-related purposes only. Activities not directly related to academics and library services, programs, and expertise are not allowed. These include, but are not limited to various tabling, signage, or posters requests that do not meet the above criteria;" and "[a]ll space use requests that are beyond the normal academic use (study space or the specific functional use of library spaces) must be approved by Library Administration prior to use. The Library reserves the right to deny any request if the reserving parties do not adhere to the policies and procedures of the library."

22. Pitt's Hillman Library is not a space that can be reserved by RSOs for events, nor is it a space in which RSOs may conduct protests or demonstrations.

23. Pitt also maintains policies that govern its conduct review process.

24. Those policies are contained within the Student Code of Conduct and are designed to ensure the fair and unhindered administration of justice

**Students for Justice in Palestine's December "Study-In"**

25. Students for Justice in Palestine ("SJP-Pitt") is an RSO that is currently suspended.

26. Prior to this year, the University had never disciplined SJP-Pitt or charged SJP-Pitt with any Code of Conduct Violations.

27. Suspension of an RSO means that the RSO no longer has access to the privileges, described above, of being an RSO.

28. From December 9, 2024 to December 12, 2024, SJP-Pitt engaged in a demonstration event in Pitt's Hillman Library, in which they, among other things, pushed together tables, used University property whiteboards to convey their political message, put up other signs and table tents to convey their message, and draped full-size flags over library tables. They have referred to this event as the "Study-In."

29. SJP-Pitt held their event in a space that is not reservable for events, demonstrations, or protests.

**The Study-In Conduct Proceedings**

30. In January 2025, Pitt initiated conduct charges against SJP-Pitt for policy violations relating to the Study-In event.

31. Pitt scheduled the hearing at which SJP-Pitt's responsibility for the alleged policy violations would be adjudicated for February 4, 2025.

32. I did not participate in the hearing.

33. The hearing was moderated by Matthew Landy, Pitt's Director of Student Conduct, within the Division of Student Affairs.

34. Pitt enlisted a panel of trained neutral hearing board officers (the "First Panel") to hear the arguments and evidence to be presented by both Pitt and SJP-Pitt, and to determine whether SJP-Pitt should be found responsible for violating University policy relating to the Study-In event.

35. On the evening of February 4, 2025, the same day as that hearing, I received an email from SJP-Pitt ("Open Letter"). Defendants' Exhibit 4 is a true and correct copy of that email.

36. That Open Letter had also been sent to the members of the First Panel.

37. Marlin Nabors, Associate Vice Provost and Dean of Student at Pitt then conducted an investigation to determine the effect of the Open Letter upon the First Panel's members and their deliberations.

**SJP-Pitt's Interim Suspension**

38. As a result of Dean Nabors' investigation, Pitt made the decision to vacate SJP-Pitt's conduct proceedings as a result of the Open Letter.

39. Pitt also initiated new charges against SJP-Pitt for sending the Open Letter, which violated Pitt's policy that prohibits: (1) intimidation, coercion, influencing, or attempts to do the same against a person who is participating or has participated in any University process or proceeding. and (2) disruption or interference with the conduct process.  Those policies are set forth in Pitt's Student Code of Conduct.

40. Pitt also temporarily suspended SJP-Pitt for the Open Letter on an interim basis, pending formal adjudication of the policy violation charges.

41. SJP-Pitt's temporary interim suspension applied only to SJP-Pitt as an RSO; it did not apply to SJP-Pitt's leadership or any individual student members of SJP-Pitt.

**SJP-Pitt's Active Suspension**

42.  In April 2025, Pitt formalized the new charges against SJP-Pitt for the Open Letter.

43. Pitt conducted another conduct proceeding and hearing, which occurred on May 23, 2025.

44. Pitt again enlisted a panel of trained hearing board officers (the "Second Panel") to hear the arguments and evidence to be presented by both Pitt and SJP-Pitt.

45. The charges considered by the Second Panel included charges relating to the Study-In event, as well as the Open Letter.

46. I did not participate in the May 23, 2025 hearing.

47. After hearing the argument and evidence presented by Pitt against SJP-Pitt, and hearing the argument and evidence presented by SJP-Pitt, the Second Panel submitted their conduct board recommendation form, which found, among other things, that by sending its Open Letter to the First Panel demanding that the case be dismissed before an outcome of the case was shared with SJP-Pitt, SJP-Pitt had violated University policy prohibiting "[i]ntimidat[ion], coerc[ion], influenc[ing], or attempt[ing] to do the same against a person who is participating or has

participated in any University process or proceeding" and "[d]isrupt[ing] or interfere[ing] with the conduct process. A true and correct copy of the Conduct Board Recommendation Form is attached as Plaintiff's Exhibit 5 to Plaintiff's Memorandum of Law in Support of Plaintiff's Revised Motion for Preliminary Injunction (ECF No. 46-8).

48. The Second Panel recommended that SJP-Pitt be sanctioned with a suspension of registration until January 1, 2026.

49. Following that finding by the Second Panel, on June 18, I affirmed the hearing officers' recommendation and imposed a suspension on SJP-Pitt for sending the Open Letter.

50. The suspension was for six months, but I allowed that suspension to begin on March 18, the date of the interim suspension, so it would expire on September 18, 2025, rather than January 1, 2026.

51. I also made an allowance that SJP-Pitt's leadership can meet and can plan and reserve space for campus events, even while suspended, after SJP-Pitt completes educational conversations with University staff to discuss Pitt's expectations of its registered student organizations.

52. A true and correct copy of the formal letter advising SJP-Pitt of the outcome of the May 23, 2025 is attached as Plaintiff's Exhibit 18 to Plaintiff's Memorandum of Law in Support of Plaintiff's Revised Motion for Preliminary Injunction (ECF No. 46-21).

53. One of SJP-Pitt's Co-Presidents emailed Pitt to schedule the educational conversations on July 14, 2025.

54. Pitt suggested a time on July 23, 2025, when it would be able to meet.

55. SJP-Pitt did not respond to that suggestion for a meeting on July 23, 2025, and, as of the date of this Declaration, the Student Conduct Office has not heard further from SJP-Pitt about scheduling the educational conversations.

56. SJP-Pitt's active suspension applies only to SJP-Pitt as an RSO; it does not apply to SJP-Pitt's leadership or any individual student members of SJP-Pitt.

57. Pitt did not charge or sanction SJP-Pitt at any time because of the political viewpoint that it, or its members, expressed.

**Harm to Pitt if SJP-Pitt's Suspension is Lifted**

58. Based on my years of experience in higher education student affairs, it is evident that Pitt would suffer irreparable harm if the Court were to lift SJP-Pitt's suspension.

59. This is so because SJP-Pitt's lawsuit and request to lift the suspension does not exist in a vacuum.

60. How Pitt has responded to SJP-Pitt's rule violations and how this Court addresses this matter will be noted by other students and student organizations.

61. Pitt has the responsibility to manage and regulate the conduct and behavior of its students, particularly behavior that tends to impede, obstruct or threaten the achievement of a University's educational goals and compromise the University's ability to maintain discipline and a suitable climate for education.

62. Granting SJP-Pitt's request to lift its suspension would set a precedent and send a signal that would empower students to disregard Pitt's policies that are in place to protect and support all students and encourage other students and RSOs to not only (a) deliberately violate Pitt's policies, but also (b) interfere with the conduct review process.

63. Pitt's ability to enforce its policies, and, therefore, fulfill its obligations and responsibilities to its students, and fulfill its educational mission, would be significantly undermined and compromised.

64. Pitt would lose its ability to ability to manage and regulate the conduct and behavior of its students and RSOs and, therefore, its ability to create a suitable climate for education.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___Jul 31___, 2025            _____
                                           Carla Panzella