# EXHIBIT 1

Transcript of the Testimony of

# MARLIN NABORS

July 1, 2025

**STUDENTS FOR JUSTICE IN PALESTINE AT PITT  VS
UNIVERSITY OF PITTSBURGH**



**412-261-2323
depo@akf.com
www.akf.com**

MARLIN NABORS  -  7/1/2025

1 (Pages 1 to 4)

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 2:25-CV-00524

STUDENTS FOR JUSTICE IN          )
PALESTINE AT PITT,               )
                                 )
          Plaintiff,             )
                                 )
     VS.                         )
                                 )
UNIVERSITY OF PITTSBURGH; JOAN    )
GABEL, MARLIN NABORS, KARIN       )
ASHER, DaVAUGHN VINCENT-BRYAN,   )
MATTHEW LANDY, and JAMEY MENTZER,)
all in their official and        )
individual capacities,           )
                                 )
          Defendants.            )

DEPOSITION OF MARLIN NABORS
VIA VIDEOCONFERENCE

     DEPOSITION taken before me, Mary J. Carney, a
Notary Public within and for the Commonwealth of
Pennsylvania, via Zoom videoconference, beginning at
11:07 a.m. on July 1, 2025, pursuant to Notice and to
be used pursuant to the Federal Rules of Civil
Procedure in the aforesaid cause of action, pending
in the United States District Court for the Western
District of Pennsylvania.

**2**

1                    APPEARANCES
2
3        On Behalf of Plaintiff:
4        Witold J. Walczak, Esquire
         Ali Szemanski, Esquire
5        ACLU OF PENNSYLVANIA
         P.O. Box 23058
6        Pittsburgh, PA  15222
         412-681-7864
7        vwalczak@aclupa.org
         aszemanski@aclupa.org
8
         Solomon Furious Worlds, Esquire
9        Kirsten M. Hanlon, Esquire
         ACLU OF PENNSYLVANIA
10       P.O. Box 60173
         Philadelphia, PA  19102
11       215-592-1513
         sfworlds@aclupa.org
12       khanlon@aclupa.org
13
14       On Behalf of Defendants:
15       Alexander R. Bilus, Esquire
         SAUL EWING LLP
16       Centre Square West
         1500 Market Street, 38th Floor
17       Philadelphia, PA  19102-2186
         215-972-7777
18       alexander.bilus@saul.com
19
20       Also Present:
21       J. Nicole Rhodes, Esquire
         University of Pittsburgh
22
23
24
25

**3**

1                              INDEX
2
3 EXAMINATION BY MR. WALCZAK - PAGE 4
4
5 NABORS EXHIBITS INTRODUCED:
6  1 - PAGE 15
7  2 - PAGE 18
8  3 - PAGE 36
9  4 - PAGE 44
10  5 - PAGE 50
11  6 - PAGE 70
12  7 - PAGE 73
13  8 - PAGE 75
14  9 - PAGE 81
15 10 - PAGE 100
16 11 - PAGE 102
17 12 - PAGE 103
18 13 - PAGE 110
19 14 - PAGE 111
20 15 - PAGE 114
21 16 - PAGE 115
22 17 - PAGE 118
23 18 - PAGE 121
24 19 - PAGE 123
25 20 - PAGE 124

**4**

1         WHEREUPON, MARLIN NABORS, of lawful
2    age, being by me first duly sworn
3    to testify the truth, the whole
4    truth, and nothing but the truth,
5    as hereinafter certified, deposes
6    and says as follows:
7 EXAMINATION:
8 BY MR. WALCZAK
9         Q.  Good morning, Mr. Nabors.  My name
10   is Vic Walczak.  I am one of the lawyers
11   for the Plaintiffs in the lawsuit, Students
12   for Justice in Palestine at Pitt versus
13   University of Pittsburgh and a number of
14   individuals, including yourself.  Are you
15   familiar with that case?
16        A.  I am.
17        Q.  Have you ever been deposed before?
18        A.  I have not.
19        Q.  So let me just go over some ground
20   rules.  So this is an opportunity provided
21   by the Federal Rules of Civil Procedure for
22   us to be able to ask you questions.  We
23   have Mary here, who's going to transcribe
24   everything that's said while we're on the
25   record here.  You are under oath so will

MARLIN NABORS  -  7/1/2025

5

1  hopefully be telling the truth here.
2      If I ask a question and you don't
3  understand or you don't hear it, please ask
4  me to repeat or clarify and I'll do that.
5  If you answer the question, then I'll
6  assume that you've both heard and
7  understood it.  Is that fair?
8      **A.  Yes.**
9      Q.  There's also a tendency and I
10  especially have a tendency to step on
11  somebody else's answer, and as wonderful as
12  Mary is, she can't take down if we're both
13  talking at the same time.  So I'm sure I'm
14  going to violate that, but let's try to
15  wait until the other person has finished
16  either asking a question or whatever
17  they're saying before you respond.  Is that
18  okay?
19      **A.  Yes.**
20      Q.  Are you under the influence of any
21  kind of medication or substance that would
22  prevent you from fairly and truthfully and
23  comprehensively answering my questions?
24      **A.  No.**
25      Q.  So we will take some breaks as

6

1  needed.  As I told your counsel, because I
2  think we have limited time here, we're not
3  going to break for lunch, so we're not
4  going to take a prolonged break.  Just can
5  I ask you, do you have a hard stop today at
6  a certain time?
7      **A.  At 3.**
8      Q.  So you have to be -- you have to be
9  done at 3?
10      **A.  Correct.**
11      Q.  Okay.  Now, where are you
12  physically located right now?
13      **A.  In my home in Pittsburgh.**
14      Q.  Is there anybody else in the room
15  with you?
16      **A.  There is not.**
17      Q.  Do you have any communication
18  devices within reach?
19      **A.  Yes.**
20      Q.  Such as an iPhone?  Yeah, what do
21  you have?
22      **A.  I have my cell phone and a laptop.**
23      Q.  Okay.  And is your laptop open?
24      **A.  It's closed.**
25      Q.  Can I ask that you move your cell

7

1  phone so that it's out of reach and at a
2  place where you can't see it?  I mean,
3  obviously if you get an emergency call, I
4  want you to be able to get that, but
5  otherwise.
6      **A.  (Complying).**
7      Q.  Thank you for that.  And that was
8  your cell phone that you moved?
9      **A.  Yes, sir.**
10      Q.  Thanks.  And can I ask what you did
11  to prep for today's deposition?
12      **A.  I had a meeting with Sandy to**
13  **prepare for this deposition.**
14      Q.  How long was that meeting?
15      **A.  Roughly an hour.  Hour, hour and a**
16  **half.**
17      Q.  And when was that?
18      **A.  Yesterday.**
19      Q.  Did you review any documents in
20  preparation for today's deposition?
21      **A.  I did not.**
22      Q.  I'm going to just have you briefly
23  recap your formal education for us, so kind
24  of post high school, when, where, those
25  kind of things?

8

1      **A.  I have a Bachelor of Science from**
2  **Central Michigan University and a Master's**
3  **degree from Syracuse University.**
4      Q.  And what's that Master's degree in?
5      **A.  It's in education.  Specifically**
6  **the degree is Cultural Foundations of**
7  **Education.**
8      Q.  And when did you get that degree?
9      **A.  2002.**
10      Q.  Okay.  And if you could briefly
11  recap your work history, I'll just say
12  since you got that degree?
13      **A.  Can you -- can you further clarify**
14  **about briefly recap?  I just want to make**
15  **sure I'm giving you what you need.**
16      Q.  Yeah, thank you, I appreciate that.
17  That was probably a poorly framed
18  question.  Just like where you worked,
19  when, and what was your title there?
20      **A.  Do you want to give me a starting**
21  **point?**
22      Q.  Yeah, I'm sorry, after you got your
23  Master's degree, so that was 2002?
24      **A.  Okay.  I worked at Syracuse**
25  **University as a Residence Director.  I**

MARLIN NABORS  -  7/1/2025

9

1    worked at Denison University as an
2    Assistant Director of Residence Life.  I
3    worked at Indiana University Purdue
4    University Indianapolis as a Coordinator of
5    Diversity Programs.  I worked at Wentworth
6    Institute of Technology as Associate
7    Director of Residence Life, later a
8    Director of Student Conduct or Director of
9    Community Standards.
10        I worked at Southern New Hampshire
11    University as an Associate Dean.  I worked
12    at Salem State University as an Associate
13    Dean.  I worked at Endicott College as AVP
14    and Dean of Students before my current role
15    as AVP and Dean of Students at University
16    of Pittsburgh.
17        Q.  What dates were you at Endicott,
18    which I believe was the last placement
19    prior to Pitt?
20        A.  Correct.
21        Q.  Approximately?
22        A.  So 2020 until 2024.
23        Q.  What brought you to the University
24    of Pittsburgh; what attracted you to the
25    position?

10

1        A.  Well, it's a professional growth
2    opportunity.
3        Q.  And when did you start at
4    University of Pittsburgh?
5        A.  In January of this year.
6        Q.  And what is the title of your
7    position?
8        A.  Associate Vice Provost and Dean of
9    Students.
10        Q.  What are the sort of formal job
11    responsibilities under that position?
12        A.  To supervise or oversee various
13    units within the division, to assist the
14    Vice Provost in her responsibilities, and
15    to be a representative for broad student
16    needs and interests.
17        Q.  When you say oversee units, what
18    are you referring to?
19        A.  Departments within the division.
20        Q.  And the division is what?
21        A.  The Division of Student Affairs at
22    University of Pittsburgh.
23        Q.  And so, and who is it that you
24    report to; what's the name of that person?
25        A.  The Vice Provost.

11

1        Q.  Yes.
2        A.  Her name?
3        Q.  Her name, if it's a her, yeah.
4        A.  Dr. Carla Panzella.
5        Q.  And we're going to be talking about
6    a couple of disciplinary proceedings today
7    involving Plaintiff SJP.  If I use the term
8    SJP, is that familiar to you?
9        A.  It is.
10        Q.  Okay, we'll continue to use that
11    then.  Besides your involvement with the
12    SJP discipline, have you been involved in
13    other disciplinary matters since you
14    started in January?
15        A.  Involved in?  Is there any clarity
16    that might be helpful there for me to
17    answer?
18        Q.  I'm sorry, any what?
19        A.  Any clarity there that might be
20    helpful for me to answer more accurately?
21        Q.  How many other disciplinary
22    proceedings have you participated in?
23        A.  I have not --
24        Q.  In any fashion, yeah.
25        A.  So in the case with SJP, I

12

1    participated as a witness in the hearing.
2    I have not participated as a witness for a
3    hearing any other time at Pitt.
4        Q.  Well, let me try to clarify.  So as
5    I think we'll be discussing today, your
6    involvement with SJP has been more than
7    just a witness; is that a fair statement?
8        A.  That is fair.
9        Q.  So I'm not asking whether you've
10    been a witness in other proceedings, but
11    whether or not you have been involved in
12    assessing whether to file charges, what
13    kind of charges, involvement in setting up
14    proceeding, any of those types of
15    functions?
16        A.  I have been involved in those types
17    of functions in other cases.
18        Q.  In how many cases would you say
19    that is?
20        A.  I don't have an exact number.
21        Q.  An estimate is fine.
22        A.  I would estimate maybe 20 to 30
23    other cases.
24        Q.  So is this a significant part of
25    your overall responsibilities, overseeing

13

1  student discipline?
2       MR. BILUS:  I object to the
3  form.
4       Q.  You can answer.
5       **A.  I think what I can say is that**
6  **student conduct is one of the units that**
7  **reports in to me, yes.**
8       Q.  Have any of these other 25 or so
9  disciplinary matters that you've been
10  involved in gone to a hearing?
11       **A.  Yes.**
12       Q.  How many?
13       **A.  I think it might be helpful to be**
14  **clear about what type of hearing you mean.**
15  **Do you mean any type of hearing whatsoever?**
16       Q.  Well, what are the different types
17  that could have occurred?
18       **A.  There are hearings that happen with**
19  **administrators, and there are hearings that**
20  **happen with a board.**
21       Q.  Okay, well, let's take the first
22  one.  How many of those, how many of the
23  proceedings have gone to an administrator
24  hearing?
25       **A.  I would say half.**

14

1       Q.  And how many have gone to a board
2  hearing?
3       **A.  The other half.**
4       Q.  So all of these proceedings were
5  contested; is that -- I mean, what's the --
6  strike that.  Let me -- so what, explain
7  what the different processes are for when
8  it goes to an administrator versus when it
9  goes to the board?
10       **A.  I would rely on our practices that**
11  **are processes established in our handbook.**
12  **Would it be helpful for me to walk through**
13  **that?**
14       Q.  No, you know, I mean, we're a
15  little bit off topic here.  Just, I'm
16  trying to understand a little bit more
17  about your familiarity with the process.
18  So I mean, what kind of cases go to just an
19  administrative hearing?
20       **A.  Typically lower level cases that**
21  **are heard by Residence Life or**
22  **administrators in the Student Conduct**
23  **Office.**
24       Q.  So are those, are they called Level
25  I charges?  Do you know what that is?

15

1       **A.  Yes.**
2       Q.  And what about Level II charges?
3       **A.  Those typically go to a board.**
4       Q.  Are there any other kind of charges
5  besides Level I or Level II?
6       **A.  Not that I'm aware of.**
7       Q.  All right, I have a number of
8  documents to review with you today.  We're
9  going to start with Plaintiff's Exhibit 60.
10  That's the Bates number.
11  Ali, could you put that up on the screen?
12  Can you go to the, yeah, next page.  Thank
13  you.
14       Can we mark this as Nabors 1, Mary.
15       I'm sorry, am I pronouncing your name
16  correctly, Mr. Nabors?
17       **A.  You are.**
18       Q.  All right, I have on the screen
19  what's been marked as Nabors 1.  Do you
20  recognize this document?
21       **A.  I do.**
22       Q.  What is it?
23       **A.  It's an email from me.**
24       Q.  Okay.
25       **A.  To students representing the**

16

1  **Students for Justice in Palestine.**
2       Q.  Did you write this?
3       **A.  Yes, in consultation with others.**
4       Q.  Can you see that or do you need Ali
5  to blow that up a little?
6       **A.  I can see it.**
7       Q.  When you say you wrote it in
8  consultation with others, can you identify
9  those others?
10       **A.  In consultation with my supervisor**
11  **and inside legal counsel.**
12       Q.  Your supervisor is Dr. Panzella?
13       **A.  Correct.**
14       Q.  Did you discuss with her the
15  contents of this email before you sent it?
16       **A.  I did.**
17       Q.  And when you say inside counsel,
18  who do you mean?
19       **A.  Stan O'Loughlin.**
20       Q.  And is he one of Ms. Rhodes'
21  colleagues in the, what's called the Office
22  of General Counsel?
23       **A.  He is colleagues with her, yes.**
24       Q.  Did you discuss this with anybody
25  else?

17

1       A. No.
2       Q. I want to go to the first large
3   paragraph. And you can enlarge that, Ali.
4   So in that, I guess it's the second full
5   paragraph, I'll read, "I have received
6   information that while this conduct
7   proceeding was ongoing, you engaged in
8   additional conduct that may have violated
9   the Student Code of Conduct." Did I read
10  that correctly?
11      A. Yes.
12      Q. Now, the letter here, unless I'm
13  mistaken, doesn't specify what that
14  additional conduct is. Can you clarify
15  that?
16      A. I believe that subsequent sentences
17  begin to address that.
18      Q. It says that you improperly engaged
19  in communications following the February 4
20  hearing. Are you referring to what's been
21  termed I think an Open Letter that SJP sent
22  on February the 4th?
23      A. Yes.
24      Q. All right, and just to get this out
25  of the way, I want to mark Defendant's

18

1   Exhibit 364 as Nabors 2. Ali, can you put
2   that on the screen?
3       All right, I'm showing you, Mr. Nabors,
4   what's been marked as Exhibit 2. Is this
5   the letter that is referenced in the March
6   18 email?
7       A. Yes.
8          MR. BILUS: Can I see the top
9   part of it? It looks like this is part of
10  an email chain. So, Vic, when you're
11  talking about the letter, are you talking
12  about the specific part of this document or
13  the whole document?
14      Q. Good clarification. So my
15  understanding is that where it, below the
16  Bee Involved logo is what would have come
17  to the university. Is that, I just want to
18  make sure that we're talking about the same
19  content. And, Ali, maybe you can scroll
20  down to the other pages.
21      Now that you've had a chance to review
22  this, is this the communication that you
23  reference in the March 18 letter?
24      A. It is.
25      Q. Yes, thank you. Let's go back to

19

1   Nabors 1. Just for clarity's sake, I'm
2   going to refer to this letter from here on
3   out as the Open Letter or the February 4
4   Open Letter. Is that agreeable to you, Mr.
5   Nabors?
6       A. You don't mean the letter that
7   we're looking at; you mean the previous
8   one?
9       Q. Yes, yes, correct. I'm just
10  looking for an easy handle to refer to that
11  letter. So if I call it the Open Letter,
12  can we agree that I'm referring to what is
13  Nabors 2, the February 4 letter sent by SJP
14  with 70 signatories?
15      A. Yes.
16      Q. When you say on Nabors 1 that
17  additional conduct may have violated the
18  Student Code and is now triggering this
19  March 18 correspondence, is there any other
20  conduct that prompted this email?
21      A. There was, yes.
22      Q. What would that be?
23      A. There were concerns with language
24  that representatives from SJP used during
25  the hearing to panelists.

20

1       Q. So language during the hearing.
2   Can you be more specific; what kind of
3   language?
4       A. Panelists present for the hearing
5   described to me that members or the
6   students representing SJP made comments --
7   I'm paraphrasing their paraphrasing -- but
8   comments to the panelists that they should
9   be careful about their decision, that
10  people are watching, that they're working
11  with lawyers, so they should think
12  carefully about how they decide this. Those
13  were comments that panelists referenced as
14  concerning.
15      Q. And do those comments go into the
16  decision that is communicated in this March
17  18 email?
18      A. I'm sorry, can you ask that again?
19      Q. Yeah, or, so as I said, this
20  doesn't specifically identify the
21  additional conduct, so I'm trying to
22  establish, you know, what conduct is at
23  issue. So we've identified the Open
24  Letter, and then you said that there were
25  comments made during the hearing which you

MARLIN NABORS  -  7/1/2025

21

1  just clarified.  And I'm asking if those
2  comments were part of the decision that is
3  communicated in this email that they're now
4  suspended and that the proceedings will be
5  started anew?
6      **A.  Yes.**
7      Q.  Now, in the last sentence of that
8  second paragraph -- Ali, maybe you can make
9  that a little bigger, at least for me -- so
10  it says there, "As set forth in the Code,
11  interference with the conduct process,
12  which includes any action designed or with
13  the potential to influence or intimidate
14  any person... constitutes a serious
15  violation."  Did I read that correctly?
16      **A.  I'm not seeing where you're saying
17  that.**
18      Q.  Second-to-last sentence in the
19  second paragraph.
20      **A.  Thank you.**
21      Q.  Do you see that?
22      **A.  Yes.**
23      Q.  So this says, "any action designed
24  or with the potential to influence or
25  intimidate."  Did you write those words?

22

1      **A.  I believe that those are in our
2  policies.**
3      Q.  And that sentence starts, "As set
4  forth in the Code"; correct?  So that's a
5  representation that that is the Code of
6  Conduct; is that right?
7      **A.  Yes.**
8      Q.  But in fact are the words "designed
9  or with the potential to" included in your
10  Code of Conduct?
11      **A.  I'd have to look, sir.**
12      Q.  Okay, we'll come to that in a
13  couple minutes.  The next paragraph talks
14  about consequences for the additional
15  conduct, and the first one says that there
16  will be additional charges; is that right?
17      **A.  Yes.**
18      Q.  And to be clear, the influence or
19  interference or disruption with the
20  proceeding at issue involves an incident
21  that occurred in Pitt's Hillman Library in
22  December 2024; correct?  That was the
23  subject of the first proceeding; is that
24  right?
25      **A.  Yes.**

23

1      Q.  So this additional conduct that we
2  just discussed, the Open Letter and the
3  comments at the hearing, are what are
4  prompting additional charges; correct?
5      **A.  Yes.**
6      Q.  Now, that next sentence, it says,
7  "due to the serious nature of these
8  cumulative actions."  What, what are you
9  referring to there?
10      **A.  All unresolved allegations of
11  potential violations of the Student Code of
12  Conduct.**
13      Q.  So those are the library and the
14  Open Letter as we've been discussing.  What
15  else, if anything?
16      **A.  I believe all of the charges are
17  connected to those two instances.**
18      Q.  Well, there's a third one about
19  somehow behaving improperly under
20  suspension; is that a third charge?
21      **A.  It is.  It's -- I think that comes
22  after this communication.**
23      Q.  Okay.  So when you said cumulative
24  actions, is there anything else that that
25  includes?

24

1      **A.  It's meant to address any
2  unresolved charges that were alleged at
3  that point.**
4      Q.  The only unresolved charge at this
5  point is the library, the ones related to
6  the library; correct?
7      **A.  This letter references additional
8  coming charges.**
9      Q.  Okay, I guess my question is, do
10  those encompass anything beyond the Open
11  Letter and the comments made during the
12  hearing?
13      **A.  Can you repeat the question?  Do
14  those?  I'm sorry.**
15      Q.  I'm trying to understand the scope
16  of cumulative actions, all right?
17      **A.  Uh-huh.**
18      Q.  So there's the library incident at
19  issue in the first misconduct hearing on
20  February 4.  The new ones that we've just
21  discussed -- and I don't want to put words
22  in your mouth, so if I'm misstating
23  something, please correct me -- we have
24  additional charges based on the Open Letter
25  and the students' statements or comments at

MARLIN NABORS  -  7/1/2025

25

1  the hearing.
2  My question is, and this is the 18th, so
3  as you rightly point out, it's right before
4  the alleged third violation involving
5  social media posts.  Is there any other
6  conduct at issue here?
7      **A. No.**
8      Q. So I want to, in that same
9  paragraph, go down to the word "Third."  Do
10  you see that?  It says, "these actions also
11  irreparably compromise the integrity and
12  credibility of the current conduct
13  proceeding."  Did I read that correctly?
14      **A. Yes.**
15      Q. And when you say current conduct
16  proceeding, you're referring to the
17  February 4 proceeding?
18      **A. Yes.**
19      Q. When you say irreparably compromise
20  the integrity and credibility of the
21  current conduct proceeding, can you explain
22  why that's so?
23      **A. I was concerned that the letter to**
24  **members of the board and their behavior**
25  **during the hearing was an attempt to**

26

1  **influence the board and the outcome of the**
2  **hearing and compromised my faith in the**
3  **outcome of the process, given that attempt.**
4      Q. Isn't the purpose of the hearing to
5  allow the students to influence the
6  tribunal?
7      MR. BILUS:  Object to the form.
8      **A. The purpose of the hearing is for**
9  **students to present information and answer**
10  **questions about the alleged violations.**
11      Q. And aren't they trying to influence
12  the decision-makers to rule in their favor?
13      **A. I -- I think what I can answer is**
14  **what we ask of them.  What we ask of**
15  **students is to present information**
16  **truthfully in order to help panelists**
17  **resolve alleged violations of the Code.**
18  **That's what we ask of them.**
19      Q. And are students brought before the
20  panel allowed to make arguments in addition
21  to presenting facts?
22      **A. If -- it may be helpful for us to**
23  **look at the sequence of events used for the**
24  **-- for the panel hearings.  That's what I**
25  **would rely on to interpret what's allowable**

27

1  **during the hearing.**
2      Q. You're not saying that students
3  can't make arguments about why the
4  university shouldn't punish them at one of
5  these hearings, are you?
6      **A. I guess I'm saying that what's --**
7  **what's the most accurate answer is to look**
8  **at the process that we lay out in terms of**
9  **questioning, statements, and closing**
10  **statements.  Everything that students are**
11  **allowed to do is laid out in that process.**
12      Q. And I'm not asking for the perfect
13  answer.  I'm asking whether or not the
14  process allows students to make arguments
15  about why they shouldn't be punished, for
16  instance, in a closing statement?
17      **A. Yes.**
18      Q. And is there a limit on the type of
19  arguments you can make in your closing
20  statement?
21      **A. Because we have policies that are**
22  **meant to address actions that could**
23  **potentially interfere with the process, I**
24  **believe that there are limits to how**
25  **students act, behave, speak, during the**

28

1  **hearing or after a hearing.**
2      Q. And you think those are written
3  down somewhere?
4      **A. Many of our policies are written so**
5  **that there's enough room for interpretation**
6  **in application.**
7      Q. What do you mean by that?
8      **A. That our policies aren't written to**
9  **specify every behavior in every**
10  **circumstance.**
11      Q. Who decides what behavior is
12  allowed or isn't allowed?
13      **A. I think what, what our**
14  **administrators decide is whether or not**
15  **that behavior is a potential violation of**
16  **the policy, either in letter or in spirit.**
17      Q. So it's enough that a violation is
18  a potential violation, that the conduct is
19  a potential violation of a rule?
20      **A. To levy charges?**
21      Q. Yes.
22      **A. Yes.**
23      Q. How about to make a finding of
24  misconduct?
25      **A. You'll have to repeat the whole**

29

1    question for me, I'm sorry.
2        Q.  Is it enough to make a finding that
3    a student or a group violated a rule simply
4    because their action had the potential to
5    violate a rule?
6        A.  I think in our system, in order to
7    find a person responsible for a policy
8    violation, we have to find that there's
9    preponderance of the evidence that the
10    violation, that the policy was violated.
11    That's our standard.
12        Q.  The policy's violated as written or
13    as interpreted by administrators?
14        A.  Both.
15        Q.  I heard you say that it's the
16    potential to violate a policy both in
17    letter and spirit.  So I understand letter.
18    That would be the rule as written.  What
19    does it mean to violate the spirit?
20        A.  We have a policy that, for
21    instance, would prohibit students from
22    providing alcohol to under-age persons.
23    Providing, for instance, could take a
24    number of different -- could be executed in
25    a number of different ways.  So if I hand

30

1    an under-age person a beer or if I leave a
2    beer out for an under-age person, that
3    could violate the letter and the spirit of
4    the policy.
5        Q.  Who made this decision to impose
6    the interim suspension?
7        A.  I'm sorry?
8        Q.  Who made the decision to impose
9    this interim suspension on March 18?
10        A.  I did in consultation with my
11    supervisor and our legal counsel, inside
12    legal counsel.
13        Q.  Any other Pitt staff?
14        A.  Those were the two humans that I
15    interacted with around this decision.
16        Q.  So that's Dr. Panzella and Stan in
17    the legal office?
18        A.  Correct.
19        Q.  Does Stan have a last name?
20        A.  O'Loughlin.
21        Q.  Look at that last line in the third
22    paragraph. It says, "Under the
23    circumstances presented here, the integrity
24    of the process dictates that the current
25    Conduct Hearing Board be dismissed and

31

1    released from further deliberation without
2    decision, and that the entire proceeding be
3    vacated as null and void." Did I read that
4    correctly?
5        A.  Yes.
6        Q.  When it says, "Under the
7    circumstances presented here," what does
8    that refer to?
9        A.  The improper communications, the
10    concern about the interference with the
11    conduct process.
12        Q.  Those concerns were great enough to
13    abort the February 4 process?
14        A.  Yes.
15        Q.  It says, "the current Conduct
16    Hearing Board be dismissed and released
17    from further deliberation without
18    decision."  Do you know how much progress
19    that first hearing board had made on a
20    decision?
21        A.  I know that they were in
22    deliberations.
23        Q.  Do you know whether they put pen to
24    paper?
25        A.  I don't know the answer to that.

32

1        Q.  So you don't know whether or not
2    they started an opinion or a decision or
3    findings?
4        A.  I don't.
5        Q.  Did you ask them?
6        A.  I only was interested at that time
7    about whether or not they had reached a
8    decision, and they had not.
9        Q.  We'll explore that in a little bit.
10    As you sit here now, are you aware of any
11    draft findings that the first panel made?
12        A.  I have not seen any draft findings
13    that the panel made.
14        Q.  Are you aware whether they made
15    draft findings?
16        A.  No.
17        Q.  So just to clarify that, the
18    consequences identified in this Nabors
19    Exhibit 1, the interim, the new charges,
20    interim suspension and aborting of the
21    first process were all caused by a
22    combination of the Open Letter and the
23    students' comments at the February 4
24    hearing; is that a fair statement?
25        A.  I'm sorry, can you say that again?

33

1      Q.  I'm trying to summarize what, what
2   we have here.  So is it a fair statement to
3   say that the additional charges, the
4   interim suspension that's being imposed,
5   and the aborting of the first conduct panel
6   in process was all triggered by a
7   combination of the Open Letter and what the
8   students said at the February 4 hearing?
9      A.  Yes.
10      Q.  So between February 4 and March 18
11   is -- I'm not a math major -- about six or
12   seven weeks.  Why the delay?
13      A.  The delay in what?
14      Q.  So the letter was sent, the Open
15   Letter, Nabors 2, was sent on the evening
16   of February the 4th; correct?
17      A.  Yes.
18      Q.  You investigated and as of February
19   10 had spoken to the hearing, the initial
20   panel hearing officers; correct?
21      A.  I don't have the exact date in
22   front of me, but that sounds -- that sounds
23   fair.
24      Q.  Okay.  So between February 10 and
25   March 18 is, I don't know, six weeks about,

34

1   give or take.  My question is, why the delay
2   in visiting these consequences on SJP?
3      A.  I think from my perspective there
4   was an interest in being sort of
5   intentional about the decisions that we
6   make and considering them before we make
7   them.
8      Q.  So was there work being done on
9   this matter between February 10 and March
10   18?
11      A.  Work?  Can you --
12      Q.  Let me define.  I mean, you said
13   you wanted to be intentional.  What if
14   anything was being done in relation to
15   SJP's new transgressions, I'll call them,
16   between February 10 and March 18?
17      A.  What was being done?  There were
18   discussions between myself and my
19   supervisor and our inside legal counsel.
20      Q.  Tell me about the discussions with
21   Dr. Panzella.  What were they about?
22         MR. BILUS:  Let me just jump in.
23    If those discussions included inside, in-
24   house legal counsel, I'd like to object on
25   the basis of privilege and direct the

35

1   witness not to answer.  To the extent those
2   discussions occurred outside of the
3   presence of counsel, then you can answer.
4      A.  All of our discussions were
5   together.
6      Q.  So all the discussions you had
7   about SJP between February 10 and March 18
8   involved in-house University counsel?
9      A.  Correct.
10      Q.  You said you've done about 25
11   proceedings, half of which involved panels.
12    Did they all involve discussions with in-
13   house counsel?
14      A.  Not all.
15      Q.  What percentage would you say
16   involved in-house counsel?
17      A.  Maybe half of the ones that went to
18   a Level II hearing.
19      Q.  And what is it that necessitates
20   involvement of inside counsel?
21         MR. BILUS:  I'm objecting.  That
22   gets into a privileged area.  Vic, I don't
23   think you can ask him about why they're
24   asking their lawyers for help.
25      Q.  So besides discussions between

36

1   February 10 and March 18, any other work
2   being done involving or relating to the new
3   additional conduct that we've been
4   discussing?
5      A.  Any work consisted of
6   conversations.
7      Q.  Let's go to -- let's mark this as
8   Nabors Exhibit 3.  It is Bates No. 13856 to
9   57.  Do you see what's marked as Nabors 3
10   on the screen, Mr. Nabors?
11      A.  Yes.
12      Q.  Do you recognize this document?
13      A.  I do.
14      Q.  What is it?
15      A.  This is a notification to
16   representatives for SJP.
17         MR. BILUS:  Can we see the
18   whole, just scan through quickly to see the
19   whole document?  Thank you.
20      Q.  Now, I note that this is signed by
21   somebody named Jamey Mentzer.  Who is that?
22      A.  The Associate Director of Student
23   Conduct.
24      Q.  What's his relation to you?
25      A.  Where does he sit in the

37

1   organization?  I'm sorry, I need to -- I
2   just want to make sure that I'm clear about
3   what you're asking.
4       Q.  Yeah, sorry.  Just, yeah, in kind
5   of the organizational chart, where does he
6   fall compared to where -- I mean, is he in
7   your direct line of supervision; is he
8   outside of that?  Just, what's the
9   relation?
10      A.  Jamey reports to the Director of
11  Student Conduct, and the Director of
12  Student Conduct has temporarily been
13  reporting to me.
14      Q.  Okay.  Who's the director?
15      A.  The Director of Student Conduct is
16  Matt Landy.
17      Q.  So you supervise Mr. Landy, who
18  supervises Mr. Mentzer; is that correct?
19      A.  Correct.
20      Q.  So Exhibit 3 that we're looking at
21  raises charges essentially grouped into
22  three; is that correct?  It looks like, let
23  me say that there are a number of charges,
24  but they relate to really three incidents?
25      A.  Can you scroll to the second page

38

1   again?  And back to the first page, I'm
2   sorry.  I think three is the right number,
3   yes.
4       Q.  And if you need to look at the
5   document, it's not ideal, be a lot easier
6   in person, but feel free to please ask Ali
7   whatever necessary.  So the first set of
8   charges relates to the Hillman Library
9   incident that was the subject of the first
10  February 4 panel; is that correct?
11      A.  Yes.
12      Q.  And those charges are the same as
13  they were initially back in February; is
14  that right?
15      A.  Again, without the documents right
16  in front of me, I -- I, you know, don't
17  want to say definitively, but that's my
18  understanding.
19      Q.  The second set there where it says
20  alleged violations relating to actions
21  taken during the board hearing process,
22  that relates to what we have just been
23  discussing, the Open Letter and the
24  comments at the first disciplinary hearing;
25  is that correct?

39

1       A.  Yes.
2       Q.  Does that relate to anything else,
3   or that's the universe?
4       A.  Can you restate what you're asking
5   whether or not these are related to?
6       Q.  I want to make sure that we
7   understand the conduct that's identified as
8   problematic.  And based on the discussion
9   we've just had, I'm asking whether or not
10  that second set of charges relates to
11  anything besides the Open Letter and the
12  comments you identified that the students
13  made at the hearing?  Is there any other
14  conduct encompassed by that?
15      A.  No.
16      Q.  And the third, third one, third set
17  of charges, which is just a single charge
18  with Conduct Rule 36, relates to a social
19  media posting; is that fair?
20      A.  Yes.
21      Q.  That was made while they were on
22  interim suspension?
23      A.  Yes.
24      Q.  I'm not trying to minimize that,
25  but that's not the focus of this

40

1   proceeding, so I'm just going to put that
2   to the side for now.  So a moment ago I had
3   asked you about the language of the Code of
4   Conduct, and you indicated you wanted to
5   look at the actual text.  So if you could
6   look at Rules 42 and 43 on Nabors 3 and
7   tell me whether those appear to be accurate
8   renditions of those respective rules in the
9   Pitt Code of Conduct?
10      A.  Yes.
11      Q.  Neither 42 nor 43 include the words
12  potential, do they?
13      A.  The word potential is not listed
14  there.
15      Q.  And it doesn't include the word
16  design, does it?
17      A.  It does include the word attempts.
18      Q.  It doesn't include the word design;
19  correct?
20      A.  It does not.
21      Q.  And on 43 it doesn't say attempt to
22  disrupt; it says disrupts or interferes
23  with the conduct process; is that correct?
24      A.  You're correct.
25      Q.  And does the University apply not

41

1    just the letter but a spirit interpretation
2    to that rule?
3        **A. I think in my example about under-**
4    **age, providing to under-age persons, I**
5    **think that is consistently what we do, is**
6    **to interpret our policies to make a**
7    **determination about whether or not the**
8    **preponderance of the evidence is that**
9    **they've been violated.**
10       Q. So you're saying, or are you saying
11   that somebody could violate Rule 43 without
12   actually disrupting or interfering with the
13   conduct process?
14       **A. I don't think that's what I'm**
15   **saying.**
16       Q. Well, I hear you saying you apply
17   it to all different situations, and I guess
18   I'm trying to understand how strictly you
19   interpret Rule 43, how much, how much
20   leeway is there in deciding whether or not
21   there's disruption or interference?
22       **A. So I just want to be clear that at**
23   **this point, these are charges.  I think you**
24   **might be asking me about a decision-making**
25   **process, and I was not involved in making a**

42

1        **decision about whether or not these**
2        **policies were actually violated. I was**
3        **involved in deciding charges.**
4        Q.  And what standard do you apply to
5    deciding whether or not to bring such
6    charges?
7        **A. It's a -- it's a very low standard.**
8        Q.  How much evidence do you need to
9    support charges?
10           MR. BILUS:  Vic, just to --
11       Q.  Let me rephrase.  I'll rephrase it.
12           MR. BILUS:  Okay.
13       Q.  I'll strike that.  I'll rephrase.
14   Yeah, no, that, we'll reword it.  My
15   apologies.
16   What disruption or interference were you
17   aware of in bringing these charges?
18       **A. The two circumstances that we noted**
19   **thus far, the Open Letter and language used**
20   **during the previous hearing.**
21       Q.  What evidence do you have that the
22   proceedings were actually disrupted?
23       **A. My conversations with the three**
24   **panelists were part of the information we**
25   **used, in addition to the Open Letter.**

43

1        Q.  So is the Open Letter by itself
2    enough to constitute disruption or
3    interference?
4        **A. Well, in this case I felt it was**
5    **necessary to talk with the three panelists,**
6    **so I used that and the conversations to**
7    **substantiate this charge.**
8        Q.  So you relied on what the panelists
9    told you about their reaction to the Open
10   Letter?
11       **A. I relied on information shared with**
12   **me during those conversations.**
13       Q.  By those conversations, you're
14   referring to the interviews with the three
15   panel members?
16       **A. Correct.**
17       Q.  What other information did you have
18   about the effect of the letter or the
19   comments made during the hearing besides
20   what you got from the interviews with the
21   three hearing officers?
22       **A. That's it.**
23       Q.  How are you doing in terms of, do
24   you need a break?  Or we can do a short one
25   or we can keep going and do it in a little

44

1    bit.  What's your preference?
2        **A. We can keep going.**
3        Q.  Okay, sounds good.  All right,
4    let's go to, let's mark this as -- what are
5    we on, 4?  Mark this as Nabors 4, Bates
6    13881.  Scroll up, Ali.
7    I show you what's been marked as Exhibit
8    4.  Do you recognize this?
9        **A. I recognize this, this form, but I**
10   **don't believe I've looked at this exact**
11   **letter, no.**
12       Q.  Were you involved in the
13   recommended, in deciding on what the
14   recommended sanctions should be?
15       **A. No.  Like, well, sorry.  For which?**
16       Q.  So --
17       **A. No, no.**
18       Q.  I'm sorry.
19       **A. No.**
20       Q.  All right, so looking at Exhibit 4,
21   it says Recommended sanction there?
22       **A. Uh-huh.**
23       Q.  Do you see that's underlined?  And
24   then below that it says, "Termination of
25   Registration with the ability to reapply

MARLIN NABORS  -  7/1/2025

45

1  for reinstatement after two years." Did I
2  read that correctly?
3      **A. You did.**
4      Q. My question was whether you were
5  involved in that, making that recommended
6  sanction?
7      **A. I'm sorry, I was involved in making**
8      **that recommended sanction. My apologies.**
9      Q. Not a worry. You know, and again,
10 if there's something that you say that you
11 realize you may have made an error and want
12 to correct that, now is absolutely the best
13 time to do that. Although I'm not trying to
14 give you advice that should come from your
15 lawyer, but just, you know, we want to be
16 transparent here. We're just trying to get
17 your side of the story here.
18     **A. Thank you.**
19     Q. So did you make this decision by
20 yourself or did it involve other people?
21     **A. It involved other people.**
22     Q. Can you identify those other
23 people?
24     **A. Dr. Panzella and Stan O'Loughlin.**
25     Q. And what was the basis for

46

1  recommending a two-year termination of
2  registration?
3      **A. There were a separate set of**
4  **recommended sanctions after the first or**
5  **related to the first hearing. I think what**
6  **we did was, in consideration of the new**
7  **charges, extend the recommended sanctions**
8  **from this, from the first hearing to**
9  **encompass the new, you know, the potential,**
10 **the new violations.**
11     Q. So the presumption would be that
12 they would be found responsible for the
13 first set of hearings; is that right?
14     **A. I don't -- I don't know that**
15 **there's a presumption here. But the --**
16 **yeah, I don't think that there's a**
17 **presumption here.**
18     Q. If you're adding onto the
19 recommended sanctions for the first one,
20 then that's in addition to if they violated
21 any rules for the library incident; is that
22 correct?
23     **A. Yeah, I think it might be helpful**
24 **to review the process so that you're clear**
25 **about the role that the disciplinary**

47

1  **conference plays in the process. There's**
2  **no presumption.**
3      Q. Yeah, would you mind describing
4  that for us?
5      **A. It provides students with an**
6  **opportunity to accept responsibility and**
7  **accept sanctions.**
8      Q. Is there any negotiation over those
9  sanctions during this process or is it a
10 take-it-or-leave-it situation?
11     **A. Again, I would have to refer to our**
12 **practice as laid out in the Code. I -- I**
13 **don't believe that our policies are written**
14 **as if the disciplinary conference is a**
15 **negotiation.**
16     Q. So beneath that recommended
17 sanction it asked the students to respond
18 with a number of possible paths, from
19 admitting to sort of admitting to denying.
20 But if they were to admit, then they would
21 accept a two-year deregistration; is that
22 correct?
23     **A. "And accept the above-recommended**
24 **sanctions" is what the letter reads.**
25     Q. Are you familiar with the

48

1  consequences for SJP of deregistration?
2      **A. Can you ask the question again?**
3      Q. Are you familiar with the
4  consequences that would befall SJP if they
5  were deregistered for two years or
6  deregistered at all, what are the
7  consequences for how they can operate?
8      **A. Yes.**
9      Q. And what are those consequences?
10     **A. Well, roughly that they're not**
11 **allowed to operate as a registered student**
12 **organization under our expectations and**
13 **privileges of registered student**
14 **organizations.**
15     Q. And would that include a loss of
16 University funding?
17     **A. It would preclude them from**
18 **receiving funding from the Student**
19 **Government Board.**
20     Q. And that could be $10,000 or more
21 per semester; is that right?
22     **A. I don't -- I don't have good**
23 **information about that.**
24     Q. And would deregistration deny them
25 access to use of any Pitt facilities for

49

1  lectures, programs, presentations,
2  meetings, the like?
3      A.  Them, the organization?  Like,
4  please --
5      Q.  The organization, yeah.
6      A.  It would prevent, yes, it would
7  prevent the student organization from
8  reserving space.
9      Q.  And they would not allow them to
10  use any of the University's internal
11  communications channels?
12      A.  I don't -- I don't know what you
13  mean.
14      Q.  Neither do I.  Do you have internal
15  -- do you have internal communications
16  challenges?  Or channels?  Sorry.  Are
17  there like ListServes, for instance?  If
18  students want to make an announcement about
19  something going on, are there mediums
20  within the University to do that?
21      A.  There is -- students can have
22  posters approved.  That's a -- that's a way
23  that students can, student groups can
24  advertise.
25      Q.  And those posters can be displayed

50

1  where?
2      A.  I don't have exact places for you.
3  There are places around the University that
4  they can be.  I just don't know the exact
5  locations.
6      Q.  And if a group is deregistered,
7  they can no longer display posters on
8  campus; is that right?
9      A.  Correct.
10      Q.  Okay.  Let's mark as Exhibit 5
11  Bates 2629.  Showing you what's been marked
12  as Exhibit 5, do you recognize this
13  document?  I was going to say, if you need
14  to look at another part of it, just let us
15  know.
16      A.  Can you scroll, Ali, please?
17       Yes, I recognize this language, yes.
18      Q.  Have you seen this document before?
19      A.  So, yes.
20      Q.  What is it; what is this document?
21      A.  This, this looks like this was some
22  version of the opening sort of statement
23  that we planned to use for the hearing.
24      Q.  When you say we, who are you
25  referring to?

51

1      A.  Myself and Dr. Karin Asher.
2      Q.  What role did the two of you play
3  in the May 23 proceeding?
4      A.  We were witnesses.
5      Q.  And did you have any involvement in
6  drafting the language in Exhibit 5?
7      A.  The one that we are looking at?
8      Q.  Yes.
9      A.  I did.
10      Q.  What role?  Did you draft this?
11      A.  This, this was a shared document
12  between Dr. Asher and myself, so we both
13  authored portions of this.
14      Q.  So would you say it was jointly
15  produced by you and Dr. Asher?
16      A.  Yes.
17      Q.  Did anybody else help you with this
18  or assist in this?
19      A.  Broadly, but I don't know -- I
20  don't know how to answer that.  Let me see.
21   Did anyone else assist you?  Can you say
22  that for me again?
23      Q.  Did anybody else review or
24  contribute to this document?
25      A.  There was no one else that

52

1  contributed to this document, no.  I would
2  -- no.
3      Q.  Is there anybody who reviewed it
4  and gave you feedback on the document?
5      A.  Yes.  Dr. Panzella reviewed it and
6  gave us feedback.
7      Q.  And do you remember what that
8  feedback was?
9      A.  Not specifically, no.
10          MR. BILUS:  Vic, while you're
11  pausing, did you want to try to plan for a
12  break maybe in five minutes or so since
13  we've been going almost an hour and a half?
14          MR. WALCZAK:  Sure, yeah.  Maybe
15  we can get through this document, which I
16  don't think I have a lot, so, okay.
17          MR. BILUS:  Thank you.
18          MR. WALCZAK:  Yeah.
19      Q.  (BY MR. WALCZAK)  So, Ali, can you
20  go to the top of the document?
21       So in that first paragraph, five lines
22  down, it says, "University staff addressed
23  in a content-neutral manner," fifth line
24  down on the left.  Do you see that?
25      A.  I do.

MARLIN NABORS  -  7/1/2025

53

1    Q.  Whose language is that?
2    A.  I mean, this was a conversation
3  between Dr. Asher and I, so I don't -- I
4  don't remember who exactly wrote that part.
5    Q.  And what does content-neutral
6  manner mean to you?
7    A.  In general or in this context?
8    Q.  In this context.
9    A.  Content-neutral meaning with only
10  regard to the behavior and the applicable
11  policies.
12    Q.  So go down to the first line in the
13  third paragraph on the first page.  It
14  says, "SJP actions as part of the
15  disciplinary process provide more examples
16  of their intentionally subversive actions."
17   Do you see that?
18    A.  I do.
19    Q.  What are you referring to as
20  intentionally subversive actions?
21    A.  It's not clear to me what stage of
22  the drafting process this document is in.
23  I don't know if this is our final version
24  or not.  I think that I just, I want to
25  make that, make that point.  As Dr. Asher

54

1  and I were discussing this potential
2  opening statement, we wanted to make the
3  point that SJP's actions were not
4  unintentional, that they were not made by
5  accident, that these were deliberate
6  decisions made on their part.
7    Q.  So the deliberate would be
8  reflected by intentionally.  What do you
9  mean by subversive?
10    A.  Actions meant to challenge the
11  system.
12    Q.  Is that illegal?
13    A.  Well, I'm not a lawyer.  I deal
14  with student conduct.
15    Q.  As a non-lawyer involved in student
16  conduct, is it legal for students to engage
17  in subversive action?
18        MR. BILUS:  Object to the form.
19    A.  Are you asking me illegal or are
20  you asking me against policy?  I'm sorry,
21  can you just restate where you're going?
22    Q.  I'm trying to understand what you
23  mean by subversive here.
24    A.  If, I think that if a person is
25  intentionally violating a policy, that's

55

1  meant to challenge the policies themselves.
2    Q.  Sounds to me like you're defining
3  civil disobedience here?
4        MR. BILUS:  Objection.  Is that
5  a question, Vic, or just a statement?
6        MR. WALCZAK:  It's on question,
7  Sandy.  I'll strike that.
8    Q.  (BY MR. WALCZAK)  Mr. Nabors, was
9  this read at the May 23 hearing to the
10  hearing officers, or what, how was this
11  document used?
12    A.  I know that this was a preparatory
13  document.  I don't -- I don't -- I would
14  need to have more information to determine
15  if this is the one that we actually used in
16  the hearing.
17    Q.  So this is I think the fullest one
18  we have.
19        MR. WALCZAK:  I'm wondering if
20  counsel might look to see if there is a
21  document that is more up to date or that it
22  was actually used at the May 23 hearing,
23  Sandy?
24        MR. BILUS:  We can look.  I
25  don't know if this had metadata associated

56

1  with it or not.  We can see if there's a
2  later version.
3    Q.  (BY MR. WALCZAK)  So regardless
4  whether this is the, or irrespective of
5  whether this is the final version or not,
6  would that document, whatever the final
7  version was, whether it's this or something
8  else, would that have been recited to the
9  hearing panel on May 23?
10    A.  What specifically?
11    Q.  So it says Opening Statement.  Did
12  somebody just read this, or how is this
13  used?
14    A.  Correct; this would have been read
15  as an opening statement.
16    Q.  So I want to look at the last
17  sentence in that third paragraph.  "These
18  actions created the potential for undue
19  influence on panelists, which is a
20  violation of the Code of Conduct."  Did I
21  read that correctly?
22    A.  You did.
23    Q.  As we discussed before, potential
24  for undue influence is not the language
25  used in the actual Code of Conduct rule;

57

1    correct?
2        **A. Correct.**
3        Q. Why did you add that language?
4        **A. Well, I think it was the panel's**
5    **decision about whether or not that policy**
6    **was violated.**
7        Q. So is the issue whether or not the
8    students potentially created undue
9    influence or whether they actually
10    instigated undue influence?  And this goes
11    back to the questions we had a little while
12    ago.
13        **A. There is some language in the**
14    **policy that deals with attempt as well,**
15    **which I think is an important part to**
16    **consider.**
17        MR. WALCZAK:  All right, why
18    don't we break here.  Can we do ten minutes
19    and come back at 12:45?
20        MR. BILUS:  That will be great.
21        MR. WALCZAK:  Okay, thanks. (A
22    recess was taken 12:38 to 12:48 p.m.)
23        Q. (BY MR. WALCZAK)  Did you attend
24    the May 23 hearing?
25        **A. I did.**

58

1        Q. And you I believe said you were a
2    witness?
3        **A. Correct.**
4        Q. So you testified at that hearing?
5        **A. Correct.**
6        Q. Did the process, did the procedures
7    or process around that May 23 hearing
8    differ from the process or procedures at
9    the February 4 hearing?
10        **A. So I was not at the February 4**
11    **hearing, so I would need to compare the two**
12    **sort of agendas, and I have not done that.**
13        Q. I believe you said you've been
14    involved in about a dozen proceedings that
15    have gone to a panel hearing; is that
16    right?
17        **A. More or less.**
18        Q. Yeah, approximately.  Over the
19    course of the approximately six months that
20    you've been at Pitt and involved in these
21    proceedings, did you direct any changes in
22    process or procedures for these hearings?
23        **A. At times, yes.**
24        Q. What kind of changes?
25        **A. Whether or not it was desirable to**

59

1    **call witnesses for a case, for instance, is**
2    **one thing that I can think of.**
3        Q. And how did you direct a change on
4    that or what was the change?
5        MR. BILUS:  Is this for -- can
6    we focus on the SJP hearing?  I'm not sure
7    why we're going out of scope here.
8        MR. WALCZAK:  We are focused on
9    the SJP hearing.  I'm trying to -- I'm
10    trying to understand whether or not the
11    process was different from February 4.  And
12    he testified that he was not there, so I'm
13    asking whether or not, in his capacity as
14    overseeing these processes, whether he
15    directed any changes in how the proceedings
16    should work.  I think that's fair game.
17        MR. BILUS:  For the May SJP
18    hearing or for all the hearings that he's
19    ever been involved with?  That's what I'm
20    unsure.
21        MR. WALCZAK:  Right now I'm
22    asking about generally, whether or not he
23    direct -- you know, so as somebody who came
24    in, was learning the process, observing it,
25    did at some point between January and the

60

1    end of May he direct changes in how these
2    proceedings should operate.
3        MR. BILUS:  Okay.
4        MR. WALCZAK:  I think he said
5    yes, and my question is like what, what
6    kinds of changes?
7        **A. Yeah, the only thing that comes to**
8    **mind is making a decision about whether or**
9    **not witnesses would be called for a**
10    **particular hearing or not.**
11        Q. (BY MR. WALCZAK)  What was the
12    actual change?
13        **A. Well, I don't know; maybe that**
14    **wasn't a change to the procedure.  We**
15    **didn't end up calling or inviting any**
16    **witnesses to participate.**
17        Q. So was this about whether or not
18    witnesses were allowed at hearings?  Or I'm
19    not following.
20        **A. It was not about whether or not**
21    **witnesses were allowed at hearings.**
22        Q. What was it about witnesses that
23    was being changed?
24        **A. So maybe I should revise my answer.**
25    **I can't think of any procedural changes**

61

1    that I made to hearings this, this semester
2    while I've been employed at Pitt.
3        Q.  Were there any changes made in
4    directions that the panel gave to the
5    parties in terms of dos and don'ts?
6        **A.  Can you ask again?  I'm sorry.**
7        Q.  Yeah.  So did you direct any
8    changes into what directions were given to
9    students appearing before a panel either
10   before, during, or after a proceeding?
11       **A.  That, that is possible.  I -- I**
12   **think what I would need to do is to look at**
13   **the instructions that were given to**
14   **students before the February hearing and**
15   **before the May hearing.  I just, I don't**
16   **know for sure.**
17       Q.  Do you know whether there was a
18   change that inserted language specifically
19   telling students that they could not
20   communicate with panel hearing officers
21   after the conclusion of the hearing?
22       **A.  I don't -- I don't know for sure**
23   **that that was added.**
24       Q.  And are you aware that that was not
25   something that was told to students

62

1    appearing before a panel prior to May?
2        **A.  I can't answer that confidently.**
3        Q.  Do you know whether the students
4    are told specifically, either in writing or
5    verbally at a hearing, that they should not
6    communicate directly with hearing officers
7    after the close of the proceedings?
8        **A.  I don't know confidently that that**
9    **instruction is given.**
10       Q.  So you're not aware that that
11   instruction is generally given?
12       **A.  Correct.**
13       Q.  And you're not aware that it was
14   given to the students on the February 4
15   hearing?
16       **A.  Correct.**
17       Q.  And you're not aware that it was
18   given to the students at the May 23
19   hearing?
20       **A.  Correct.**
21       Q.  Okay.  Well, let me ask you, you
22   were at that May 23 hearing.  Do you recall
23   that instruction being given to the SJP
24   students?
25       **A.  I don't recall.  I would need to**

63

1    look back at the -- at the script.  I don't
2    recall that specifically.
3        Q.  And what we're talking about is
4    some kind of direction making clear that
5    communication with panel hearing officers
6    after the hearing is prohibited.  You don't
7    recall that?
8        **A.  I -- I don't recall that coming up**
9    **at the hearing.**
10       Q.  I note there was a Mr. Bruce Albert
11   who was, I think was he the hearing
12   manager?  What do you call Mr. Albert at
13   the May 23 hearing; what was his role?
14       **A.  The hearing moderator.**
15       Q.  What's the hearing moderator's
16   role?
17       **A.  To lead the proceedings and ensure**
18   **that all relevant information is brought to**
19   **the panel.**
20       Q.  What does the person in that role
21   do to ensure that all relevant information
22   is brought to the panel?  How do they do
23   that?
24       **A.  Ask questions, clarify questions,**
25   **clarify process, ask for certain topics or**

64

1    areas not to be explored to keep things on
2    track.
3        Q.  So the moderator is an active
4    presence during the hearing?
5        **A.  Yeah, yes.**
6        Q.  And was Mr. Albert active during
7    the May 23 proceeding?
8        **A.  I feel that's a little too broad**
9    **for me to answer that.**
10       Q.  I note Mr. Albert is not a
11   University of Pittsburgh employee; is that
12   correct?
13       **A.  Correct.**
14       Q.  In any of the other 25 or so
15   proceedings that you've been involved in
16   since you started in January, has there
17   been a non-Pitt employee enlisted as
18   moderator?
19       **A.  No.**
20       Q.  Why did you -- why did -- were you
21   involved in the decision to select Mr.
22   Albert?
23       **A.  I was not.**
24       Q.  Who made that decision?
25       **A.  That was a decision by the Vice**

65

1    Provost.
2       Q. By Dr. Panzella?
3       A. Uh-huh.
4       Q. And you didn't -- have you ever
5    asked her why she made that decision?
6       A. No.
7       Q. Was there any discussion about who
8    would be the moderator?  Were you
9    participating in any discussion about who
10   would be the moderator?
11      A. I was not a participant in the --
12   well, I mean, yes, I was a participant in
13   the discussion about whether or not Matt
14   Landy, who is the Director of Student
15   Conduct, whether or not he should continue
16   in the role as moderator. I don't that's
17   the part of the discussion that I was involved in.
18      Q. So Mr. Landy was the moderator for
19   the February 4 discussion?
20      A. Hearing, correct.
21      Q. Right, sorry. And what was the
22   discussion about whether he would continue
23   in that role on May 23 for the second
24   proceedings?
25      MR. BILUS:  Again, to the extent

66

1    those discussions involve counsel, I would
2    object on the basis of privilege.  I don't
3    know if they did or not, but I'm just, if
4    that's calling for privileged information,
5    I would object.
6       Q. What's your understanding of why
7    Mr. Landy did not continue as moderator for
8    the May 23 decision?  May 23 proceedings?
9    Sorry.
10      A. I had a very limited role in that
11   conversation. I think that I may have said
12   to Dr. Panzella that if we were vacating
13   the original hearing, that we should, you
14   know, wipe everyone clean, including the
15   moderator.  And that's, that I believe was
16   the extent of my involvement in the
17   discussion.
18      Q. You were not party to any
19   discussions about whether that moderator
20   should be a Pitt employee?
21      A. No.
22      Q. Are you aware of the University
23   ever using a non-Pitt employee as moderator
24   at a disciplinary panel?
25      A. I mean, yes.  I mean, I am -- I

67

1    guess what's more accurate to say is that
2    I'm aware of this practice. I don't have
3    any specific circumstance at Pitt that I
4    can point to.
5       Q. Are you talking about practice at
6    Pitt or practice in the industry or what?
7       A. Practice in -- practice in the
8    industry.
9       Q. Are you aware of this practice at
10   Pitt outside of the May 23 hearing?
11      A. I cannot reference any cases that I
12   have knowledge of that used an outside
13   hearing moderator.
14      Q. Between February 4 and May 23 are
15   you aware of any changes in how panel
16   hearing officers are selected?
17      A. I am not clear on how panelists
18   were selected for the February hearing.
19      Q. Were you involved in panel
20   selection for May 23?
21      A. That was Dr. Panzella and our
22   inside legal counsel.
23      Q. They are the ones who selected the
24   panel members?
25      A. I -- I think that I was involved in

68

1    the conversation about the panelists for
2    the May hearing.
3       Q. What was your role, just to be part
4    of discussions?
5       A. I reviewed information about the
6    panelists' potential for bias connected to
7    this hearing and shared that information
8    with Dr. Panzella and our internal counsel.
9       Q. And how did you -- so you were in
10   charge of assessing potential bias of panel
11   members?
12      A. I was in charge of collecting that
13   information and then providing information
14   for the conversation with Dr. Panzella and
15   Stan.
16      Q. What did -- how did you collect
17   that information; what did you do?
18      A. I believe that they were sent an
19   email survey.
20      Q. Did you develop that survey or did
21   somebody else do that?
22      A. I did not develop the survey.
23      Q. So it was given to you and you sent
24   it to prospective panelists?
25      A. I don't even know if I sent it,

69

1    sir.  I would have to look back to, to be
2    clear about that. I just know that I looked
3    at the results and we had conversations
4    about the results.
5        Q.  How many panelists did you
6    consider?
7        A.  We got feedback from eight people.
8        Q.  How were those eight people
9    selected?
10       A.  From either existing board members
11   or panelists or people who had panel
12   experience.
13       Q.  Is there a list of potential panel
14   members, or how does that work if you know?
15       A.  My understanding is that the
16   Director of Student Conduct maintains a
17   list of active panelists or people who have
18   served on panels in the past.
19       Q.  And are you aware of any change in
20   panelist selection process between February
21   and May 23?
22       A.  I am not confident about what the
23   panel selection process was prior to May.
24       Q.  Do you know what training, if any,
25   panel hearing officers -- what, how do you

70

1    refer to them; what do you call them?
2        A.  Panelists.
3        Q.  I mean, are you aware of what, if
4    any, training panelists receive for this,
5    this role?
6        A.  At Pitt specifically I was not
7    involved in their training and I don't know
8    what training was offered to them.
9        Q.  Do you know what instructions they
10   have about what they should and shouldn't
11   do while they're deliberating on a matter?
12       A.  Sorry, can you ask that one more
13   time?
14       Q.  Are you aware whether the panelists
15   are given any instructions about, for
16   instance, not reading newspapers or opening
17   social media; are there any restrictions on
18   how panelists should comport themselves
19   while they are deliberating on a matter, on
20   a disciplinary matter?
21       A.  I'm not aware of any guidance.
22       Q.  All right.  Let's look at, let's
23   mark as Exhibit 6 Bates No. 2595.  Do you
24   see what's been marked as Exhibit 6 on the
25   screen, Mr. Nabors?

71

1        A.  I do.
2        Q.  What is this?
3        A.  Looks like it's an email to my
4    executive assistant.
5        Q.  And this says that you'll be having
6    a 15-minute chat every morning with Carla
7    to check in about the SJP conduct process;
8    is that correct?
9        A.  That's right.
10       Q.  And did these 15-minute sessions
11   occur?
12       A.  Not every morning.
13       Q.  How often?
14       A.  I could not say.
15       Q.  Was anybody else part of these
16   discussions?
17       A.  Sometimes our -- Stan would be
18   involved.
19       Q.  But not always?
20       A.  But not always.
21       Q.  What did you talk about when Stan
22   was not there?
23       A.  It would be difficult for me to
24   make a meaningful distinction because I
25   don't -- his presence wasn't necessarily

72

1    the thing that, that marked the
2    conversation for me, so I don't know if I
3    could accurately say.
4        Q.  In other proceedings you've,
5    conduct proceedings you've been involved
6    in, did you have regular meetings with Dr.
7    Panzella before those proceedings?
8        A.  It's not uncommon for Dr. Panzella
9    and I to talk about open conduct cases.
10       Q.  Is she involved in all conduct
11   cases?
12       A.  She requires updates and
13   information about conduct cases.
14       Q.  How often is she involved in
15   shaping what a conduct process can or
16   should look like?
17           MR. BILUS:  Object to the form.
18       A.  I would say we pretty consistently
19   just try and use our process and stick to
20   what's in our policies and procedures.  So,
21   you know, my conversations with Dr.
22   Panzella about conduct cases are typically
23   updates.
24       Q.  Have you had another case in your
25   tenure at Pitt where you had nearly daily

73

1   meetings with Dr. Panzella about the
2   disciplinary proceedings?
3       A. No.
4       Q. Have you had any other proceedings
5   that went to a panel hearing during your
6   tenure at Pitt that involved discussions
7   with University counsel prior to the
8   hearing?
9       A. Yes.
10      Q. Out of the approximately dozen that
11  you've been involved in, what percentage of
12  those involved counsel, in your estimation?
13      A. Half.
14      Q. Let's mark as Exhibit 7 Bates
15  13886. I'll show you what's been marked as
16  Exhibit 7. Do you recognize this document?
17      A. Sure, yes.
18      Q. What is it?
19      A. It looks like this is a page of the
20  information that was provided for the
21  hearing.
22      Q. Does this go to the panel members?
23      A. I don't know that confidently. I
24  don't know what the -- what the -- what the
25  hearing moderator shared and what things --

74

1   I don't know that.
2       Q. This is a document that either you
3   compiled or was compiled under your
4   direction?
5       A. Like this individual page?
6       Q. Yes.
7       A. Sure, yes.
8       Q. Does the listing of the evidence
9   there, is that the sum total of evidence
10  that goes to the panel? Or tell me what
11  that is.
12      A. So I believe, and again this is, I
13  don't think that this is a stand-alone
14  document. I think that this was maybe part
15  of more pieces of information. But I
16  believe that this is the pieces of
17  information that Dr. Asher and I prepared
18  to bring to the hearing that we
19  participated in.
20      Q. Is this part of what might be
21  referred to as the hearing binder?
22      A. It should be part of that, yeah.
23      Q. You don't know whether it was in
24  this case?
25      A. Again, it's really difficult for me

75

1   not to have things in front of me, so I
2   don't.
3       Q. Okay. All right, let's mark as
4   Exhibit 8, 13878. I show you what's marked
5   as Exhibit 8. Do you recognize this
6   document?
7       A. Can I read it?
8       Q. Of course.
9       A. Can you scroll, Ali? Can you
10  continue to scroll, please? Can you scroll
11  again, I'm sorry. Okay, thank you.
12      Q. What is this document?
13      A. I believe that this was another
14  document in preparation for the hearing.
15      Q. Were you involved in the
16  preparation?
17      A. I was.
18      Q. What was your role?
19      A. Can you scroll back up, Ali, to the
20  first page? I was likely a lead author for
21  this. I don't remember whether or not
22  Karin and I worked on this together or if
23  it was just me, but I think I was probably
24  lead writer for this.
25      Q. Was this shared with the panelists?

76

1       A. I do not believe that this was part
2   of what we shared as evidence.
3       Q. You don't know for certain then?
4       A. You mean this document or the
5   information contained in the document?
6       Q. Let's start with the document.
7       A. I don't -- I don't believe that we
8   shared this document in this form as part
9   of the hearing.
10      Q. Did you share it in another form?
11      A. I think we may have referenced all
12  of these pieces at some point in the
13  hearing.
14      Q. So that at the top of Page 1 in
15  Exhibit 8 is a timeline. Was that
16  information conveyed to the panelists
17  during the hearing?
18      A. We used a document Opening
19  Statement and a document Closing Statement.
20   So it was not -- if it wasn't, if these
21  elements weren't referenced in that opening
22  or closing statement, I don't -- I can't
23  say for sure which pieces of this may have
24  come up.
25      Q. If there's a written opening and

77

1   closing statement, that would have been
2   read to, read and -- read to the panelists?
3       **A. Correct.**
4       Q. Would it have been given to them in
5   writing as well?
6       **A. I'm not confident about that.**
7       Q. Okay, but it was definitely read to
8   them?
9       **A. Yes.**
10      Q. And would it have been read
11  verbatim?
12      **A. Yeah, likely.**
13      Q. Give or take a word. So I just
14  want to set down some, some timeline
15  markers here, and we'll come back and
16  discuss these. So the fourth bullet on the
17  first page there, February 4, while board
18  members were still in deliberations, SJP
19  sent an email. Do you see that?
20      **A. I do.**
21      Q. Okay. And that, that email is the
22  Exhibit 2 that we talked about, the Open
23  Letter?
24      **A. Correct.**
25      Q. And then on the next bullet under

78

1   February 5, it says a board member sent an
2   email to Moderator Landy outlining
3   concerns. Do you see that?
4       **A. I do.**
5       Q. And that board member was Scott
6   Carlton?
7       **A. Correct.**
8       Q. Is he the only board member who
9   emailed you or anybody else at the
10  University about the proceedings?
11      **A. That's my understanding.**
12      Q. Are you aware of any other
13  complaints that were made about, made in
14  writing about the effect of the letter,
15  Open Letter?
16      **A. I am not aware of any.**
17      Q. On the February 6 bullet point
18  there, you sent what I'll just call a stop-
19  work order to the panel members; is that
20  right?
21      **A. Correct.**
22      Q. Then on February 10, next bullet
23  point down, you actually met with the three
24  panel members?
25      **A. Met may be an overstatement. I had**

79

1   **phone conversations with the three of them**
2   **separately.**
3       Q. So each of those calls was
4   separate?
5       **A. Correct.**
6       Q. And did you memorialize the results
7   of those conversations?
8       **A. Can you -- can you use a different**
9   **word? Can you be a little more specific?**
10  **I'm sorry.**
11      Q. Are there notes of those
12  conversations?
13      **A. I did take notes for those, of**
14  **those conversations.**
15      Q. Was anybody else on those calls
16  besides you and the panel member?
17      **A. No.**
18      Q. And all three took place on
19  February 10?
20      **A. Correct.**
21      Q. And then the next bullet says
22  February 18, Dean Nabors notified SJP that
23  their actions had compromised the
24  integrity, do you see that?
25      **A. Uh-huh.**

80

1       Q. Okay. Is that February 18 supposed
2   to be March 18?
3       **A. Oh, it probably is.**
4       Q. So there's a gap between February
5   10 and March 18 again; right? Nothing
6   important, according to you, happened
7   between February 10 and March 18?
8           MR. BILUS: Object to the form.
9       Q. Let me say, let me change the
10  wording. Anything significant in this case
11  happen between February 10 and March 18?
12          MR. BILUS: Object to the form.
13      **A. I stated before that there were**
14  **conversations about proper next steps.**
15      Q. Just to clarify, so you don't
16  believe that this document marked as
17  Exhibit 8 was actually given to the May 23
18  panel members?
19      **A. I -- I have to look to be sure. I**
20  **don't believe that we used this as part of**
21  **the hearing. Or I think that this was a**
22  **preparatory document.**
23      Q. And you relied on this during the
24  hearing?
25      **A. No.**

81

1      Q. You didn't refer to this during the
2  hearing?
3      A. This document?  No.  This
4  information broadly, you know, sure.  There
5  was another document that we -- that we
6  used for the hearing.
7      Q. I'm sorry, I'm confused about what
8  -- so what, what role did this serve you?
9      A. This was to help me organize my
10  thoughts, to help me sort of understand and
11  organize the sort of sequence of events,
12  yeah.
13      Q. Okay, let's go to, let's mark as
14  Exhibit 9 Bates 13887.
15      MR. WALCZAK:  Sandy, I think
16  this is the hearing binder.  It's the 138-
17  page document you produced last night.
18      MR. BILUS:  Okay.
19      Q. (BY MR. WALCZAK)  Go to the second
20  page, Ali.
21      Do you recognize this document, Mr.
22  Nabors?
23      Let's go to the next page, Ali.
24      A. I'm sorry, do I recognize this
25  document?  Yes.

82

1      Q. What is it?
2      A. This looks like what would have
3  been made available to everyone as part of
4  the hearing.
5      Q. When you say everyone, who do you
6  mean?
7      A. Panelists, witnesses, members of
8  the SJP, representatives of SJP.
9      Q. So I'm going to represent to you
10  that the -- I'm going to go through these
11  slowly.  What I want you to look at and
12  tell me if this looks right, the first 16
13  pages relate to the December 2024 library
14  incident?
15      A. Okay.
16      MR. BILUS:  Do you want to
17  reference the Bates number?  I think that
18  might help.
19      Q. It's 13889 to 13904.  And I'll
20  represent to you that it looks to be all
21  about the library.  I guess my question to
22  you that you should be able to answer
23  assuming that what I just told you is true,
24  do you know whether any changes to this
25  presentation were made between the first

83

1  hearing on February 4 and the second
2  hearing on May 23?  In other words, did you
3  or anybody else you know of make changes to
4  the presentation about the library
5  violation?
6      A. Yes.  Not me.  There was, but, yes,
7  there was a change.
8      Q. Were you involved in that?
9      A. I was not involved in composing it,
10  but I was involved in discussions about
11  how, what sort of changes we might make.
12      Q. And what kind of changes did you
13  discuss?
14      A. Being --
15      Q. I'm sorry, what kind of changes did
16  you make?
17      A. This timeline is more detailed than
18  what I believe was presented at the first
19  hearing.
20      Q. Detailed in what way?
21      A. To include screenshots, social
22  media activity.
23      Q. Okay.  Let's go to the next page,
24  Ali.  I believe Page 17 of Exhibit 9 is
25  where the presentation starts about the

84

1  Open Letter.  Does that look right?
2      A. It does.
3      Q. And how if at all was this document
4  used during the hearing?
5      A. I believe we walked through
6  portions of this timeline with the panel.
7      Q. All right.  Sticking just with the
8  interference with the ongoing conduct
9  process, this that starts on Page 17, did
10  you walk the panel through, through these
11  pages?
12      A. Page 17?
13      Q. Yeah, let's start, yeah, let's
14  start with Page 17.  That would be easiest.
15      A. I -- I believe we did.
16      Q. Ali, can you enlarge that a little
17  bit?  My eyes aren't what they used to be.
18  So in that last bullet under February 4,
19  it says, "That evening, while the hearing
20  board was still deliberating, SJP
21  improperly communicated with and interfered
22  with the deliberations of the board via an
23  email attaching an Open Letter asserting
24  various new allegations and urging the
25  board to dismiss the conduct charges

85

1    against SJP." Is that correct? Did I read
2    that correctly?
3        **A. Yes.**
4        Q. When you say -- did you write that?
5        **A. I don't recall. I'm sure I was at**
6    **least a co-author.**
7        Q. You approved of this language?
8        **A. Yes.**
9        Q. Okay, when you say improperly
10   communicated, what was improper about it?
11       **A. That the communication was an**
12   **attempt to, to not only to continue to have**
13   **sort of hearing, sort of points and**
14   **processes outside of the hearing process,**
15   **but to influence the deliberations or the**
16   **decision of the board.**
17       Q. Is asking the panel to dismiss the
18   charges new information?
19       **A. No.**
20       Q. And that was the whole purpose of
21   or that's what I think the students hoped
22   would happen at the hearing; correct?
23           MR. BILUS:  Objection to the
24   form.
25       **A. I'm sorry, what do you want me to**

86

1    respond to?
2        Q. Would you agree with me that the
3    students' argument at the first hearing was
4    to dismiss the charges against them;
5    correct?
6        **A. I wasn't at the first hearing.**
7        Q. But you're familiar with it?
8        **A. Sure. Again, I would say in each**
9    **of the hearings, what we ask for is for**
10   **students to respond to the allegations by**
11   **bringing forward statements and**
12   **information.**
13       Q. SJP's goal would have been to have
14   the panel dismiss the charges; correct?
15       **A. I'm -- I mean, I don't know how you**
16   **want me to respond to that, sir.**
17       Q. It would not be a surprise to the
18   panel members that SJP wanted them to
19   dismiss the charges; that's not new
20   information; correct?
21       **A. That's likely not new information.**
22       Q. When you say asserting various new
23   allegations, what are you referring to?
24   Would it help to look at the letter?
25       **A. Sure.**

87

1        Q. Ali, can you put up, I think it's
2    Exhibit 2.
3    Is that large enough for you to see, Mr.
4    Nabors?
5        **A. It is.**
6        Q. You must be younger than me.
7    Definitely better eyes.
8        **A. And a bigger screen.**
9        Q. So again I'm asking, what are the
10   new allegations here?
11       **A. Can you scroll for me, Ali, please?**
12   **Okay, can you go back to the first page up**
13   **here?**
14       **I can't say with any confidence that**
15   **there's actually any new information**
16   **presented here.**
17       Q. Did you say you cannot say with
18   confidence?
19       **A. I cannot.**
20       Q. So all of this information may just
21   be a repeat of what was presented at the
22   hearing; is that right?
23       **A. Again, I wasn't there.**
24       Q. But you are a co-author of making
25   this allegation that these were new

88

1    allegations in the letter?
2        **A. Correct.**
3        Q. But now as you look at the letter,
4    you can't identify information that you
5    know to have been new?
6        **A. Correct.**
7        Q. Okay, let's go back to Exhibit 9.
8    Sorry, Ali. You probably didn't get this
9    training in law school, but you are doing a
10   very good job I will say. Let's go to the
11   next, let's go to Page 18. We were just
12   looking at 17. Can you go to, I'm sorry,
13   go to Page 18. Yeah. Right, so we could
14   have looked at the letter here. My bad,
15   okay. Can you scroll down to the bottom of
16   the page?
17   So the first line there reads, "Attempting
18   to influence anyone involved in a conduct
19   proceeding outside of the context of the
20   hearing - particularly the board members -
21   fundamentally undermines the integrity of
22   the process." Did I read that correctly?
23       **A. You did.**
24       Q. I want to understand what
25   attempting to influence anyone involved in

89

1  a conduct proceeding outside the context of
2  a hearing entails.  So in this case we had
3  an Open Letter that was sent to about 20
4  administrators; correct?
5      **A.  Yes.**
6      Q.  And included in that group of
7  administrators was the three hearing
8  officers; correct?
9      **A.  Correct.**
10     Q.  If -- was the problem or was the
11  violation here because those hearing
12  officers were included on that email?
13     **A.  Yes.**
14     Q.  So if they had sent that letter to
15  the administrators not including the
16  hearing officers, that would not have
17  constituted a violation?
18     **A.  Correct.**
19     Q.  What if they posted the letter on
20  social media in addition to sending it to
21  the administrators, would that have been a
22  violation?
23     **A.  So again, I just want to be clear**
24  **that my role in this was to bring alleged**
25  **violations to the panel, and it's their**

90

1  **role to make a decision about whether or**
2  **not those policies were violated.  So can**
3  **you give me the question again with that**
4  **context in mind?**
5      Q.  Yeah, so let me just back up.  So
6  may I assume when you decide whether to
7  bring charges, you apply, my term,
8  something like a probable cause standard,
9  that you believe there may be a violation;
10  is that fair?
11     **A.  That's fair.**
12     Q.  So in bringing these, I'm asking
13  you, trying to understand what attempting
14  to influence means.  If the students, let's
15  say their intent was to influence the
16  process, they sent the exact same letter to
17  the administrators but not including the
18  hearing officers.  Would that have
19  triggered charges?
20     **A.  I would not have individually made**
21  **the argument that that should result in**
22  **charges, no.**
23     Q.  Let's say that that letter was then
24  also published on social media widely,
25  reshared by allied groups, and duplicated

91

1  in the Pitt News, so it's widely available.
2  Would that have triggered charges?
3      MR. BILUS:  Object to the form.
4      **A.  The reason that this communication**
5  **triggered this alleged violation is because**
6  **it was communicated directly to the board**
7  **members.**
8      Q.  If the, in the hypothetical I just
9  used involving letter to many other
10  administrators, social media distribution
11  and republication in the Pitt News, and it
12  is entirely likely that the hearing
13  officers or the panel members would have
14  seen that, that still, that wouldn't be a
15  violation?
16     MR. BILUS:  Objection to the
17  form.
18     Q.  That would not have prompted you to
19  file charges?  Sorry.
20     **A.  It would not have.**
21     Q.  Even though the very same content
22  would have reached or likely reached the
23  panel members?
24     MR. BILUS:  Object to the form.
25     **A.  In this hypothetical situation?**

92

1      Q.  Yes.
2      **A.  I would -- I would not have**
3  **advocated that we pursue charges under the**
4  **hypothetical that you're describing.**
5      Q.  So that the sole problem here was
6  the fact that the panel hearing members
7  were directed or the panel members received
8  a copy of the letter directly from the
9  students?
10     MR. BILUS:  Object to the form.
11     **A.  The problem was that the students**
12  **emailed the panelists directly.**
13     Q.  So if the exact same letter made
14  its way to the panelists while they were
15  deliberating through some other means, that
16  would not have been a violation?  You, I'm
17  sorry, you would not have pressed charges
18  against SJP?
19     **A.  Correct.**
20     Q.  So the fact that they sent it to,
21  that SJP sent it directly to the panel
22  members, in your mind is that a -- is that
23  by itself a violation regardless of the
24  actual impact on the panel members?
25     **A.  I believe that the attempt at**

93

1    influence is a violation.
2        Q. The attempt at influence by
3    communicating directly with the panel
4    members; correct?
5        A. Correct.
6        Q. But if they attempted to influence
7    by indirectly getting it to the panel
8    members, that would not be a violation?
9        A. It would be if I could prove that
10   they indirectly attempted to get it to the
11   panelists.
12       Q. You're not aware of any direction
13   to panelists to stay away from social media
14   or regular media or outside communications
15   during their deliberations; in other words,
16   they're not sequestered like a jury could
17   be?
18       A. The panelists are not sequestered.
19       Q. So would it still be a violation if
20   the students sent it directly to the panel
21   members but the panel members told you that
22   it did not impact their deliberations;
23   would that still be a violation?
24       A. It's the attempt that's the
25   concern, sir.

94

1        Q. So that the effect is irrelevant?
2        A. Not irrelevant, but what's --
3    what's relevant for the charges is the
4    attempt.
5        Q. And even if they did this, so let's
6    say that they -- let's go back to my
7    hypothetical, no direct communication. If
8    you had evidence that their objective was
9    to have the panel dismiss the charges, then
10   you believe that would violate Pitt's Code
11   of Conduct as well?
12       A. You have to -- I'm sorry, can you
13   give me a little more detail there? Their
14   objective in doing what?
15       Q. In exact same letter, did
16   everything that they did in this case
17   except they didn't include the panel
18   members. But they went and said, yeah, we
19   hope that everybody looks at this letter
20   and that it results in a dismissal of our
21   charges. Violation or no violation?
22       A. I would not have advocated for
23   charges in that circumstance.
24       Q. Back on the bottom of Page 18, that
25   second sentence under that bullet point,

95

1    "For this reason, the Code of Conduct
2    specifically forbids any action that could
3    potentially intimidate, coerce or influence
4    a witness or Hearing Officer." Is that
5    correct?
6        A. You read it correctly.
7        Q. Yeah. So that's where you say that
8    you don't have to have actual intimidation,
9    coercion or influence; it's just if there's
10   a potential for it; is that correct?
11       A. Yeah, I, you know, I think that
12   we're playing a little bit of semantics
13   here between, you know, attempt and
14   potential, but, yeah.
15       Q. Let's go to the next page, Ali,
16   Page 19. So that that top bullet point,
17   the first sentence, the allegations in
18   SJP's Open Letter were generally untrue or
19   misleading and inflammatory.
20   Could you go back to the previous page,
21   Ali, to the Open Letter. And I'd like you
22   to identify what was
23   untrue, misleading, or inflammatory in that
24   letter?
25       A. It is untrue that the

96

1    administration defunded their events.
2        Q. All right, where are you reading?
3        A. Ali's got it up. I think it's
4    misleading to say that any of these actions
5    disproportionately penalized students of
6    color.
7        Q. Is it false or is it untrue?
8        A. So not all of the previous
9    statements are true, so I think that the
10   subsequent statement about the effect also
11   has to be untrue. I think that, and then
12   in an earlier paragraph, consistent
13   harassment with SJP and its members feels
14   misleading at best.
15       Can you scroll for me, Ali? Can you
16   continue to scroll?
17   Oh, there's a -- there's a part that isn't
18   included in what you have here that, or
19   what's shown here, that lists the entire
20   group of, you know, co-signed or
21   undersigned humans. Thanks. Yeah, she's on
22   it. Yeah, that's the other part that is
23   misleading or untrue.
24       Q. Were you aware on May 23 about
25   SJP's explanation of how the Law School was

97

1  listed as a signatory?
2      **A. Am I now aware?**
3      Q. Were you aware on May 23?
4      **A. Is that the day of the hearing?**
5      Q. Yes.
6      **A. I heard during the hearing SJP**
7  **explain how that happened, yes.**
8      Q. And is it true that the panel
9  rejected the false statement allegation?
10     **A. I would need to look at their**
11 **outcome again, but, yeah.**
12     Q. We'll look at that just
13 momentarily.  You testified earlier that
14 you interviewed each of the three members
15 of the February 4 panel.  Did you present
16 any information about what they told you to
17 the May 23 hearing panel?
18     **A. Ali, would you be willing to scroll**
19 **down this document a little bit?  Can you**
20 **continue to scroll, please?  You can go a**
21 **little bit more.  More.**
22 **I do not believe that we shared specific**
23 **information from those conversations with**
24 **the board.**
25     Q. Let's go to the top of Page 20

98

1  there.  So, I'm sorry, go to the bottom of
2  Page 19, Ali.
3      Under February 6 it says that at that
4  point you notified the board members to
5  pause their deliberations; is that right?
6      **A. Correct.**
7      Q. But you didn't talk to the panel
8  hearing members until February 10; is that
9  right?
10     **A. Correct.**
11     Q. So you made this determination to
12 stop the proceedings before you had their
13 input or views on the effect of the letter?
14     **A. Correct.**
15     Q. If you would scroll down a little
16 further, Ali.
17 There's, under February 8 it says, "SJP
18 further amplified the potential effects of
19 the Open Letter by posting a version of it
20 on their IG," I assume is Instagram; is
21 that right?
22     **A. Correct.**
23     Q. So this is then just putting up
24 their, the letter they sent on February 4
25 on social media; correct?

99

1      **A. Correct.**
2      Q. What do you mean when you say
3  amplified the potential effects of the Open
4  Letter?
5      **A. I don't -- I don't have a -- I**
6  **don't have an explanation for that.**
7      Q. This is what -- this is the
8  argument you and Ms. Asher, Dr. Asher made
9  to the May 23 hearing panel; right?
10     **A. Yes.**
11     Q. And here you're identifying a
12 social media post as amplifying potential
13 effects; correct?
14     **A. That's what it says.**
15     Q. Let's mark as Exhibit 10 Bates No.
16 14049.  I show you what's been marked as
17 Exhibit 10.
18     MR. BILUS:  Just to jump in, it
19 looks like the file number is, at the top,
20 says 9, on the top of the -- Ali, if you
21 look up at the top, it says 9.UPITT.  I
22 think this was identified as 10, not 9.  I
23 just want to make sure we're not --
24     MS. SZEMANSKI:  It was
25 identified by the Bates number that was

100

1  read.  This is just our internal numbering.
2      MR. BILUS:  Oh, okay.
3      MS. SZEMANSKI:  So the ones you
4  and the court reporter will receive will be
5  accurately numbered.
6      MR. BILUS:  Okay, great.  I just
7  didn't want it to get mixed up later.
8  Thank you.
9      MS. SZEMANSKI:  Okay, thanks.
10     MR. WALCZAK:  I think I added an
11 Exhibit in here.
12     MR. BILUS:  All right, I'll
13 blame Vic.
14     MR. WALCZAK:  Welcome to my
15 world.
16     Q. (BY MR. WALCZAK)  All right.  Do
17 you recognize this document marked as
18 Exhibit 10, Mr. Nabors?
19     **A. No.  I mean, I know the form.  I**
20 **don't know this exact, you know, execution**
21 **of the form.**
22     Q. Do you know this to be that
23 disposition of the May 23 hearing?
24     **A. I don't know that.**
25     Q. Were you involved in the

101

```
 1    preparation of this form?
 2       A. No.
 3       Q. Did you have any discussions with
 4    Dr. Panzella after the hearing -- I'm
 5    sorry, I'm mixing up the hearings here.
 6    From your understanding of the process,
 7    does this appear to be the disposition by
 8    the panel hearing board?
 9       A. It does.
10       Q. Did you have any communications
11    with the panel members between May 23 and
12    when they issued this on May 27?
13       A. No.
14       Q. Do you have any reason to believe
15    that this document may be inaccurate?
16       A. I don't have any reason.
17          MR. WALCZAK: Let's go to -- is
18    there a new, I'm sorry, do we have a new
19    Bates number on the June 18 decision,
20    Kirsten? No, okay. Sandy, this is the
21    June 18 letter.
22          MR. BILUS: Yeah.
23          MR. WALCZAK: Which I don't
24    think you all have formally produced. We
25    obviously got it. But let's mark this as,
```

102

```
 1    what are we on, 11, Exhibit 11.
 2       Q. (BY MR. WALCZAK) Do you see what's
 3    marked as Exhibit 11, Mr. Nabors?
 4       A. I do.
 5       Q. Do you recognize this document?
 6       A. I do not.
 7       Q. Have you never seen this before?
 8       A. I have not read this document.
 9       Q. Were you aware of the results of
10    the disciplinary hearing against SJP held
11    on May 23?
12       A. Yes.
13       Q. How did you learn that?
14       A. Dr. Panzella informed me.
15       Q. Between May 23 and June 18 did you
16    have any discussions with Dr. Panzella
17    about the SJP proceedings?
18       A. No.
19       Q. When did Dr. Panzella inform you
20    about the decision?
21       A. I don't recall.
22       Q. Are you aware that Dr. Panzella
23    changed the terms of the sanctions
24    recommended by the hearing panel?
25       A. I am not aware of that.
```

103

```
 1       Q. Let's go to Exhibit 12. This is
 2    Bates 2437. I show you what's marked as
 3    Exhibit 12. Do you recognize this
 4    document?
 5          MR. BILUS: Hang on a second.
 6    I'm seeing in this some notes that look
 7    like they're intended for counsel. I would
 8    like to direct you not to ask questions
 9    about it until we get a chance to look at
10    it more closely. We may need to claw it
11    back or redact portions of it.
12          MR. WALCZAK: Are there portions
13    we can examine now?
14          MR. BILUS: If you give me a
15    chance to look at it, I can -- I can do
16    that and let you know what I think you can
17    ask about.
18          MR. WALCZAK: Well, I don't want
19    to take up time because we're running short
20    on time here, so I --
21          MR. BILUS: Can you point me to
22    what you wanted to ask about and I can at
23    least look at that?
24          MR. WALCZAK: It looks like
25    probably the whole thing.
```

104

```
 1          MR. BILUS: All right.
 2          MR. WALCZAK: We can, you know,
 3    we may just have to leave the deposition
 4    open then.
 5          MR. BILUS: I mean, you've got
 6    45 minutes. Do you want to stop now and
 7    save 45 minutes of your time, or how do you
 8    want to do that?
 9          MR. WALCZAK: No, I mean, I want
10    to move on. But let's put this to the side
11    and then figure out what we're going to do
12    with it.
13          MR. BILUS: Okay.
14          MR. WALCZAK: I don't want you
15    taking a bunch of time. You know, this was
16    produced. It was produced twice, I think,
17    once with the highlighting and once without
18    it.
19          MR. BILUS: Well, I've got to
20    look into it more before I know. Sorry.
21          MR. WALCZAK: We know nothing --
22    there's nothing about provenance of this
23    document, so --
24          MR. BILUS: Yeah.
25          MR. WALCZAK: Okay. All right.
```

105

1    MS. SZEMANSKI:  Vic, should it
2  remain labeled as Exhibit 12 or just
3  unlabeled?
4    MR. BILUS:  Yeah, I don't think
5  it should be attached yet to the deposition
6  as an Exhibit.  I would -- I mean, you can
7  identify it by Bates number, but let's,
8  since questions aren't being asked about it
9  and it may be clawed back, I would suggest
10  we not tag it as an Exhibit yet.
11    MR. WALCZAK:  Okay.  So we're
12  talking about Bates 2437 to 2438.
13    MR. BILUS:  Yeah.
14    Q. (BY MR. WALCZAK)  All right.  So I
15  just, I want to go to the sequence, kind of
16  review the sequence of events around
17  February 4.  So the board hearing is on
18  February 4; correct?  The first panel
19  hearing for SJP is on February 4; is that
20  right?
21    A. That's my understanding.
22    Q. Okay.  The Open Letter is sent that
23  evening by SJP to approximately 20
24  administrators, including the three hearing
25  officers, so that's the evening of February

106

1  4; is that correct?
2    A. To my knowledge.
3    Q. When did you first see that Open
4  Letter?
5    A. I mean, we ended up sending the
6  communication the next day; right?  I mean,
7  I -- the problem is that I don't recall
8  specifically.  I'm sorry, I'm trying to
9  piece it together using context clues, but
10  I really don't remember.
11    Q. Do you remember having any
12  discussions with other Pitt staff or
13  administrators on the night of the 4th
14  about the letter?
15    A. No.
16    Q. Do you recall when the first
17  conversation you had with somebody else was
18  about this letter?
19    A. I do not.
20    Q. Okay, let's mark as Exhibit 12,
21  13854.  Do you see the Exhibit marked as 12
22  on the screen?  Do you recognize this
23  document?
24    A. This obviously wasn't sent directly
25  to me, but I recognize the language here.

107

1    Q. Is this the email from a panel
2  member that you've referenced previously
3  during this deposition as coming in and
4  complaining about the Open Letter?
5    A. Yes.
6    Q. To your knowledge, are there any
7  other written communications from board
8  members complaining about the Open Letter
9  or referencing the Open Letter at all?
10    A. No.
11    Q. Are there any other written
12  communications raising concerns about the
13  Open Letter?
14    A. Not that I'm aware of.
15    Q. Do you recall when you first saw
16  this email?
17    A. I do not.
18    Q. So the day after the hearing, the
19  day after the Open Letter would be February
20  the 5th.  Do you recall any discussions
21  about the Open Letter?
22    A. Any discussions about the Open
23  Letter on, like, in general?
24    Q. Any, anything related, any
25  discussions related to the Open Letter sent

108

1  on the evening of February 4.
2    A. Yes.
3    Q. What discussions can you recall?
4    A. I recall having a conversation with
5  Matt asking him if he had received this
6  communication. There were some
7  conversations with our legal counsel and a
8  conversation with Dr. Panzella as we tried
9  to determine how to respond.
10    Q. What do you recall about your
11  conversation with Matt?
12    A. Very little.  Only that I asked him
13  if he got this communication and if he
14  would forward it to me.
15    Q. Did you talk about the substance of
16  the communication?
17    A. Only to identify it.  Like, did you
18  get this communication from Carlton; can
19  you forward it to me.
20    Q. What was your discussion with Dr.
21  Panzella about the email?
22    A. About the -- whether or not this
23  would constitute a violation or not.
24    Q. And who raised that question, you
25  or her?

109

1    A. I don't recall. I mean, I don't
2    recall.
3    Q. Did you think upon seeing this that
4    there may have been a problem with the Open
5    Letter?
6    A. Yes.
7    Q. What did you think the problem was?
8    A. Well, my first reaction is that it
9    was highly unusual for students to
10   communicate directly with board members
11   outside of the hearing process, so that was
12   sort of my initial flag. And then it just
13   continued to evolve into questions about,
14   was this their intention to try and
15   influence them during deliberations. It
16   just, it just caused me to question what
17   the -- what their -- what the attempt was
18   here and what the potential impact was.
19   Q. So on that, in the middle of the
20   second paragraph, Mr. Carlton says, "While
21   I personally believe it was inappropriate
22   to make veiled threats in attempt to sway
23   my decision, I did not allow it to impact
24   my role which, once again, was to evaluate
25   the evidence." Did I read that correctly?

110

1    A. You did read it.
2    Q. So he's not claiming that this is
3    in any way impacting his ability to weigh
4    the merits of this, this proceeding or
5    weigh the merits of the allegations;
6    correct?
7    A. He does not -- he does not appear
8    to say that.
9    MR. BILUS: Objection to the
10   form. Sorry.
11   Q. Okay, let's mark as Exhibit 13
12   Bates 2863. I show you what's marked as
13   Exhibit 13. Do you recognize this
14   document?
15   A. I do.
16   Q. What is it?
17   A. It's an email to the board members
18   from me.
19   Q. Essentially directing them to stop
20   whatever work they were doing on the
21   decision?
22   A. Correct.
23   Q. Had you spoken to anybody by this
24   point from, any of the three panel members?
25   A. No.

111

1    Q. So you hadn't spoken to Carlton on
2    the 5th or the 6th?
3    A. Correct.
4    Q. And you didn't speak to the other
5    two panel members either?
6    A. Correct.
7    Q. Did you have any knowledge of where
8    the panel was in their deliberative
9    process?
10   A. I knew that they were in
11   deliberations.
12   Q. How did you know that?
13   A. The hearing moderator, Matt Landy,
14   indicated this to me.
15   Q. Do you remember exactly what he
16   told you about where they were in the
17   process?
18   A. No.
19   Q. All right, let's mark as Exhibit 14
20   Bates 2439. Sorry, before we turn to this,
21   on the stop-work order, did you consult
22   anybody about that decision?
23   A. Yes.
24   Q. Who did you consult?
25   A. Dr. Panzella and our internal legal

112

1    counsel.
2    Q. All right, let's to back to Exhibit
3    14. I show you what's marked as Exhibit
4    14. Do you recognize this?
5    A. I do.
6    Q. What is it?
7    A. This looks like my notes from my
8    conversations with the panelists.
9    Q. And these conversations occurred on
10   February the 6th?
11   A. I don't think that's the right
12   date.
13   Q. I'm sorry. February 10?
14   A. That sounds better.
15   Q. Okay. And I believe you said you
16   spoke to each of them separately?
17   A. I did.
18   Q. And how long were those
19   conversations?
20   A. Brief. Maybe about 15 minutes.
21   Q. Each?
22   A. Yes.
23   Q. And nobody else was party to those
24   calls besides you and the panel members?
25   A. That's right.

MARLIN NABORS  -  7/1/2025

113

1    Q. Did somebody direct you to make
2  these calls or did you take, do it on your
3  own initiative?
4    **A. I don't think that either of those**
5  **is true. I think there's a -- there's a**
6  **consensus building around this next step.**
7    Q. Next step being what?
8    **A. These interviewing the panelists.**
9    Q. Consensus among whom?
10    **A. Myself, Dr. Panzella, and our legal**
11  **counsel.**
12    Q. So there's consensus that you
13  should interview the panel members?
14    **A. So I think what I can say is that**
15  **after conversation with Dr. Panzella and**
16  **our legal counsel, this was the action that**
17  **I took.**
18    Q. And were these notes -- when did
19  you prepare these notes?
20    **A. These notes were written as the**
21  **conversations took place.**
22    Q. So they were -- the notes were
23  taken contemporaneously with the calls?
24    **A. Yes.**
25    MR. BILUS: Vic, did you say

114

1  were or weren't?
2    MR. WALCZAK: Were.
3    MR. BILUS: Okay.
4    Q. (BY MR. WALCZAK) Yeah, just to be
5  clear, so these notes were prepared
6  contemporaneously with the conversations
7  you had with the panel members?
8    **A. Yes.**
9    Q. And in looking at them now, are
10  they accurate? Is there anything that you
11  would say is inaccurate?
12    **A. No.**
13    Q. All right, so we have a document
14  that's not marked. Let's mark it here as
15  Exhibit 15.
16    MS. SZEMANSKI: Sorry, Vic, is
17  it the --
18    MR. WALCZAK: It's the February
19  4.
20    MS. SZEMANSKI: November 16?
21    MR. WALCZAK: No.
22    MS. SZEMANSKI: No. Okay, I
23  think I know what you're talking about.
24    MR. WALCZAK: The recommendation
25  form.

115

1    MS. SZEMANSKI: Yeah, sorry.
2    Q. (BY MR. WALCZAK) I show you what's
3  marked as Exhibit 15. Do you recognize
4  this? Ali can scroll down if you want.
5    **A. I do not recognize this document.**
6    Q. Have you ever seen it before?
7    **A. No.**
8    Q. Do you know what it is?
9    **A. I think I know what the form is,**
10  **yes.**
11    Q. What is the form?
12    **A. A Conduct Board Recommendation**
13  **Form.**
14    Q. Would this be from the first panel?
15    **A. So I have not seen this, sir.**
16    Q. Were you aware it existed?
17    **A. No.**
18    Q. Has nobody mentioned to you the
19  existence of this document?
20    **A. Can you -- so I, can I read this?**
21  **Because I don't --**
22    Q. Sure, yeah.
23    **A. I don't think I have seen this.**
24    **Can you continue to scroll? Can you**
25  **continue to scroll? Can you continue to**

116

1  **scroll, please?**
2    **No, no.**
3    Q. Go down to the last page and let
4  Mr. Nabors take a look at that.
5    **A. I have not seen this document.**
6    Q. Okay. Let's mark as Exhibit 16
7  Bates 14034. I show you what's marked as
8  Exhibit 16. Do you recognize this?
9    **A. I do.**
10    Q. What is it?
11    **A. It's an email from one of the**
12  **panelists to me.**
13    Q. So this is dated February 24, so
14  this is two weeks after you spoke to the
15  panel members; is that right?
16    **A. Correct.**
17    Q. You spoke to them on February 10.
18  This is February the 24th. Did you have
19  any communication with the panel members
20  between February 10 and February 24?
21    **A. Not that I can recall.**
22    Q. And did you respond to this email?
23    **A. I don't remember.**
24    Q. Is it possible you didn't respond
25  to it?

117

1      A. I -- I don't -- I don't remember.
2      Q. Do you know if any of your --
3  you're one of, it looks like you and
4  Matthew Landy and the three panel members
5  are party to this. Do you know whether Mr.
6  Landy responded to this?
7      A. I am not -- I'm not aware.
8      Q. Have you had any communication with
9  the first panel hearing members since
10 February the 10th?
11     A. Have I had any communication with
12 panel members since February 10?
13     Q. Yes.
14     A. I think there was a final
15 communication where we told them that we
16 were vacating the hearing.
17     Q. That went to them?
18     A. Oh, actually I don't know that. No
19 I don't know. Maybe not.
20     Q. You don't recall corresponding with
21 panel members about the status of the
22 hearing that they sat on?
23         MR. BILUS: Object to the form.
24     A. I don't recall any communication.
25     Q. Okay, I'm skipping the next

118

1  document, 570, and going to 2370. Let's
2  mark that as Exhibit 17. And is 2365
3  attached to that?
4         MS. SZEMANSKI: (Shaking head).
5      A. It's not, okay. I show you what's
6  marked as Exhibit 17. Do you recognize
7  this?
8      A. I mean, clearly this was sent to
9  me, but I don't -- I don't remember this in
10 context.
11     Q. Okay. What's CCAT?
12     A. That is an administrative meeting.
13 I forget what it stands for. But it's
14 essentially an administrative meeting where
15 people get around the table and talk about
16 any sort of high-profile sort of
17 circumstances, incidents that may be
18 occurring, to sort of facilitate
19 communication between, between areas.
20     Q. And is there a regular cohort of
21 people that participate in these meetings?
22     A. Yes.
23     Q. Who are the people that are in
24 these meetings?
25     A. Oh, geez. I -- I don't want to --

119

1  I don't want to misspeak or miss anyone.
2  There are probably about ten folks from
3  around various parts of the University.
4  Some of them I'm still not super familiar
5  with because I only have interactions with
6  them in this meeting, so I don't know that
7  I could accurately name all the folks.
8      Q. How about name the folks that you
9  know that are part of this group?
10     A. There are folks from the
11 communications team. There are folks from
12 Student Affairs, from the Provost's Office,
13 folks from the like safety, security, risk
14 management area. Those are the big ones
15 that I remember.
16     Q. Any of the people that we've been
17 talking about in the last three and a half
18 hours on this, in this CCAT group?
19     A. Dr. Panzella.
20     Q. Is the Chancellor part of this
21 group?
22     A. No.
23     Q. Who's the highest ranking official
24 on this group?
25     A. I am not clear about that.

120

1      Q. The first agenda item here on this
2  February 12 meeting is SJP Conduct Update.
3  Do you see that?
4      A. I do.
5      Q. And then two bullets below that,
6  Update on pause? Do you see that?
7      A. I do.
8      Q. And then next to that it has NO!!
9  with two exclamation points and then
10 Please. Do you see that?
11     A. Uh-huh.
12     Q. And is it your understanding that
13 Dr. Panzella wrote that?
14     A. Yes.
15     Q. And do you recall that being
16 discussed?
17     A. This was still very early in my
18 tenure, and this might have actually been
19 the first CCAT meeting that I had gone to,
20 which is why this doesn't stick in my
21 memory. So I don't believe that I had any
22 conversation around this.
23     Q. Do you recall what the conversation
24 was?
25     A. I do not.

121

1      Q.  Okay.  Do you know why Dr. Panzella
2  did not want to provide an update on the
3  pause?
4      A.  I do not.
5      Q.  All right, I'm skipping the next
6  Exhibit, Ali, and going to 65.1.  Exhibit
7  18, this is Bates 65.1.
8          MR. WALCZAK:  Must be ours,
9  Sandy.
10         MR. BILUS:  Okay.  I see P80 as
11  well on the --
12         MR. WALCZAK:  Oh, maybe.  I have
13  65.1 on mine.
14         MS. SZEMANSKI:  It was produced
15  as native, and 65.1 is the internal control
16  number.
17         MR. WALCZAK:  I'm glad I have
18  help.  All right, can you scroll down to the
19  next page, please?
20     Q.  (BY MR. WALCZAK)  Do you recognize
21  this document?
22     A.  No.  No.
23     Q.  Do you know what this document is
24  used for?
25     A.  I mean, if you're going to make me

122

1  try and draw context clues, I have not seen
2  this email and I have not seen this form
3  used.
4      Q.  Do you recall whether some version
5  of this was used in the May 23 hearing?
6      A.  There, yes, there was probably some
7  version of this used for the May 23
8  hearing.
9      Q.  Do you know if it would have been
10  the same?
11     A.  I don't know.
12     Q.  Who is Shatea Player?
13     A.  She's the administrative assistant
14  for the Office of Student Conduct.
15     Q.  And who's the head of that office?
16     A.  Matt Landy.
17     Q.  He works for you?
18     A.  Correct.
19     Q.  Is she the person who posts
20  information to the portal that students can
21  access?  That students, I'm sorry, that
22  students who are receiving hearings are
23  able to access?
24     A.  I believe that that's her role when
25  Matt's the moderator, yes.

123

1      Q.  Is that -- so she doesn't do that
2  for all hearings, if you know?
3      A.  I don't know.
4      Q.  Okay, let's mark as Exhibit 19,
5  1788.  Do you recognize what's marked as
6  Exhibit 19?
7      A.  Can you scroll, Ali?
8      I have not seen this document.
9      Q.  In looking at it, do you have an
10  understanding of what it is?
11     A.  I think I do.
12     Q.  What do you think it is?
13     A.  Looks like this may have been the
14  hearing script for the first hearing.
15     Q.  This would function as a guide for
16  whoever was presenting the case for the
17  University at the February 4 hearing?
18     A.  More like a guide for the
19  moderator.
20     Q.  And that was Matt Landy for the
21  first hearing?
22     A.  Correct.
23     Q.  Is it your understanding that
24  what's contained in these scripts is
25  generally presented largely verbatim?

124

1      A.  I don't know that I can answer
2  that.
3      Q.  All right.  Exhibit 20, 13412.
4          MR. WALCZAK:  Sandy, we should
5  probably redact everything below the top
6  half of this page because it relates to,
7  and I don't think it identifies -- well, it
8  does identify people.  We should redact
9  everything underneath this because it's an
10  unrelated proceeding. Just, maybe we can
11  redact that before we send it to Mary.
12         MR. BILUS:  So everything from
13  that second email to the end?
14         MR. WALCZAK:  Yeah, from
15  Landy's, well, actually maybe we should do
16  below the Landy -- no, actually below
17  Marlin's email on the second page, all the,
18  starting from Anna Donovan, all that stuff.
19         MR. BILUS:  May I see the second
20  page?  Yeah, so we did redact the student
21  names there, but I'm fine with redacting
22  the remainder because it's unrelated.
23         MR. WALCZAK:  Yeah, I don't know
24  who's going to be looking at this.  I don't
25  want to get anybody else in trouble, so --

125

1          MR. BILUS:  I would be happy to
2    redact that.  Or if you guys want to do
3    that before you provide it to the court
4    reporter as an Exhibit, I think that --
5          MR. WALCZAK:  Yeah, we can do
6    that.
7       Q.  (BY MR. WALCZAK)  All right, Mr.
8    Nabors, do you recognize what's marked as
9    Exhibit 20?
10      **A.  I need to read it a little bit.  Is
11   that okay?**
12      Q.  Yes, please, yeah.
13      **A.  Ali, can you start from the bottom
14   and just sort of slowly scroll up, please?
15   Okay.  Can you continue to scroll?  Okay,
16   can you continue to scroll?  Okay, more.
17   Okay.**
18      Q.  Just focusing on your 3/6 email to
19   Landy, you've got listed the fourth line
20   down, "No contact order between board
21   members."  What does that -- what did you
22   mean by that?
23      **A.  I don't recall.**
24      Q.  Who would a board member be; who's
25   that referring to?

126

1       **A.  Board members are typically the
2    panelists.**
3       Q.  Okay.  So the next line is,
4    "Additional language that makes clear that
5    individual contact with board members will
6    result in charges."  What are you referring
7    to there?
8       **A.  I believe that this was all things
9    in preparation for the new hearing.  So
10   this would have been referencing
11   instructions to the -- to students coming
12   to the -- to the second hearing.**
13         MR. BILUS:  Vic, can I just jump
14   in. This looks like this all relates to the
15   stuff that we've already agreed to redact
16   as being unrelated down below.  We -- it
17   doesn't seem like this relates to this case
18   at all.
19         MR. WALCZAK:  Well, thanks,
20   Sandy, that's not what your witness just
21   testified to, so why don't you let me
22   continue with my questions.
23         MR. BILUS:  All right.
24      Q.  (BY MR. WALCZAK)  So after that
25   speaking objection, so you think this

127

1    relates to the upcoming SJP proceeding
2    which was ultimately held on May 23?
3          MR. BILUS:  Objection to form.
4       **A.  I think that it is.**
5       Q.  Okay.  And then the third line
6    there in that sort of second block is,
7    "Revisit the additional remote script
8    language we used and update."  What does
9    remote script language refer to?
10      **A.  The instructions that the moderator
11   would give to people participating in a
12   remote hearing.**
13      Q.  Why are you -- are you -- what's
14   the purpose of this email that you sent?
15   What were you hoping to accomplish here?
16      **A.  We've been in conversation during
17   my entire time at Pitt about changes we
18   want to make to the process.  So this was
19   sort of a part of that conversation, but
20   then also trying to prepare information for
21   the -- for the new hearing moderator.**
22      Q.  So these would be changes made
23   after the February 4 hearing and before the
24   May 23 hearing?
25      **A.  I think that that's what I was**

128

1    **asking him to consider.**
2       Q.  And when you say no contact order
3    between board members, that would be to
4    articulate specifically that there should
5    be no contact by participants with the
6    board?
7       **A.  I don't -- I don't know.  That
8    language doesn't make any sense to me,
9    because a no-contact order is a very
10   specific thing in our world, so I don't --
11   I don't understand this then.**
12      Q.  What about the second one there,
13   make clear that individual contact with
14   board members will result in charges, why
15   are you suggesting that?
16      **A.  We, after the experience with the
17   first board hearing, we were talking about
18   changes that we wanted to make broadly to
19   the process moving forward.**
20      Q.  And is that to clarify because it
21   was unclear on February 4?
22      **A.  I don't think that that's fair to
23   say.  I think what's fair to say is that we
24   were having conversations about changes
25   that we wanted to make to the process, ways**

**129**

```
 1    that we wanted to improve the process.
 2        Q.  And how would that improve the
 3    process?
 4            MR. BILUS:  Can you all hear me?
 5            THE WITNESS:  Yes.
 6            MR. BILUS:  Okay.  I got kicked
 7    out. The storm that must have been coming
 8    through Pittsburgh has made its way to me,
 9    and it may be interfering with my internet.
10     But I'm back. Hopefully I won't get kicked
11    out again.
12        I don't know what the last couple, if
13    there were questions while I was paused?
14            MR. WALCZAK:  I asked how the
15    changes would improve the process, and
16    we're waiting for Mr. Nabors to answer.
17            MR. BILUS:  Okay.
18        Q.  (BY MR. WALCZAK)  Still thinking,
19    Mr. Nabors, or --
20        A.  I am.
21        I -- I would put this under the
22        category
23    of greater clarity helps to improve the
24    process.
25        Q.  Greater clarity for whom?
```

**130**

```
 1        A.  For all involved.
 2        Q.  Including the students being
 3    brought up on conduct charges?
 4        A.  Sure.
 5        Q.  I have just a couple more
 6    questions.  I know we're at 3:00.  So I've
 7    seen a number of emails where you've been
 8    invited to and seemingly attended events
 9    with Jewish student leaders at the
10    University.  Is that true?
11        A.  Sure.
12        Q.  And it looks like there were some
13    in January, February, March.  I'm not sure
14    about April or May.  Actually April I'm not
15    sure.  But is this a -- is this something
16    that you and some of your colleagues do
17    regularly?
18            MR. BILUS:  Object to the form.
19        A.  I'm invited by students to attend
20    events pretty frequently.
21        Q.  Have you ever attended an event
22    with the Muslim Students Association?
23        A.  I've had meetings with the
24    leadership of the Muslim Student
25    Association.  I have not been invited to an
```

**131**

```
 1    event.
 2        Q.  You weren't invited in April to an
 3    event?
 4        A.  By MSA?
 5        Q.  Yeah.
 6        A.  I mean, I, if it happened, I
 7    apologize.  I can't recall being invited.
 8            MR. WALCZAK:  All right, I know
 9    we're at 3:00, so --
10            MR. BILUS:  Yep, I think we
11    should end it here.  I can agree to keep it
12    open while we look into the provenance of
13    that one document and figure out if we need
14    to claw it back because it's privileged.  I
15    would -- I will reserve my rights on, the
16    University's and the other Defendants'
17    rights to whether or not the deposition
18    should go forward at all.  But I won't
19    force us to say right now it's closed. I'll
20    get back to you as soon as I can about that
21    document.
22            MR. WALCZAK:  Okay, that's fair
23    enough.  We can go off the record, Mary.
24    (Signature having not been waived, the
25    deposition was adjourned at 3:05 p.m.)
```

**132**

```
 1    COMMONWEALTH OF PENNSYLVANIA   )
 2                     ) CERTIFICATE
      COUNTY OF ALLEGHENY          ) SS:
 3        I, Mary J. Carney, RMR and Notary Public in and
 4    for the Commonwealth of Pennsylvania, do hereby
 5    certify that the witness, MARLIN NABORS, was by me
 6    first duly sworn to testify to the truth; that the
 7    foregoing deposition was taken at the time and place
 8    stated herein; and that the said deposition was
 9    recorded stenographically by me and then reduced to
10    printing under my direction, and constitutes a true
11    record of the testimony given by said witness.
12        I further certify that the inspection, reading
13    and signing of said deposition were NOT waived by
14    counsel for the respective parties and by the
15    witness.
16        I further certify that I am not a relative or
17    employee of any of the parties, or a relative or
18    employee of either counsel, and that I am in no way
19    interested directly or indirectly in this action.
20        IN WITNESS WHEREOF, I have hereunto set my hand
21    and affixed my seal of office this 3rd day of July,
22    2025.
23            _____
24                 Notary Public
25
```

133

1  COMMONWEALTH OF PENNSYLVANIA  ) E R R A T A
   COUNTY OF ALLEGHENY         ) S H E E T

2

     I, MARLIN NABORS, have read the foregoing pages
3  of my deposition given on July 1, 2025, and wish to
   make the following, if any, amendments, additions,
4  deletions or corrections:

5  Pg. No.   Line No.     Change and reason for change:

6

7

8

9

10

11

12

13

14

15

16

17  In all other respects, the transcript is true and
    correct.

18

                    _____
19                    MARLIN NABORS

20

   Subscribed and sworn to before me this
21  _____ day of _____, 2025.

22
    _____
23     Notary Public
       Reference No. MC62100

24

25

134

1              AKF TECHNOLOGIES
            445 Fort Pitt Boulevard, Suite 200
2             Pittsburgh, PA  15219
               412-261-2323
3

              July 3, 2025
4

5
   TO:  Marlin Nabors
6      c/o Alexander R. Bilus, Esquire
       SAUL EWING LLP
7      Centre Square West
       1500 Market Street, 38th Floor
8      Philadelphia, PA  19102-2186
       215-972-7777
9      alexander.bilus@saul.com

10  RE:  DEPOSITION OF MARLIN NABORS

11  NOTICE OF NON-WAIVER OF SIGNATURE

12     Please have the deponent read his deposition
    transcript.  All corrections are to be noted on the
13  preceding Errata Sheet.

14     Upon completion of the above, the deponent must
    affix his signature on the Errata Sheet, and it is to
15  then be notarized.

16     Please forward the signed original of the Errata
    Sheet to Witold J. Walczak, Esq. for attachment to
17  the Original Transcript, which is in his possession.
    Send a copy of same to all counsel, and also a copy
18  to me.

19     Please return the completed Errata Sheet within
    thirty (30) days of receipt hereof.

20

21
    Mary J. Carney, RMR
22  Court Reporter

23

24

25

**A**

**a.m** 1:19
**ability** 44:25
  110:3
**able** 4:22 7:4
  82:22 122:23
**abort** 31:13
**aborting** 32:20
  33:5
**above-recomm...**
  47:23
**absolutely** 45:12
**accept** 47:6,7,21
  47:23
**access** 48:25
  122:21,23
**accident** 54:5
**accomplish**
  127:15
**accurate** 27:7
  40:7 67:1
  114:10
**accurately** 11:20
  72:3 100:5
  119:7
**ACLU** 2:5,9
**act** 27:25
**action** 1:2,21
  21:12,23 29:4
  54:17 95:2
  113:16 132:19
**actions** 23:8,24
  24:16 25:10
  27:22 38:20
  53:14,16,20
  54:3,10 56:18
  79:23 96:4
**active** 64:3,6
  69:17
**activity** 83:22
**actual** 40:5 56:25
  60:12 92:24
  95:8
**add** 57:3
**added** 61:23

100:10
**adding** 46:18
**addition** 26:20
  42:25 46:20
  89:20
**additional** 17:8
  17:14 19:17
  20:21 22:14,16
  23:1,4 24:7,24
  33:3 36:3 126:4
  127:7
**additions** 133:3
**address** 17:17
  24:1 27:22
**addressed** 52:22
**adjourned**
  131:25
**administration**
  96:1
**administrative**
  14:19 118:12,14
  122:13
**administrator**
  13:23 14:8
**administrators**
  13:19 14:22
  28:14 29:13
  89:4,7,15,21
  90:17 91:10
  105:24 106:13
**admit** 47:20
**admitting** 47:19
  47:19
**advertise** 49:24
**advice** 45:14
**advocated** 92:3
  94:22
**Affairs** 10:21
  119:12
**affix** 134:14
**affixed** 132:21
**aforesaid** 1:21
**age** 4:2 41:4
**agenda** 120:1
**agendas** 58:12

**ago** 40:2 57:12
**agree** 19:12 86:2
  131:11
**agreeable** 19:4
**agreed** 126:15
**AKF** 134:1
**Albert** 63:10,12
  64:6,10,22
**alcohol** 29:22
**Alexander** 2:15
  134:6
**alexander.bilus...**
  2:18 134:9
**Ali** 2:4 15:11 16:4
  17:3 18:1,19
  21:8 38:6 44:6
  50:16 52:19
  75:9,19 81:20
  81:23 83:24
  84:16 87:1,11
  88:8 95:15,21
  96:15 97:18
  98:2,16 99:20
  115:4 121:6
  123:7 125:13
**Ali's** 96:3
**allegation** 87:25
  97:9
**allegations** 23:10
  84:24 86:10,23
  87:10 88:1
  95:17 110:5
**alleged** 24:2 25:4
  26:10,17 38:20
  89:24 91:5
**ALLEGHENY**
  132:2 133:1
**allied** 90:25
**allow** 26:5 49:9
  109:23
**allowable** 26:25
**allowed** 26:20
  27:11 28:12,12
  48:11 60:18,21
**allows** 27:14

**amendments**
  133:3
**amplified** 98:18
  99:3
**amplifying** 99:12
**anew** 21:5
**Anna** 124:18
**announcement**
  49:18
**answer** 5:5,11
  11:17,20 13:4
  26:9,13 27:7,13
  31:25 35:1,3
  51:20 60:24
  62:2 64:9 82:22
  124:1 129:16
**answering** 5:23
**anybody** 6:14
  16:24 51:17,23
  52:3 71:15 78:9
  79:15 83:3
  110:23 111:22
  124:25
**apologies** 42:15
  45:8
**apologize** 131:7
**appear** 40:7
  101:7 110:7
**APPEARANC...**
  2:1
**appearing** 61:9
  62:1
**applicable** 53:10
**application** 28:6
**apply** 40:25
  41:16 42:4 90:7
**appreciate** 8:16
**approved** 49:22
  85:7
**approximately**
  9:21 58:18,19
  73:10 105:23
**April** 130:14,14
  131:2
**area** 35:22

119:14
**areas** 64:1 118:19
**argument** 86:3
  90:21 99:8
**arguments** 26:20
  27:3,14,19
**articulate** 128:4
**Asher** 1:9 51:1,12
  51:15 53:3,25
  74:17 99:8,8
**asked** 40:3 47:17
  65:5 105:8
  108:12 129:14
**asking** 5:16 12:9
  21:1 27:12,13
  35:24 37:3 39:4
  39:9 41:24
  54:19,20 59:13
  59:22 85:17
  87:9 90:12
  108:5 128:1
**asserting** 84:23
  86:22
**assessing** 12:12
  68:10
**assist** 10:13 51:18
  51:21
**assistant** 9:2 71:4
  122:13
**Associate** 9:6,11
  9:12 10:8 36:22
**associated** 55:25
**Association**
  130:22,25
**assume** 5:6 90:6
  98:20
**assuming** 82:23
**aszemanski@a...**
  2:7
**attached** 105:5
  118:3
**attaching** 84:23
**attachment**
  134:16
**attempt** 25:25

26:3 40:21
57:14 85:12
92:25 93:2,24
94:4 95:13
109:17,22
**attempted** 93:6
93:10
**attempting** 88:17
88:25 90:13
**attempts** 40:17
**attend** 57:23
130:19
**attended** 130:8
130:21
**attracted** 9:24
**author** 75:20
**authored** 51:13
**available** 82:3
91:1
**AVP** 9:13,15
**aware** 15:6 32:10
32:14 42:17
61:24 62:10,13
62:17 66:22
67:2,9,15 69:19
70:3,14,21
78:12,16 93:12
96:24 97:2,3
102:9,22,25
107:14 115:16
117:7

———————

**B**
**Bachelor** 8:1
**back** 18:25 38:1
38:13 57:11,19
63:1 69:1 75:19
77:15 87:12
88:7 90:5 94:6
94:24 95:20
103:11 105:9
112:2 129:10
131:14,20
**bad** 88:14
**based** 24:24 39:8

**basis** 34:25 45:25
66:2
**Bates** 15:10 36:8
44:5 50:11
70:23 73:14
81:14 82:17
99:15,25 101:19
103:2 105:7,12
110:12 111:20
116:7 121:7
**Bee** 18:16
**beer** 30:1,2
**befall** 48:4
**beginning** 1:18
**Behalf** 2:3,14
**behave** 27:25
**behaving** 23:19
**behavior** 25:24
28:9,11,15
53:10
**believe** 9:18
17:16 22:1
23:16 27:24
44:10 47:13
58:1,13 66:15
68:18 74:12,16
75:13 76:1,7
80:16,20 83:18
83:24 84:5,15
90:9 92:25
94:10 97:22
101:14 109:21
112:15 120:21
122:24 126:8
**beneath** 47:16
**best** 45:12 96:14
**better** 87:7
112:14
**beyond** 24:10
**bias** 68:6,10
**big** 119:14
**bigger** 21:9 87:8
**Bilus** 2:15 13:2
18:8 26:7 34:22
35:21 36:17

42:10,12 52:10
52:17 54:18
55:4,24 57:20
59:5,17 60:3
65:25 72:17
80:8,12 81:18
82:16 85:23
91:3,16,24
92:10 99:18
100:2,6,12
101:22 103:5,14
103:21 104:1,5
104:13,19,24
105:4,13 110:9
113:25 114:3
117:23 121:10
124:12,19 125:1
126:13,23 127:3
129:4,6,17
130:18 131:10
134:6
**binder** 74:21
81:16
**bit** 14:15,16 32:9
44:1 84:17
95:12 97:19,21
125:10
**blame** 100:13
**block** 127:6
**blow** 16:5
**board** 13:20 14:1
14:9 15:3 25:24
26:1 30:25
31:16,19 38:21
48:19 69:10
77:17 78:1,5,8
84:20,22,25
85:16 88:20
91:6 97:24 98:4
101:8 105:17
107:7 109:10
110:17 115:12
125:20,24 126:1
126:5 128:3,6
128:14,17

**bottom** 88:15
94:24 98:1
125:13
**Boulevard** 134:1
**Box** 2:5,10
**break** 6:3,4 43:24
52:12 57:18
**breaks** 5:25
**Brief** 112:20
**briefly** 7:22 8:10
8:14
**bring** 42:5 74:18
89:24 90:7
**bringing** 42:17
86:11 90:12
**broad** 10:15 64:8
**broadly** 51:19
81:4 128:18
**brought** 9:23
26:19 63:18,22
130:3
**Bruce** 63:10
**building** 113:6
**bullet** 77:16,25
78:17,22 79:21
84:18 94:25
95:16
**bullets** 120:5
**bunch** 104:15

———————

**C**
**c/o** 134:6
**call** 7:3 19:11
34:15 59:1
63:12 70:1
78:18
**called** 14:24
16:21 60:9
**calling** 60:15 66:4
**calls** 79:3,15
112:24 113:2,23
**campus** 50:8
**capacities** 1:10
**capacity** 59:13
**careful** 20:9

**carefully** 20:12
**Carla** 11:4 71:6
**Carlton** 78:6
108:18 109:20
111:1
**Carney** 1:16
132:3 134:21
**case** 4:15 11:25
43:4 59:1 72:24
74:24 80:10
89:2 94:16
123:16 126:17
**cases** 12:17,18,23
14:18,20 67:11
72:9,11,13,22
**category** 129:22
**cause** 1:21 90:8
**caused** 32:21
109:16
**CCAT** 118:11
119:18 120:19
**cell** 6:22,25 7:8
**Central** 8:2
**Centre** 2:16
134:7
**certain** 6:6 63:25
76:3
**CERTIFICATE**
132:1
**certified** 4:5
**certify** 132:5,12
132:16
**chain** 18:10
**challenge** 54:10
55:1
**challenges** 49:16
**chance** 18:21
103:9,15
**Chancellor**
119:20
**change** 59:3,4
60:12,14 61:18
69:19 80:9 83:7
133:5,5
**changed** 60:23

102:23
**changes** 58:21,24
59:15 60:1,6,25
61:3,8 67:15
82:24 83:3,11
83:12,15 127:17
127:22 128:18
128:24 129:15
**channels** 49:11
49:16
**charge** 23:20
24:4 39:17 43:7
68:10,12
**charges** 12:12,13
14:25 15:2,4
22:16 23:4,16
24:2,8,24 28:20
32:19 33:3
37:21,23 38:8
38:12 39:10,17
41:23 42:3,6,9
42:17 46:7
84:25 85:18
86:4,14,19 90:7
90:19,22 91:2
91:19 92:3,17
94:3,9,21,23
126:6 128:14
130:3
**chart** 37:5
**chat** 71:6
**check** 71:7
**circumstance**
28:10 67:3
94:23
**circumstances**
30:23 31:7
42:18 118:17
**civil** 1:2,20 4:21
55:3
**claiming** 110:2
**clarification**
18:14
**clarified** 21:1
**clarify** 5:4 8:13

12:4 17:14
32:17 63:24,25
80:15 128:20
**clarity** 11:15,19
129:23,25
**clarity's** 19:1
**claw** 103:10
131:14
**clawed** 105:9
**clean** 66:14
**clear** 13:14 22:18
37:2 41:22
46:24 53:21
63:4 67:17 69:2
89:23 114:5
119:25 126:4
128:13
**clearly** 118:8
**close** 62:7
**closed** 6:24
131:19
**closely** 103:10
**closing** 27:9,16
27:19 76:19,22
77:1
**clues** 106:9 122:1
**co-author** 85:6
87:24
**co-signed** 96:20
**Code** 17:9 19:18
21:10 22:4,5,10
23:11 26:17
40:3,9 47:12
56:20,25 94:10
95:1
**coerce** 95:3
**coercion** 95:9
**cohort** 118:20
**colleagues** 16:21
16:23 130:16
**collect** 68:16
**collecting** 68:12
**College** 9:13
**color** 96:6
**combination**

32:22 33:7
**come** 18:16 22:12
45:14 57:19
76:24 77:15
**comes** 23:21 60:7
**coming** 24:8 63:8
107:3 126:11
129:7
**comments** 20:6,8
20:13,15,25
21:2 23:3 24:11
24:25 32:23
38:24 39:12
43:19
**Commonwealth**
1:17 132:1,4
133:1
**communicate**
61:20 62:6
109:10
**communicated**
20:16 21:3
84:21 85:10
91:6
**communicating**
93:3
**communication**
6:17 18:22
23:22 63:5
85:11 91:4 94:7
106:6 108:6,13
108:16,18
116:19 117:8,11
117:15,24
118:19
**communications**
17:19 31:9
49:11,15 93:14
101:10 107:7,12
119:11
**Community** 9:9
**compare** 58:11
**compared** 37:6
**compiled** 74:3,3
**complaining**

107:4,8
**complaints** 78:13
**completed** 134:19
**completion**
134:14
**Complying** 7:6
**comport** 70:18
**composing** 83:9
**comprehensively**
5:23
**compromise**
25:11,19
**compromised**
26:2 79:23
**concern** 31:10
93:25
**concerned** 25:23
**concerning** 20:14
**concerns** 19:23
31:12 78:3
107:12
**conclusion** 61:21
**conduct** 9:8 13:6
14:22 17:6,8,9
17:14 19:17,20
20:21,22 21:11
22:6,10,15 23:1
23:12 25:6,12
25:15,21 28:18
30:25 31:11,15
33:5 36:3,23
37:11,12,15
39:7,14,18 40:4
40:9,23 41:13
54:14,16 56:20
56:25 65:15
69:16 71:7 72:5
72:9,10,13,15
72:22 84:8,25
88:18 89:1
94:11 95:1
115:12 120:2
122:14 130:3
**conference** 47:1
47:14

**confidence** 87:14
87:18
**confident** 69:22
77:6
**confidently** 62:2
62:8 73:23
**confused** 81:7
**connected** 23:17
68:6
**consensus** 113:6
113:9,12
**consequences**
22:14 32:18
34:2 48:1,4,7,9
**consider** 57:16
69:6 128:1
**consideration**
46:6
**considering** 34:6
**consisted** 36:5
**consistent** 96:12
**consistently** 41:5
72:18
**constitute** 43:2
108:23
**constituted** 89:17
**constitutes** 21:14
132:10
**consult** 111:21,24
**consultation** 16:3
16:8,10 30:10
**contact** 125:20
126:5 128:2,5
128:13
**contained** 76:5
123:24
**contemporane...**
113:23 114:6
**content** 18:19
91:21
**content-neutral**
52:23 53:5,9
**contents** 16:15
**contested** 14:5
**context** 53:7,8

88:19 89:1 90:4
106:9 118:10
122:1
**continue** 11:10
65:15,22 66:7
75:10 85:12
96:16 97:20
115:24,25,25
125:15,16
126:22
**continued** 109:13
**contribute** 51:24
**contributed** 52:1
**control** 121:15
**conversation**
53:2 66:11 68:1
68:14 72:2
106:17 108:4,8
108:11 113:15
120:22,23
127:16,19
**conversations**
36:6 42:23 43:6
43:12,13 69:3
72:21 79:1,7,12
79:14 80:14
97:23 108:7
112:8,9,19
113:21 114:6
128:24
**conveyed** 76:16
**Coordinator** 9:4
**copy** 92:8 134:17
134:17
**correct** 6:10 9:20
16:13 19:9 22:4
22:22 23:4 24:6
24:23 30:18
33:16,20 35:9
37:18,19,22
38:10,25 40:19
40:23,24 43:16
45:12 46:22
47:22 50:9
56:14 57:1,2

58:3,5 62:12,16
62:20 64:12,13
65:20 71:8 77:3
77:24 78:7,21
79:5,20 85:1,22
86:5,14,20 88:2
88:6 89:4,8,9,18
92:19 93:4,5
95:5,10 98:6,10
98:14,22,25
99:1,13 105:18
106:1 110:6,22
111:3,6 116:16
122:18 123:22
133:17
**corrections** 133:4
134:12
**correctly** 15:16
17:10 21:15
25:13 31:4 45:2
56:21 85:2
88:22 95:6
109:25
**correspondence**
19:19
**corresponding**
117:20
**counsel** 6:1 16:11
16:17,22 30:11
30:12 34:19,24
35:3,8,13,16,20
55:20 66:1
67:22 68:8 73:7
73:12 103:7
108:7 112:1
113:11,16
132:14,18
134:17
**COUNTY** 132:2
133:1
**couple** 11:6 22:13
129:12 130:5
**course** 58:19 75:8
**court** 1:1,22
100:4 125:3

134:22
**created** 56:18
57:8
**credibility** 25:12
25:20
**Cultural** 8:6
**cumulative** 23:8
23:23 24:16
**current** 9:14
25:12,15,21
30:24 31:15

──────── **D** ────────
**daily** 72:25
**date** 33:21 55:21
112:12
**dated** 116:13
**dates** 9:17
**DaVAUGHN** 1:9
**day** 97:4 106:6
107:18,19
132:21 133:21
**days** 134:19
**deal** 54:13
**deals** 57:14
**Dean** 9:11,13,14
9:15 10:8 79:22
**December** 22:22
82:13
**decide** 20:12
28:14 90:6
**decides** 28:11
**deciding** 41:20
42:3,5 44:13
**decision** 20:9,16
21:2 30:5,8,15
31:2,18,20 32:2
32:8 42:1 45:19
57:5 60:8 64:21
64:24,25 65:5
66:8 85:16 90:1
101:19 102:20
109:23 110:21
111:22
**decision-makers**

26:12
**decision-making**
41:24
**decisions** 34:5
54:6
**Defendant's**
17:25
**Defendants** 1:11
2:14
**Defendants'**
131:16
**define** 34:12
**defining** 55:2
**definitely** 77:7
87:7
**definitively** 38:17
**defunded** 96:1
**degree** 8:3,4,6,8
8:12,23
**delay** 33:12,13
34:1
**deletions** 133:4
**deliberate** 54:5,7
**deliberating**
70:11,19 84:20
92:15
**deliberation** 31:1
31:17
**deliberations**
31:22 77:18
84:22 85:15
93:15,22 98:5
109:15 111:11
**deliberative**
111:8
**Denison** 9:1
**deny** 48:24
**denying** 47:19
**Departments**
10:19
**deponent** 134:12
134:14
**deposed** 4:17
**deposes** 4:5
**deposition** 1:13

1:16 7:11,13,20
104:3 105:5
107:3 131:17,25
132:7,8,13
133:3 134:10,12
**deregistered** 48:5
48:6 50:6
**deregistration**
47:21 48:1,24
**described** 20:5
**describing** 47:3
92:4
**design** 40:16,18
**designed** 21:12
21:23 22:8
**desirable** 58:25
**detail** 94:13
**detailed** 83:17,20
**determination**
41:7 98:11
**determine** 55:14
108:9
**develop** 68:20,22
**devices** 6:18
**dictates** 30:24
**differ** 58:8
**different** 13:16
14:7 29:24,25
41:17 59:11
79:8
**difficult** 71:23
74:25
**direct** 34:25 37:7
58:21 59:3,23
60:1 61:7 94:7
103:8 113:1
**directed** 59:15
92:7
**directing** 110:19
**direction** 63:4
74:4 93:12
132:10
**directions** 61:4,8
**directly** 62:6 91:6
92:8,12,21 93:3

93:20 106:24
109:10 132:19
**director** 8:25 9:2
9:7,8,8 36:22
37:10,11,14,15
65:14 69:16
**disciplinary** 11:6
11:13,21 13:9
38:24 46:25
47:14 53:15
66:24 70:20
73:2 102:10
**discipline** 11:12
13:1
**discuss** 16:14,24
77:16 83:13
**discussed** 23:2
24:21 56:23
120:16
**discussing** 12:5
23:14 36:4
38:23 54:1
**discussion** 39:8
65:7,9,13,17,19
65:22 66:17
108:20
**discussions** 34:18
34:20,23 35:2,4
35:6,12,25 66:1
66:19 68:4
71:16 73:6
83:10 101:3
102:16 106:12
107:20,22,25
108:3
**dismiss** 84:25
85:17 86:4,14
86:19 94:9
**dismissal** 94:20
**dismissed** 30:25
31:16
**disobedience**
55:3
**display** 50:7
**displayed** 49:25

**disposition**
100:23 101:7
**disproportiona...**
96:5
**disrupt** 40:22
**disrupted** 42:22
**disrupting** 41:12
**disruption** 22:19
41:21 42:16
43:2
**disrupts** 40:22
**distinction** 71:24
**distribution**
91:10
**District** 1:1,1,22
1:23
**Diversity** 9:5
**division** 10:13,19
10:20,21
**document** 15:20
18:12,13 36:12
36:19 38:5
50:13,18,20
51:11,24 52:1,4
52:15,20 53:22
55:11,13,21
56:6 73:16 74:2
74:14 75:6,12
75:14 76:4,5,6,8
76:18,19 80:16
80:22 81:3,5,17
81:21,25 84:3
97:19 100:17
101:15 102:5,8
103:4 104:23
106:23 110:14
114:13 115:5,19
116:5 118:1
121:21,23 123:8
131:13,21
**documents** 7:19
15:8 38:15
101:5
**doing** 43:23 88:9
94:14 110:20

**don'ts** 61:5
**Donovan** 124:18
**dos** 61:5
**dozen** 58:14
73:10
**Dr** 11:4 16:12
30:16 34:21
45:24 51:1,12
51:15 52:5 53:3
53:25 65:2
66:12 67:21
68:8,14 72:6,8
72:21 73:1
74:17 99:8
101:4 102:14,16
102:19,22 108:8
108:20 111:25
113:10,15
119:19 120:13
121:1
**draft** 32:11,12,15
51:10
**drafting** 51:6
53:22
**draw** 122:1
**due** 23:7
**duly** 4:2 132:6
**duplicated** 90:25

**E**

**E** 133:1,1,1
**earlier** 96:12
97:13
**early** 120:17
**easier** 38:5
**easiest** 84:14
**easy** 19:10
**education** 7:23
8:5,7
**effect** 43:18 78:14
94:1 96:10
98:13
**effects** 98:18 99:3
99:13
**eight** 69:7,8

**either** 5:16 28:16
61:9 62:4 69:10
74:2 111:5
113:4 132:18
**elements** 76:21
**else's** 5:11
**email** 15:23 16:15
18:6,10 19:20
20:17 21:3
68:19 71:3
77:19,21 78:2
84:23 89:12
107:1,16 108:21
110:17 116:11
116:22 122:2
124:13,17
125:18 127:14
**emailed** 78:9
92:12
**emails** 130:7
**emergency** 7:3
**employed** 61:2
**employee** 64:11
64:17 66:20,23
132:17,18
**encompass** 24:10
46:9
**encompassed**
39:14
**ended** 106:5
**Endicott** 9:13,17
**engage** 54:16
**engaged** 17:7,18
**enlarge** 17:3
84:16
**enlisted** 64:17
**ensure** 63:17,21
**entails** 89:2
**entire** 31:2 96:19
127:17
**entirely** 91:12
**Errata** 134:13,14
134:16,19
**error** 45:11
**especially** 5:10

**Esq** 134:16
**Esquire** 2:4,4,8,9
2:15,21 134:6
**essentially** 37:21
110:19 118:14
**establish** 20:22
**established** 14:11
**estimate** 12:21,22
**estimation** 73:12
**evaluate** 109:24
**evening** 33:15
84:19 105:23,25
108:1
**event** 130:21
131:1,3
**events** 26:23
81:11 96:1
105:16 130:8,20
**everybody** 94:19
**evidence** 29:9
41:8 42:8,21
74:8,9 76:2
94:8 109:25
**evolve** 109:13
**EWING** 2:15
134:6
**exact** 12:20 33:21
44:10 50:2,4
90:16 92:13
94:15 100:20
**exactly** 53:4
111:15
**EXAMINATI...**
3:3 4:7
**examine** 103:13
**example** 41:3
**examples** 53:15
**exclamation**
120:9
**executed** 29:24
**execution** 100:20
**executive** 71:4
**Exhibit** 15:9 18:1
18:4 32:19 36:8
37:20 44:7,20

MARLIN NABORS  -  7/1/2025

50:10,12 51:6
70:23,24 73:14
73:16 75:4,5
76:15 77:22
80:17 81:14
83:24 87:2 88:7
99:15,17 100:11
100:18 102:1,3
103:1,3 105:2,6
105:10 106:20
106:21 110:11
110:13 111:19
112:2,3 114:15
115:3 116:6,8
118:2,6 121:6,6
123:4,6 124:3
125:4,9
**EXHIBITS** 3:5
**existed** 115:16
**existence** 115:19
**existing** 69:10
**expectations**
48:12
**experience** 69:12
128:16
**explain** 14:6
25:21 97:7
**explanation**
96:25 99:6
**explore** 32:9
**explored** 64:1
**extend** 46:7
**extent** 35:1 65:25
66:16
**eyes** 84:17 87:7

———————
**F**
**facilitate** 118:18
**facilities** 48:25
**fact** 22:8 92:6,20
**facts** 26:21
**fair** 5:7 12:7,8
32:24 33:2,23
39:19 59:16
90:10,11 128:22

128:23 131:22
**fairly** 5:22
**faith** 26:2
**fall** 37:6
**false** 96:7 97:9
**familiar** 4:15
11:8 47:25 48:3
86:7 119:4
**familiarity** 14:17
**far** 42:19
**fashion** 11:24
**favor** 26:12
**February** 17:19
17:22 19:3,13
24:20 25:17
31:13 32:23
33:8,10,16,18
33:24 34:9,16
35:7 36:1 38:10
38:13 58:9,10
59:11 61:14
62:14 65:19
67:14,18 69:20
77:17 78:1,17
78:22 79:19,22
80:1,4,7,11 83:1
84:18 97:15
98:3,8,17,24
105:17,18,19,25
107:19 108:1
112:10,13
114:18 116:13
116:17,18,20,20
117:10,12 120:2
123:17 127:23
128:21 130:13
**Federal** 1:20 4:21
**feedback** 52:4,6,8
69:7
**feel** 38:6 64:8
**feels** 96:13
**felt** 43:4
**fifth** 52:23
**figure** 104:11
131:13

**file** 12:12 91:19
99:19
**final** 53:23 56:5,6
117:14
**find** 29:7,8
**finding** 28:23
29:2
**findings** 32:3,11
32:12,15
**fine** 12:21 124:21
**finished** 5:15
**first** 4:2 13:21
17:2 22:15,23
24:19 31:19
32:11,21 33:5
38:1,7,9,24 46:4
46:5,8,13,19
52:21 53:12,13
75:20 77:17
82:12,25 83:18
86:3,6 87:12
88:17 95:17
105:18 106:3,16
107:15 109:8
115:14 117:9
120:1,19 123:14
123:21 128:17
132:6
**five** 52:12,21
**flag** 109:12
**Floor** 2:16 134:7
**focus** 39:25 59:6
**focused** 59:8
**focusing** 125:18
**folks** 119:2,7,8,10
119:11,13
**following** 17:19
60:19 133:3
**follows** 4:6
**forbids** 95:2
**force** 131:19
**foregoing** 132:7
133:2
**forget** 118:13
**form** 13:3 26:7

44:9 54:18
72:17 76:8,10
80:8,12 85:24
91:3,17,24
92:10 100:19,21
101:1 110:10
114:25 115:9,11
115:13 117:23
122:2 127:3
130:18
**formal** 7:23 10:10
**formally** 101:24
**Fort** 134:1
**forth** 21:10 22:4
**forward** 86:11
108:14,19
128:19 131:18
134:16
**found** 46:12
**Foundations** 8:6
**fourth** 77:16
125:19
**framed** 8:17
**free** 38:6
**frequently**
130:20
**front** 33:22 38:16
75:1
**full** 17:4
**fullest** 55:17
**function** 123:15
**functions** 12:15
12:17
**fundamentally**
88:21
**funding** 48:16,18
**Furious** 2:8
**further** 8:13 31:1
31:17 98:16,18
132:12,16

———————
**G**
**GABEL** 1:8
**game** 59:16
**gap** 80:4

**geez** 118:25
**general** 16:22
53:7 107:23
**generally** 59:22
62:11 95:18
123:25
**getting** 93:7
**give** 8:20 34:1
45:14 77:13
90:3 94:13
103:14 127:11
**given** 26:3 61:8
61:13 62:9,11
62:14,18,23
68:23 70:15
77:4 80:17
132:11 133:3
**giving** 8:15
**glad** 121:17
**go** 4:19 14:18
15:3,12 17:2
18:25 20:15
25:9 36:7 44:4
52:20 53:12
73:22 81:13,19
81:23 82:10
83:23 87:12
88:7,10,11,12
88:13 94:6
95:15,20 97:20
97:25 98:1
101:17 103:1
105:15 116:3
131:18,23
**goal** 86:13
**goes** 14:8,9 57:10
74:10
**going** 4:23 5:14
6:3,4 7:22 11:5
15:9 19:2 40:1
43:25 44:2
49:19 50:13
52:13 54:21
59:7 82:9,10
104:11 118:1

121:6,25 124:24
**good** 4:9 18:14
 44:3 48:22
 88:10
**Government**
 48:19
**great** 31:12 57:20
 100:6
**greater** 129:23,25
**ground** 4:19
**group** 29:3 50:6
 89:6 96:20
 119:9,18,21,24
**grouped** 37:21
**groups** 49:23
 90:25
**growth** 10:1
**guess** 17:4 24:9
 27:6 41:17 67:1
 82:21
**guidance** 70:21
**guide** 123:15,18
**guys** 125:2

**H**
**H** 133:1
**half** 7:16 13:25
 14:3 35:11,17
 52:13 73:13
 119:17 124:6
**Hampshire** 9:10
**hand** 29:25
 132:20
**handbook** 14:11
**handle** 19:10
**Hang** 103:5
**Hanlon** 2:9
**happen** 13:18,20
 80:11 85:22
**happened** 80:6
 97:7 131:6
**happy** 125:1
**harassment**
 96:13
**hard** 6:5

**head** 118:4
 122:15
**hear** 5:3 41:16
 129:4
**heard** 5:6 14:21
 29:15 97:6
**hearing** 12:1,3
 13:10,14,15,24
 14:2,19 17:20
 19:25 20:1,4,25
 23:3 24:12,19
 25:1,25 26:2,4,8
 27:1 28:1,1
 30:25 31:16,19
 32:24 33:8,19
 33:20 35:18
 38:21,24 39:13
 42:20 43:19,21
 46:5,8 50:23
 55:9,10,16,22
 56:9 57:24 58:4
 58:7,9,11,15
 59:6,9,18 60:10
 61:14,15,20,21
 62:5,6,15,19,22
 63:5,6,9,11,13
 63:14,15 64:4
 65:20 66:13
 67:10,13,16,18
 68:2,7 69:25
 73:5,8,21,25
 74:18,21 75:14
 76:9,13,17
 80:21,24 81:2,6
 81:16 82:4 83:1
 83:2,19 84:4,19
 85:13,14,22
 86:3,6 87:22
 88:20 89:2,7,11
 89:16 90:18
 91:12 92:6 95:4
 97:4,6,17 98:8
 99:9 100:23
 101:4,8 102:10
 102:24 105:17

105:19,24
 107:18 109:11
 111:13 117:9,16
 117:22 122:5,8
 123:14,14,17,21
 126:9,12 127:12
 127:21,23,24
 128:17
**hearings** 13:18
 13:19 26:24
 27:5 46:13
 58:22 59:18
 60:18,21 61:1
 86:9 122:22
 123:2
**held** 102:10 127:2
**help** 26:16 35:24
 51:17 81:9,10
 82:18 86:24
 121:18
**helpful** 11:16,20
 13:13 14:12
 26:22 46:23
**helps** 129:23
**hereinafter** 4:5
**hereof** 134:19
**hereunto** 132:20
**high** 7:24
**high-profile**
 118:16
**highest** 119:23
**highlighting**
 104:17
**highly** 109:9
**Hillman** 22:21
 38:8
**history** 8:11
**home** 6:13
**hope** 94:19
**hoped** 85:21
**hopefully** 5:1
 129:10
**hoping** 127:15
**hour** 7:15,15,15
 52:13

**hours** 119:18
**house** 34:24
 35:13
**humans** 30:14
 96:21
**hypothetical** 91:8
 91:25 92:4 94:7

**I**
**ideal** 38:5
**identified** 20:23
 32:18 39:7,12
 99:22,25
**identifies** 124:7
**identify** 16:8
 20:20 45:22
 88:4 95:22
 105:7 108:17
 124:8
**identifying** 99:11
**IG** 98:20
**II** 15:2,5 35:18
**illegal** 54:12,19
**impact** 92:24
 93:22 109:18,23
**impacting** 110:3
**important** 57:15
 80:6
**impose** 30:5,8
**imposed** 33:4
**improper** 31:9
 85:10
**improperly** 17:18
 23:19 84:21
 85:9
**improve** 129:1,2
 129:15,23
**in-** 34:23 35:12
**in-house** 35:8,16
**inaccurate**
 101:15 114:11
**inappropriate**
 109:21
**incident** 22:20
 24:18 38:9

46:21 82:14
**incidents** 37:24
 118:17
**include** 40:11,15
 40:17,18 48:15
 83:21 94:17
**included** 22:9
 34:23 89:6,12
 96:18
**includes** 21:12
 23:25
**including** 4:14
 66:14 89:15
 90:17 105:24
 130:2
**INDEX** 3:1
**Indiana** 9:3
**Indianapolis** 9:4
**indicated** 40:4
 111:14
**indirectly** 93:7,10
 132:19
**individual** 1:10
 74:5 126:5
 128:13
**individually**
 90:20
**individuals** 4:14
**industry** 67:6,8
**inflammatory**
 95:19,23
**influence** 5:20
 21:13,24 22:18
 26:1,5,11 56:19
 56:24 57:9,10
 85:15 88:18,25
 90:14,15 93:1,2
 93:6 95:3,9
 109:15
**inform** 102:19
**information** 17:6
 26:9,15 42:24
 43:11,17 48:23
 55:14 63:18,21
 66:4 68:5,7,13

MARLIN NABORS  -  7/1/2025

68:13,17 72:13
73:20 74:15,17
76:5,16 81:4
85:18 86:12,20
86:21 87:15,20
88:4 97:16,23
122:20 127:20
**informed** 102:14
**initial** 33:19
109:12
**initially** 38:13
**initiative** 113:3
**input** 98:13
**inserted** 61:18
**inside** 16:11,17
30:11 34:19,23
35:20 67:22
**inspection** 132:12
**Instagram** 98:20
**instance** 27:16
29:21,23 49:17
59:1 70:16
**instances** 23:17
**instigated** 57:10
**Institute** 9:6
**instruction** 62:9
62:11,23
**instructions**
61:13 70:9,15
126:11 127:10
**integrity** 25:11
25:20 30:23
79:24 88:21
**intended** 103:7
**intent** 90:15
**intention** 109:14
**intentional** 34:5
34:13
**intentionally**
53:16,20 54:8
54:25
**interacted** 30:15
**interactions**
119:5
**interest** 34:4

**interested** 32:6
132:19
**interests** 10:16
**interfere** 27:23
**interfered** 84:21
**interference**
21:11 22:19
31:10 41:21
42:16 43:3 84:8
**interferes** 40:22
**interfering** 41:12
129:9
**interim** 30:6,9
32:19,20 33:4
39:22
**internal** 49:10,14
49:15 68:8
100:1 111:25
121:15
**internet** 129:9
**interpret** 26:25
41:6,19
**interpretation**
28:5 41:1
**interpreted** 29:13
**interview** 113:13
**interviewed**
97:14
**interviewing**
113:8
**interviews** 43:14
43:20
**intimidate** 21:13
21:25 95:3
**intimidation** 95:8
**INTRODUCED**
3:5
**investigated**
33:18
**invited** 130:8,19
130:25 131:2,7
**inviting** 60:15
**involve** 35:12
45:20 66:1
**involved** 11:12,15

12:11,16 13:10
18:16 35:8,11
35:16 41:25
42:3 44:12 45:5
45:7,21 54:15
58:14,20 59:19
64:15,21 65:17
67:19,25 70:7
71:18 72:5,10
72:14 73:6,11
73:12 75:15
83:8,9,10 88:18
88:25 100:25
130:1
**involvement**
11:11 12:6,13
35:20 51:5
66:16
**involves** 22:20
**involving** 11:7
25:4 36:2 91:9
**iPhone** 6:20
**irrelevant** 94:1,2
**irreparably** 25:11
25:19
**irrespective** 56:4
**issue** 20:23 22:20
24:19 25:6 57:7
**issued** 101:12
**item** 120:1

**J**
**J** 1:16 2:4,21
132:3 134:16,21
**Jamey** 1:9 36:21
37:10
**January** 10:5
11:14 59:25
64:16 130:13
**Jewish** 130:9
**JOAN** 1:8
**job** 10:10 88:10
**jointly** 51:14
**July** 1:19 132:21
133:3 134:3

**jump** 34:22 99:18
126:13
**June** 101:19,21
102:15
**jury** 93:16
**Justice** 1:4 4:12
16:1

**K**
**Karin** 1:8 51:1
75:22
**keep** 43:25 44:2
64:1 131:11
**khanlon@aclu...**
2:12
**kicked** 129:6,10
**kind** 5:21 7:23,25
12:13 14:18
15:4 20:2 37:4
58:24 63:4
83:12,15 105:15
**kinds** 60:6
**Kirsten** 2:9
101:20
**knew** 111:10
**know** 14:14,25
20:22 31:18,21
31:23,25 32:1
33:25 38:16
45:9,15 46:9,14
49:12 50:4,15
51:19,20 53:23
55:12,25 59:23
60:13 61:16,17
61:22 62:3,8
66:3,14 68:25
69:2,14,24 70:7
70:9 72:2,21
73:23,24 74:1
74:23 76:3 81:4
82:24 83:3
86:15 88:5
95:11,13 96:20
100:19,20,22
100:24 103:16

104:2,15,20,21
111:12 114:23
115:8,9 117:2,5
117:18,19 119:6
119:9 121:1,23
122:9,11 123:2
123:3 124:1,23
128:7 129:12
130:6 131:8
**knowledge** 67:12
106:2 107:6
111:7

**L**
**labeled** 105:2
**laid** 27:11 47:12
**Landy** 1:9 37:16
37:17 65:14,18
66:7 78:2
111:13 117:4,6
122:16 123:20
124:16 125:19
**Landy's** 124:15
**language** 19:23
20:1,3 40:3
42:19 50:17
51:6 53:1 56:24
57:3,13 61:18
85:7 106:25
126:4 127:8,9
128:8
**laptop** 6:22,23
**large** 17:2 87:3
**largely** 123:25
**law** 88:9 96:25
**lawful** 4:1
**lawsuit** 4:11
**lawyer** 45:15
54:13
**lawyers** 4:10
20:11 35:24
**lay** 27:8
**lead** 63:17 75:20
75:24
**leaders** 130:9

**leadership** 130:24
**learn** 102:13
**learning** 59:24
**leave** 30:1 104:3
**lectures** 49:1
**leeway** 41:20
**left** 52:24
**legal** 16:11 30:11
  30:12,17 34:19
  34:24 54:16
  67:22 108:7
  111:25 113:10
  113:16
**let's** 5:14 13:21
  18:25 36:7,7
  44:4,4 50:10
  70:22,22 73:14
  75:3 76:6 81:13
  81:13,23 83:23
  84:13,13 88:7
  88:10,11 90:14
  90:23 94:5,6
  95:15 97:25
  99:15 101:17,25
  103:1 104:10
  105:7 106:20
  110:11 111:19
  112:2 114:14
  116:6 118:1
  123:4
**letter** 17:12,21
  18:5,11,23 19:2
  19:3,4,6,11,11
  19:13 20:24
  23:2,14 24:7,11
  24:24 25:23
  28:16 29:17,17
  30:3 32:22 33:7
  33:14,15 38:23
  39:11 41:1
  42:19,25 43:1
  43:10,18 44:11
  47:24 77:23
  78:14,15 84:1

84:23 86:24
88:1,3,14 89:3
89:14,19 90:16
90:23 91:9 92:8
92:13 94:15,19
95:18,21,24
98:13,19,24
99:4 101:21
105:22 106:4,14
106:18 107:4,8
107:9,13,19,21
107:23,25 109:5
**level** 14:20,24
  15:2,5,5 35:18
**levy** 28:20
**library** 22:21
  23:13 24:5,6,18
  38:8 46:21
  82:13,21 83:4
**Life** 9:2,7 14:21
**limit** 27:18
**limited** 6:2 66:10
**limits** 27:24
**line** 30:21 37:7
  52:23 53:12
  88:17 125:19
  126:3 127:5
  133:5
**lines** 52:21
**list** 69:13,17
  125:19
**listing** 74:8
**lists** 96:19
**ListServes** 49:17
**little** 14:15,16
  16:5 21:9 32:9
  43:25 57:11
  64:8 79:9 84:16
  94:13 95:12
  97:19,21 98:15
  108:12 125:10
**LLP** 2:15 134:6
**located** 6:12
**locations** 50:5

**logo** 18:16
**long** 7:14 112:18
**longer** 50:7
**look** 22:11 26:23
  27:7 30:21 38:4
  40:5,6 50:14
  55:20,24 56:16
  61:12 63:1 69:1
  70:22 72:16
  80:19 82:11
  84:1 86:24 88:3
  97:10,12 99:21
  103:6,9,15,23
  104:20 116:4
  131:12
**looked** 44:10 69:2
  88:14
**looking** 19:7,10
  37:20 44:20
  51:7 88:12
  114:9 123:9
  124:24
**looks** 18:9 37:22
  50:21 71:3
  73:19 82:2,12
  82:20 94:19
  99:19 103:24
  112:7 117:3
  123:13 126:14
  130:12
**loss** 48:15
**lot** 38:5 52:16
**low** 42:7
**lower** 14:20
**lunch** 6:3

———————
       **M**
———————
**M** 2:9
**maintains** 69:16
**major** 33:11
**making** 41:25
  45:5,7 60:8
  63:4 87:24
**management**
  119:14

**manager** 63:12
**manner** 52:23
  53:6
**March** 18:5,23
  19:19 20:16
  30:9 33:10,25
  34:9,16 35:7
  36:1 80:2,5,7,11
  130:13
**mark** 15:14 17:25
  36:7 44:4,5
  50:10 70:23
  73:14 75:3
  81:13 99:15
  101:25 106:20
  110:11 111:19
  114:14 116:6
  118:2 123:4
**marked** 15:19
  18:4 36:9 44:7
  50:11 70:24
  72:1 73:15 75:4
  80:16 99:16
  100:17 102:3
  103:2 106:21
  110:12 112:3
  114:14 115:3
  116:7 118:6
  123:5 125:8
**markers** 77:15
**Market** 2:16
  134:7
**Marlin** 1:8,13 4:1
  132:5 133:2,19
  134:5,10
**Marlin's** 124:17
**Mary** 1:16 4:23
  5:12 15:14
  124:11 131:23
  132:3 134:21
**Master's** 8:2,4,23
**math** 33:11
**Matt** 37:16 65:13
  108:5,11 111:13
  122:16 123:20

**Matt's** 122:25
**matter** 34:9
  70:11,19,20
**matters** 11:13
  13:9
**Matthew** 1:9
  117:4
**MC62100** 133:23
**mean** 7:2 13:14
  13:15 14:5,14
  14:18 16:18
  19:6,7 28:7
  29:19 34:12
  37:6 49:13 53:2
  53:6 54:9,23
  65:12 66:25,25
  70:3 76:4 82:6
  86:15 99:2
  100:19 104:5,9
  105:6 106:5,6
  109:1 118:8
  121:25 125:22
  131:6
**meaning** 53:9
**meaningful** 71:24
**means** 90:14
  92:15
**meant** 24:1 27:22
  54:10 55:1
**media** 25:5 39:19
  70:17 83:22
  89:20 90:24
  91:10 93:13,14
  98:25 99:12
**medication** 5:21
**mediums** 49:19
**meeting** 7:12,14
  118:12,14 119:6
  120:2,19
**meetings** 49:2
  72:6 73:1
  118:21,24
  130:23
**member** 78:1,5,8
  79:16 107:2

125:24
**members** 20:5
  25:24 43:15
  67:24 68:11
  69:10,14 73:22
  77:18 78:19,24
  80:18 82:7
  86:18 88:20
  91:7,13,23 92:6
  92:7,22,24 93:4
  93:8,21,21
  94:18 96:13
  97:14 98:4,8
  101:11 107:8
  109:10 110:17
  110:24 111:5
  112:24 113:13
  114:7 116:15,19
  117:4,9,12,21
  125:21 126:1,5
  128:3,14
**memorialize** 79:6
**memory** 120:21
**mentioned**
  115:18
**Mentzer** 1:9
  36:21 37:18
**merits** 110:4,5
**met** 78:23,25
**metadata** 55:25
**Michigan** 8:2
**middle** 109:19
**mind** 47:3 60:8
  90:4 92:22
**mine** 121:13
**minimize** 39:24
**minutes** 22:13
  52:12 57:18
  104:6,7 112:20
**misconduct** 24:19
  28:24
**misleading** 95:19
  95:23 96:4,14
  96:23
**misspeak** 119:1

**misstating** 24:22
**mistaken** 17:13
**mixed** 100:7
**mixing** 101:5
**moderator** 63:14
  64:3,18 65:8,10
  65:16,18 66:7
  66:15,19,23
  67:13 73:25
  78:2 111:13
  122:25 123:19
  127:10,21
**moderator's**
  63:15
**moment** 40:2
**momentarily**
  97:13
**months** 58:19
**morning** 4:9 71:6
  71:12
**mouth** 24:22
**move** 6:25 104:10
**moved** 7:8
**moving** 128:19
**MSA** 131:4
**Muslim** 130:22
  130:24

—————
## N
**Nabors** 1:8,13 3:5
  4:1,9 15:14,16
  15:19 18:1,3
  19:1,5,13,16
  32:18 33:15
  36:8,9,10 40:6
  44:5 55:8 70:25
  79:22 81:22
  87:4 100:18
  102:3 116:4
  125:8 129:16,19
  132:5 133:2,19
  134:5,10
**name** 4:9 10:24
  11:2,3 15:15
  30:19 119:7,8

**named** 36:21
**names** 124:21
**native** 121:15
**nature** 23:7
**nearly** 72:25
**necessarily** 71:25
**necessary** 38:7
  43:5
**necessitates**
  35:19
**need** 8:15 16:4
  37:1 38:4 42:8
  43:24 50:13
  55:14 58:11
  61:12 62:25
  97:10 103:10
  125:10 131:13
**needed** 6:1
**needs** 10:16
**negotiation** 47:8
  47:15
**Neither** 40:11
  49:14
**never** 102:7
**new** 9:10 24:20
  32:19 34:15
  36:2 46:6,9,10
  84:24 85:18
  86:19,21,22
  87:10,15,25
  88:5 101:18,18
  126:9 127:21
**News** 91:1,11
**newspapers**
  70:16
**Nicole** 2:21
**night** 81:17
  106:13
**no-contact** 128:9
**non-lawyer** 54:15
**non-Pitt** 64:17
  66:23
**NON-WAIVER**
  134:11
**notarized** 134:15

**Notary** 1:17
  132:3,24 133:23
**note** 36:20 63:10
  64:10
**noted** 42:18
  134:12
**notes** 79:11,13
  103:6 112:7
  113:18,19,20,22
  114:5
**Notice** 1:19
  134:11
**notification**
  36:15
**notified** 79:22
  98:4
**November**
  114:20
**null** 31:3
**number** 4:13
  12:20 15:7,10
  29:24,25 37:23
  38:2 47:18
  82:17 99:19,25
  101:19 105:7
  121:16 130:7
**numbered** 100:5
**numbering** 100:1

—————
## O
**O'Loughlin**
  16:19 30:20
  45:24
**oath** 4:25
**object** 13:2 26:7
  34:24 54:18
  66:2,5 72:17
  80:8,12 91:3,24
  92:10 117:23
  130:18
**objecting** 35:21
**objection** 55:4
  85:23 91:16
  110:9 126:25
  127:3

**objective** 94:8,14
**observing** 59:24
**obviously** 7:3
  101:25 106:24
**occur** 71:11
**occurred** 13:17
  22:21 35:2
  112:9
**occurring** 118:18
**offered** 70:8
**office** 14:23 16:21
  30:17 119:12
  122:14,15
  132:21
**Officer** 95:4
**officers** 33:20
  43:21 55:10
  61:20 62:6 63:5
  67:16 69:25
  89:8,12,16
  90:18 91:13
  105:25
**official** 1:10
  119:23
**Oh** 80:3 96:17
  100:2 117:18
  118:25 121:12
**okay** 5:18 6:11,23
  8:10,24 11:10
  13:21 15:24
  22:12 23:23
  24:9 33:24
  37:14 42:12
  44:3 50:10
  52:16 57:21
  60:3 62:21 75:3
  75:11 77:7,21
  80:1 81:13,18
  82:15 83:23
  85:9 87:12 88:7
  88:15 100:2,6,9
  101:20 104:13
  104:25 105:11
  105:22 106:20
  110:11 112:15

114:3,22 116:6
117:25 118:5,11
121:1,10 123:4
125:11,15,15,16
125:17 126:3
127:5 129:6,17
131:22
**once** 104:17,17
109:24
**ones** 24:5,20
35:17 67:23
100:3 119:14
**ongoing** 17:7
84:8
**open** 6:23 17:21
19:3,4,11 20:23
23:2,14 24:10
24:24 32:22
33:7,14 38:23
39:11 42:19,25
43:1,9 72:9
77:22 78:15
84:1,23 89:3
95:18,21 98:19
99:3 104:4
105:22 106:3
107:4,8,9,13,19
107:21,22,25
109:4 131:12
**opening** 50:22
54:2 56:11,15
70:16 76:18,21
76:25
**operate** 48:7,11
60:2
**opinion** 32:2
**opportunity** 4:20
10:2 47:6
**order** 26:16 29:6
78:19 111:21
125:20 128:2,9
**organization** 37:1
48:12 49:3,5,7
**organizational**
37:5

**organizations**
48:14
**organize** 81:9,11
**original** 66:13
134:16,17
**outcome** 26:1,3
97:11
**outlining** 78:2
**outside** 35:2 37:8
67:10,12 85:14
88:19 89:1
93:14 109:11
**overall** 12:25
**oversee** 10:12,17
**overseeing** 12:25
59:14
**overstatement**
78:25

---

**P**

**p.m** 57:22 131:25
**P.O** 2:5,10
**P80** 121:10
**PA** 2:6,10,17
134:2,8
**page** 3:3,6,7,8,9
3:10,11,12,13
3:14,15,16,17
3:18,19,20,21
3:22,23,24,25
15:12 37:25
38:1 53:13
73:19 74:5
75:20 76:14
77:17 81:17,20
81:23 83:23,24
84:9,12,14
87:12 88:11,13
88:16 94:24
95:15,16,20
97:25 98:2
116:3 121:19
124:6,17,20
**pages** 18:20
82:13 84:11

133:2
**Palestine** 1:5 4:12
16:1
**panel** 26:20,24
32:11,13 33:5
33:20 38:10
43:15 56:9
58:15 61:4,9,20
62:1 63:5,19,22
66:24 67:15,19
67:24 68:10
69:11,13,23,25
73:5,22 74:10
78:19,24 79:16
80:18 84:6,10
85:17 86:14,18
89:25 91:13,23
92:6,7,21,24
93:3,7,20,21
94:9,17 97:8,15
97:17 98:7 99:9
101:8,11 102:24
105:18 107:1
110:24 111:5,8
112:24 113:13
114:7 115:14
116:15,19 117:4
117:9,12,21
**panel's** 57:4
**panelist** 69:20
**panelists** 19:25
20:4,8,13 26:16
42:24 43:5,8
56:19 67:17
68:1,24 69:5,11
69:17 70:2,4,14
70:18 75:25
76:16 77:2 82:7
92:12,14 93:11
93:13,18 112:8
113:8 116:12
126:2
**panelists'** 68:6
**panels** 35:11
69:18

**Panzella** 11:4
16:12 30:16
34:21 45:24
52:5 65:2 66:12
67:21 68:8,14
72:7,8,22 73:1
101:4 102:14,16
102:19,22 108:8
108:21 111:25
113:10,15
119:19 120:13
121:1
**paper** 31:24
**paragraph** 17:3,5
21:8,19 22:13
25:9 30:22
52:21 53:13
56:17 96:12
109:20
**paraphrasing**
20:7,7
**part** 12:24 18:9,9
18:12 21:2
42:24 50:14
53:4,14 54:6
57:15 65:16
68:3 71:15
74:14,20,22
76:1,8 80:20
82:3 96:17,22
119:9,20 127:19
**participant** 65:11
65:12
**participants**
128:5
**participate** 60:16
118:21
**participated**
11:22 12:1,2
74:19
**participating**
65:9 127:11
**particular** 60:10
**particularly**
88:20

**parties** 61:5
132:14,17
**parts** 119:3
**party** 66:18
112:23 117:5
**paths** 47:18
**pause** 98:5 120:6
121:3
**paused** 129:13
**pausing** 52:11
**pen** 31:23
**penalized** 96:5
**pending** 1:21
**Pennsylvania** 1:1
1:18,23 2:5,9
132:1,4 133:1
**people** 20:10
45:20,21,23
69:7,8,11,17
118:15,21,23
119:16 124:8
127:11
**percentage** 35:15
73:11
**perfect** 27:12
**person** 5:15
10:24 21:14
29:7 30:1,2
38:6 54:24
63:20 122:19
**personally** 109:21
**persons** 29:22
41:4
**perspective** 34:3
**Pg** 133:5
**Philadelphia** 2:10
2:17 134:8
**phone** 6:22 7:1,8
79:1
**physically** 6:12
**piece** 106:9
**pieces** 74:15,16
76:12,23
**Pitt** 1:5 4:12 9:19
12:3 30:13 40:9

48:25 58:20
61:2 66:20 67:3
67:6,10 70:6
72:25 73:6 91:1
91:11 106:12
127:17 134:1
**Pitt's** 22:21 94:10
**Pittsburgh** 1:8
2:6,21 4:13
6:13 9:16,24
10:4,22 64:11
129:8 134:2
**place** 7:2 79:18
113:21 132:7
**placement** 9:18
**places** 50:2,3
**Plaintiff** 1:6 2:3
11:7
**Plaintiff's** 15:9
**Plaintiffs** 4:11
**plan** 52:11
**planned** 50:23
**play** 51:2
**Player** 122:12
**playing** 95:12
**plays** 47:1
**please** 5:3 24:23
38:6 49:4 50:16
75:10 87:11
97:20 116:1
120:10 121:19
125:12,14
134:12,16,19
**point** 8:21 24:3,5
25:3 41:23
53:25 54:3
59:25 67:4
76:12 78:17,23
94:25 95:16
98:4 103:21
110:24
**points** 85:13
120:9
**policies** 22:2
27:21 28:4,8

41:6 42:2 47:13
53:11 55:1
72:20 90:2
**policy** 28:16 29:7
29:10,16,20
30:4 54:20,25
57:5,14
**policy's** 29:12
**poorly** 8:17
**portal** 122:20
**portions** 51:13
84:6 103:11,12
**position** 9:25
10:7,11
**possession** 134:17
**possible** 47:18
61:11 116:24
**post** 7:24 99:12
**posted** 89:19
**posters** 49:22,25
50:7
**posting** 39:19
98:19
**posts** 25:5 122:19
**potential** 21:13
21:24 22:9
23:11 28:15,18
28:19 29:4,16
40:12,13 46:9
54:1 56:18,23
68:6,10 69:13
95:10,14 98:18
99:3,12 109:18
**potentially** 27:23
57:8 95:3
**practice** 47:12
67:2,5,6,7,7,9
**practices** 14:10
**preceding** 134:13
**preclude** 48:17
**preference** 44:1
**prep** 7:11
**preparation** 7:20
75:14,16 101:1
126:9

**preparatory**
55:12 80:22
**prepare** 7:13
113:19 127:20
**prepared** 74:17
114:5
**preponderance**
29:9 41:8
**presence** 35:3
64:4 71:25
**present** 2:20 20:4
26:9,15 97:15
**presentation**
82:25 83:4,25
**presentations**
49:1
**presented** 30:23
31:7 83:18
87:16,21 123:25
**presenting** 26:21
123:16
**pressed** 92:17
**presumption**
46:11,15,17
47:2
**pretty** 72:18
130:20
**prevent** 5:22 49:6
49:7
**previous** 19:7
42:20 95:20
96:8
**previously** 107:2
**printing** 132:10
**prior** 9:19 62:1
69:23 73:7
**privilege** 34:25
**privileged** 35:22
66:4 131:14
**privileges** 48:13
**probable** 90:8
**probably** 8:17
75:23 80:3 88:8
103:25 119:2

122:6 124:5
**problem** 89:10
92:5,11 106:7
109:4,7
**problematic** 39:8
**procedural** 60:25
**procedure** 1:21
4:21 60:14
**procedures** 58:6
58:8,22 72:20
**proceeding** 12:14
17:7 22:20,23
25:13,16,17,21
31:2 40:1 51:3
61:10 64:7
88:19 89:1
110:4 124:10
127:1
**proceedings** 11:6
11:22 12:10
13:23 14:4 21:4
35:11 42:22
58:14,21 59:15
60:2 62:7 63:17
64:15 65:24
66:8 72:4,5,7
73:2,4 78:10
98:12 102:17
**process** 14:17
21:11 26:3 27:8
27:11,14,23
30:24 31:11,13
32:21 33:6
38:21 40:23
41:13,25 46:24
47:1,9 53:15,22
58:6,7,8,22
59:11,24 63:25
69:20,23 71:7
72:15,19 84:9
85:14 88:22
90:16 101:6
109:11 111:9,17
127:18 128:19
128:25 129:1,3

129:15,24
**processes** 14:7,11
59:14 85:14
**produced** 51:15
81:17 101:24
104:16,16
121:14
**professional** 10:1
**programs** 9:5
49:1
**progress** 31:18
**prohibit** 29:21
**prohibited** 63:6
**prolonged** 6:4
**prompted** 19:20
91:18
**prompting** 23:4
**pronouncing**
15:15
**proper** 80:14
**prospective** 68:24
**prove** 93:9
**provenance**
104:22 131:12
**provide** 53:15
121:2 125:3
**provided** 4:20
73:20
**provides** 47:5
**providing** 29:22
29:23 41:4
68:13
**Provost** 10:8,14
10:25 65:1
**Provost's** 119:12
**Public** 1:17 132:3
132:24 133:23
**published** 90:24
**punish** 27:4
**punished** 27:15
**Purdue** 9:3
**purpose** 26:4,8
85:20 127:14
**pursuant** 1:19,20
**pursue** 92:3

MARLIN NABORS  -  7/1/2025

put 15:11 18:1
24:21 31:23
40:1 87:1
104:10 129:21
putting 98:23

**Q**

question 5:2,5,16
8:18 24:9,13
25:2 29:1 34:1
45:4 48:2 55:5
55:6 60:5 82:21
90:3 108:24
109:16
questioning 27:9
questions 4:22
5:23 26:10
57:11 63:24,24
103:8 105:8
109:13 126:22
129:13 130:6
quickly 36:18

**R**

R 2:15 133:1,1
134:6
raised 108:24
raises 37:21
raising 107:12
ranking 119:23
reach 6:18 7:1
reached 32:7
91:22,22
reaction 43:9
109:8
read 17:5,9 21:15
25:13 31:3 45:2
55:9 56:12,14
56:21 75:7 77:2
77:2,2,7,10 85:1
88:22 95:6
100:1 102:8
109:25 110:1
115:20 125:10
133:2 134:12

reading 70:16
96:2 132:12
reads 47:24 88:17
realize 45:11
really 37:24
74:25 106:10
reapply 44:25
reason 91:4 95:1
101:14,16 133:5
recall 62:22,25
63:2,7,8 85:5
102:21 106:7,16
107:15,20 108:3
108:4,10 109:1
109:2 116:21
117:20,24
120:15,23 122:4
125:23 131:7
recap 7:23 8:11
8:14
receipt 134:19
receive 70:4
100:4
received 17:5
92:7 108:5
receiving 48:18
122:22
recess 57:22
recited 56:8
recognize 15:20
36:12 44:8,9
50:12,17 73:16
75:5 81:21,24
100:17 102:5
103:3 106:22,25
110:13 112:4
115:3,5 116:8
118:6 121:20
123:5 125:8
recommendation
114:24 115:12
recommended
44:13,14,21
45:5,8 46:4,7,19
47:16 102:24

recommending
46:1
record 4:25
131:23 132:11
recorded 132:9
redact 103:11
124:5,8,11,20
125:2 126:15
redacting 124:21
reduced 132:9
refer 19:2,10 31:8
47:11 70:1 81:1
127:9
reference 18:23
67:11 82:17
133:23
referenced 18:5
20:13 76:11,21
107:2
references 24:7
referencing 107:9
126:10
referred 74:21
referring 10:18
17:20 19:12
23:9 25:16
43:14 50:25
53:19 86:23
125:25 126:6
reflected 54:8
regard 53:10
regardless 56:3
92:23
registered 48:11
48:13
registration
44:25 46:2
regular 72:6
93:14 118:20
regularly 130:17
reinstatement
45:1
rejected 97:9
relate 37:24 39:2
82:13

related 24:5 39:5
46:5 107:24,25
relates 38:8,22
39:10,18 124:6
126:14,17 127:1
relating 36:2
38:20
relation 34:14
36:24 37:9
relative 132:16
132:17
released 31:1,16
relevant 63:18,21
94:3
relied 43:8,11
80:23
rely 14:10 26:25
remain 105:2
remainder
124:22
remember 52:7
53:4 75:21
106:10,11
111:15 116:23
117:1 118:9
119:15
remote 127:7,9
127:12
renditions 40:8
repeat 5:4 24:13
28:25 87:21
rephrase 42:11
42:11,13
report 10:24
reporter 100:4
125:4 134:22
reporting 37:13
reports 13:7
37:10
represent 82:9,20
representation
22:5
representative
10:15
representatives

19:24 36:16
82:8
representing
15:25 20:6
republication
91:11
requires 72:12
reserve 131:15
reserving 49:8
reshared 90:25
Residence 8:25
9:2,7 14:21
resolve 26:17
respective 40:8
132:14
respects 133:17
respond 5:17
47:17 86:1,10
86:16 108:9
116:22,24
responded 117:6
responsibilities
10:11,14 12:25
responsibility
47:6
responsible 29:7
46:12
restate 39:4
54:21
restrictions 70:17
result 90:21
126:6 128:14
results 69:3,4
79:6 94:20
102:9
return 134:19
review 7:19 15:8
18:21 46:24
51:23 105:16
reviewed 52:3,5
68:5
revise 60:24
Revisit 127:7
reword 42:14
Rhodes 2:21

**Rhodes'** 16:20
**right** 6:12 15:7
  15:18 17:24
  18:3 22:6,16,24
  24:16 25:3 38:2
  38:14,15 44:3
  44:20 46:13
  48:21 50:8
  57:17 58:16
  59:21 65:21
  70:22 71:9 75:3
  78:20 80:5
  82:12 84:1,7
  87:22 88:13
  96:2 98:5,9,21
  99:9 100:12,16
  104:1,25 105:14
  105:20 106:6
  111:19 112:2,11
  112:25 114:13
  116:15 121:5,18
  124:3 125:7
  126:23 131:8,19
**rightly** 25:3
**rights** 131:15,17
**risk** 119:13
**RMR** 132:3
  134:21
**role** 9:14 46:25
  51:2,10 63:13
  63:16,20 65:16
  65:23 66:10
  68:3 70:5 75:18
  81:8 89:24 90:1
  109:24 122:24
**room** 6:14 28:5
**roughly** 7:15
  48:10
**rule** 26:12 28:19
  29:3,5,18 39:18
  41:2,11,19
  56:25
**rules** 1:20 4:20,21
  40:6,8 46:21
**running** 103:19

**S**

**S** 133:1
**safety** 119:13
**sake** 19:1
**Salem** 9:12
**sanction** 44:21
  45:6,8 47:17
**sanctions** 44:14
  46:4,7,19 47:7,9
  47:24 102:23
**Sandy** 7:12 55:7
  55:23 81:15
  101:20 121:9
  124:4 126:20
**sat** 117:22
**SAUL** 2:15 134:6
**save** 104:7
**saw** 107:15
**saying** 5:17 21:16
  27:2,6 41:10,10
  41:15,16
**says** 4:6 17:18
  21:10,23 22:15
  23:6 25:10
  30:22 31:6,15
  38:19 40:22
  44:21,24 52:22
  53:14 56:11
  71:5 78:1 79:21
  84:19 98:3,17
  99:14,20,21
  109:20
**scan** 36:18
**school** 7:24 88:9
  96:25
**Science** 8:1
**scope** 24:15 59:7
**Scott** 78:5
**screen** 15:11,18
  18:2 36:10
  70:25 87:8
  106:22
**screenshots** 83:21
**script** 63:1
  123:14 127:7,9

**scripts** 123:24
**scroll** 18:19 37:25
  44:6 50:16 75:9
  75:10,10,19
  87:11 88:15
  96:15,16 97:18
  97:20 98:15
  115:4,24,25
  116:1 121:18
  123:7 125:14,15
  125:16
**seal** 132:21
**second** 17:4 21:8
  21:19 37:25
  38:19 39:10
  65:23 81:19
  83:1 94:25
  103:5 109:20
  124:13,17,19
  126:12 127:6
  128:12
**Second-to-last**
  21:18
**security** 119:13
**see** 7:2 16:4,6
  18:8 21:21
  25:10 36:9,17
  36:18 44:23
  51:20 52:24
  53:17 55:20
  56:1 70:24
  77:19 78:3
  79:24 87:3
  102:2 106:3,21
  120:3,6,10
  121:10 124:19
**seeing** 21:16
  103:6 109:3
**seemingly** 130:8
**seen** 32:12 50:18
  91:14 102:7
  115:6,15,23
  116:5 122:1,2
  123:8 130:7
**select** 64:21

**selected** 67:16,18
  67:23 69:9
**selection** 67:20
  69:20,23
**semantics** 95:12
**semester** 48:21
  61:1
**send** 124:11
  134:17
**sending** 89:20
  106:5
**sense** 128:8
**sent** 16:15 17:21
  19:13 33:14,15
  68:18,23,25
  77:19 78:1,18
  89:3,14 90:16
  92:20,21 93:20
  98:24 105:22
  106:24 107:25
  118:8 127:14
**sentence** 21:7,18
  22:3 23:6 56:17
  94:25 95:17
**sentences** 17:16
**separate** 46:3
  79:4
**separately** 79:2
  112:16
**sequence** 26:23
  81:11 105:15,16
**sequestered**
  93:16,18
**serious** 21:14
  23:7
**serve** 81:8
**served** 69:18
**sessions** 71:10
**set** 21:10 22:3
  38:7,19 39:10
  39:16 46:3,13
  77:14 132:20
**setting** 12:13
**seven** 33:12
**sfworlds@aclu...**

2:11
**Shaking** 118:4
**shaping** 72:15
**share** 76:10
**shared** 43:11
  51:11 68:7
  73:25 75:25
  76:2,8 97:22
**Shatea** 122:12
**Sheet** 134:13,14
  134:16,19
**short** 43:24
  103:19
**show** 44:7 73:15
  75:4 99:16
  103:2 110:12
  112:3 115:2
  116:7 118:5
**showing** 18:3
  50:11
**shown** 96:19
**side** 40:2 45:17
  104:10
**signatories** 19:14
**signatory** 97:1
**signature** 131:24
  134:11,14
**signed** 36:20
  134:16
**significant** 12:24
  80:10
**signing** 132:13
**simply** 29:3
**single** 39:17
**sir** 7:9 22:11 69:1
  86:16 93:25
  115:15
**sit** 32:10 36:25
**situation** 47:10
  91:25
**situations** 41:17
**six** 33:11,25
  58:19
**SJP** 11:7,8,12,25
  12:6 17:21

19:13,24 20:6
34:2 35:7 36:16
48:1,4 53:14
59:6,9,17 62:23
71:7 77:18
79:22 82:8,8
84:20 85:1
86:18 92:18,21
96:13 97:6
98:17 102:10,17
105:19,23 120:2
127:1
**SJP's** 34:15 54:3
86:13 95:18
96:25
**skipping** 117:25
121:5
**slowly** 82:11
125:14
**social** 25:5 39:18
70:17 83:21
89:20 90:24
91:10 93:13
98:25 99:12
**sole** 92:5
**Solomon** 2:8
**somebody** 5:11
36:21 41:11
56:12 59:23
68:21 106:17
113:1
**soon** 131:20
**sorry** 8:22 11:18
15:15 20:18
24:14 29:1 30:7
32:25 37:1,4
38:2 44:15,18
45:7 49:16
54:20 61:6
65:21 66:9
70:12 75:11
79:10 81:7,24
83:15 85:25
88:8,12 91:19
92:17 94:12

98:1 101:5,18
104:20 106:8
110:10 111:20
112:13 114:16
115:1 122:21
**sort** 10:10 34:4
47:19 50:22
58:12 81:10,11
83:11 85:13,13
109:12 118:16
118:16,18
125:14 127:6,19
**sounds** 33:22,22
44:3 55:2
112:14
**Southern** 9:10
**space** 49:8
**speak** 27:25
111:4
**speaking** 126:25
**specific** 18:12
20:2 67:3 79:9
97:22 128:10
**specifically** 8:5
20:20 52:9
56:10 61:18
62:4 63:2 70:6
95:2 106:8
128:4
**specify** 17:13
28:9
**spirit** 28:16 29:17
29:19 30:3 41:1
**spoke** 112:16
116:14,17
**spoken** 33:19
110:23 111:1
**Square** 2:16
134:7
**SS** 132:2
**staff** 30:13 52:22
106:12
**stage** 53:21
**Stan** 16:19 30:16
30:19 45:24

68:15 71:17,21
**stand-alone**
74:13
**standard** 29:11
42:4,7 90:8
**Standards** 9:9
**stands** 118:13
**start** 10:3 15:9
76:6 84:13,14
125:13
**started** 11:14
21:5 32:2 64:16
**starting** 8:20
124:18
**starts** 22:3 83:25
84:9
**State** 9:12
**stated** 80:13
132:8
**statement** 12:7
27:16,20 32:24
33:2 50:22 54:2
55:5 56:11,15
76:19,19,22
77:1 96:10 97:9
**statements** 24:25
27:9,10 86:11
96:9
**States** 1:1,22
**status** 117:21
**stay** 93:13
**stenographically**
132:9
**step** 5:10 113:6,7
**steps** 80:14
**stick** 72:19
120:20
**Sticking** 84:7
**stop** 6:5 98:12
104:6 110:19
**stop-** 78:18
**stop-work** 111:21
**storm** 129:7
**story** 45:17
**Street** 2:16 134:7

**strictly** 41:18
**strike** 14:6 42:13
55:7
**student** 9:8 10:15
10:21 13:1,6
14:22 17:9
19:18 23:11
29:3 36:22
37:11,12,15
48:11,13,18
49:7,23 54:14
54:15 65:14
69:16 119:12
122:14 124:20
130:9,24
**students** 1:4 4:11
9:14,15 10:9
15:25 16:1 20:6
26:5,9,15,19
27:2,10,14,25
29:21 33:8
39:12 47:5,17
49:18,21,23
54:16 57:8 61:9
61:14,19,25
62:3,14,18,24
85:21 86:10
90:14 92:9,11
93:20 96:5
109:9 122:20,21
122:22 126:11
130:2,19,22
**students'** 24:25
32:23 86:3
**stuff** 124:18
126:15
**subject** 22:23
38:9
**Subscribed**
133:20
**subsequent** 17:16
96:10
**substance** 5:21
108:15
**substantiate** 43:7

**subversive** 53:16
53:20 54:9,17
54:23
**suggest** 105:9
**suggesting**
128:15
**Suite** 134:1
**sum** 74:9
**summarize** 33:1
**super** 119:4
**supervise** 10:12
37:17
**supervises** 37:18
**supervision** 37:7
**supervisor** 16:10
16:12 30:11
34:19
**support** 42:9
**supposed** 80:1
**sure** 5:13 8:15
18:18 37:2 39:6
52:14 59:6
61:16,22 73:17
74:7 76:23
80:19 81:4 85:5
86:8,25 99:23
115:22 130:4,11
130:13,15
**surprise** 86:17
**survey** 68:19,20
68:22
**suspended** 21:4
**suspension** 23:20
30:6,9 32:20
33:4 39:22
**sway** 109:22
**sworn** 4:2 132:6
133:20
**Syracuse** 8:3,24
**system** 29:6
54:11
**Szemanski** 2:4
99:24 100:3,9
105:1 114:16,20
114:22 115:1

118:4 121:14

**T**

**T** 133:1,1
**table** 118:15
**tag** 105:10
**take** 5:12,25 6:4
 13:21 29:23
 34:1 77:13
 79:13 103:19
 113:2 116:4
**take-it-or-leave...**
 47:10
**taken** 1:16 38:21
 57:22 113:23
 132:7
**talk** 43:5 71:21
 72:9 98:7
 108:15 118:15
**talked** 77:22
**talking** 5:13 11:5
 18:11,11,18
 63:3 67:5
 105:12 114:23
 119:17 128:17
**talks** 22:13
**team** 119:11
**TECHNOLOG...**
 134:1
**Technology** 9:6
**tell** 34:20 40:7
 74:10 82:12
**telling** 5:1 61:19
**temporarily**
 37:12
**ten** 57:18 119:2
**tendency** 5:9,10
**tenure** 72:25 73:6
 120:18
**term** 11:7 90:7
**termed** 17:21
**termination**
 44:24 46:1
**terms** 27:8 43:23
 61:5 102:23

**testified** 58:4
 59:12 97:13
 126:21
**testify** 4:3 132:6
**testimony** 132:11
**text** 40:5
**thank** 7:7 8:16
 15:12 18:25
 21:20 36:19
 45:18 52:17
 75:11 100:8
**thanks** 7:10
 57:21 96:21
 100:9 126:19
**thing** 59:2 60:7
 72:1 103:25
 128:10
**things** 7:25 64:1
 73:25 75:1
 126:8
**think** 6:2 12:5
 13:5,13 17:21
 20:11 23:21
 26:13 28:2,13
 29:6 34:3 35:23
 38:2 41:3,5,14
 41:23 46:5,16
 46:23 52:16
 53:24 54:24
 55:17 57:4,15
 59:2,16 60:4,25
 61:12 63:11
 66:11 67:25
 74:13,14 75:23
 76:11 80:21
 81:15 82:17
 85:21 87:1
 95:11 96:3,9,11
 99:22 100:10
 101:24 103:16
 104:16 105:4
 109:3,7 112:11
 113:4,5,14
 114:23 115:9,23
 117:14 123:11

123:12 124:7
 125:4 126:25
 127:4,25 128:22
 128:23 131:10
**thinking** 129:18
**third** 23:18,20
 25:4,9 30:21
 39:16,16,16
 53:13 56:17
 127:5
**thirty** 134:19
**thoughts** 81:10
**threats** 109:22
**three** 37:22,24
 38:2 42:23 43:5
 43:14,21 78:23
 79:1,18 89:7
 97:14 105:24
 110:24 117:4
 119:17
**time** 5:13 6:2,6
 12:3 32:6 45:13
 70:13 103:19,20
 104:7,15 127:17
 132:7
**timeline** 76:15
 77:14 83:17
 84:6
**times** 58:23
**title** 8:19 10:6
**today** 6:5 11:6
 12:5 15:8
**today's** 7:11,20
**told** 6:1 43:9
 61:25 62:4
 82:23 93:21
 97:16 111:16
 117:15
**top** 18:8 52:20
 76:14 95:16
 97:25 99:19,20
 99:21 124:5
**topic** 14:15
**topics** 63:25
**total** 74:9

**track** 64:2
**training** 69:24
 70:4,7,8 88:9
**transcribe** 4:23
**transcript** 133:17
 134:12,17
**transgressions**
 34:15
**transparent**
 45:16
**tribunal** 26:6
**tried** 108:8
**triggered** 33:6
 90:19 91:2,5
**triggering** 19:18
**trouble** 124:25
**true** 82:23 96:9
 97:8 113:5
 130:10 132:10
 133:17
**truth** 4:3,4,4 5:1
 132:6
**truthfully** 5:22
 26:16
**try** 5:14 12:4
 52:11 72:19
 109:14 122:1
**trying** 14:16
 20:21 24:15
 26:11 33:1
 39:24 41:18
 45:13,16 54:22
 59:9,10 90:13
 106:8 127:20
**turn** 111:20
**twice** 104:16
**two** 23:17 30:14
 42:18 45:1 48:5
 51:2 58:11
 111:5 116:14
 120:5,9
**two-year** 46:1
 47:21
**type** 13:14,15
 27:18

**types** 12:14,16
 13:16
**typically** 14:20
 15:3 72:22
 126:1

**U**

**Uh-huh** 24:17
 44:22 65:3
 79:25 120:11
**ultimately** 127:2
**unclear** 128:21
**uncommon** 72:8
**under-** 41:3
**under-age** 29:22
 30:1,2 41:4
**underlined** 44:23
**undermines**
 88:21
**underneath**
 124:9
**undersigned**
 96:21
**understand** 5:3
 14:16 24:15
 29:17 39:7
 41:18 54:22
 59:10 81:10
 88:24 90:13
 128:11
**understanding**
 18:15 38:18
 66:6 69:15
 78:11 101:6
 105:21 120:12
 123:10,23
**understood** 5:7
**undue** 56:18,24
 57:8,10
**unintentional**
 54:4
**United** 1:1,22
**units** 10:13,17
 13:6
**universe** 39:3

university 1:8
  2:21 4:13 8:2,3
  8:25 9:1,3,4,11
  9:12,15,23 10:4
  10:22 18:17
  27:4 35:8 40:25
  48:16 49:20
  50:3 52:22
  64:11 66:22
  73:7 78:10
  119:3 123:17
  130:10
University's
  49:10 131:16
unlabeled 105:3
unrelated 124:10
  124:22 126:16
unresolved 23:10
  24:2,4
unsure 59:20
untrue 95:18,23
  95:25 96:7,11
  96:23
unusual 109:9
upcoming 127:1
update 120:2,6
  121:2 127:8
updates 72:12,23
urging 84:24
use 11:7,10 48:25
  49:10 50:23
  72:19 79:8

――――――
          V
――――――
vacated 31:3
vacating 66:12
  117:16
various 10:12
  84:24 86:22
  119:3
veiled 109:22
verbally 62:5
verbatim 77:11
  123:25
version 50:22

53:23 56:2,5,7
  98:19 122:4,7
versus 4:12 14:8
Vic 4:10 18:10
  35:22 42:10
  52:10 55:5
  100:13 105:1
  113:25 114:16
  126:13
Vice 10:8,14,25
  64:25
videoconference
  1:14,18
views 98:13
VINCENT-BR...
  1:9
violate 5:14 29:5
  29:16,19 30:3
  41:11 94:10
violated 17:8
  19:17 29:3,10
  29:12 41:9 42:2
  46:20 57:6 90:2
violating 54:25
violation 21:15
  25:4 28:15,17
  28:18,19 29:8
  29:10 56:20
  83:5 89:11,17
  89:22 90:9 91:5
  91:15 92:16,23
  93:1,8,19,23
  94:21,21 108:23
violations 23:11
  26:10,17 38:20
  46:10 89:25
visiting 34:2
void 31:3
VS 1:7
vwalczak@acl...
  2:7

――――――
          W
――――――
wait 5:15
waiting 129:16

waived 131:24
  132:13
Walczak 2:4 3:3
  4:8,10 52:14,18
  52:19 55:6,8,19
  56:3 57:17,21
  57:23 59:8,21
  60:4,11 81:15
  81:19 100:10,14
  100:16 101:17
  101:23 102:2
  103:12,18,24
  104:2,9,14,21
  104:25 105:11
  105:14 114:2,4
  114:18,21,24
  115:2 121:8,12
  121:17,20 124:4
  124:14,23 125:5
  125:7 126:19,24
  129:14,18 131:8
  131:22 134:16
walk 14:12 84:10
walked 84:5
want 7:4 8:14,20
  17:2,25 18:17
  24:21 25:8 37:2
  38:17 39:6
  41:22 45:11,15
  49:18 52:11
  53:24 56:16
  77:14 82:11,16
  85:25 86:16
  88:24 89:23
  99:23 100:7
  103:18 104:6,8
  104:9,14 105:15
  115:4 118:25
  119:1 121:2
  124:25 125:2
  127:18
wanted 34:13
  40:4 54:2 86:18
  103:22 128:18
  128:25 129:1

wasn't 60:14
  71:25 76:20
  86:6 87:23
  106:24
watching 20:10
way 17:25 49:22
  83:20 92:14
  110:3 129:8
  132:18
ways 29:25
  128:25
we'll 11:10 12:5
  22:12 32:9
  42:14 77:15
  97:12
we're 4:24 5:12
  6:2,3 11:5
  14:14 15:8
  18:18 19:7
  37:20 45:16
  59:7 63:3 95:12
  99:23 103:19
  104:11 105:11
  129:16 130:6
  131:9
we've 20:23
  23:14 24:20
  36:3 39:9 52:13
  119:16 126:15
  127:16
weeks 33:12,25
  116:14
weigh 110:3,5
Welcome 100:14
went 35:17 73:5
  94:18 117:17
Wentworth 9:5
weren't 76:21
  114:1 131:2
West 2:16 134:7
Western 1:1,22
whatsoever 13:15
WHEREOF
  132:20
widely 90:24 91:1

willing 97:18
wipe 66:14
wish 133:3
witness 12:1,2,7
  12:10 35:1 58:2
  95:4 126:20
  129:5 132:5,11
  132:15,20
witnesses 51:4
  59:1 60:9,16,18
  60:21,22 82:7
Witold 2:4
  134:16
wonderful 5:11
wondering 55:19
word 25:9 40:13
  40:15,17,18
  77:13 79:9
wording 80:10
words 21:25 22:8
  24:21 40:11
  83:2 93:15
work 8:11 34:8
  34:11 36:1,5
  59:16 69:14
  78:19 110:20
worked 8:18,24
  9:1,3,5,10,11,13
  75:22
working 20:10
works 122:17
world 100:15
  128:10
Worlds 2:8
worry 45:9
wouldn't 91:14
write 16:2 21:25
  85:4
writer 75:24
writing 62:4 77:5
  78:14
written 28:2,4,8
  29:12,18 47:13
  76:25 107:7,11
  113:20

MARLIN NABORS  -  7/1/2025

**wrote** 16:7 53:4
120:13

---
**X**
---
**Y**
---
**yeah** 6:20 8:16,22
11:3,24 15:12
20:19 37:4,4
42:14 46:16,23
47:3 49:5 52:14
52:18 58:18
60:7 61:7 64:5
74:22 77:12
81:12 84:13,13
88:13 90:5
94:18 95:7,11
95:14 96:21,22
97:11 101:22
104:24 105:4,13
114:4 115:1,22
124:14,20,23
125:5,12 131:5
**year** 10:5
**years** 45:1 48:5
**Yep** 131:10
**Yesterday** 7:18
**younger** 87:6

---
**Z**
---
**Zoom** 1:18

---
**0**
---
**1**
---
**1** 1:19 3:6 15:14
15:19 19:1,16
32:19 76:14
133:3
**10** 3:15 33:19,24
34:9,16 35:7
36:1 78:22
79:19 80:5,7,11
98:8 99:15,17
99:22 100:18
112:13 116:17

116:20 117:12
**10,000** 48:20
**100** 3:15
**102** 3:16
**103** 3:17
**10th** 117:10
**11** 3:16 102:1,1,3
**11:07** 1:19
**110** 3:18
**111** 3:19
**114** 3:20
**116** 3:21
**118** 3:22
**12** 3:17 103:1,3
105:2 106:20,21
120:2
**12:38** 57:22
**12:45** 57:19
**12:48** 57:22
**121** 3:23
**123** 3:24
**124** 3:25
**13** 3:18 110:11,13
**13412** 124:3
**138-** 81:16
**13854** 106:21
**13856** 36:8
**13878** 75:4
**13881** 44:6
**13886** 73:15
**13887** 81:14
**13889** 82:19
**13904** 82:19
**14** 3:19 111:19
112:3,4
**14034** 116:7
**14049** 99:16
**15** 3:6,20 112:20
114:15 115:3
**15-minute** 71:6
71:10
**1500** 2:16 134:7
**15219** 134:2
**15222** 2:6
**16** 3:21 82:12

114:20 116:6,8
**17** 3:22 83:24
84:9,12,14
88:12 118:2,6
**1788** 123:5
**18** 3:7,23 18:6,23
19:19 20:17
30:9 33:10,25
34:10,16 35:7
36:1 79:22 80:1
80:2,5,7,11
88:11,13 94:24
101:19,21
102:15 121:7
**18th** 25:2
**19** 3:24 95:16
98:2 123:4,6
**19102** 2:10
**19102-2186** 2:17
134:8

---
**2**
---
**2** 3:7 18:1,4 19:13
33:15 77:22
87:2
**2:25-CV-00524**
1:2
**20** 3:25 12:22
89:3 97:25
105:23 124:3
125:9
**200** 134:1
**2002** 8:9,23
**2020** 9:22
**2024** 9:22 22:22
82:13
**2025** 1:19 132:22
133:3,21 134:3
**215-592-1513**
2:11
**215-972-7777**
2:17 134:8
**23** 51:3 55:9,22
56:9 57:24 58:7
62:18,22 63:13

64:7 65:23 66:8
66:8 67:10,14
67:20 69:21
80:17 83:2
96:24 97:3,17
99:9 100:23
101:11 102:11
102:15 122:5,7
127:2,24
**23058** 2:5
**2365** 118:2
**2370** 118:1
**24** 116:13,20
**2437** 103:2
105:12
**2438** 105:12
**2439** 111:20
**24th** 116:18
**25** 13:8 35:10
64:14
**2595** 70:23
**2629** 50:11
**27** 101:12
**2863** 110:12

---
**3**
---
**3** 3:8 6:7,9 36:8,9
37:20 40:6
134:3
**3/6** 125:18
**3:00** 130:6 131:9
**3:05** 131:25
**30** 12:22 134:19
**36** 3:8 39:18
**364** 18:1
**38th** 2:16 134:7
**3rd** 132:21

---
**4**
---
**4** 3:3,9 17:19 19:3
19:13 24:20
25:17 31:13
32:23 33:8,10
38:10 44:5,5,8
44:20 58:9,10

59:11 62:14
65:19 67:14
77:17 83:1
84:18 97:15
98:24 105:17,18
105:19 106:1
108:1 114:19
123:17 127:23
128:21
**412-261-2323**
134:2
**412-681-7864** 2:6
**42** 40:6,11
**43** 40:6,11,21
41:11,19
**44** 3:9
**445** 134:1
**45** 104:6,7
**4th** 17:22 33:16
106:13

---
**5**
---
**5** 3:10 50:10,12
51:6 78:1
**50** 3:10
**57** 36:9
**570** 118:1
**5th** 107:20 111:2

---
**6**
---
**6** 3:11 70:23,24
78:17 98:3
**60** 15:9
**60173** 2:10
**65.1** 121:6,7,13
121:15
**6th** 111:2 112:10

---
**7**
---
**7** 3:12 73:14,16
**70** 3:11 19:14
**73** 3:12
**75** 3:13

---
**8**
---
**8** 3:13 75:4,5

76:15 80:17
98:17
**81** 3:14

| **9** |
|---|

**9** 3:14 81:14
83:24 88:7
99:20,22
**9.UPITT** 99:21