# EXHIBIT 24

Transcript of the Testimony of

# JENNIFER TUSCANO

July 3, 2025

## STUDENTS FOR JUSTICE IN PALESTINE AT PITT  VS UNIVERSITY OF PITTSBURGH



**412-261-2323**
**depo@akf.com**
**www.akf.com**

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 2:25-CV-00524

STUDENTS FOR JUSTICE IN          )
PALESTINE AT PITT,               )
                                 )
            Plaintiff,           )
                                 )
    VS.                          )
                                 )
UNIVERSITY OF PITTSBURGH; JOAN   )
GABEL, MARLIN NABORS, KARIN      )
ASHER, DaVAUGHN VINCENT-BRYAN,   )
MATTHEW LANDY, and JAMEY MENTZER,)
all in their official and        )
individual capacities,           )
                                 )
            Defendants.          )

DEPOSITION OF JENNIFER TUSCANO
VIA VIDEOCONFERENCE

    DEPOSITION taken before me, Mary J. Carney, a
Notary Public within and for the Commonwealth of
Pennsylvania, via Zoom videoconference, beginning at
12:03 p.m. on July 3, 2025, pursuant to Notice and to
be used pursuant to the Federal Rules of Civil
Procedure in the aforesaid cause of action, pending
in the United States District Court for the Western
District of Pennsylvania.

**2**

                    APPEARANCES

On Behalf of Plaintiff:
Solomon Furious Worlds, Esquire
Kirsten M. Hanlon, Esquire
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA  19102
215-592-1513
sfworlds@aclupa.org
khanlon@aclupa.org

Witold J. Walczak, Esquire
ACLU OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA  15222
412-681-7864
vwalczak@aclupa.org

On Behalf of Defendants:
Alexander R. Bilus, Esquire
Mary Hutchings, Esquire
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186
215-972-7777
alexander.bilus@saul.com
mary.hutchings@saul.com

Also Present:
J. Nicole Rhodes, Esquire
University of Pittsburgh

Emily Hoecker, Paralegal
ACLU of Pennsylvania

**3**

INDEX

EXAMINATION BY MX. WORLDS - PAGE 4

TUSCANO EXHIBITS INTRODUCED:
1 - PAGE 17
2 - PAGE 32
3 - PAGE 34
4 - PAGE 51
5 - PAGE 51
6 - PAGE 57
7 - PAGE 73

**4**

1    WHEREUPON, JENNIFER TUSCANO, of
2  lawful age, being by me first duly
3  sworn to testify the truth, the
4  whole truth, and nothing but the
5  truth, as hereinafter certified,
6  deposes and says as follows:
7  EXAMINATION:
8  BY MX. WORLDS
9    Q. Hello, Ms. Tuscano.  Just before we
10 really get into things, I'll just do an
11 introduction.  My name is Solomon Furious
12 Worlds, they/them pronouns.  I'm an
13 attorney here at the ACLU of Pennsylvania.
14 I'm an attorney specifically representing
15 Students for Justice in Palestine at Pitt
16 in the lawsuit against the University of
17 Pennsylvania.  Are you familiar with the
18 lawsuit that's going on between them?
19   **A. I am.**
20   Q. Okay, excellent.  Have you ever
21 been deposed before?
22   **A. I have.**
23   Q. Okay.  How many times?
24   **A. One.**
25   Q. What was the occasion?

5

1     **A. Termination of an employee.**
2     Q. That doesn't sound like it was a
3  fun occasion.
4     **A. It was not.**
5     Q. Well, I'm going to go through the
6  ground rules again.  You may have heard
7  these before, especially if you've been
8  through a deposition, but I think this
9  would be helpful.
10    MX. WORLDS:  Before I go through
11 those ground rules, actually, Sandy, just
12 to be sure, did you want to stipulate again
13 to the same?
14    MR. BILUS:  Yeah, we would like
15 to read and sign, and we can stipulate that
16 all objections are reserved except for as
17 to form, just like last time.  Thank you.
18    MX. WORLDS:  Yeah, of course.
19 Just wanted to get that done.
20    Q. (BY MX. WORLDS)  So some ground
21 rules, only one person should speak at a
22 time.  We'll do our best, everyone, we'll
23 all do our best to maintain that rule.  All
24 answers must be verbal.  And you should ask
25 for clarification if you don't understand a

6

1  question I ask you. If you answer, I'll
2  just assume that you understand, but always
3  feel free to ask for clarification.  And to
4  that end, if you later realize that you
5  misspoke or maybe you remember something
6  new or that you misremembered before,
7  always feel free to correct it.  It's
8  always better to correct it here and now
9  versus needing to correct it later.
10 Sandy, your attorney, is present.  I know
11 Nikki is also present.  I'm not sure
12 exactly Mary's role, but she said Sandy's
13 name, so I assume she's also part of the
14 team there.  You can request a break at any
15 time except for when I have already asked a
16 question and am waiting for an answer.  And
17 you must answer all questions truthfully
18 and to the best of your ability.
19 Do you understand all those rules as I've
20 laid them out?
21    **A. I do.**
22    Q. Excellent.  And are you taking any
23 medications or on any substances or have
24 any sort of conditions that may prevent you
25 from answering truthfully today?

7

1     **A. No.**
2     Q. Okay, excellent.  And I believe you
3  said you're at home?
4     **A. I am.**
5     Q. With a struggling AC system?
6     **A. Clarify, with no AC system.**
7     Q. I'm sorry, okay.  Excuse me, excuse
8  me.  I wouldn't want to oversell it.  Well,
9  if you need a break for water or ice or
10 just a cold rag, please let us know.  All
11 right.  Is anyone else in the room with
12 you?
13    **A. No.**
14    Q. No, okay.  And then do you have
15 your cell phone near you?
16    **A. I do.**
17    Q. Would it be possible for you to
18 just kind of move it a little bit away from
19 you?
20    **A. Sure.**
21    Q. Of course if an emergency comes up
22 --
23    **A. Yep.**
24    Q. Thanks.  And do you have any other
25 computers, laptops, tablets around you,

8

1  other communication devices like that?
2     **A. No.**
3     Q. No, okay.  Let's begin then.  So
4  did you do anything to prepare for this
5  deposition?
6     **A. No.**
7     Q. I saw you move closer to the
8  screen.  Are you having trouble hearing me
9  at all?
10    **A. I did on that one, Solomon, yeah.**
11    Q. Okay, let me -- give me one second
12 to make sure I'm not muting myself and
13 using the correct microphone.  Is this
14 better?
15    **A. No.**
16    Q. Is it worse?
17    **A. Yes.**
18    Q. Okay.  Then I'll speak up a little
19 bit and move a little closer to my laptop.
20    **A. Okay.**
21    Q. I'll ask that question again.  I'm
22 sorry, I got a little distracted.  Did you
23 do anything to prepare for this deposition?
24    **A. Only my meeting with Sandy and the**
25 **team yesterday.**

JENNIFER TUSCANO  -  7/3/2025

---

9

1    Q.  And when you say the team, do you
2  mean the legal team?
3    **A.  Correct.**
4    Q.  And about how long was that
5  meeting?
6    **A.  An hour and a half.**
7    Q.  Hour and a half, okay.  During that
8  meeting -- and now I'm going to be very
9  careful here the way I phrase this question
10  because I don't want to get into any
11  privileged information -- but during that
12  meeting did counsel go into great detail as
13  to how you are to answer questions?
14    **A.  No.**
15    MX. WORLDS:  Sandy, I see your
16  face, yeah.
17    MR. BILUS:  Yeah, let's try and
18  stay away from content.
19    MX. WORLDS:  I'll try, yeah.
20    MR. BILUS:  I'll note an
21  objection there, but, you know, she's
22  already answered.  But, yeah, go ahead.
23    MX. WORLDS:  Absolutely.  I
24  wasn't going to probe too deep there.  I
25  wasn't trying to get too much of the

---

10

1  content either.
2    MR. BILUS:  Okay.
3    Q.  (BY MX. WORLDS)  Okay.  Ms.
4  Tuscano, would you prefer that I refer to
5  you as Ms. Tuscano, Jen, Jenny from the
6  Block, I'm not sure what's --
7    **A.  Jen is good.**
8    Q.  Jen is good, excellent.  Could you
9  tell me a little bit about your higher
10  education, kind of post high school,
11  specifically what schools you went to and
12  the like?
13    **A.  I attended the University of
14  Pittsburgh at Johnstown, obtained my
15  undergraduate degree, and then attended the
16  Indiana University of Pennsylvania to
17  obtain a Master's degree.**
18    Q.  And what is your current role at
19  Pitt?
20    **A.  I am the Executive Associate
21  Athletic Director and Senior Women's
22  Administrator.**
23    Q.  Is that the highest position you've
24  held within the Pitt administration?
25    **A.  No.**

---

11

1    Q.  No.  What other positions kind of
2  in that realm, Pitt administration, have
3  you held?
4    **A.  I served as the Interim Athletic
5  Director in the fall.**
6    Q.  In any of -- have you ever, excuse
7  me, have you served in any other kind of
8  administrative roles within the University?
9    **A.  No.**
10    Q.  I'd say kind of like at the Dean
11  level or higher?  Just those two?
12    **A.  Correct, yep.**
13    Q.  During your time as the Interim
14  Athletic Director or during your time now
15  in your current role in the upper
16  administration, could you tell me a little
17  bit about your job responsibilities?
18    **A.  Actively work with members of our
19  Athletic Department to provide resources
20  and opportunities for student athletes and
21  coaches.**
22    Q.  Is that specific to the Athletics
23  Department; it doesn't go any further than
24  that?
25    **A.  Correct.**

---

12

1    Q.  All right.  Is there a disciplinary
2  process within the Athletics Department
3  specifically?
4    **A.  Can you clarify?**
5    Q.  Absolutely.  I know from my own
6  personal experience in working with
7  students across the Commonwealth that at
8  some schools there will be a disciplinary
9  process for the School of Law and then the
10  College of Liberal Arts and then the
11  Engineering School.  Sometimes they'll have
12  different disciplinary processes.  I'm not
13  sure if that's the case at Pitt.  Does the
14  Athletics Department perhaps have its own
15  separate from the main campus disciplinary
16  process?
17    **A.  Our student athletes participate in
18  the general student conduct process for any
19  violations that may or may not occur on
20  campus.**
21    Q.  That makes sense.  And of course
22  athletics isn't a school in the same way as
23  a College of Engineering, and so that
24  tracks.  What is your general experience
25  with the disciplinary processes at Pitt?

---

---

13

1  Student disciplinary processes, excuse me?
2  **A. I've served on the Level II Student**
3  **Conduct Hearing Board for about 18 months.**
4  Q. Eighteen, okay, 18 months. So when
5  you say you've served on the board for
6  about 18 months, to me, what I'm hearing is
7  like there's a general body perhaps that
8  maybe sits and it sounds like you sit for a
9  term; is that correct?
10  **A. Yeah, I -- there's no defined term**
11  **to my knowledge, Solomon.**
12  Q. Okay. Could you tell me about how
13  you got on the board?
14  **A. I was approached by Matt Landy and**
15  **asked if I'd be willing to serve on the**
16  **board.**
17  Q. Did Landy tell you why you were
18  approached?
19  **A. Not that I remember.**
20  Q. Not that, I'm not thinking there's
21  any conspiracy or anything; it just, it
22  sounds like a secret society, you get
23  tapped and then you get approached. I
24  think there's something kind of cool about
25  that. Is it just part of, because of your

---

14

1  role in Athletics, or is it because of how
2  long you've been at Pitt; do you have any
3  reason why?
4  **A. I don't have any reason why.**
5  Q. Okay, cool. Is this the first time
6  then that you've been on an 18-month stint
7  with the board?
8  **A. Correct.**
9  Q. And you said there aren't set
10  terms, which makes me think that your stint
11  on the disciplinary board is maybe done?
12  **A. No, I'm still an active member.**
13  Q. You're still an active member,
14  okay.
15  **A. Yep.**
16  Q. It's just been 18 months since you
17  started?
18  **A. Sure, yep.**
19  Q. Got it, thank you.
20  **A. Correct.**
21  Q. How familiar are you then with
22  student conduct in disciplinary matters?
23  **A. I would say somewhat familiar.**
24  Q. This is the first kind of time
25  you've been -- you've served in this

---

15

1  capacity?
2  **A. Yes.**
3  Q. How many disciplinary boards have
4  you been on?
5  **A. I don't know the exact number.**
6  Q. Could you give me an estimate?
7  **A. Less than five.**
8  Q. Okay, less than five, okay. Okay.
9  More than three?
10  **A. I don't believe.**
11  Q. So it sounds like even though
12  you've been on the board for 18 months, you
13  haven't been called on to kind of, to
14  active duty, if you will, many times?
15  **A. Correct.**
16  Q. Less than three times you've been
17  called up to be on what I, if I'm
18  understanding the verbiage correctly, an
19  individual panel for a specific
20  disciplinary instance?
21  **A. Correct.**
22  Q. So there's a larger board, but then
23  individual panelists will sit on individual
24  disciplinary matters?
25  **A. Correct.**

---

16

1  Q. Okay. Do you know how many people
2  are on the larger board?
3  **A. I don't know.**
4  Q. You said you've served on
5  disciplinary panels less than three times,
6  so either two or one. Do you -- were both
7  instances regarding student organizations
8  or individuals?
9  **A. I don't remember both of them. One**
10  **of them was regarding individuals and was**
11  **not a student organization.**
12  Q. Without revealing any, you know,
13  personal identifying information with
14  regards to that situation, could you tell
15  me a little bit about the disciplinary
16  conduct I guess alleged? Not necessarily
17  the facts related to it, but merely the,
18  maybe the charges -- excuse me, there we go
19  -- can you tell me about the charges that
20  were brought against that individual?
21  **A. I don't remember the charges.**
22  Q. Okay, thank you. One last
23  question. Members of this board who then
24  go on individual panels, do they serve for
25  disciplinary and academic infractions, or

---

17

1  only disciplinary?
2      A. I don't know.
3      Q. Okay. I said that was the last
4  question of the board. I'm going to stop
5  saying last question because I think I'll
6  just keep lying to you. Is there any
7  hierarchy on that board?
8      A. Not to my knowledge.
9      Q. Not to your knowledge, okay. All
10  right.
11      Kirsten, could you please bring up the
12  first document, the email to Jennifer from
13  Landy?
14  Mary, I am -- could you please mark this
15  document once we bring it up. And, Sandy,
16  just so you know, this is
17  UPITT 1777.
18      MR. BILUS: Thank you.
19      MS. HANLON: Can you see the
20  screen? Oh. Now can you see the screen?
21      MX. WORLDS: Now it's coming up,
22  yeah.
23      MS. HANLON: And, Sandy, can you
24  see the file in the Dropbox, too?
25      MR. BILUS: I'm checking. Yes,

18

1  thank you.
2      Q. (BY MX. WORLDS) Jen, are you able
3  to read this document or would you like us
4  to maybe zoom in some?
5      A. I can read it.
6      Q. Okay. Wonderful eyes, good. Do
7  you recognize this document?
8      A. I do.
9      Q. Could you describe what it is?
10      A. An email from Matt Landy confirming
11  training, and then if I had any previous
12  involvement with the SJP student
13  organization.
14      Q. Excellent. And am I to understand
15  from the content of this email that you had
16  no prior involvement with SJP?
17      A. Yes, that's correct.
18      Q. And that would, excuse me, and that
19  would be involvement prior to the February
20  4 disciplinary hearing; correct?
21      A. Correct.
22      Q. Yeah, because this email is dated
23  February 2. The training that Mr. Landy is
24  referring to, what is that training?
25      A. Implicit bias training.

19

1      Q. Implicit bias training. Okay, is
2  that standard for all faculty members or is
3  that, was that related to the Conduct
4  Board?
5      A. I don't know.
6      Q. You don't know. When did you take
7  this implicit bias training?
8      A. I don't remember. We -- it's
9  annual, an annual training for athletics,
10  but I don't remember --
11      Q. I see.
12      A. -- the date.
13      Q. Thank you.
14      And, Mary, I'm sorry, I keep speaking.
15  My
16  active listening skills are biting me in
17  the butt right now. I will do my best to
18  not talk at the same time as Jen.
19      And thank you for that clarification,
20  Jen.
21  So this training was about implicit bias,
22  not about any sort of specific training
23  pursuant to being on the Conduct Board?
24      A. Correct.
25      Q. Did you get any training when you

20

1  joined the Conduct Board?
2      A. I did.
3      Q. You did. What was that training
4  like?
5      A. Matt Landy reviewed policies and
6  procedures as a member of the board,
7  Hearing Board.
8      Q. Which policies and procedures?
9  There's lot of policies and procedures.
10      A. I don't remember.
11      Q. Yeah, that's -- there's a lot of
12  policies and procedures. Was it perhaps
13  the Student Code of Conduct, or was that
14  included?
15      A. I don't remember.
16      Q. You don't remember. Do you
17  remember how the University -- excuse me --
18  how Landy represented that the University
19  interprets its code?
20      A. Can you clarify?
21      Q. Yes, I can. I'm guessing that part
22  of what was described in this training was
23  the Student Code of Conduct because that
24  seems to be the main code with regards to
25  disciplinary matters. You'd agree it's the

21

1  main code; is that correct?
2     **A. Correct.**
3     Q. Yeah, it's got the policy and the
4  procedure in there. It has the various
5  substantive rules that students must
6  follow, if that makes sense. I'm curious to
7  know if Landy described how the school goes
8  about charging students for alleged
9  infractions?
10     **A. I don't remember.**
11     Q. You don't remember. Do you know if
12  Landy talked about the charging process at
13  all?
14     **A. I don't remember, I'm sorry,**
15  **Solomon.**
16     Q. No, that's okay. And feel -- do
17  not worry. Feel free to keep saying you
18  don't remember. I'm going to probably ask
19  you some other questions, too, to be frank,
20  I wouldn't remember either. I totally get
21  it.
22     In regards to the training, we both
23  assume, without actually knowing, that the
24  Code of Conduct was likely involved given
25  the topic. Do you think that -- excuse me,

22

1  not do you think -- do you recall if anyone
2  at any point talked about differences in
3  how the code is interpreted for individuals
4  versus student organizations?
5     **A. No, I don't remember.**
6     Q. Okay. Let's talk more specifically
7  about SJP Pitt's February 4 disciplinary
8  hearing.
9     Kirsten, we can take this down now. Thank
10  you. So when I say SJP, do you know who I'm
11  talking about?
12     **A. I do.**
13     Q. Excellent. So for purposes of the
14  rest of today, we, I can say SJP and that
15  means Students for Justice in Palestine at
16  Pitt?
17     **A. Yes.**
18     Q. Excellent, thank you. You are
19  familiar with the February 4 disciplinary
20  proceedings, I assume?
21     **A. Yes.**
22     Q. Excellent. How were you selected
23  for that particular panel?
24     **A. I don't know. I provided my**
25  **availability.**

23

1     Q. I see. So it seems like selection
2  for individual panels is based largely on
3  availability of the board members?
4     **A. I don't know.**
5     Q. You think? Yeah, you don't know?
6     **A. Right.**
7     Q. You don't know. That's fair,
8  that's fair.
9     **A. Yep.**
10     Q. Before you were on the panel, you
11  said that you had undergone implicit bias
12  training, per the last email we saw?
13     **A. Yes, correct.**
14     Q. Did they ask you questions about
15  any biases you may have with regards to the
16  student organization before you served on
17  this individual panel?
18     **A. Yes.**
19     Q. Did they ask you those same kind of
20  bias questions before you served on the
21  other panel that you were on?
22     **A. I don't remember.**
23     Q. You don't remember. Do you
24  remember any of the bias questions?
25     **A. No.**

24

1     Q. No. Do you remember how you felt
2  while you were answering those bias
3  questions?
4     **A. No, no feeling, just answered the**
5  **questions.**
6     Q. Okay. Sometimes you can get a
7  survey or a list of questions or have a
8  phone call with questions in it and you can
9  feel maybe like these questions are pretty
10  pedestrian, they seem pretty typical; or
11  perhaps they seem more tailored, they seem
12  more specific. Do you recall having any
13  impressions of any kind when you heard
14  them?
15     **A. Yeah, no impression either way.**
16     Q. No impression. Excellent. What
17  was your role in the disciplinary
18  proceedings?
19     **A. Hearing Officer.**
20     Q. Hearing Officer. How would you
21  describe the role of a Hearing Officer?
22  How would you describe the role?
23     **A. Listen to both sides during the**
24  **hearing process. Ask questions or**
25  **clarifications.**

25

1  Q. When you were on the -- when you
2  got the role -- not when you got the role.
3  As, in your role as a Hearing Officer, was
4  there ever a time when someone kind of
5  described to you what you were -- was there
6  ever a time when someone described to you
7  what you should be doing as a Hearing
8  Officer?
9       MR. BILUS: Object to form.
10  **A. No.**
11       MR. BILUS: Sorry. I just,
12  Mary, did you hear my objection?
13       THE COURT REPORTER: Yes.
14       MR. BILUS: Thank you.
15  Q. Got it. And thank you both for
16  that. You were never told -- could you
17  describe the expectations that, the
18  expectations for Hearing Officers?
19  **A. To fairly listen to both sides.**
20  Q. You said you would ask questions,
21  clarifying questions. Were you also or at
22  any point did those questions diverge into
23  more perhaps investigative?
24  **A. In this particular hearing, I don't**
25  **recall asking any questions.**

26

1  Q. Okay. Why didn't you ask any
2  questions?
3  **A. I didn't -- I didn't have any**
4  **questions based on information that had**
5  **been shared.**
6  Q. Okay, makes sense, makes sense.
7  You felt like both sides then pretty
8  adequately presented their arguments?
9       MR. BILUS: Objection to form.
10  **A. Correct.**
11  Q. Did you believe that both sides
12  were adequately -- did you believe both
13  sides, excuse me, adequately fleshed out
14  their arguments?
15       MR. BILUS: Object to the form.
16  You can answer.
17  **A. I believe they presented the**
18  **information that both sides had.**
19       MX. WORLDS: Good objection,
20  Sandy, thank you. I'm learning.
21  Q. (BY MX. WORLDS) All right. Have
22  you had any interactions with SJP since the
23  February 4 disciplinary hearing?
24  **A. Can you define interaction?**
25  Q. Yes, I can.

27

1  **A. Thank you.**
2  Q. Have you yourself had any -- have
3  you yourself communicated with them, as
4  opposed to them communicating with you or
5  you reading about something in the news,
6  but have you either in written, verbal,
7  through carrier pigeon, communicated with
8  the officers of SJP?
9  **A. No.**
10  Q. Before the hearing, how did you
11  prepare for your role?
12  **A. I didn't do anything.**
13  Q. Yeah. I was pretty sure, I was
14  pretty sure that was the answer. Earlier
15  you said you don't recall much from the
16  first disciplinary panel you sat on; is
17  that correct?
18  **A. Correct.**
19  Q. Though you don't recall much, do
20  you recall there being any major
21  differences in the way the processes worked
22  between that first panel and then the SJP
23  panel?
24  **A. No.**
25  Q. No. Do you recall anything unusual

28

1  happening during the SJP procedures?
2  Proceedings, excuse me?
3  **A. No.**
4  Q. Anything inappropriate?
5  **A. Can you define inappropriate?**
6  Q. How would you define inappropriate?
7  **A. Nothing out of the ordinary that I**
8  **can recall, Solomon.**
9  Q. I'm asking you of course because
10  it's, to me, it's really about your
11  impression.
12  **A. Sure.**
13  Q. I think inappropriate, much like
14  beauty, is in the eye of the beholder. So
15  did you recall, did you think that anyone
16  was unfair about how the process went
17  about?
18  **A. No.**
19  Q. How long would you say that
20  February 4 hearing was?
21  **A. Long. I don't recall a definitive**
22  **timeline, Solomon, without looking back at**
23  **my calendar.**
24  Q. Makes sense. It feels like
25  whenever you're in those kinds of

JENNIFER TUSCANO  -  7/3/2025

29

```
1    disciplinary proceedings, it just becomes a
2    void.  Any, did you receive any specific
3    instructions as to what to do, rather, how
4    to, how to weigh the evidence?
5        A. Not that I remember.
6        Q. And I believe you already answered
7    this, but any specific trainings for this
8    panel?
9        A. No.
10       Q. Okay, Kirsten, could you please
11   open up the document that we'll now mark as
12   Tuscano 2.
13   Sandy, it's 14054 through -57.  I believe
14   this is the document you sent us last
15   night; is that correct, Sandy?
16       MR. BILUS:  I'll have to look at
17   it once it comes up on the screen.
18       Q. I think it's, yeah, well, once it
19   comes up on screen, we'll talk about it.
20       MR. BILUS:  Looks like it.
21       Q. Yeah.  Jen, can you see this
22   document?
23       A. I can.
24       Q. And do you recognize it?
25       A. Yes.
```

30

```
1        Q. Excellent.  What is this document?
2        A. Those are my notes from the Conduct
3    Hearing.
4        Q. And this document, you said they're
5    your notes, so you drafted them?
6        A. Correct.
7        Q. When did you draft them?
8        A. During the Conduct Hearing.
9        Q. Okay.  The handwritten portion at
10   the top right, did you also draft that?
11       A. I did, yes.
12       Q. Do you believe these notes are
13   accurate?
14       A. Yes.
15       MR. BILUS:  Objection to form.
16       Q. When did you write the handwritten
17   portion of it in the top right?
18       A. I don't remember.
19       Q. Do you believe it would have been
20   the same day?
21       A. Yes.
22       Q. Would you like to -- actually I'd
23   like to give you an opportunity to read
24   through this document and then I actually
25   have some questions about the document.
```

31

```
1    Would you like us to zoom in on it so you
2    can read it better?
3        A. Please.
4        Q. Excellent.  Kirsten, could you
5    please?
6    Jen, feel free to ask Kirsten to scroll as
7    you're ready.
8        A. Okay.  Kirsten, you can scroll on
9    that, "Can you explain the cadence."
10   Kirsten, you can scroll again, please.  You
11   can scroll again, please, Kirsten.  I'm
12   ready, Kirsten, to scroll again.  You can
13   scroll again.
14       Good.  Complete.
15       Q. Thank you.  Sorry to do this, but,
16   Kirsten, could you please bring up unmarked
17   Exhibits, Conduct Board Recommendation
18   Form.
19       Sandy, I believe you should also have
20   access to that in the Dropbox.
21       And, Mary, I believe this should be
22   Tuscano 3 once we complete and mark things.
23   Thank you.
24   I'm going to bounce back and forth between
25   both of these documents and ask you
```

32

```
1    questions.  So this document is a little bit
2    longer, sorry.  If you could also read this
3    one over, that would be great.  Thank you.
4        A. You can scroll, Kirsten.  You can
5    scroll.  You can scroll.  You can scroll
6    for me.  You can scroll.  You can scroll.
7    You can scroll, Kirsten.  You can scroll.
8        I've completed reading this page, too,
9    Solomon.
10       Q. Thank you, Jen.
11       A. Yep.
12       Q. Let's go back to your notes.
13       A. Okay.
14       Q. Which, Mary, I'm not sure if I
15   asked to mark this as Tuscano 2, but just
16   in case I hadn't.
17   The handwritten portion on the first page
18   in the top right, towards the bottom of
19   that handwritten portion I read something
20   that says, "Why is there a conduct
21   violation."  Do you see that?
22       Kirsten, could you highlight that?
23       A. Yeah, oh, yep, gotcha.
24       Q. What did you mean when you wrote
25   that?
```

33

1    **A. That I didn't believe that the**
2    **complainant provided sufficient evidence or**
3    **information for me to determine whether a**
4    **conduct violation actually occurred.**
5         Q. Who --
6    **A. I'm sorry, say it again?**
7         Q. I'm sorry, I think when I moved my
8    papers it might have clogged my mic. I
9    asked, who is the complainant?
10   **A. David and DaVaughn.**
11        Q. David Day? David's last name I
12   believe is Day; correct, D-A-Y?
13   **A. I believe so.**
14        Q. I believe we're talking about the
15   same person, I just want to make sure.
16   Give me one moment, please.
17   I believe we are talking about the same
18   person, but for now we'll just keep
19   referring to this individual as David.
20   **A. Okay.**
21        Q. David and DaVaughn were the
22   complainants, and were they representing
23   themselves as the complainants, they as
24   individuals were complainants or --
25   **A. I don't know.**

34

1         Q. So it's unclear as to whether or
2    not David and DaVaughn were in fact
3    representing an office or the University or
4    themselves?
5    **A. No, it was clear they were**
6    **representative of the offices outlined in**
7    **the other document. Sorry, I don't know the**
8    **-- how you're phrasing them or categorizing**
9    **them, but the second document that you**
10   **asked me to read, they were representing**
11   **those two offices.**
12        Q. Kirsten, could you please move to
13   the Conduct Recommendation, or the Conduct
14   Board Recommendation. Thank you. Could
15   you scroll to the top, please.
16   Now, you said that it was clear that they
17   were representing which office now?
18   **A. Student Involvement and Student**
19   **Organizations and Advising.**
20        Q. I'm reading this testimony that was
21   just highlighted that's on this, that's on
22   Tuscano 3, is what we're calling it, the
23   Recommendation Form, and I believe I see it
24   says the complainant in this case is
25   University of Pittsburgh. Do you think

35

1    it's possible that David Day and DaVaughn
2    were representing the University of
3    Pittsburgh in this matter?
4         MR. BILUS: Objection to the
5    form.
6         Q. You can still answer.
7    **A. I'm sorry, Solomon?**
8         Q. I said you can still answer.
9    **A. Yes.**
10        Q. Thank you. Let's go back to the
11   prior document,
12   Kirsten. Thank you. Okay, so as you said
13   earlier, you wrote,
14   "Why is there a conduct violation" on your
15   notes, you hand-wrote that because you
16   didn't think that the complainant, the
17   University of Pittsburgh, had presented
18   sufficient information to prosecute its
19   case basically?
20   **A. Correct.**
21        MR. BILUS: Object to the form.
22   Go ahead.
23   **A. Yes.**
24        Q. Thank you. What information did
25   DaVaughn and David Day present?

36

1    **A. Can you clarify?**
2         Q. Yes. In what ways did you believe
3    that the information was -- strike that.
4    We'll move on.
5    In the presentations between SJP and the
6    University of Pittsburgh during the
7    February 4 hearing, were there important
8    factual differences?
9         MR. BILUS: Object to form.
10        MX. WORLDS: Could you specify,
11   Sandy?
12        MR. BILUS: Sorry?
13        MX. WORLDS: Will you specify?
14        MR. BILUS: Vague. Ambiguous.
15        Q. (BY MX. WORLDS) When the
16   University of Pittsburgh presented its
17   recitation of the facts -- excuse me.
18   During the February 4 hearing, did the
19   University of Pittsburgh present factual
20   evidence? Did it present its side of the
21   story?
22   **A. Yes.**
23        Q. Did SJP present its side of the
24   story?
25   **A. Yes.**

37

1    Q. Were there differences between both
2  sides of the story?
3    A. Yes.
4    Q. What were those differences?
5    A. The event or lack thereof event and
6  the perception based on both sides, how
7  they viewed it.
8    Q. It's my understanding from your
9  notes that there wasn't clarity as to what
10  an event was; is that correct?
11    A. Correct.
12    MR. BILUS:  Objection to form.
13  Go ahead.
14    Q. Is that correct?
15    A. Yes.
16    Q. Per your reading of your notes?
17    A. Yes.
18    Q. And is that what you recall from
19  your own recollection?
20    A. That is what I recall.
21    Q. Did SJP present arguments during
22  the hearing? Did it argue on its own behalf
23  that it didn't -- you know, anything, did
24  it argue on its own behalf with regard to
25  its own side of the story?

38

1    A. Yes.
2    Q. Yes.  Did it argue why it should
3  not be found responsible for the charges
4  against it?
5    A. Yes.
6    Q. Do you remember those arguments?
7    A. They believed that what occurred in
8  the library was not defined as an event or
9  that it violated library policy.
10    Q. Did SJP mention that they felt
11  targeted by Pitt?
12    A. Yes.
13    Q. Did they say that they felt
14  targeted based on their political views?
15    A. I don't remember.
16    Q. Did SJP ever mention an
17  organization called Betar USA?
18    A. I don't remember.
19    Q. Do you remember SJP bringing up
20  anything about a bomb threat against the
21  organization?
22    A. I don't remember.
23    Q. Okay.  Did SJP argue that Pitt was
24  overly surveilling them?
25    A. Yes.

39

1    Q. Did SJP argue that the policies
2  were perhaps inconsistent as applied to
3  them?
4    A. Yes.
5    Q. Did SJP argue that the policies
6  were vague or perhaps hard to understand?
7    A. I don't remember.
8    Q. Did SJP argue that the hearing and
9  charges set a dangerous precedent for free
10  speech?
11    A. Yes.
12    Q. Did SJP ask you to find them not
13  responsible for the charges?
14    A. Yes.
15    Q. Did they ask you to dismiss the
16  charges?
17    A. I don't remember.
18    Q. Were there any instructions to SJP
19  after the hearing from the University?  Do
20  you recall any instructions to SJP after
21  the hearing?
22    A. I don't recall.
23    Q. You don't recall.  I suppose I know
24  the answer here.  I initially asked from
25  Pitt, but did the panel give them any

40

1  specific instructions?
2    A. No.
3    Q. Do you recall -- I guess this, I
4  also know the answer to this -- do you
5  recall whether anyone specifically
6  communicated to SJP that they were not to
7  communicate with the panel?
8    A. I don't know.
9    Q. You don't -- I'm going to re-ask
10  that question. I'm going to see if I can --
11  did anyone -- excuse me.  You don't recall
12  or are you -- you don't recall whether
13  someone gave SJP that instruction, or are
14  you saying no one gave SJP that
15  instruction?
16    A. I --
17    MR. BILUS:  Object to the form.
18  Go ahead.
19    A. I don't know.
20    Q. Remember?
21    MR. BILUS:  Objection to form.
22    THE COURT REPORTER:  Excuse me,
23  I'm not sure I heard that question.  I just
24  heard, "Remember."
25    MX. WORLDS:  I asked, "You don't

41

1  remember?" But I will ask again.
2       THE COURT REPORTER: And then
3  there was an objection. Okay, thank you.
4       Q. (BY MX. WORLDS) Was SJP instructed
5  not to communicate with panelists?
6       **A. I don't know.**
7       Q. You don't know. Thank you. Sorry
8  for that confusion. Did the panelists
9  receive any instructions from the
10  University after the hearing?
11      **A. Can you clarify?**
12      Q. Did you ask me to clarify or did
13  you say did you?
14      **A. Yeah, can you clarify or be --**
15      Q. Yes. I may not be able to. Did
16  the University give you any instructions at
17  all after the -- after the hearing, with
18  regards to the hearing?
19      **A. Only as it relates to next steps**
20  **for our deliberations and completion of the**
21  **form that you've shared on the screen.**
22      Q. And what were the next steps that
23  they talked about?
24      **A. Panel was to meet, discuss the**
25  **hearing, and make -- and complete the form.**

42

1       Q. Did the panel ever get a chance to
2  meet?
3       **A. Yes.**
4       Q. When did the panel meet?
5       **A. Immediately following the hearing.**
6       Q. Like ten minutes following the
7  hearing or --
8       **A. Immediately following the hearing.**
9       Q. Less than ten minutes following?
10  Okay.
11      **A. Yeah, from what I can remember.**
12      Q. Okay. What was that meeting like?
13      **A. The panelists discussed the**
14  **hearing.**
15      Q. Was there consensus early on?
16      MR. BILUS: Objection to the
17  form.
18      Q. Did the panel, did the panelists
19  ever reach consensus as to rationale or
20  conclusion?
21      **A. I don't believe we reached full**
22  **consensus.**
23      Q. It sounds like you believe there
24  may have been a partial consensus?
25      **A. I don't believe we completed our**

43

1  **process before being notified to end our**
2  **process with the hearing.**
3       Q. During the discussions immediately
4  following that February 4 hearing, what was
5  your impression of the hearing?
6       **A. Can you repeat that first part,**
7  **Solomon?**
8       Q. During that immediate conversation
9  following the hearing, what was your
10  impression of the hearing? How did you
11  express your thoughts about SJP's
12  disciplinary hearing?
13      **A. My initial thoughts were that the**
14  **complainants did not adequately provide**
15  **information or evidence related to a**
16  **library policy violation.**
17      Q. Had you been the only panelist, you
18  were the czar of the panel, you could have
19  decided right then and there in that
20  immediate moment, would you have found SJP
21  responsible?
22      MR. BILUS: Object to the form.
23      Q. Please answer the question.
24      **A. Can you repeat it for me, Solomon?**
25      Q. In the immediate aftermath, had you

44

1  been the sole panelist, would you have --
2  how would you have found for SJP,
3  responsible or not responsible, with
4  regards to the allegations?
5       MR. BILUS: Object to the form.
6       Q. Please answer.
7       **A. I can still answer?**
8       Q. Yes.
9       **A. I wouldn't -- I wouldn't say in the**
10  **immediate, Solomon, without reviewing my**
11  **notes post. But if I were the only**
12  **panelist, I do believe I would have found**
13  **SJP not responsible for a policy violation.**
14      Q. Kirsten, could we look at the
15  recommendation form.
16      Jen, do you recognize this document?
17      **A. Yes.**
18      Q. Kirsten, could you quickly, not too
19  quickly, but with some pace scroll through
20  this document again just to show Jen that
21  this is the document she read not too long
22  ago.
23  And I'm sorry, Jen, I don't know that I
24  caught your pronouns at the beginning of
25  this. Do you use she/her pronouns?

45

1      A. I do.
2      Q. Excellent, thank you. Just, you
3   understand this is the document you read
4   not too long ago, Jen?
5      A. Yes.
6      Q. Excellent, thank you.
7      Kirsten, you can go back to the top of
8      the
9   document. You said you recognize this
10   document?
11      A. Yes.
12      Q. What is this document?
13      A. A Conduct Board Recommendation
14   Form.
15      Q. When's the first time you saw this
16   document? Do you recall seeing this
17   document before today?
18      A. I do.
19      Q. Do you remember when that was?
20      A. On a Zoom with the other panelists.
21      Q. Do you know who made this document?
22      A. One of the other panelists.
23      Q. Do you recall which one?
24      A. Zach Davis.
25      Q. Zach Davis. Is Zach Davis -- do

46

1   you know who the author is of this, of the
2   -- not the form aspect of the form, but the
3   entry, the entries as it were, do you know
4   who authored that?
5      A. Do you mean the content?
6      Q. That's the word I'm looking for.
7   Thank you.
8      A. Zach Davis.
9      Q. Zach. Did Zach get your input
10   while authoring this?
11      A. Yes.
12      Q. How many panelists were there
13   during the February 4 hearing?
14      A. Three including myself.
15      Q. So it was you, Zach, and then who
16   was the third?
17      A. Carlton Scott.
18      Q. Carlton Scott. Two first names.
19   Did Carlton also have a hand in drafting
20   this?
21      A. Yes.
22      Q. This document seems to be, seems to
23   be pretty far along in the drafting
24   process. Where would you say this document
25   is in the drafting process?

47

1         MR. BILUS: Object to the form.
2      Q. Could you say? Could you say where
3   this document is in the drafting process?
4      A. Pretty far along.
5      Q. That's a good answer. Okay, so
6   just to recap, Zach was the one who was
7   actually typing into the document; correct?
8      A. That is correct.
9      Q. As he was typing into the document,
10   though, you and Carlton were weighing in;
11   is that correct?
12      A. That is correct.
13      Q. During that drafting process, was
14   it difficult to come to final language?
15   Well, was it difficult to come to the
16   language that ultimately we're reading
17   today?
18         MR. BILUS: Object to the form.
19      A. No.
20      Q. Sandy said, "Object to the form,"
21   but, Jen, you just said, "No"; is that
22   correct?
23      A. Correct.
24      Q. Thank you. Did the group discuss a
25   recommended outcome?

48

1      A. Yes.
2      Q. And all of this, the conversation,
3   the drafting, and the discussion of the
4   recommended outcome, that was all in the
5   immediate Zoom call after the February 4
6   hearing? Or excuse me. Was that all in
7   the immediate call after the February 4
8   hearing?
9      A. Yes.
10      Q. You said you discussed a
11   recommended outcome. What was that
12   discussion like?
13      A. Discussion revolved around whether
14   there was an actual library policy
15   violation. We discussed.
16      Q. And --
17      A. But did not finalize or generate a
18   recommendation from the panel. We didn't
19   get to a conclusion from the panel.
20      Q. You didn't get to a conclusion from
21   the panel. What was your view during that
22   discussion? Excuse me. What was your view
23   during that discussion?
24      A. Can you clarify?
25      Q. What was your view during that

49

1  discussion with regards to the outcome?
2      **A. That it was unclear whether there**
3  **was a violation, policy violation or not.**
4      Q. What was Zach's view during the
5  discussion with regards to the outcome?
6      **A. I don't remember.  You'd have to**
7  **ask him.**
8      Q. Carlton's view?
9      **A. I don't remember.**
10     Q. Thank you.  Did you share these
11 findings with anyone?
12     **A. No.**
13     Q. I'm going to re-ask that question.
14 I think I'll get the same answer.  Did you
15 share these findings with anyone in Pitt's
16 upper administration?
17     **A. I did not.**
18     Q. Anyone in Student Conduct?
19     **A. Did I share them with anyone?**
20     Q. Did you, yes, yes, ma'am.
21     **A. I did not.**
22     Q. Are you aware of whether Zach or
23 Scott, excuse me, Zach or Carlton -- two
24 first names -- whether Zach or Carlton
25 shared them with anyone in Pitt's upper

50

1  administration or anyone in Student
2  Conduct?
3      **A. Shared, can you clarify?  Did**
4  **either of those two share this form; is**
5  **that what you're asking me?**
6      Q. Yes, ma'am, that's what I'm asking.
7      **A. I don't know.**
8      Q. Thank you.  Was that the only --
9  excuse me. Immediately after the February 4
10 panel, you and the other two panelists got
11 together to deliberate and created the
12 draft of the recommendation form that I see
13 before me, before us all; is that correct?
14     **A. Yes.**
15     Q. Did you get the occasion to meet
16 any other times?
17     **A. Yes.**
18     Q. When was the next time you all met?
19     **A. I don't remember.**
20     Q. Kirsten, I'm sorry to do this to
21 you because it's going to be a little out
22 of order, but could you please bring up
23 what was previously I believe marked as 6
24 but we'll now mark as 5.
25 And, Mary, could we please mark this next

51

1  document as Tuscano 5. Sandy, it's UPITT
2  14030 to 31.
3          MR. BILUS:  I think we skipped a
4  4. (The court reporter asked for
5  clarification.)
6          MX. WORLDS:  Yes, this is the
7  correct document, Kirsten.  Thank you.
8          MR. BILUS:  So we're going to
9  mark Bates No. 14030 as Exhibit 4?
10         MX. WORLDS:  Yes, that is
11 correct. Thank you.  Sorry, everybody,
12 about the confusion.
13     Q. (BY MX. WORLDS)  Kirsten, could you
14 scroll down to the bottom.  Because it's an
15 email, it makes sense to read it from
16 bottom to top.
17     And, Jen, if you could just read over
18 this.
19     **A. Okay, I've read it.**
20     Q. Okay, thank you.
21     **A. You can scroll.**
22     Q. Excellent.  Jen, is this document
23 -- do you know what this document is?
24     **A. Yes.**
25     Q. What is it?

52

1      **A. An email exchange between Marlin**
2  **and the panel with Matt Landy copied.**
3      Q. It looks like Marlin's email is
4  dated February 6 to everybody; is that
5  correct?
6      **A. Can you scroll down?  Correct.**
7      Q. Excellent.  So Dean Nabors sent the
8  email to you on, sent this email to you on
9  February 6 then.  This email is asking the
10 panel to pause its deliberation?
11 Kirsten, could you please highlight that?
12 It's near the middle of what Nabors had
13 said.
14     Asks that you pause any ongoing
15 deliberations or preparations of any
16 written record of findings; is that
17 correct?
18     **A. Correct.**
19     Q. Okay.  I'm showing you this email
20 because you said you weren't sure when you
21 would have met with the rest of the panel.
22 We know that the hearing was on the 4th.
23 We know that Nabors sent you and the rest
24 of the panel this email on the 6th, which
25 means that you likely met on the 5th; would

53

1  you say that that's probable?
2   **A. Yes.**
3   Q. Excellent. Do you recall what a
4  meeting on the 5th would have been about?
5  Excuse me. Please let me rephrase that
6  question. Do you recall any specifics
7  about what a meeting on February 5 with the
8  panelists, what the contents of that
9  meeting would have been, what you would
10  have discussed with them?
11   **A. Yes.**
12   Q. Will you please describe it?
13   **A. Continued work on the conduct form**
14  **draft.**
15   Q. So the document that we marked as
16  3, the recommendation form, that is the
17  work of you, Zach, and Carlton in your
18  meetings immediately after the February 4
19  panel and then on a meeting that took place
20  on February 5; is that correct?
21   **A. Yes.**
22   Q. Excellent, thank you. And thank
23  you for going along with me with that
24  email.
25  Kirsten, could you please present the Open

54

1  Letter? Sandy, this is UPITT 527. And,
2  Mary, could we please mark this as
3  Tuscano 5. On the screen you'll see that
4  the title has a 4 in front of it. Please
5  disregard that 4. This is Tuscano 5.
6   Jen, have you seen this before?
7   **A. Yes.**
8   Q. Do you know what it is?
9   **A. Yes.**
10   Q. Could you tell us what it is?
11   **A. A letter from SJP.**
12   Q. For purposes of today's deposition,
13  do you mind if we refer to it as the Open
14  Letter?
15   **A. Yes, good.**
16   Q. I know that was a trick question.
17  I said do you mind.
18   **A. Yeah, I was going to say, no, I**
19  **don't mind.**
20   Q. Okay, thank you, thank you.
21   **A. Yep.**
22   Q. Would you like -- actually I'll
23  give you a chance to read over it if you
24  could. For my purposes, it's not very
25  important if you read the To, From, and CC

55

1  line. If you'd like to read them, please
2  feel free, but it's really the body of the
3  message.
4   **A. You can scroll, please, Kirsten.**
5   Q. And for your own awareness, we can
6  of course continue to scroll to the bottom
7  of this document, but I only intend to ask
8  you about contents on the first page.
9   **A. Okay.**
10   Q. You let me know when you're ready.
11   **A. I'm ready, Solomon.**
12   Q. Excellent, thank you. You're a
13  recipient of the Open Letter; correct?
14   **A. Yes.**
15   Q. What did you do when you first saw
16  it?
17   **A. Read it.**
18   Q. Normal response to email. How did
19  you react when you read it?
20   **A. No real --**
21   Q. Did you react? Excuse me, did you
22  react?
23   **A. I did not.**
24   Q. Why not?
25   **A. Because I believed my role on the**

56

1   **Hearing Board was to determine whether a**
2   **University library policy violation**
3   **occurred.**
4   Q. Did you communicate with anyone,
5  after reading the letter, about the letter?
6   In the immediate, you know --
7   **A. No.**
8   Q. Okay, thank you, thank you. I'm
9  aware that there were some communications,
10  I mean, we just saw one.
11   **A. Sure.**
12   Q. So when you first got the letter,
13  you read it, didn't think much of it and
14  you didn't immediately reach out to someone
15  to communicate with them; is that correct?
16   **A. That is --**
17    MR. BILUS: Object to the form.
18   Q. Please answer.
19   **A. That is correct.**
20   Q. Thank you. When was the first time
21  you spoke to someone from the University
22  about the letter?
23   **A. I don't remember.**
24   Q. Did you speak with the co-
25  panelists about the letter?

57

1    Jen, before you answer that question,
2  Kirsten, could you please pull up document
3  No. 6, which will remain document No. 6.
4    For you, Sandy, once I find it, it is
5  UPITT 2439.
6  And, Mary, could we please mark this as
7  Tuscano 6. Thank you. Jen, could you take
8  a moment and read over
9  this document, please?
10   **A. Yes. You can scroll, Kirsten,**
11  **please. You can scroll, please.**
12   Q. That's the document. Thank you,
13  Kirsten.
14  We'll stay on this document for now. But
15  talking about the Open Letter, did you get
16  a chance to speak with panelists about the
17  Open Letter before a University Dean or
18  someone from the administration reached out
19  to you about it?
20   **A. Yes.**
21   Q. What was that conversation like?
22   **A. Acknowledgment that we received it.**
23   Q. Acknowledged it. Was there any
24  other kind of group reaction with regards
25  to the Open Letter?

58

1    **A. No.**
2    Q. Did the Open Letter influence at
3  all how you thought about the February 4
4  hearing?
5    **A. No.**
6    Q. Do you recall whether the letter,
7  whether Zach had any sort of strong, or had
8  any reaction, excuse me, at all, to the
9  Open Letter?
10   **A. I don't recall.**
11   Q. Do you recall if Carlton had any
12  reaction to the Open Letter?
13   **A. I don't recall.**
14   Q. You just read over Tuscano 6. Am I
15  saying your last name correctly, Tuscano?
16   **A. Tuscano, "can" instead of "cahn".**
17   Q. Thank you. It's not fun to hear
18  your name mispronounced the entire way, the
19  entire time. Tuscano, thank you. Tuscano 6
20  -- I'm working on it -- you just read over
21  it. Have you seen this document before?
22   **A. No.**
23   Q. No. Do you know what it is,
24  though, from reading it?
25   **A. From the parts where it has my name**

59

1  **indicated, I recall those questions being**
2  **asked of me in a phone call by Marlin**
3  **Nabors.**
4    Q. Okay. These are notes from Marlin
5  Nabors in conversations that he had with
6  you and conversations that he had with Zach
7  and Carlton. The portions that are of
8  course yours, are they correct and accurate
9  to the best of your recollection?
10   **A. Yes, to the best of my**
11  **recollection.**
12    MR. BILUS: Object to the form.
13  Go ahead.
14   **A. Yes.**
15   Q. From what you've read, is the
16  content, does the content reflect the
17  conversations you had with Zach?
18   **A. Yes.**
19   Q. Does the content reflect what the
20  conversations you had with Carlton?
21   **A. Yes.**
22   Q. Excellent.
23   Kirsten, could you please go back to
24  the
25  Open Letter. Kirsten, I'm sorry, let's go

60

1  back to the document we were on. Okay,
2  appreciate it. Let's scroll to the top.
3    In this document we see that Carlton
4  in
5  particular was concerned with threatening
6  language that was used during the February
7  4 panel. Do you see instances of that in
8  this document? If you'd like I can --
9    MR. BILUS: Object to the form.
10  I'm sorry, I didn't mean to cut you off,
11  Solomon. Go ahead.
12   Q. That's okay. If you'd like, I can
13  direct you to a few places, if that would
14  be helpful?
15   **A. Please, yes, please.**
16   Q. Kirsten, on Page 1, if you go to
17  Carlton.
18    So the second question, "Did you talk
19  about the email during deliberations?"
20  Carlton's answer, the one, two, third line,
21  it says, "The other board members didn't
22  understand it in the same way I did. My
23  concern was there should be something where
24  they shouldn't be able to do that - speak
25  to Hearing Board members in that capacity.

61

```
 1      Similar to saying to jurors that 'watch
 2   what you decide' because I have all these
 3   people behind me.  You should be aware.  We
 4   didn't need to be on that email."
 5       Carlton's, is it fair to say Carlton's
 6   concerned here; right?  He literally used
 7   the words, "My concern"?
 8      A.  Yes.
 9      Q.  He references language used when
10   they, which I assume is SJP, spoke to the
11   Hearing Board members.  Would you agree
12   with that assessment? Would you like me to
13   resay that?
14      A.  Yeah.
15      Q.  That's okay.  Carlton is
16   referencing SJP's words to the panelists;
17   is that correct?
18      MR. BILUS:  Are you -- are you
19   just -- I mean, she's never seen this
20   document before and wasn't on the phone
21   call that this was, these are notes about.
22   Are you just asking her to read it and give
23   you her interpretation?
24      MX. WORLDS:  No, I'm not just
25   asking her to read it and give her
```

62

```
 1   interpretation. I'm -- my plan is to ask if
 2   this comports with some of the
 3   conversations that she had with Carlton.  I
 4   know that we've gotten a yes on that
 5   already, but I want to get into the details
 6   because I think the details are important.
 7      MR. BILUS:  What was your
 8   question again?
 9      Q.  (BY MX. WORLDS)  According to
10   Carlton here per Nabors' notes, he had
11   concern with some of the language that SJP
12   used during the February 4 hearing.  Is
13   that your understanding from the
14   highlighted information there, Jen?
15      MR. BILUS:  I'll object.  But,
16   Jen, go ahead and answer if you can.
17      A.  Yes.
18      Q.  Do you recall conversations with
19   Carlton where he discussed issues that he
20   had with SJP's words and rhetoric during
21   the February 4 hearing?
22      A.  Yes.
23      Q.  Do you recall what comments
24   specifically he took issue with?
25      A.  I don't recall.
```

63

```
 1      Q.  Later on in the next paragraph, the
 2   question posed is, "Did you talk about the
 3   fact that it could influence the board
 4   during deliberations?"  Zach's response is,
 5   "No.  Their comments during the hearing was
 6   more problematic."  Do you recall Zach
 7   expressing issue or concern with comments
 8   SJP representatives made during the
 9   February 4 hearing?
10      A.  No, I don't recall.
11      Q.  Now I'm ready to go back to the
12   Open Letter, Kirsten, thank you.
13   You read over the Open Letter today.  In
14   doing so, was there anything that stood out
15   to you?
16      A.  No.
17      Q.  And if I recall correctly, nothing
18   stood out to you when you first received
19   the letter; is that correct?
20      A.  That is correct.
21      Q.  We earlier referenced a pause in
22   adjudication, or rather, excuse me, in
23   deliberation, and I believe we looked at an
24   email from Nabors asking the panelists to
25   pause; is that correct?
```

64

```
 1      A.  That's correct.
 2      Q.  From your understanding, why was
 3   the panelists, why was the panel, excuse
 4   me, asked to pause deliberations?
 5      A.  From my understanding, it was due
 6   to the Open Letter sent to the panelists.
 7      Q.  Okay.  Kirsten, you can stop
 8   sharing your screen now.  Thanks.
 9      MR. BILUS:  Solomon, at this
10   point we've been going for an hour and a
11   half.  Do you have a lot left, or should we
12   take a break?
13      MX. WORLDS:  You know what, this
14   is actually a perfect time for a pause.
15   Let's take maybe ten minutes, come back at,
16   eleven minutes, come back at 1:45?
17      MR. BILUS:  Sounds great.
18      MX. WORLDS:  Thanks, everyone.
19      THE WITNESS:  Thank you. (A
20   recess was taken 1:36 to 1:48 p.m.)
21      Q.  (BY MX. WORLDS)  All right, now
22   we're back from the break.  I think we're
23   probably into our final descent.  So let's
24   kind of do some timeline, just let's go
25   over the timeline for a second, please.
```

65

1   The hearing, SJP's hearing was on February
2   4, the one that you were a panelist on;
3   correct, Jen?
4       A. Yes.
5       Q. And it's your opinion that the
6   University of Pittsburgh was unable to
7   sustain its burden at that -- sustain its
8   burden to show that SJP was responsible for
9   the conduct violations for which they were
10  alleged to have committed?
11      MR. BILUS: Object to the form.
12      Q. Please answer.
13      A. Yes.
14      Q. Okay, thank you. And you got the
15  Open Letter that evening on February 4; is
16  that correct?
17      A. Yes.
18      Q. When did you read the letter?
19      A. When I received it.
20      Q. Did you read it that night then,
21  the night of February 4?
22      A. I don't remember.
23      Q. If you didn't read it the 4th,
24  would you have read it on February 5th?
25      A. Yes.

66

1       Q. Excellent. And the letter had no
2   bearing on your thoughts as to the February
3   4 panel; is that correct?
4       MR. BILUS: Object to the form.
5       A. That is correct.
6       Q. You stated earlier that it hadn't
7   -- that it didn't change your views on the
8   February 4 panel; is that correct?
9       A. Yes.
10      Q. Do you recall it changing the views
11  of either of the other panelists, Carlton
12  or Zach?
13      A. No.
14      Q. Right after the February 4 panel
15  proceedings, you and the other panelists
16  you said met together to begin writing in
17  the recommendation form document that we
18  saw earlier; is that correct?
19      A. Yes.
20      Q. Was that meeting over Zoom?
21      A. Yes.
22      Q. And were all three of you writing
23  in the document at the same time?
24      A. No.
25      Q. Was the document, it was over Zoom,

67

1   so was the document maybe shown via screen
2   share or something like that?
3       A. Yes.
4       Q. And if I recall correctly, you said
5   Zach was the author, so Zach was the one
6   actually typing into the document?
7       A. Yes.
8       Q. While Zach was typing into the
9   document, were you giving input?
10      A. Yes.
11      Q. As was Carlton?
12      A. Yes.
13      Q. Where was that document saved?
14  Excuse me, do you know where that document
15  was saved?
16      A. No.
17      Q. Do you know if it lived on -- I
18  guess you just said no, so you don't know
19  if it lived on Zach's computer or perhaps
20  in whatever cloud system Pitt uses?
21      A. I don't know.
22      Q. And by cloud, I mean of course
23  being a drive or something like that.
24  You're not aware of it being on any --
25      A. I am not aware, no.

68

1       Q. Okay. Did you ever have access to
2   that document?
3       A. I believe I would have had access
4   while it was being shared on a screen, but
5   I don't recall, Solomon.
6       Q. Access to edit the document while
7   it was shared on the screen?
8       A. I believe -- not actually via Zoom,
9   right, with the document pulled up. But I
10  do recall the ability, if in fact the
11  document was pulled up on my computer, that
12  I could see Zach entering information on my
13  computer.
14      Q. That seems to suggest that the
15  document was somewhere that you could have
16  edited it then, if you could see and type?
17      A. Perhaps. But I don't -- don't know
18  where and couldn't tell you how to access
19  it.
20      Q. Right, right. If that's the case
21  then, and you said it wasn't through a
22  screen share, which means it was probably
23  in an application outside of Zoom that you
24  were viewing this document?
25      A. I don't know.

69

1    Q. You don't know. Okay, that's fine.
2  If the document -- I'm trying to
3  understand what you mean when you say that
4  you could see him typing in, so this may
5  seem -- are you familiar with Google Docs,
6  in general?
7    A. Vaguely, yeah.
8    Q. Have you ever worked in a Google
9  Doc document before where you can see
10 someone else typing while you're also
11 typing?
12   A. I have.
13   Q. Are you familiar that Microsoft has
14 a similar system called SharePoint where
15 they have an online version of Word or
16 Excel similar to the Google Suite where you
17 can do similar things?
18   A. Vaguely, yes.
19   Q. All right. Do you think it's
20 possible that you would have had the
21 document open in an application like that
22 or perhaps on your browser, looking at
23 something like that?
24   A. Yes, I do think it's possible.
25   Q. If you're looking, if you're able

70

1  to see what's being typed, and perhaps even
2  if you had the ability to comment or edit,
3  does that seem likely that it was something
4  akin to that, versus, you know, certainly
5  versus a screen share on Zoom?
6    A. Yes.
7    Q. On February 5, the day after the
8  SJP's proceedings, you met with the other
9  co-panelists; is that correct?
10   A. Yes.
11   Q. During that meeting you discussed
12 the letter, the Open Letter, excuse me; is
13 that correct?
14   A. Yes.
15   Q. And again, all panelists said that
16 they wouldn't -- that the Open Letter
17 didn't change the way they viewed that
18 February 4 hearing; is that correct?
19   A. Can you repeat the question for me,
20 Solomon?
21   Q. Yes. Yeah, just, just confirming
22 what you said earlier, which is that
23 neither you nor Carlton nor Zach thought
24 that the Open Letter changed your views
25 with regards to the February 4 hearing?

71

1        MR. BILUS: Are you asking what
2  they said during the February 5 call or
3  meeting that they had or --
4    Q. Yes.
5        MR. BILUS: Or what they
6  thought?
7    Q. I'm asking what they -- I'm asking
8  what they said. I think that's a little
9  bit of semantics, but I'm asking what, what
10 they represented, what they -- I assume
11 what they said was what they thought, which
12 is why I think it's a little bit of
13 semantics there, but I'll rephrase the
14 question. Did the panelists say that the
15 Open Letter, the other two panelists, did
16 they say that the Open Letter had no -- it
17 didn't change their view with regards to
18 the February 4 hearing?
19   A. Correct, yes.
20   Q. Okay, excellent. Did any of the
21 panelists suggest pausing deliberations
22 because of the Open Letter?
23   A. No.
24   Q. Do you think that the process
25 should have been paused because of the Open

72

1  Letter?
2    A. No.
3    Q. Do you recall whether Zach or
4  Carlton thought that the process should
5  have been paused because of the Open
6  Letter?
7    A. I don't recall.
8    Q. When Nabors emailed you on the 6th
9  asking you and Scott and Zach to pause
10 deliberations, was that the first time a
11 pause came up?
12   A. Yes.
13   Q. Did you work on it at all after --
14 excuse me -- did you work on the
15 recommendations, on that recommendation
16 form at all after receiving that email from
17 Nabors?
18   A. No.
19   Q. So that means starting on February
20 6, you stopped working on that
21 recommendation form; is that correct?
22   A. Yes.
23   Q. Kirsten, could you please pull up
24 the late February email. And could you
25 also tell us what Bates number that is?

73

1    I'm sorry, I didn't write that down.
2         MS. HANLON:  Yes, it's 14034.
3    And I will share that in the Dropbox, too.
4         Q.  And this will be Tuscano 7.  Please
5    scroll to the bottom of this one, too,
6    since it's an email, please.  Thank you,
7    Kirsten.
8    This email, well, once you're done reading
9    this, Jen, we can scroll up.
10        **A.  You can scroll up.  You can scroll
11   up.  I've read it.**
12        Q.  Excellent.  Does this document look
13   familiar to you?
14        **A.  It does.**
15        Q.  Do you recognize it as an email to
16   Dean Nabors from Zach, your co-panelist,
17   with you and Scott cc-ed on it?
18        **A.  Yes.**
19        Q.  Excuse me, you and Carlton cc-ed on
20   it, excuse me.  The contents of this email,
21   it seems that Zach is asking for an update
22   with regards to the hearing panel; is that
23   correct?
24        **A.  Yes.**
25        Q.  Did you ever get an update?

74

1         **A.  I don't recall.**
2         Q.  Did you ever end up working on the
3    recommendation form between that February 6
4    date and this, I believe this is February
5    24 when this email was sent?
6         **A.  No.**
7         Q.  And has there been any work on that
8    document since February 24?
9         **A.  Not to my knowledge.**
10        Q.  Not to your knowledge, okay.  I
11   believe one more, maybe not one more, but I
12   do have a few other questions.
13        Kirsten, could you please pull up
14   Tuscano's hearing notes.  I believe that's
15   -- I'm not going to guess the number.
16        MS. HANLON:  2.
17        Q.  2, yes, thank you, Tuscano 2.  On
18   Page 3, near the middle, this is connected
19   to Jonathan Engel's -- Kirsten, could you
20   scroll up just a little bit, please -- just
21   for context, this is connected to your
22   notes on Jonathan Engel, the library
23   faculty member, I believe your notes during
24   his testimony.
25   I see a note you've written here towards

75

1    the end of this section of notes, I see the
2    question, "Have you ever witnessed in
3    non-reservable spaces groups in that
4    space?" And then it seems to be an answer
5    afterwards, it says, "Saw a sorority group
6    advertising for a study-in."  Can you see
7    the highlighted text?
8         **A.  Yes.**
9         Q.  Could you please give us a little
10   bit of context about what, what this means?
11    I'm not entirely -- I'm not entirely sure
12   what this means.
13        **A.  Based on my notes, Solomon, the
14   question was asked of Jonathan if he had
15   ever witnessed, in other non-reservable
16   spaces in the library, if he ever saw
17   groups in that area.  His response was that
18   he saw a sorority group advertising for a
19   study-in.**
20        Q.  Do you remember anything else about
21   this question and answer?
22        **A.  I'm sorry, I don't.**
23        Q.  Okay.  And is this a question that
24   you asked or is this a question that
25   someone else asked?

76

1         **A.  Someone else asked.**
2         Q.  Do you recall who asked the
3    question?
4         **A.  I don't.**
5         MX. WORLDS:  Those are all the
6    questions.  Thank you.
7         MR. BILUS:  And I have no
8    questions. I think we can close the
9    deposition.
10   (Signature having not been waived, the
11   deposition was concluded at 2:03 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JENNIFER TUSCANO - 7/3/2025

77

1  COMMONWEALTH OF PENNSYLVANIA   )
                                  ) CERTIFICATE
2  COUNTY OF ALLEGHENY            ) SS:
3     I, Mary J. Carney, RMR and Notary Public in and
4  for the Commonwealth of Pennsylvania, do hereby
5  certify that the witness, JENNIFER TUSCANO, was by me
6  first duly sworn to testify to the truth; that the
7  foregoing deposition was taken at the time and place
8  stated herein; and that the said deposition was
9  recorded stenographically by me and then reduced to
10 printing under my direction, and constitutes a true
11 record of the testimony given by said witness.
12    I further certify that the inspection, reading
13 and signing of said deposition were NOT waived by
14 counsel for the respective parties and by the
15 witness.
16    I further certify that I am not a relative or
17 employee of any of the parties, or a relative or
18 employee of either counsel, and that I am in no way
19 interested directly or indirectly in this action.
20    IN WITNESS WHEREOF, I have hereunto set my hand
21 and affixed my seal of office this 8th day of July,
22 2025.
23    _____
24              Notary Public
25

78

1  COMMONWEALTH OF PENNSYLVANIA  ) E R R A T A
   COUNTY OF ALLEGHENY           ) S H E E T
2
3     I, JENNIFER TUSCANO, have read the foregoing
   pages of my deposition given on July 3, 2025, and
   wish to make the following, if any, amendments,
4  additions, deletions or corrections:
5  Pg. No.  Line No.    Change and reason for change:
6
7
8
9
10
11
12
13
14
15
16
17 In all other respects, the transcript is true and
   correct.
18
   _____
19              JENNIFER TUSCANO
20
   Subscribed and sworn to before me this
21 _____ day of _____, 2025.
22
   _____
23        Notary Public
          Reference No. MC62101
24
25

79

1        AKF TECHNOLOGIES
         445 Fort Pitt Boulevard, Suite 200
2        Pittsburgh, PA  15219
         412-261-2323
3
         July 8, 2025
4
5
   TO:  Jennifer Tuscano
6     c/o Alexander R. Bilus, Esquire
      SAUL EWING LLP
7     Centre Square West
      1500 Market Street, 38th Floor
8     Philadelphia, PA  19102-2186
      215-972-7777
9     alexander.bilus@saul.com
10    RE:  DEPOSITION OF JENNIFER TUSCANO
11    NOTICE OF NON-WAIVER OF SIGNATURE
12    Please have the deponent read her deposition
   transcript.  All corrections are to be noted on the
13 preceding Errata Sheet.
14    Upon completion of the above, the deponent must
   affix her signature on the Errata Sheet, and it is to
15 then be notarized.
16    Please forward the signed original of the Errata
   Sheet to Solomon Furious Worlds, Esq. for attachment
17 to the Original Transcript, which is in their
   possession.  Send a copy of same to all counsel, and
18 also a copy to me.
19    Please return the completed Errata Sheet within
   thirty (30) days of receipt hereof.
20
21
   Mary J. Carney, RMR
22 Court Reporter
23
24
25

JENNIFER TUSCANO - 7/3/2025

Page 80

## A

ability 6:18 68:10
70:2
able 18:2 41:15
60:24 69:25
Absolutely 9:23
12:5
AC 7:5,6
academic 16:25
access 31:20 68:1
68:3,6,18
accurate 30:13
59:8
Acknowledged
57:23
Acknowledgme...
57:22
ACLU 2:5,9,23
4:13
action 1:2,21
77:19
active 14:12,13
15:14 19:16
Actively 11:18
actual 48:14
additions 78:4
adequately 26:8
26:12,13 43:14
adjudication
63:22
administration
10:24 11:2,16
49:16 50:1
57:18
administrative
11:8
Administrator
10:22
advertising 75:6
75:18
Advising 34:19
affix 79:14
affixed 77:21
aforesaid 1:21
aftermath 43:25

age 4:2
ago 44:22 45:4
agree 20:25 61:11
ahead 9:22 35:22
37:13 40:18
59:13 60:11
62:16
AKF 79:1
akin 70:4
Alexander 2:14
79:6
alexander.bilus...
2:17 79:9
allegations 44:4
alleged 16:16
21:8 65:10
ALLEGHENY
77:2 78:1
Ambiguous 36:14
amendments
78:3
annual 19:9,9
answer 6:1,16,17
9:13 26:16
27:14 35:6,8
39:24 40:4
43:23 44:6,7
47:5 49:14
56:18 57:1
60:20 62:16
65:12 75:4,21
answered 9:22
24:4 29:6
answering 6:25
24:2
answers 5:24
APPEARANC...
2:1
application 68:23
69:21
applied 39:2
appreciate 60:2
approached
13:14,18,23
area 75:17

argue 37:22,24
38:2,23 39:1,5,8
arguments 26:8
26:14 37:21
38:6
Arts 12:10
ASHER 1:9
asked 6:15 13:15
32:15 33:9
34:10 39:24
40:25 51:4 59:2
64:4 75:14,24
75:25 76:1,2
asking 25:25 28:9
50:5,6 52:9
61:22,25 63:24
71:1,7,7,9 72:9
73:21
Asks 52:14
aspect 46:2
assessment 61:12
Associate 10:20
assume 6:2,13
21:23 22:20
61:10 71:10
athletes 11:20
12:17
Athletic 10:21
11:4,14,19
athletics 11:22
12:2,14,22 14:1
19:9
attachment 79:16
attended 10:13
10:15
attorney 4:13,14
6:10
author 46:1 67:5
authored 46:4
authoring 46:10
availability 22:25
23:3
aware 49:22 56:9
61:3 67:24,25
awareness 55:5

## B

back 28:22 31:24
32:12 35:10
45:7 59:23 60:1
63:11 64:15,16
64:22
based 23:2 26:4
37:6 38:14
75:13
basically 35:19
Bates 51:9 72:25
bearing 66:2
beauty 28:14
beginning 1:18
44:24
behalf 2:3,13
37:22,24
beholder 28:14
believe 7:2 15:10
26:11,12,17
29:6,13 30:12
30:19 31:19,21
33:1,12,13,14
33:17 34:23
36:2 42:21,23
42:25 44:12
50:23 63:23
68:3,8 74:4,11
74:14,23
believed 38:7
55:25
best 5:22,23 6:18
19:17 59:9,10
Betar 38:17
better 6:8 8:14
31:2
bias 18:25 19:1,7
19:21 23:11,20
23:24 24:2
biases 23:15
Bilus 2:14 5:14
9:17,20 10:2
17:18,25 25:9
25:11,14 26:9
26:15 29:16,20

30:15 35:4,21
36:9,12,14
37:12 40:17,21
42:16 43:22
44:5 47:1,18
51:3,8 56:17
59:12 60:9
61:18 62:7,15
64:9,17 65:11
66:4 71:1,5
76:7 79:6
bit 7:18 8:19 10:9
11:17 16:15
32:1 71:9,12
74:20 75:10
biting 19:16
Block 10:6
board 13:3,5,13
13:16 14:7,11
15:12,22 16:2
16:23 17:4,7
19:4,23 20:1,6,7
23:3 31:17
34:14 45:13
56:1 60:21,25
61:11 63:3
boards 15:3
body 13:7 55:2
bomb 38:20
bottom 32:18
51:14,16 55:6
73:5
Boulevard 79:1
bounce 31:24
Box 2:5,9
break 6:14 7:9
64:12,22
bring 17:11,15
31:16 50:22
bringing 38:19
brought 16:20
browser 69:22
burden 65:7,8
butt 19:17

**C**

c/o 79:6
cadence 31:9
cahn 58:16
calendar 28:23
call 24:8 48:5,7
  59:2 61:21 71:2
called 15:13,17
  38:17 69:14
calling 34:22
campus 12:15,20
capacities 1:10
capacity 15:1
  60:25
careful 9:9
Carlton 46:17,18
  46:19 47:10
  49:23,24 53:17
  58:11 59:7,20
  60:3,17 61:15
  62:3,10,19
  66:11 67:11
  70:23 72:4
  73:19
Carlton's 49:8
  60:20 61:5,5
Carney 1:16 77:3
  79:21
carrier 27:7
case 12:13 32:16
  34:24 35:19
  68:20
categorizing 34:8
caught 44:24
cause 1:21
CC 54:25
cc-ed 73:17,19
cell 7:15
Centre 2:15 79:7
certainly 70:4
CERTIFICATE
  77:1
certified 4:5
certify 77:5,12,16
chance 42:1

54:23 57:16
change 66:7
  70:17 71:17
  78:5,5
changed 70:24
changing 66:10
charges 16:18,19
  16:21 38:3 39:9
  39:13,16
charging 21:8,12
checking 17:25
Civil 1:2,20
clarification 5:25
  6:3 19:19 51:5
clarifications
  24:25
clarify 7:6 12:4
  20:20 36:1
  41:11,12,14
  48:24 50:3
clarifying 25:21
clarity 37:9
clear 34:5,16
clogged 33:8
close 76:8
closer 8:7,19
cloud 67:20,22
co- 56:24
co-panelist 73:16
co-panelists 70:9
coaches 11:21
code 20:13,19,23
  20:24 21:1,24
  22:3
cold 7:10
College 12:10,23
come 47:14,15
  64:15,16
comes 7:21 29:17
  29:19
coming 17:21
comment 70:2
comments 62:23
  63:5,7
committed 65:10

Commonwealth
  1:17 12:7 77:1
  77:4 78:1
communicate
  40:7 41:5 56:4
  56:15
communicated
  27:3,7 40:6
communicating
  27:4
communication
  8:1
communications
  56:9
complainant 33:2
  33:9 34:24
  35:16
complainants
  33:22,23,24
  43:14
complete 31:14
  31:22 41:25
completed 32:8
  42:25 79:19
completion 41:20
  79:14
comports 62:2
computer 67:19
  68:11,13
computers 7:25
concern 60:23
  61:7 62:11 63:7
concerned 60:5
  61:6
concluded 76:11
conclusion 42:20
  48:19,20
conditions 6:24
conduct 12:18
  13:3 14:22
  16:16 19:3,23
  20:1,13,23
  21:24 30:2,8
  31:17 32:20
  33:4 34:13,13

35:14 45:13
  49:18 50:2
  53:13 65:9
confirming 18:10
  70:21
confusion 41:8
  51:12
connected 74:18
  74:21
consensus 42:15
  42:19,22,24
conspiracy 13:21
constitutes 77:10
content 9:18 10:1
  18:15 46:5
  59:16,16,19
contents 53:8
  55:8 73:20
context 74:21
  75:10
continue 55:6
Continued 53:13
conversation
  43:8 48:2 57:21
conversations
  59:5,6,17,20
  62:3,18
cool 13:24 14:5
copied 52:2
copy 79:17,18
correct 6:7,8,9
  8:13 9:3 11:12
  11:25 13:9 14:8
  14:20 15:15,21
  15:25 18:17,20
  18:21 19:24
  21:1,2 23:13
  26:10 27:17,18
  29:15 30:6
  33:12 35:20
  37:10,11,14
  47:7,8,11,12,22
  47:23 50:13
  51:7,11 52:5,6
  52:17,18 53:20

55:13 56:15,19
  59:8 61:17
  63:19,20,25
  64:1 65:3,16
  66:3,5,8,18 70:9
  70:13,18 71:19
  72:21 73:23
  78:17
corrections 78:4
  79:12
correctly 15:18
  58:15 63:17
  67:4
counsel 9:12
  77:14,18 79:17
COUNTY 77:2
  78:1
course 5:18 7:21
  12:21 28:9 55:6
  59:8 67:22
court 1:1,22
  25:13 40:22
  41:2 51:4 79:22
created 50:11
curious 21:6
current 10:18
  11:15
cut 60:10
czar 43:18

**D**

D-A-Y 33:12
dangerous 39:9
date 19:12 74:4
dated 18:22 52:4
DaVAUGHN 1:9
  33:10,21 34:2
  35:1,25
David 33:10,11
  33:19,21 34:2
  35:1,25
David's 33:11
Davis 45:24,25
  45:25 46:8
day 30:20 33:11

33:12 35:1,25
70:7 77:21
78:21
**days** 79:19
**Dean** 11:10 52:7
57:17 73:16
**decide'** 61:2
**decided** 43:19
**deep** 9:24
**Defendants** 1:11
2:13
**define** 26:24 28:5
28:6
**defined** 13:10
38:8
**definitive** 28:21
**degree** 10:15,17
**deletions** 78:4
**deliberate** 50:11
**deliberation**
52:10 63:23
**deliberations**
41:20 52:15
60:19 63:4 64:4
71:21 72:10
**Department**
11:19,23 12:2
12:14
**deponent** 79:12
79:14
**deposed** 4:21
**deposes** 4:6
**deposition** 1:13
1:16 5:8 8:5,23
54:12 76:9,11
77:7,8,13 78:3
79:10,12
**descent** 64:23
**describe** 18:9
24:21,22 25:17
53:12
**described** 20:22
21:7 25:5,6
**detail** 9:12
**details** 62:5,6

**determine** 33:3
56:1
**devices** 8:1
**differences** 22:2
27:21 36:8 37:1
37:4
**different** 12:12
**difficult** 47:14,15
**direct** 60:13
**direction** 77:10
**directly** 77:19
**Director** 10:21
11:5,14
**disciplinary** 12:1
12:8,12,15,25
13:1 14:11,22
15:3,20,24 16:5
16:15,25 17:1
18:20 20:25
22:7,19 24:17
26:23 27:16
29:1 43:12
**discuss** 41:24
47:24
**discussed** 42:13
48:10,15 53:10
62:19 70:11
**discussion** 48:3
48:12,13,22,23
49:1,5
**discussions** 43:3
**dismiss** 39:15
**disregard** 54:5
**distracted** 8:22
**District** 1:1,1,22
1:23
**diverge** 25:22
**Doc** 69:9
**Docs** 69:5
**document** 17:12
17:15 18:3,7
29:11,14,22
30:1,4,24,25
32:1 34:7,9
35:11 44:16,20

44:21 45:3,9,10
45:12,16,17,21
46:22,24 47:3,7
47:9 51:1,7,22
51:23 53:15
55:7 57:2,3,9,12
57:14 58:21
60:1,3,8 61:20
66:17,23,25
67:1,6,9,13,14
68:2,6,9,11,15
68:24 69:2,9,21
73:12 74:8
**documents** 31:25
**doing** 25:7 63:14
**draft** 30:7,10
50:12 53:14
**drafted** 30:5
**drafting** 46:19,23
46:25 47:3,13
48:3
**drive** 67:23
**Dropbox** 17:24
31:20 73:3
**due** 64:5
**duly** 4:2 77:6
**duty** 15:14

_____
**E**
_____
**E** 78:1,1,1
**earlier** 27:14
35:13 63:21
66:6,18 70:22
**early** 42:15
**edit** 68:6 70:2
**edited** 68:16
**education** 10:10
**Eighteen** 13:4
**either** 10:1 16:6
21:20 24:15
27:6 50:4 66:11
77:18
**eleven** 64:16
**email** 17:12 18:10
18:15,22 23:12

51:15 52:1,3,8,8
52:9,19,24
53:24 55:18
60:19 61:4
63:24 72:16,24
73:6,8,15,20
74:5
**emailed** 72:8
**emergency** 7:21
**Emily** 2:22
**employee** 5:1
77:17,18
**Engel** 74:22
**Engel's** 74:19
**Engineering**
12:11,23
**entering** 68:12
**entire** 58:18,19
**entirely** 75:11,11
**entries** 46:3
**entry** 46:3
**Errata** 79:13,14
79:16,19
**especially** 5:7
**Esq** 79:16
**Esquire** 2:4,4,8
2:14,14,21 79:6
**estimate** 15:6
**evening** 65:15
**event** 37:5,5,10
38:8
**everybody** 51:11
52:4
**evidence** 29:4
33:2 36:20
43:15
**EWING** 2:15
79:6
**exact** 15:5
**exactly** 6:12
**EXAMINATI...**
3:4 4:7
**Excel** 69:16
**excellent** 4:20
6:22 7:2 10:8

18:14 22:13,18
22:22 24:16
30:1 31:4 45:2
45:6 51:22 52:7
53:3,22 55:12
59:22 66:1
71:20 73:12
**exchange** 52:1
**excuse** 7:7,7 11:6
13:1 16:18
18:18 20:17
21:25 26:13
28:2 36:17
40:11,22 48:6
48:22 49:23
50:9 53:5 55:21
58:8 63:22 64:3
67:14 70:12
72:14 73:19,20
**Executive** 10:20
**Exhibit** 51:9
**Exhibits** 3:7
31:17
**expectations**
25:17,18
**experience** 12:6
12:24
**explain** 31:9
**express** 43:11
**expressing** 63:7
**eye** 28:14
**eyes** 18:6

_____
**F**
_____
**face** 9:16
**fact** 34:2 63:3
68:10
**facts** 16:17 36:17
**factual** 36:8,19
**faculty** 19:2
74:23
**fair** 23:7,8 61:5
**fairly** 25:19
**fall** 11:5
**familiar** 4:17

14:21,23 22:19
69:5,13 73:13
**far** 46:23 47:4
**February** 18:19
18:23 22:7,19
26:23 28:20
36:7,18 43:4
46:13 48:5,7
50:9 52:4,9
53:7,18,20 58:3
60:6 62:12,21
63:9 65:1,15,21
65:24 66:2,8,14
70:7,18,25 71:2
71:18 72:19,24
74:3,4,8
**Federal** 1:20
**feel** 6:3,7 21:16
21:17 24:9 31:6
55:2
**feeling** 24:4
**feels** 28:24
**felt** 24:1 26:7
38:10,13
**file** 17:24
**final** 47:14 64:23
**finalize** 48:17
**find** 39:12 57:4
**findings** 49:11,15
52:16
**fine** 69:1
**first** 4:2 14:5,24
17:12 27:16,22
32:17 43:6
45:15 46:18
49:24 55:8,15
56:12,20 63:18
72:10 77:6
**five** 15:7,8
**fleshed** 26:13
**Floor** 2:16 79:7
**follow** 21:6
**following** 42:5,6
42:8,9 43:4,9
78:3

**follows** 4:6
**foregoing** 77:7
78:2
**form** 5:17 25:9
26:9,15 30:15
31:18 34:23
35:5,21 36:9
37:12 40:17,21
41:21,25 42:17
43:22 44:5,15
45:14 46:2,2
47:1,18,20 50:4
50:12 53:13,16
56:17 59:12
60:9 65:11 66:4
66:17 72:16,21
74:3
**Fort** 79:1
**forth** 31:24
**forward** 79:16
**found** 38:3 43:20
44:2,12
**frank** 21:19
**free** 6:3,7 21:17
31:6 39:9 55:2
**front** 54:4
**full** 42:21
**fun** 5:3 58:17
**Furious** 2:4 4:11
79:16
**further** 11:23
77:12,16

——————
**G**
**GABEL** 1:8
**general** 12:18,24
13:7 69:6
**generate** 48:17
**give** 8:11 15:6
30:23 33:16
39:25 41:16
54:23 61:22,25
75:9
**given** 21:24 77:11
78:3

**giving** 67:9
**go** 5:5,10 9:12,22
11:23 16:18,24
32:12 35:10,22
37:13 40:18
45:7 59:13,23
59:25 60:11,16
62:16 63:11
64:24
**goes** 21:7
**going** 4:18 5:5
9:8,24 17:4
21:18 31:24
40:9,10 49:13
50:21 51:8
53:23 54:18
64:10 74:15
**good** 10:7,8 18:6
26:19 31:14
47:5 54:15
**Google** 69:5,8,16
**gotcha** 32:23
**gotten** 62:4
**great** 9:12 32:3
64:17
**ground** 5:6,11,20
**group** 47:24
57:24 75:5,18
**groups** 75:3,17
**guess** 16:16 40:3
67:18 74:15
**guessing** 20:21

——————
**H**
**H** 78:1
**half** 9:6,7 64:11
**hand** 46:19 77:20
**hand-wrote**
35:15
**handwritten** 30:9
30:16 32:17,19
**Hanlon** 2:4 17:19
17:23 73:2
74:16
**happening** 28:1

**hard** 39:6
**hear** 25:12 58:17
**heard** 5:6 24:13
40:23,24
**hearing** 8:8 13:3
13:6 18:20 20:7
22:8 24:19,20
24:21,24 25:3,7
25:18,24 26:23
27:10 28:20
30:3,8 36:7,18
37:22 39:8,19
39:21 41:10,17
41:18,25 42:5,7
42:8,14 43:2,4,5
43:9,10,12
46:13 48:6,8
52:22 56:1 58:4
60:25 61:11
62:12,21 63:5,9
65:1,1 70:18,25
71:18 73:22
74:14
**held** 10:24 11:3
**Hello** 4:9
**helpful** 5:9 60:14
**hereinafter** 4:5
**hereof** 79:19
**hereunto** 77:20
**hierarchy** 17:7
**high** 10:10
**higher** 10:9 11:11
**highest** 10:23
**highlight** 32:22
52:11
**highlighted** 34:21
62:14 75:7
**Hoecker** 2:22
**home** 7:3
**hour** 9:6,7 64:10
**Hutchings** 2:14

——————
**I**
**ice** 7:9
**identifying** 16:13

**II** 13:2
**immediate** 43:8
43:20,25 44:10
48:5,7 56:6
**immediately** 42:5
42:8 43:3 50:9
53:18 56:14
**implicit** 18:25
19:1,7,21 23:11
**important** 36:7
54:25 62:6
**impression** 24:15
24:16 28:11
43:5,10
**impressions**
24:13
**inappropriate**
28:4,5,6,13
**included** 20:14
**including** 46:14
**inconsistent** 39:2
**INDEX** 3:1
**Indiana** 10:16
**indicated** 59:1
**indirectly** 77:19
**individual** 1:10
15:19,23,23
16:20,24 23:2
23:17 33:19
**individuals** 16:8
16:10 22:3
33:24
**influence** 58:2
63:3
**information** 9:11
16:13 26:4,18
33:3 35:18,24
36:3 43:15
62:14 68:12
**infractions** 16:25
21:9
**initial** 43:13
**initially** 39:24
**input** 46:9 67:9
**inspection** 77:12

instance 15:20
instances 16:7
  60:7
instructed 41:4
instruction 40:13
  40:15
instructions 29:3
  39:18,20 40:1
  41:9,16
intend 55:7
interaction 26:24
interactions
  26:22
interested 77:19
Interim 11:4,13
interpretation
  61:23 62:1
interpreted 22:3
interprets 20:19
INTRODUCED
  3:7
introduction 4:11
investigative
  25:23
involved 21:24
involvement
  18:12,16,19
  34:18
issue 62:24 63:7
issues 62:19

**J**

J 1:16 2:8,21 77:3
  79:21
JAMEY 1:9
Jen 10:5,7,8 18:2
  19:18,20 29:21
  31:6 32:10
  44:16,20,23
  45:4 47:21
  51:17,22 54:6
  57:1,7 62:14,16
  65:3 73:9
Jennifer 1:13 4:1
  17:12 77:5 78:2

78:19 79:5,10
Jenny 10:5
JOAN 1:8
job 11:17
Johnstown 10:14
joined 20:1
Jonathan 74:19
  74:22 75:14
July 1:19 77:21
  78:3 79:3
jurors 61:1
Justice 1:4 4:15
  22:15

**K**

KARIN 1:8
keep 17:6 19:14
  21:17 33:18
khanlon@aclu...
  2:7
kind 7:18 10:10
  11:1,7,10 13:24
  14:24 15:13
  23:19 24:13
  25:4 57:24
  64:24
kinds 28:25
Kirsten 2:4 17:11
  22:9 29:10 31:4
  31:6,8,10,11,12
  31:16 32:4,7,22
  34:12 35:12
  44:14,18 45:7
  50:20 51:7,13
  52:11 53:25
  55:4 57:2,10,13
  59:23,25 60:16
  63:12 64:7
  72:23 73:7
  74:13,19
know 6:10 7:10
  9:21 12:5 15:5
  16:1,3,12 17:2
  17:16 19:5,6
  21:7,11 22:10

22:24 23:4,5,7
33:25 34:7
37:23 39:23
40:4,8,19 41:6,7
44:23 45:21
46:1,3 50:7
51:23 52:22,23
54:8,16 55:10
56:6 58:23 62:4
64:13 67:14,17
67:18,21 68:17
68:25 69:1 70:4
knowing 21:23
knowledge 13:11
  17:8,9 74:9,10

**L**

lack 37:5
laid 6:20
Landy 1:9 13:14
  13:17 17:13
  18:10,23 20:5
  20:18 21:7,12
  52:2
language 47:14
  47:16 60:6 61:9
  62:11
laptop 8:19
laptops 7:25
largely 23:2
larger 15:22 16:2
late 72:24
Law 12:9
lawful 4:2
lawsuit 4:16,18
learning 26:20
left 64:11
legal 9:2
let's 8:3 9:17 22:6
  32:12 35:10
  59:25 60:2
  64:15,23,24
letter 54:1,11,14
  55:13 56:5,5,12
  56:22,25 57:15

57:17,25 58:2,6
58:9,12 59:25
63:12,13,19
64:6 65:15,18
66:1 70:12,12
70:16,24 71:15
71:16,22 72:1,6
level 11:11 13:2
Liberal 12:10
library 38:8,9
  43:16 48:14
  56:2 74:22
  75:16
line 55:1 60:20
  78:5
list 24:7
listen 24:23 25:19
listening 19:16
literally 61:6
little 7:18 8:18,19
  8:22 10:9 11:16
  16:15 32:1
  50:21 71:8,12
  74:20 75:9
lived 67:17,19
LLP 2:15 79:6
long 9:4 14:2
  28:19,21 44:21
  45:4
longer 32:2
look 29:16 44:14
  73:12
looked 63:23
looking 28:22
  46:6 69:22,25
looks 29:20 52:3
lot 20:9,11 64:11
lying 17:6

**M**

M 2:4
ma'am 49:20
  50:6
main 12:15 20:24
  21:1

maintain 5:23
major 27:20
mark 17:14 29:11
  31:22 32:15
  50:24,25 51:9
  54:2 57:6
marked 50:23
  53:15
Market 2:16 79:7
Marlin 1:8 52:1
  59:2,4
Marlin's 52:3
Mary 1:16 2:14
  17:14 19:14
  25:12 31:21
  32:14 50:25
  54:2 57:6 77:3
  79:21
Mary's 6:12
mary.hutching...
  2:18
Master's 10:17
Matt 13:14 18:10
  20:5 52:2
matter 35:3
matters 14:22
  15:24 20:25
MATTHEW 1:9
MC62101 78:23
mean 9:2 32:24
  46:5 56:10
  60:10 61:19
  67:22 69:3
means 22:15
  52:25 68:22
  72:19 75:10,12
medications 6:23
meet 41:24 42:2,4
  50:15
meeting 8:24 9:5
  9:8,12 42:12
  53:4,7,9,19
  66:20 70:11
  71:3
meetings 53:18

**member** 14:12,13
20:6 74:23
**members** 11:18
16:23 19:2 23:3
60:21,25 61:11
**mention** 38:10,16
**MENTZER** 1:9
**merely** 16:17
**message** 55:3
**met** 50:18 52:21
52:25 66:16
70:8
**mic** 33:8
**microphone** 8:13
**Microsoft** 69:13
**middle** 52:12
74:18
**mind** 54:13,17,19
**minutes** 42:6,9
64:15,16
**mispronounced**
58:18
**misremembered**
6:6
**misspoke** 6:5
**moment** 33:16
43:20 57:8
**months** 13:3,4,6
14:16 15:12
**move** 7:18 8:7,19
34:12 36:4
**moved** 33:7
**muting** 8:12
**MX** 3:4 4:8 5:10
5:18,20 9:15,19
9:23 10:3 17:21
18:2 26:19,21
36:10,13,15
40:25 41:4 51:6
51:10,13 61:24
62:9 64:13,18
64:21 76:5

_____
**N**
**Nabors** 1:8 52:7

52:12,23 59:3,5
63:24 72:8,17
73:16
**Nabors'** 62:10
**name** 4:11 6:13
33:11 58:15,18
58:25
**names** 46:18
49:24
**near** 7:15 52:12
74:18
**necessarily** 16:16
**need** 7:9 61:4
**needing** 6:9
**neither** 70:23
**never** 25:16
61:19
**new** 6:6
**news** 27:5
**Nicole** 2:21
**night** 29:15 65:20
65:21
**Nikki** 6:11
**non-reservable**
75:3,15
**NON-WAIVER**
79:11
**Normal** 55:18
**notarized** 79:15
**Notary** 1:17 77:3
77:24 78:23
**note** 9:20 74:25
**noted** 79:12
**notes** 30:2,5,12
32:12 35:15
37:9,16 44:11
59:4 61:21
62:10 74:14,22
74:23 75:1,13
**Notice** 1:19 79:11
**notified** 43:1
**number** 15:5
72:25 74:15

_____
**O**

**object** 25:9 26:15
35:21 36:9
40:17 43:22
44:5 47:1,18,20
56:17 59:12
60:9 62:15
65:11 66:4
**objection** 9:21
25:12 26:9,19
30:15 35:4
37:12 40:21
41:3 42:16
**objections** 5:16
**obtain** 10:17
**obtained** 10:14
**occasion** 4:25 5:3
50:15
**occur** 12:19
**occurred** 33:4
38:7 56:3
**office** 34:3,17
77:21
**Officer** 24:19,20
24:21 25:3,8
**officers** 25:18
27:8
**offices** 34:6,11
**official** 1:10
**oh** 17:20 32:23
**okay** 4:20,23 7:2
7:7,14 8:3,11,18
8:20 9:7 10:2,3
13:4,12 14:5,14
15:8,8,8 16:1,22
17:3,9 18:6
19:1 21:16 22:6
24:6 26:1,6
29:10 30:9 31:8
32:13 33:20
35:12 38:23
41:3 42:10,12
47:5 51:19,20
52:19 54:20
55:9 56:8 59:4
60:1,12 61:15

64:7 65:14 68:1
69:1 71:20
74:10 75:23
**once** 17:15 29:17
29:18 31:22
57:4 73:8
**ongoing** 52:14
**online** 69:15
**open** 29:11 53:25
54:13 55:13
57:15,17,25
58:2,9,12 59:25
63:12,13 64:6
65:15 69:21
70:12,16,24
71:15,16,22,25
72:5
**opinion** 65:5
**opportunities**
11:20
**opportunity**
30:23
**opposed** 27:4
**order** 50:22
**ordinary** 28:7
**organization**
16:11 18:13
23:16 38:17,21
**organizations**
16:7 22:4 34:19
**original** 79:16,17
**outcome** 47:25
48:4,11 49:1,5
**outlined** 34:6
**outside** 68:23
**overly** 38:24
**oversell** 7:8

_____
**P**
**p.m** 1:19 64:20
76:11
**P.O** 2:5,9
**PA** 2:6,10,16 79:2
79:8
**pace** 44:19

**page** 3:4,8,9,10
3:11,12,13,14
32:8,17 55:8
60:16 74:18
**pages** 78:3
**Palestine** 1:5 4:15
22:15
**panel** 15:19 22:23
23:10,17,21
27:16,22,23
29:8 39:25 40:7
41:24 42:1,4,18
43:18 48:18,19
48:21 50:10
52:2,10,21,24
53:19 60:7 64:3
66:3,8,14 73:22
**panelist** 43:17
44:1,12 65:2
**panelists** 15:23
41:5,8 42:13,18
45:20,22 46:12
50:10 53:8
56:25 57:16
61:16 63:24
64:3,6 66:11,15
70:15 71:14,15
71:21
**panels** 16:5,24
23:2
**papers** 33:8
**paragraph** 63:1
**Paralegal** 2:22
**part** 6:13 13:25
20:21 43:6
**partial** 42:24
**participate** 12:17
**particular** 22:23
25:24 60:5
**parties** 77:14,17
**parts** 58:25
**pause** 52:10,14
63:21,25 64:4
64:14 72:9,11
**paused** 71:25

72:5
**pausing** 71:21
**pedestrian** 24:10
**pending** 1:21
**Pennsylvania** 1:1
 1:18,23 2:5,9,23
 4:13,17 10:16
 77:1,4 78:1
**people** 16:1 61:3
**perception** 37:6
**perfect** 64:14
**person** 5:21
 33:15,18
**personal** 12:6
 16:13
**Pg** 78:5
**Philadelphia** 2:6
 2:16 79:8
**phone** 7:15 24:8
 59:2 61:20
**phrase** 9:9
**phrasing** 34:8
**pigeon** 27:7
**Pitt** 1:5 4:15
 10:19,24 11:2
 12:13,25 14:2
 22:16 38:11,23
 39:25 67:20
 79:1
**Pitt's** 22:7 49:15
 49:25
**Pittsburgh** 1:8
 2:10,21 10:14
 34:25 35:3,17
 36:6,16,19 65:6
 79:2
**place** 53:19 77:7
**places** 60:13
**Plaintiff** 1:6 2:3
**plan** 62:1
**please** 7:10 17:11
 17:14 29:10
 31:3,5,10,11,16
 33:16 34:12,15
 43:23 44:6

50:22,25 52:11
53:5,12,25 54:2
54:4 55:1,4
56:18 57:2,6,9
57:11,11 59:23
60:15,15 64:25
65:12 72:23
73:4,6 74:13,20
75:9 79:12,16
79:19
**point** 22:2 25:22
 64:10
**policies** 20:5,8,9
 20:12 39:1,5
**policy** 21:3 38:9
 43:16 44:13
 48:14 49:3 56:2
**political** 38:14
**portion** 30:9,17
 32:17,19
**portions** 59:7
**posed** 63:2
**position** 10:23
**positions** 11:1
**possession** 79:17
**possible** 7:17
 35:1 69:20,24
**post** 10:10 44:11
**precedent** 39:9
**preceding** 79:13
**prefer** 10:4
**preparations**
 52:15
**prepare** 8:4,23
 27:11
**present** 2:20 6:10
 6:11 35:25
 36:19,20,23
 37:21 53:25
**presentations**
 36:5
**presented** 26:8
 26:17 35:17
 36:16
**pretty** 24:9,10

26:7 27:13,14
46:23 47:4
**prevent** 6:24
**previous** 18:11
**previously** 50:23
**printing** 77:10
**prior** 18:16,19
 35:11
**privileged** 9:11
**probable** 53:1
**probably** 21:18
 64:23 68:22
**probe** 9:24
**problematic** 63:6
**procedure** 1:21
 21:4
**procedures** 20:6
 20:8,9,12 28:1
**proceedings**
 22:20 24:18
 28:2 29:1 66:15
 70:8
**process** 12:2,9,16
 12:18 21:12
 24:24 28:16
 43:1,2 46:24,25
 47:3,13 71:24
 72:4
**processes** 12:12
 12:25 13:1
 27:21
**pronouns** 4:12
 44:24,25
**prosecute** 35:18
**provide** 11:19
 43:14
**provided** 22:24
 33:2
**Public** 1:17 77:3
 77:24 78:23
**pull** 57:2 72:23
 74:13
**pulled** 68:9,11
**purposes** 22:13
 54:12,24

**pursuant** 1:19,20
 19:23

_____

**Q**

**question** 6:1,16
 8:21 9:9 16:23
 17:4,5 40:10,23
 43:23 49:13
 53:6 54:16 57:1
 60:18 62:8 63:2
 70:19 71:14
 75:2,14,21,23
 75:24 76:3
**questions** 6:17
 9:13 21:19
 23:14,20,24
 24:3,5,7,8,9,24
 25:20,21,22,25
 26:2,4 30:25
 32:1 59:1 74:12
 76:6,8
**quickly** 44:18,19

_____

**R**

**R** 2:14 78:1,1
 79:6
**rag** 7:10
**rationale** 42:19
**re-ask** 40:9 49:13
**reach** 42:19
 56:14
**reached** 42:21
 57:18
**react** 55:19,21,22
**reaction** 57:24
 58:8,12
**read** 5:15 18:3,5
 30:23 31:2 32:2
 32:19 34:10
 44:21 45:3
 51:15,17,19
 54:23,25 55:1
 55:17,19 56:13
 57:8 58:14,20
 59:15 61:22,25

63:13 65:18,20
65:23,24 73:11
78:2 79:12
**reading** 27:5 32:8
 34:20 37:16
 47:16 56:5
 58:24 73:8
 77:12
**ready** 31:7,12
 55:10,11 63:11
**real** 55:20
**realize** 6:4
**really** 4:10 28:10
 55:2
**realm** 11:2
**reason** 14:3,4
 78:5
**recall** 22:1 24:12
 25:25 27:15,19
 27:20,25 28:8
 28:15,21 37:18
 37:20 39:20,22
 39:23 40:3,5,11
 40:12 45:16,23
 53:3,6 58:6,10
 58:11,13 59:1
 62:18,23,25
 63:6,10,17
 66:10 67:4 68:5
 68:10 72:3,7
 74:1 76:2
**recap** 47:6
**receipt** 79:19
**receive** 29:2 41:9
**received** 57:22
 63:18 65:19
**receiving** 72:16
**recess** 64:20
**recipient** 55:13
**recitation** 36:17
**recognize** 18:7
 29:24 44:16
 45:9 73:15
**recollection** 37:19
 59:9,11

**recommendation**
31:17 34:13,14
34:23 44:15
45:13 48:18
50:12 53:16
66:17 72:15,21
74:3
**recommendati...**
72:15
**recommended**
47:25 48:4,11
**record** 52:16
77:11
**recorded** 77:9
**reduced** 77:9
**refer** 10:4 54:13
**Reference** 78:23
**referenced** 63:21
**references** 61:9
**referencing** 61:16
**referring** 18:24
33:19
**reflect** 59:16,19
**regard** 37:24
**regarding** 16:7
16:10
**regards** 16:14
20:24 21:22
23:15 41:18
44:4 49:1,5
57:24 70:25
71:17 73:22
**related** 16:17
19:3 43:15
**relates** 41:19
**relative** 77:16,17
**remain** 57:3
**remember** 6:5
13:19 16:9,21
19:8,10 20:10
20:15,16,17
21:10,11,14,18
21:20 22:5
23:22,23,24
24:1 29:5 30:18

38:6,15,18,19
38:22 39:7,17
40:20,24 41:1
42:11 45:19
49:6,9 50:19
56:23 65:22
75:20
**repeat** 43:6,24
70:19
**rephrase** 53:5
71:13
**reporter** 25:13
40:22 41:2 51:4
79:22
**representative**
34:6
**representatives**
63:8
**represented**
20:18 71:10
**representing** 4:14
33:22 34:3,10
34:17 35:2
**request** 6:14
**resay** 61:13
**reserved** 5:16
**resources** 11:19
**respective** 77:14
**respects** 78:17
**response** 55:18
63:4 75:17
**responsibilities**
11:17
**responsible** 38:3
39:13 43:21
44:3,3,13 65:8
**rest** 22:14 52:21
52:23
**return** 79:19
**revealing** 16:12
**reviewed** 20:5
**reviewing** 44:10
**revolved** 48:13
**rhetoric** 62:20
**Rhodes** 2:21

**right** 7:11 12:1
17:10 19:17
23:6 26:21
30:10,17 32:18
43:19 61:6
64:21 66:14
68:9,20,20
69:19
**RMR** 77:3 79:21
**role** 6:12 10:18
11:15 14:1
24:17,21,22
25:2,2,3 27:11
55:25
**roles** 11:8
**room** 7:11
**rule** 5:23
**rules** 1:20 5:6,11
5:21 6:19 21:5

—————
**S**
—————
**S** 78:1
**Sandy** 5:11 6:10
8:24 9:15 17:15
17:23 26:20
29:13,15 31:19
36:11 47:20
51:1 54:1 57:4
**Sandy's** 6:12
**sat** 27:16
**SAUL** 2:15 79:6
**saved** 67:13,15
**saw** 8:7 23:12
45:15 55:15
56:10 66:18
75:5,16,18
**saying** 17:5 21:17
40:14 58:15
61:1
**says** 4:6 32:20
34:24 60:21
75:5
**school** 10:10 12:9
12:11,22 21:7
**schools** 10:11

12:8
**Scott** 46:17,18
49:23 72:9
73:17
**screen** 8:8 17:20
17:20 29:17,19
41:21 54:3 64:8
67:1 68:4,7,22
70:5
**scroll** 31:6,8,10
31:11,12,13
32:4,5,5,5,6,6,7
32:7 34:15
44:19 51:14,21
52:6 55:4,6
57:10,11 60:2
73:5,9,10,10
74:20
**seal** 77:21
**second** 8:11 34:9
60:18 64:25
**secret** 13:22
**section** 75:1
**see** 9:15 17:19,20
17:24 19:11
23:1 29:21
32:21 34:23
40:10 50:12
54:3 60:3,7
68:12,16 69:4,9
70:1 74:25 75:1
75:6
**seeing** 45:16
**seen** 54:6 58:21
61:19
**selected** 22:22
**selection** 23:1
**semantics** 71:9
71:13
**Send** 79:17
**Senior** 10:21
**sense** 12:21 21:6
26:6,6 28:24
51:15
**sent** 29:14 52:7,8

52:23 64:6 74:5
**separate** 12:15
**serve** 13:15 16:24
**served** 11:4,7
13:2,5 14:25
16:4 23:16,20
**set** 14:9 39:9
77:20
**sfworlds@aclu...**
2:7
**share** 49:10,15,19
50:4 67:2 68:22
70:5 73:3
**shared** 26:5
41:21 49:25
50:3 68:4,7
**SharePoint** 69:14
**sharing** 64:8
**she/her** 44:25
**Sheet** 79:13,14,16
79:19
**show** 44:20 65:8
**showing** 52:19
**shown** 67:1
**side** 36:20,23
37:25
**sides** 24:23 25:19
26:7,11,13,18
37:2,6
**sign** 5:15
**signature** 76:10
79:11,14
**signed** 79:16
**signing** 77:13
**similar** 61:1
69:14,16,17
**sit** 13:8 15:23
**sits** 13:8
**situation** 16:14
**SJP** 18:12,16
22:7,10,14
26:22 27:8,22
28:1 36:5,23
37:21 38:10,16
38:19,23 39:1,5

39:8,12,18,20
40:6,13,14 41:4
43:20 44:2,13
54:11 61:10
62:11 63:8 65:8
**SJP's** 43:11 61:16
62:20 65:1 70:8
**skills** 19:16
**skipped** 51:3
**society** 13:22
**sole** 44:1
**Solomon** 2:4 4:11
8:10 13:11
21:15 28:8,22
32:9 35:7 43:7
43:24 44:10
55:11 60:11
64:9 68:5 70:20
75:13 79:16
**somewhat** 14:23
**sorority** 75:5,18
**sorry** 7:7 8:22
19:14 21:14
25:11 31:15
32:2 33:6,7
34:7 35:7 36:12
41:7 44:23
50:20 51:11
59:25 60:10
73:1 75:22
**sort** 6:24 19:22
58:7
**sound** 5:2
**sounds** 13:8,22
15:11 42:23
64:17
**space** 75:4
**spaces** 75:3,16
**speak** 5:21 8:18
56:24 57:16
60:24
**speaking** 19:14
**specific** 11:22
15:19 19:22
24:12 29:2,7

40:1
**specifically** 4:14
10:11 12:3 22:6
40:5 62:24
**specifics** 53:6
**specify** 36:10,13
**speech** 39:10
**spoke** 56:21
61:10
**Square** 2:15 79:7
**SS** 77:2
**standard** 19:2
**started** 14:17
**starting** 72:19
**stated** 66:6 77:8
**States** 1:1,22
**stay** 9:18 57:14
**stenographically**
77:9
**steps** 41:19,22
**stint** 14:6,10
**stipulate** 5:12,15
**stood** 63:14,18
**stop** 17:4 64:7
**stopped** 72:20
**story** 36:21,24
37:2,25
**Street** 2:16 79:7
**strike** 36:3
**strong** 58:7
**struggling** 7:5
**student** 11:20
12:17,18 13:1,2
14:22 16:7,11
18:12 20:13,23
22:4 23:16
34:18,18 49:18
50:1
**students** 1:4 4:15
12:7 21:5,8
22:15
**study-in** 75:6,19
**Subscribed** 78:20
**substances** 6:23
**substantive** 21:5

**sufficient** 33:2
35:18
**suggest** 68:14
71:21
**Suite** 69:16 79:1
**suppose** 39:23
**sure** 5:12 6:11
7:20 8:12 10:6
12:13 14:18
27:13,14 28:12
32:14 33:15
40:23 52:20
56:11 75:11
**surveilling** 38:24
**survey** 24:7
**sustain** 65:7,7
**sworn** 4:3 77:6
78:20
**system** 7:5,6
67:20 69:14

--- T ---

**T** 78:1,1
**tablets** 7:25
**tailored** 24:11
**take** 19:6 22:9
57:7 64:12,15
**taken** 1:16 64:20
77:7
**talk** 19:18 22:6
29:19 60:18
63:2
**talked** 21:12 22:2
41:23
**talking** 22:11
33:14,17 57:15
**tapped** 13:23
**targeted** 38:11,14
**team** 6:14 8:25
9:1,2
**TECHNOLOG...**
79:1
**tell** 10:9 11:16
13:12,17 16:14
16:19 54:10

68:18 72:25
**ten** 42:6,9 64:15
**term** 13:9,10
**Termination** 5:1
**terms** 14:10
**testify** 4:3 77:6
**testimony** 34:20
74:24 77:11
**text** 75:7
**thank** 5:17 14:19
16:22 17:18
18:1 19:13,19
22:9,18 25:14
25:15 26:20
27:1 31:15,23
32:3,10 34:14
35:10,12,24
41:3,7 45:2,6
46:7 47:24
49:10 50:8 51:7
51:11,20 53:22
53:22 54:20,20
55:12 56:8,8,20
57:7,12 58:17
58:19 63:12
64:19 65:14
73:6 74:17 76:6
**Thanks** 7:24 64:8
64:18
**thereof** 37:5
**they/them** 4:12
**things** 4:10 31:22
69:17
**think** 5:8 13:24
14:10 17:5
21:25 22:1 23:5
28:13,15 29:18
33:7 34:25
35:16 49:14
51:3 56:13 62:6
64:22 69:19,24
71:8,12,24 76:8
**thinking** 13:20
**third** 46:16 60:20
**thirty** 79:19

**thought** 58:3
70:23 71:6,11
72:4
**thoughts** 43:11
43:13 66:2
**threat** 38:20
**threatening** 60:5
**three** 15:9,16
16:5 46:14
66:22
**time** 5:17,22 6:15
11:13,14 14:5
14:24 19:18
25:4,6 45:15
50:18 56:20
58:19 64:14
66:23 72:10
77:7
**timeline** 28:22
64:24,25
**times** 4:23 15:14
15:16 16:5
50:16
**title** 54:4
**today** 6:25 22:14
45:17 47:17
63:13
**today's** 54:12
**told** 25:16
**top** 30:10,17
32:18 34:15
45:7 51:16 60:2
**topic** 21:25
**totally** 21:20
**tracks** 12:24
**training** 18:11,23
18:24,25 19:1,7
19:9,21,22,25
20:3,22 21:22
23:12
**trainings** 29:7
**transcript** 78:17
79:12,17
**trick** 54:16
**trouble** 8:8

| | | | | |
|---|---|---|---|---|
| **true** 77:10 78:17 | 20:17,18 34:3 | **void** 29:2 | **Witold** 2:8 | 32:23 41:14 |
| **truth** 4:3,4,5 77:6 | 34:25 35:2,17 | **VS** 1:7 | **Women's** 10:21 | 42:11 54:18 |
| **truthfully** 6:17,25 | 36:6,16,19 | **vwalczak@acl...** | **Wonderful** 18:6 | 61:14 69:7 |
| **try** 9:17,19 | 39:19 41:10,16 | 2:11 | **word** 46:6 69:15 | 70:21 |
| **trying** 9:25 69:2 | 56:2,21 57:17 | | **words** 61:7,16 | **yep** 7:23 11:12 |
| **Tuscano** 1:13 3:7 | 65:6 | **W** | 62:20 | 14:15,18 23:9 |
| 4:1,9 10:4,5 | **unmarked** 31:16 | **waiting** 6:16 | **work** 11:18 53:13 | 32:11,23 54:21 |
| 29:12 31:22 | **unusual** 27:25 | **waived** 76:10 | 53:17 72:13,14 | **yesterday** 8:25 |
| 32:15 34:22 | **update** 73:21,25 | 77:13 | 74:7 | |
| 51:1 54:3,5 | **UPITT** 17:17 | **Walczak** 2:8 | **worked** 27:21 | **Z** |
| 57:7 58:14,15 | 51:1 54:1 57:5 | **want** 5:12 7:8 | 69:8 | **Zach** 45:24,25,25 |
| 58:16,19,19 | **upper** 11:15 | 9:10 33:15 62:5 | **working** 12:6 | 46:8,9,9,15 47:6 |
| 73:4 74:17 77:5 | 49:16,25 | **wanted** 5:19 | 58:20 72:20 | 49:22,23,24 |
| 78:2,19 79:5,10 | **USA** 38:17 | **wasn't** 9:24,25 | 74:2 | 53:17 58:7 59:6 |
| **Tuscano's** 74:14 | **use** 44:25 | 37:9 61:20 | **Worlds** 2:4 3:4 | 59:17 63:6 |
| **two** 11:11 16:6 | **uses** 67:20 | 68:21 | 4:8,12 5:10,18 | 66:12 67:5,5,8 |
| 34:11 46:18 | | **watch** 61:1 | 5:20 9:15,19,23 | 68:12 70:23 |
| 49:23 50:4,10 | **V** | **water** 7:9 | 10:3 17:21 18:2 | 72:3,9 73:16,21 |
| 60:20 71:15 | **vague** 36:14 39:6 | **way** 9:9 12:22 | 26:19,21 36:10 | **Zach's** 49:4 63:4 |
| **type** 68:16 | **Vaguely** 69:7,18 | 24:15 27:21 | 36:13,15 40:25 | 67:19 |
| **typed** 70:1 | **various** 21:4 | 58:18 60:22 | 41:4 51:6,10,13 | **zoom** 1:18 18:4 |
| **typical** 24:10 | **verbal** 5:24 27:6 | 70:17 77:18 | 61:24 62:9 | 31:1 45:20 48:5 |
| **typing** 47:7,9 | **verbiage** 15:18 | **ways** 36:2 | 64:13,18,21 | 66:20,25 68:8 |
| 67:6,8 69:4,10 | **version** 69:15 | **we'll** 5:22,22 | 76:5 79:16 | 68:23 70:5 |
| 69:11 | **versus** 6:9 22:4 | 29:11,19 33:18 | **worry** 21:17 | |
| | 70:4,5 | 36:4 50:24 | **worse** 8:16 | **0** |
| **U** | **videoconference** | 57:14 | **wouldn't** 7:8 | |
| **ultimately** 47:16 | 1:14,18 | **we're** 33:14 34:22 | 21:20 44:9,9 | **1** |
| **unable** 65:6 | **view** 48:21,22,25 | 47:16 51:8 | 70:16 | **1** 3:8 60:16 |
| **unclear** 34:1 49:2 | 49:4,8 71:17 | 64:22,22 | **write** 30:16 73:1 | **1:36** 64:20 |
| **undergone** 23:11 | **viewed** 37:7 | **we've** 62:4 64:10 | **writing** 66:16,22 | **1:45** 64:16 |
| **undergraduate** | 70:17 | **weigh** 29:4 | **written** 27:6 | **1:48** 64:20 |
| 10:15 | **viewing** 68:24 | **weighing** 47:10 | 52:16 74:25 | **12:03** 1:19 |
| **understand** 5:25 | **views** 38:14 66:7 | **went** 10:11 28:16 | **wrote** 32:24 | **14030** 51:2,9 |
| 6:2,19 18:14 | 66:10 70:24 | **weren't** 52:20 | 35:13 | **14034** 73:2 |
| 39:6 45:3 60:22 | **VINCENT-BR...** | **West** 2:15 79:7 | | **14054** 29:13 |
| 69:3 | 1:9 | **Western** 1:1,22 | **X** | **1500** 2:16 79:7 |
| **understanding** | **violated** 38:9 | **When's** 45:15 | | **15219** 79:2 |
| 15:18 37:8 | **violation** 32:21 | **WHEREOF** | **Y** | **15222** 2:10 |
| 62:13 64:2,5 | 33:4 35:14 | 77:20 | **yeah** 5:14,18 8:10 | **17** 3:8 |
| **unfair** 28:16 | 43:16 44:13 | **willing** 13:15 | 9:16,17,19,22 | **1777** 17:17 |
| **United** 1:1,22 | 48:15 49:3,3 | **wish** 78:3 | 13:10 17:22 | **18** 13:3,4,6 14:16 |
| **University** 1:8 | 56:2 | **witness** 64:19 | 18:22 20:11 | 15:12 |
| 2:21 4:16 10:13 | **violations** 12:19 | 77:5,11,15,20 | 21:3 23:5 24:15 | **18-month** 14:6 |
| 10:16 11:8 | 65:9 | **witnessed** 75:2,15 | 27:13 29:18,21 | **19102** 2:6 |

JENNIFER TUSCANO  -  7/3/2025

**19102-2186** 2:16
   79:8

**2**

**2** 3:9 18:23 29:12
   32:15 74:16,17
   74:17
**2:03** 76:11
**2:25-CV-00524**
   1:2
**200** 79:1
**2025** 1:19 77:22
   78:3,21 79:3
**215-592-1513** 2:6
**215-972-7777**
   2:17 79:8
**23058** 2:9
**24** 74:5,8
**2439** 57:5

**3**

**3** 1:19 3:10 31:22
   34:22 53:16
   74:18 78:3
**30** 79:19
**31** 51:2
**32** 3:9
**34** 3:10
**38th** 2:16 79:7

**4**

**4** 3:4,11 18:20
   22:7,19 26:23
   28:20 36:7,18
   43:4 46:13 48:5
   48:7 50:9 51:4
   51:9 53:18 54:4
   54:5 58:3 60:7
   62:12,21 63:9
   65:2,15,21 66:3
   66:8,14 70:18
   70:25 71:18
**412-261-2323**
   79:2
**412-681-7864**

   2:10
**445** 79:1
**4th** 52:22 65:23

**5**

**5** 3:12 50:24 51:1
   53:7,20 54:3,5
   70:7 71:2
**51** 3:11,12
**527** 54:1
**57** 3:13 29:13
**5th** 52:25 53:4
   65:24

**6**

**6** 3:13 50:23 52:4
   52:9 57:3,3,7
   58:14,19 72:20
   74:3
**60173** 2:5
**6th** 52:24 72:8

**7**

**7** 3:14 73:4
**73** 3:14

**8**

**8** 79:3
**8th** 77:21