```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA


  STUDENTS FOR JUSTICE IN
  PALESTINE AT PITT,
                    Plaintiff
     vs.                              Civil Action No. 25-524

  UNIVERSITY OF PITTSBURGH,
  et al.,,
                  Defendant.

                          - - -


     Transcript of Oral Argument on August 28, 2025, in the
  United States District Court, 700 Grant Street, Pittsburgh, PA
  15219, before Honorable J. Nicholas Ranjan, United States
  District Judge.


APPEARANCES:

   For the Plaintiff:     Witold J. Walczak, Esq.
                          Ali N. Szemanski, Esq.
                          Solomon Furious Worlds, Esq.

   For the Defendants:    Joshua W.B. Richards, Esq.
                          Alexander Robert Bilus, Esq.

   Court Reporter:        Veronica R. Trettel, RMR, CRR
                          U.S. Courthouse
                          700 Grant Street
                          Suite 6260
                          Pittsburgh, Pennsylvania 15219
```

```
        Proceedings recorded by mechanical stenography;
   transcript produced by computer-aided transcription.
```

1                        P-R-O-C-E-E-D-I-N-G-S

2                   Thursday Morning, August 28, 2025

3                          (In Open Court)

4              THE COURT:  Good morning, everyone.  You may be

5    seated.  We are here today in the case of Students for Justice

6    in Palestine at Pitt versus the University of Pittsburgh, et

7    al, at case 25-524 for an oral argument on plaintiff's revised

8    motion for preliminary injunction.

9              Let's start by having counsel enter their appearances

10   beginning with counsel for the plaintiff.

11             MR. WALCZAK:  Good morning, Your Honor.  Witold

12   Walczak with the ACLU on behalf of the plaintiff, Students for

13   Justice in Palestine.

14             THE COURT:  Good morning.

15             MR. WORLDS:  Good morning, Your Honor.  Solomon

16   Furious Worlds, ACLU attorney on behalf of the plaintiffs.

17             THE COURT:  All right.  Good morning.

18             MS. SZEMANSKI:  Ali Szemanski also on behalf of the

19   plaintiff.

20             THE COURT:  All right.  Good morning.

21             MR. WALCZAK:  Your Honor, I just wanted to mention

22   that we have a number of the Students for Justice in Palestine

23   at Pitt board members who are here, several that are seated

24   right behind me.  So I just wanted to make sure the Court was

25   aware of that.

1          THE COURT:  Okay.  Very good.  Welcome to all of you.

2          And counsel for the defendants.

3          MR. RICHARDS:  Good morning, Your Honor.  Joshua

4     Richards for all defendants.

5          THE COURT:  Good morning.

6          MR. BILUS:  Good morning, Your Honor.  Sandy Bilus

7     for all defendants.

8          THE COURT:  Good morning.  All right.  So why don't

9     we get started.  My understanding from the filings and our

10    discussion with counsel is that this is not going to be an

11    evidentiary hearing and that the presentations here will be

12    limited to attorney argument.  I have reviewed the materials

13    that were submitted to me and so I think we're ready to go

14    here.

15          Mr. Walczak, it's your motion, do you want to

16    proceed?

17          MR. RICHARDS:  Your Honor, before Mr. Walczak starts,

18    could I clarify one issue with the Court?

19          THE COURT:  Sure.

20          MR. RICHARDS:  There's a protective order in place

21    and a number of publicly filed exhibits have been redacted

22    with respect to the substance, part of the substance of those

23    filings.

24          How does the Court want us to address the substance

25    of those issues here in open court?

1          THE COURT:  Well, my view is it's a public hearing.

2    So you know, there's no -- I'm not going to place any

3    restrictions with respect to clearing the courtroom or sealing

4    the proceedings.

5          I'm not sure it's really necessary to dive into some

6    of the redacted information.  So to the extent counsel can

7    avoid discussing those, I think it would probably be safer and

8    better, but my view is once we get to a public hearing, we get

9    to a public hearing.

10          MR. RICHARDS:  I appreciate the clarification.

11          THE COURT:  Thank you.

12          Mr. Walczak, I don't know if you have any different

13    views on that.

14          MR. WALCZAK:  I do not have a different view.  I

15    might -- I suggested to Mr. Richards that maybe they could

16    just use co-presidents -- there's only two of them at the

17    time -- so everybody knows who is being talked about.

18          And to the extent that they want to get into what may

19    be marked as privileged information, maybe we can just have a

20    sidebar and, you know, talk through that and see exactly what

21    it is that they might want to discuss, and I trust them to

22    know when they're going to tread on potentially privileged

23    information.

24          THE COURT:  Okay.  That sounds fine to me.

25          Mr. Richards, are you comfortable with that?

1              MR. RICHARDS:  Yes, Your Honor.

2              THE COURT:  All right.  Thank you for raising that.

3              Mr. Walczak, do you want to proceed?

4              MR. WALCZAK:  Yes.  Your Honor, court hearings are

5     few and far between, and with the Court's indulgence, I

6     thought this was an opportunity for some of our younger

7     counsel to get an opportunity to argue depending on the issue.

8              My understanding is with the late motions filed by

9     the defendants, there may be multiple issues here today.  But

10    I would -- I'll have Mr. Furious Worlds address the

11    preliminary injunction.

12             To the extent spoliation issue arises, I would ask

13    Ms. Szemanski to address that and anything else I'll handle.

14    Is that okay with the Court?

15             THE COURT:  That's fine by me.  I mean, aren't you

16    worried they are going to show you up show, though?

17             MR. WALCZAK:  I am, but I've gotten use to it at this

18    point.

19             THE COURT:  Okay.  That's fine.

20             So Mr. Worlds, do you want to proceed then on the

21    first instance?  I think it makes sense for me to hear the

22    arguments on the motion for preliminary injunction first.

23             MR. WORLDS:  Excellent.  Thank you, Your Honor.  Good

24    morning, Your Honor.  Thank you for having us here today.

25             So you know my name is Solomon Furious Worlds.  I am

here representing the plaintiff, and we believe that the Court should grant the preliminary injunction motion.  There's a pantheon of cases that stand for the proposition that government agencies are not -- in particular universities, public universities are not allowed to infringe on the free speech rights of students or student organizations, and it is for that reason that we believe that we are likely to succeed on the merits of our motion.

Specifically, we believe that the Rule 42, one of the two rules under which SJP was -- rather is currently on suspension, doesn't pass the strict scrutiny test.

We believe that, yes, there's compelling interests here for the state to have a fair administration of justice, but that interest is not implicated because there is no clear and present danger from the speech that SJP engaged in.

Furthermore, the rule is not narrowly tailored.  It doesn't have a scienter requirement.  It doesn't mean in only improper influence, and we can see that evidence by the statements that Dean Nabors made during his deposition wherein he said that the influence -- excuse me, the attempted influence that SJP had with some in-hearing statements, even that gave some impetus, gave some credit to, in his view, gave merit to needing to pause the -- needing to pause the hearing process.

Additionally, we believe that there is still

irreparable harm.  The students, even today, they are not
allowed to communicate to the fullest with the other students
on campus.  They are not to recruit.  There are some -- I'm
sure you are aware, I'm sure many people in the courtroom
today are aware that there's a lot happening in Palestine and
Gaza especially.

So there are very important things to talk about.
Every day lost is a another day of advocacy lost, is another
day of recruitment lost, and especially at the beginning of
the semester when recruiting new students is so important, it
is imperative that they are able to do so as soon as possible.

Lastly, the balance of the equities and the public
interests are never ever in favor of a government agency
continuing to allow or to wrought unconstitutional policies on
its students and on the student organizations.

We believe our arguments are plenished on the papers
and I'm happy to go through those arguments in full if you
would like, Your Honor, but we request maybe questions from
the Court, that we can more directly address any concerns you
may have.

THE COURT:  No, I appreciate that.  So let's maybe
start with the merits here, and looking at the rules and the
application of strict scrutiny, you would agree that we get to
strict scrutiny only if there's a finding that the rules as
applied here are content based.  Correct?

**8**

1           MR. WORLDS:  Yes, Your Honor.

2           THE COURT:  So to me, I have no trouble finding, and

3     I think -- I don't know if there would be a dispute -- I'll

4     certainly hear from the defendants on this -- that Rule 42 is

5     probably content based.  It deals with you need to really

6     examine the impact of the speech to determine whether or not

7     there was an attempt to intimidate or coerce or influence.

8           Rule 43, though, I think is a little bit of a

9     different matter.  I mean, it seems like it's what I would

10    consider to be your standard decorum rule, which would be

11    content neutral.

12          Any response to that in terms of how to assess

13    Rule 43?  And I think maybe a more broader issue here is how

14    do I analyze this case from both sides with respect to the two

15    rules at issue?

16          In other words, do I have to find that -- if I find

17    that Pitt was engaged in inappropriate or unjustifiable -- let

18    me rephrase that.

19          If the suspension here doesn't pass scrutiny under

20    the First Amendment with respect to application of Rule 42,

21    does Pitt still win if I find that the suspension that was

22    meted out under Rule 43 was fine?  Or do they have to sort

23    of -- the fact that it might fail under Rule 42, is that the

24    end of the road for them?

25          And then conversely for you, do you have to sort of

1   clear both hurdles, both rules to get the relief that you seek

2   here?

3         MR. WORLDS:  I would say, Your Honor, that as an

4   initial matter, reading the rules as separate, as they are

5   written in the code -- well, first going to the open letter --

6   excuse me, going to the open letter, it was that they were

7   found -- SJP was found responsible by the hearing board on

8   both rules and both rules informed the suspension.

9         It stands to reason under any reasonable sort of

10  disciplinary process that if you infringe one rule, you get a

11  lighter punishment than if you were to infringe two rules --

12  excuse me, if you were to violate two rules.

13        So from that perspective, given that there may be a

14  proportionality argument that we would want to raise.

15        THE COURT:  So you are saying you can't really

16  separate them?  I mean, you can't really separate them with

17  respect to the analysis here?  Is that the idea?

18        MR. WORLDS:  I'm saying that the impact would be

19  tough to separate, but I don't think it's impossible.  I do

20  think, though, that whether or not they disrupted is also an

21  issue here in the case.

22        Per the facts, I wouldn't say that SJP has disrupted.

23  In fact, I would say that the disruption really came from --

24  the disruption really came from Dean Nabors deciding to halt

25  the process.

1               When the students sent the open letter, all three

2      hearing officers, according to Dean Nabors' notes, according

3      to his deposition and according to former Hearing Officer

4      Tiscano's deposition, all three hearing officers received it,

5      they acknowledged it, and they moved on.  To them, it was a

6      nothing burden.  It was a non issue.  It was something that

7      they received and they didn't think twice about that.

8               Dean Nabors, however, and as a Pitt -- representative

9      of Pitt, saw fit to disrupt the process.  They saw fit to halt

10     the process.  The disruption really lies on them.

11              The open letter didn't really raise any new

12     arguments.  The open letter was also, as the name suggests,

13     open.  Yes, they sent it via email directly to folks.  They

14     put it on social media.  It was akin to an op-ed in that way.

15              So for an op-ed to be a disruption, for the open

16     letter itself to be a disruption, that would still be the same

17     issue we are here today.  Right?  It would sill be Pitt --

18     SJP-Pitt being disciplined for its First Amendment activity,

19     which again, still falls under the same issue.  Different

20     issues, but still very on point.

21              THE COURT:  So maybe hindsight is 20/20 with respect

22     to what Dean Nabors did.  Maybe he wishes he would have taken

23     a different course there.

24              But I empathize a little bit, and I'm thinking of an

25     analogy, which would be, let's say I have a jury trial, and

there's a jury, and if somebody reports that one of the
attorneys communicated with a juror in the hallway.  I think
any judge, or any lawyer even, would say, Okay, we need to
like call the juror in, voir dire the juror, see what
happened.  So we halt the proceedings.  We call the juror in.
Ask him some questions.  Turns out the lawyer just said "good
morning."  Nothing inappropriate.  No harm.  No foul.  We
move on.  To me, that's disruptive.  I had to do this hearing.
We're now behind schedule by a half an hour.

So in a certain sense, if I had a rule that said you
can't disrupt the proceedings, it seems like that would have
risen to that level of disruption.

Is that analogous here?  Because maybe Dean Nabors
didn't have to go so far as to shut everything down, but I
think it would be reasonable to pause things at least and
inquire further.  And what's -- I suppose what's wrong with
that or maybe tell me why my analogy doesn't work here.

MR. WORLDS:  I think that's an excellent question,
Your Honor.  I'll go through the differences one at a time.
The first being that in a situation of a trial where this day,
the jury is full, the gallery is full, you have plaintiffs and
defendants on both sides.  30 minutes means a lot.  30 minutes
in your day in a courtroom, formal rules, rules of evidence,
speedy trial, all of that means a lot more than in a
disciplinary proceeding, where they had -- where the initial

1    incident happened in December.  Things, as we saw from email

2    chatter, didn't actually materialize as far as a charge being

3    filed until around the 30th, 31st of January.  It wasn't until

4    February 4th that the actual hearing happened, and then even

5    after -- because February 4th is the same day the open letter

6    was sent.  Even after that, it still took over a month for

7    Pitt to even say anything was wrong with it.

8            So the 30 minutes in the formal setting of a court is

9    much different than in the disciplinary hearing.

10           Another difference would be that a private

11   conversation with a single juror, that has the appearance and

12   the ability to be much more coercive, much more intimidating,

13   much more wrongful and corrupt than does an open letter,

14   something that was sent to everyone in this instance.

15           The other difference, too, I might add, and this is

16   something we talked about -- or excuse me, discussed in our

17   brief, the jurors are part and parcel with Pitt.  Different

18   than here in the courtroom where you, Your Honor, are wholly

19   separate from the prosecution, the defense and the jury.

20   There, say the defense, they are all part and parcel of the

21   same entity.

22           The moderator, the prosecuting officials, the hearing

23   officers which, with the analogy of them being the jury, they

24   are all part of Pitt.  They are all Pitt officials.  And so

25   that, too, also changes the calculus I'd say.

1          THE COURT:  Okay.  Thank you.  So then on the Rule 43

2     issue, I suppose as I'm hearing it, your argument, it's more

3     fact based here.  You are saying there was no disruption.  Is

4     that really it?

5          MR. WORLDS:  Yes, Your Honor.  I would say that that

6     disruption -- and I take your point, Your Honor, that it's not

7     in the instance that you described before, it wouldn't be that

8     you, Judge Ranjan caused the disruption.  It would be that the

9     attorney in this ex parte communication.

10          But here, again, without the ex parte communication

11     and without there being any actual attempt for wrongful

12     influence, for corrupted influence or coercion, or

13     intimidation, we would say that there wasn't an actual

14     disruption.  This was, again, run-of-the-mill First Amendment

15     protected speech activity.

16          And then going to Rule 42, to the extent that Pitt

17     wants to bar, prohibit this kind of communication, they could

18     specify as much.  The rule as it's written now says A -- I'll

19     actually read it to you verbatim.  "A violation is committed

20     when a student or registered organization intends, coerces,

21     influences, or attempts to do the same against the person who

22     is participating or has participated in any University process

23     or proceeding."

24          "Against a person who has participated or is

25     participating," that would imply that any human being who had

1    participated in that process -- if at some point, any point,

2    SJP attempted to influence them with regards to the process,

3    that that would be wrong.  Any point.

4         That means during the February 4th hearing, which may

5    be, in part, why Dean Nabors thought it appropriate to

6    consider the comments they made when thinking to place them on

7    interim suspension.  That's at least what he said in his

8    deposition.

9         We don't believe it's a material fact given the

10   errata that Dean Nabors now says that that's why he -- that

11   was part of the calculus for halting it.  But still, that

12   means that it was Dean Nabors who thought that that statement,

13   he still sought to punish SJP for their in-hearing speech.

14        Their in-hearing speech, mind you, that was meant to

15   influence, not improperly influence, but influence per the

16   parameters of the code.  What's the point of having a

17   disciplinary process where we have a hearing, where we call on

18   both sides, where we ask them questions about the facts, ask

19   them to make arguments if SJP can't try to influence -- then

20   what are we doing if we're not trying to influence?  What are

21   the parties here today doing if they are not trying to

22   influence?  What are you doing when you speak if you're not

23   trying to influence?

24        I would argue that virtually all speech is meant to

25   induce some sort of reaction, some sort of action, some sort

1    of thought, emotion from the listener.  All speech really is

2    trying to influence someone else.

3              And so a rule that prohibits influencing is a rule

4    that prohibits speech, unless read into the word "influence"

5    is improper.  Now we're talking about something a little

6    different, because the speech of trying to bribe a juror or a

7    hearing officer of course, of course, that should be

8    prohibited, but that's not what's at issue here.

9              What's at issue here is run-of-the-mill speech.

10    Speech that, yes, was meant to influence, but all speech is

11    meant to influence.  So as it is written, the rule is

12    extremely broad.  That's just getting to that portion.

13              Now, the portion about the person, again, if Pitt

14    wanted to make this about hearing officers, which it seems

15    pretty clear that they do, again, from Dean Nabors'

16    deposition, which this part wasn't in the errata, he stated

17    very clearly that it was the communication to the hearing

18    officers.

19              It wasn't that it was posted openly, in an op-ed or

20    social media type of form.  It wasn't that it was sent to

21    Nabors himself, Asher or any of the other Pitt administrators,

22    Dr. Panzella, all of these administrator who have a say in the

23    hearing process.

24              Instead, it was just that it went to the hearing

25    officers, and if they wanted to make that rule, if they wanted

to make Rule 42 specific in that way, they have an absolute right to.

In fact, Pitt recently updated its rules.  Nothing material for this case, so we didn't see it fit to alert the court at the time, but on August 1st of this year, they updated the rules, and they could have changed it then.  But again, that's not the case.

If the rule was written in such a way that it said hearing officer -- students involved in the process aren't allowed to contact the hearing officers in any way, shape or form, Pitt -- excuse me -- SJP may have changed their actions. They may not have actually seen it as something that was prohibited, but as the rule is written now, it makes no sense.

The logical read would be to throw the word "improper" in front of "influence" to think that it's only prohibiting improper influence.

THE COURT:  What do you think about the use of the clause after that that says "against a person"?  Like does that provide more of a defining limitation?

So in other words, like, you know, you can't influence or attempt to influence as part of a proceeding that, yeah, you know, you are trying to influence me now. Clearly that's not prohibited.  But does influence against a person cabin that to bring it within like a bribery here, you are having more direct conduct to that person?

MR. WORLDS:  Perhaps.  Perhaps it does.  I would say that the fact that we have three ACLU attorneys, I believe two attorneys from Saul Ewing, I think two attorneys from Pitt's counsel, yourself, and a number of clerks, a gallery full of people discussing it means that it may be tough for the average college student to read the phrase "against a person" and to imply that.

But to the extent that it's legally defensible here, we would say then that it doesn't apply to the speech that SJP made.  It was also sent to other participants.  It was sent to everyone that was involved.

So it seems to me that, again, that mitigates the attempt to corrupt, that mitigates the -- excuse me -- the idea that SJP was attempting to corrupt.

THE COURT:  Can I back up a little bit and just ask you something about Dean Nabors and what he said or didn't say.

Does it even matter -- you know, is it the operative thing that I'm looking at now, simply the second hearing board decision that implemented the suspension and what is in that written decision, because that's what's implemented the six-month suspension that's operative in this case, and I'm to determine whether or not that was proper or not.  Sort of the interim part is a little bit -- it seems like it's water under the bridge, and what I'm being asked at this point to

determine is whether or not whatever rationale that the

hearing board used in finding that Rules 42 and 43 were

violated here and the punishment here, that's what I should be

looking at as to whether or not it's a First Amendment

violation.  Do you agree or disagree with that?

MR. WORLDS:  I disagree with that.  To the extent

it's water, I would say it's water on the bridge and it's

flooding the bridge.

The interim suspension is part and parcel with the

six-month suspension.  The six-month suspension started the

day of the interim suspension and it's still a suspension in

fact.  So the defendants actually -- I'm sorry.

THE COURT:  Go ahead.

MR. WORLDS:  The defendants raised this exact point

when they argued that the Court was divested of authority.  We

believe that that argument is more distraction than anything

else because the central fact still remains:  Pitt, as a

government entity, restricted SJP's free speech rights, and in

doing, they did so specifically by suspending them.

The fact that Pitt changed the title of the

suspension from interim to six months, if anything, it may

eliminate some potential due process claims it would have had

if the interim suspension had lasted indefinitely, if the

interim suspension was this amorphous thing that we had no

idea when it was going to end, but all they have done is avoid

1    those issues.  I would say that because it's still a

2    suspension based on protected First Amendment activity, it's

3    still very much within the impetus of this case, it's based on

4    all of the same facts, and it's still very relevant and, of

5    course, you are within your authority to rule on it.

6            THE COURT:  But what if there's a divergence with

7    respect to why the interim -- the base -- the rationale for

8    the interim suspension and then the rationale for the hearing

9    board suspension?  I'm not sure there is here, but you know,

10   I'm just thinking what if Dean Nabors said like, But what

11   really bothered me in this case and why the SJP was suspended,

12   it wasn't about what they said or attempt to influence, you

13   can't send an email to hearing officers while a hearing is

14   ongoing.  But then the hearing board reaches a different

15   conclusion and says, The problem here and why the rules are

16   violated is you can't send an email to hearing officers with

17   an attempt to influence the outcome of the decision.

18           To me, those are different bases; we get to the same

19   point in a certain sense.  So I'm struggling a little bit as

20   to what I should be -- should I be looking at everything?  If

21   there is a divergence, what do you do about it?  Maybe you

22   tell me there isn't really one that matters here.

23           MR. WORLDS:  Your Honor, I don't view there being --

24   excuse me.  Your Honor, I don't view there being a divergence

25   that is material here.

1          However, from the facts of the case, I think that's

2     part of why I don't see a divergence.  I believe the reasoning

3     was very similar.

4          Dean Nabors said during his deposition that it was

5     the in-hearing statements on the 4th of February and then also

6     the open letter that led to the interim suspension.  In the

7     errata, he said it was just the open letter.

8          Whichever one is true, again, it's immaterial.  It

9     was their protected speech that led to the interim suspension.

10    And now, it is still their protected speech, that open letter

11    that has led to the six-month suspension.  So in that way, I

12    don't see much of a difference.

13         THE COURT:  Okay.  Maybe we can shift gears a little

14    bit.  You can tell me if I'm wrong on this, I'm a little

15    uneasy with application of the cases like Gentile and that

16    body of law, and the clear and present danger, because those

17    are typically, you know, gag orders and press, statements of

18    the press on the courthouse steps, and this seems to be a

19    little bit different -- well, maybe a lot different.  Maybe

20    defendants would say it's a lot different in the sense that,

21    you know, is a direct communication that included hearing

22    officers on it.

23         So even if you are right these are content based and

24    strict scrutiny applies here, what's your response to whether

25    or not these cases are -- and the sort of clear and present

danger rationale is implicated, and one of the reasons I also
raise this is because I feel like also -- and don't take any
offense to this, but plaintiff is trying to also have their
cake and eat it, too, because you invoke the case law that
sort of has the trappings of the judicial speech on the
courthouse steps, and then when the defendants invoke the jury
tampering case, you say, well, this isn't -- this isn't a
trial.  This isn't a jury.

            MR. WORLDS:  Right.

            THE COURT:  So I don't know.  Maybe you can tell me
you are not trying to have it both ways, but I will say I have
an uneasiness about just -- you know, even if strict scrutiny
applies -- maybe it doesn't matter, but the concept of clear
and present danger, does that really fit here I guess?

            MR. WORLDS:  Cake certainly is delicious.  And that
might be why we were tempted to do so.

            I would say that as an initial matter, the reason we
used that line of case law is because it was kind of the most
analogous.  It seemed the most kind of on point.  We searched
pretty exhaustively, and I regret to informed you that we
couldn't find many instances of disciplinary board, certainly
not within the University having this sort of First Amendment
issue.

            However, even if we put the clear and present danger
test aside, still strict scrutiny applies, and the clear and

present danger test is a repackaging, a reformulation of that same strict scrutiny.

There needs to be a compelling interest.  It can't be just the protection of the courts, as we have seen in lots of the same case law you just were alluding to, but the protection of the administration of justice certainly is an important stated interest, a compelling one.  Then it needs to be narrowly tailored, you know, just like strict scrutiny.

So in that way, yes, there's something there.  I take the point that we were attempting to kind of argue it both ways.

THE COURT:  Those cases are really -- I think it's maybe why you are also trying to allude to -- those cases are an application of the strict scrutiny in that context.  Is that a fair way of putting it?

MR. WORLDS:  Yes.

THE COURT:  Let me ask you this.  Do you win if I find that these rules are content neutral and intermediate scrutiny applies?

I mean, for intermediate scrutiny, it seems like, you know, you need, a strong interest.  I think there has to be -- maybe you tell me what intermediate scrutiny means.  But I think it's got to be sort of narrowly tailored.  Maybe not quite there, but do you still win because whether it's the interest isn't significant enough or the tailoring just

1    doesn't fly there, do you still win there?

2         MR. WORLDS:  Yes, resting on the tailoring issue,

3    Your Honor.

4         In other instances where the jury tampering statutes

5    are analyzed, specifically the federal jury tampering statute,

6    18, U.S.C., I believe it's Section 1504, which is also in that

7    same Gentile, Bridges, Woods line, and also the state law

8    equivalence.

9         In those cases, it is still clear that the things

10   need to be -- excuse me -- the jury tampering statute as it is

11   needs to be narrowly tailored.  It needs to be specific enough

12   for us to know what is and what isn't permissible.

13        THE COURT:  With respect to Rule 43, though, how do

14   you rewrite that rule to make it more narrowly tailored here?

15   I mean, disruption -- anyone who disrupts or interferes with a

16   hearing process by communicating with a hearing officer, is

17   that the idea there?

18        MR. WORLDS:  I think the way that Pitt writes that

19   rule, this rule about hearing officers specifically, could be

20   an either 42, 43.

21        I mean, Pitt in their opposition to the preliminary

22   injunction, they attempted to combine the rules.  That could

23   be a way of, and in doing so, they could, again, specify it's

24   about hearing officers, add a scienter requirement, and all of

25   that.

1          But Rule 43 as written, it's certainly broad, and it

2     wasn't the aim really of our brief because so much impact --

3     excuse me, so much emphasis has been placed on influence, but

4     Rule 43, as it is, doesn't -- I'm not going to give it the

5     ACLU seal of approval right here, but it's not ringing the

6     same alarm bells as is the broad use of the word "influence."

7          Disrupt and interfere have within the meaning of

8     those two words a sense of wrongdoing; where influence can be

9     as simple as me influencing you to maybe let us eat our cake.

10    It could be influencing just a casual conversation about the

11    news, a casual conversation about the weather, whatever the

12    case may be, but it could also be something much more

13    nefarious involving bribery or something to that affect.

14          THE COURT:  Okay.  All right.  Thank you.  I

15    appreciate it.  You can have rebuttal here in a few minutes.

16    I think it probably makes sense for me to hear from the

17    defendants, and then to the extent that you want to talk about

18    the spoliation issue on reply, we can pick up with Mr. Worlds

19    as well as Ms. Szemanski at that point.

20          MR. WORLDS:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Mr. Richards.

23          MR. RICHARDS:  Thank you, Your Honor.  Would the

24    Court prefer I start anywhere in particular?  I have issues I

25    would like to cover and then I also obviously want to speak to

1      some of the issues that the Court discussed with Mr. Worlds.

2              THE COURT:  I defer to you.  I think maybe if you

3      want to start and then I can make jump in at some point.

4              MR. RICHARDS:  Okay.  You know, I think there's been

5      a lot of focus here so far on likelihood of success.  I do

6      think that there are at least a couple of other significant

7      issues in front of the Court here that are predicates to

8      getting to that point.

9              One, just to dove-tale quickly with the conversation

10     that just concluded, I do think, and we note it in our brief,

11     it wasn't clear, at least to us, whether there was an as-

12     applied challenge here as well as an overbreadth challenge

13     going on.  The plaintiffs said that there was.  But I guess

14     that matters a little bit because I don't think it's

15     appropriate in the context of an overbreadth challenge to

16     issue a preliminary injunction where the conduct at issue

17     falls within the legitimate sweep of the rule.

18             So you know, I think in order for a preliminary

19     injunction to issue, I think plaintiffs would really have to

20     show on an as-applied basis the speech was protected and the

21     rule failed strict scrutiny in that specific regard.

22             Overbreadth may be a judgment, sure, but for purposes

23     of whether or not there's been and will continue to be

24     irreparable harm, that strikes me as sort of an odd

25     combination, and there's not a lot in the case law about that

1    point, but I think that that's something that the Court ought

2    to keep in mind as we go through this.

3          THE COURT:  So that feels right to me.  But as I

4    understand it, and maybe this is where you can help me, the

5    arguments that touch on overbreadth seem to go also to narrow

6    tailoring as to the as-applied challenge.

7          So correct me if I am wrong, but let's say that it's

8    a protected speech, there's a compelling state interest, and

9    then strict scrutiny applies, and we get to narrowly

10   tailoring, can they not at that point kind of point out the

11   same parade of horribles that they would point out on a facial

12   overbreadth challenge?

13         MR. RICHARDS:  I do think that at some point the

14   analyses do collapse, but I think that to the extent we're

15   spending our time today talking about overbreadth, that's

16   probably not the right issue to focus on for purposes of

17   the PI.

18         THE COURT:  Okay.

19         MR. RICHARDS:  So I start with jurisdiction I think

20   as we should.  There are two jurisdictional issues I think

21   that come up, and I won't spend a lot of time on them, but

22   they are obviously important since the Court has an obligation

23   to assure itself of jurisdiction.  One is mootness.  And I

24   think part of the trouble with the mootness argument is

25   plaintiffs don't really give us anything to sink our teeth

1    into.

2           We know on page one of their motion, that the thing

3    that they are really concerned about is Welcome Week, and they

4    are going to exercise their rights during Welcome Week, and

5    that that's what this injunction is about.  That's now in the

6    past.  We know it can't be -- no standing can be predicated on

7    Welcome Week.

8           So the next sort of line of defense there I suppose

9    is, Well, yeah, but other expression that we can't do.  But I

10   don't think that's enough.  I mean, I can't, for instance,

11   say, you know, there's a lot in San Francisco that I can't

12   express myself in a public square the way that I want if I

13   have no present intention of doing so.

14          So this sort of notional idea that if SJP wanted to

15   exercise its rights, it couldn't, I don't think is enough.

16   There has to be some imminent harm, so imminent intention to

17   exercise rights that we don't have here.  Right?

18          In SJP's deposition in this case, they were asked

19   whether or not they were planning any events for that time

20   period.  They said no.  We don't hear about them in the brief.

21          So there's really this sort of lack of what is the

22   actual imminent irreparable harm that's going to be suffered?

23   What we see in the brief is sort of a four sentence, Well, any

24   time constitutional rights are deprived, there's irreparable

25   harm.  And that may be true for rights that are imminent in

1    terms of their exercise.  I'm not sure it's true as a purely

2    notional matter.

3            The other issue that the Court sort of got into with

4    Mr. Worlds briefly is this question of whether or not there's

5    standing for the court to consider issues that aren't raised

6    in the complaint, and I think that analysis really turns on a

7    disagreement about what this case is really about.

8            Is the case about the suspension, that the amount of

9    time that SJP can't engage in conduct, or is it about the

10   decisional process that led to the sanction, and whether or

11   not that decisional process is constitutionally infirm?

12           I think it has to be the second.  Right?  We are

13   measuring whether or not the decisional process was based on a

14   justification that passes constitutional muster.  That's not

15   in the complaint.

16           And you know, we hear a lot about formalism in the

17   brief that SJP filed, but I don't think it's formalistic to

18   say that the court has to have jurisdiction on this subject

19   matter of the claim.

20           So I don't think there's a whole lot more to say

21   about that.  I do think that it's dispositive.

22           THE COURT:  Is it dispositive, though, or you know,

23   the standard for leave to amend is pretty relaxed, and so you

24   know, they amend.  I'm not sure there's much prejudice here,

25   and then at that point is that -- is that issue kind of

1    before me?

2          MR. RICHARDS:  It could be.  By that time, you know,

3    another week-and-a-half has gone by.  Obviously we have an

4    opportunity for notice on that.  You know, I think it erodes

5    even further the very limited potential for a live controversy

6    on this issue -- not on the lawsuit as a whole, but on the PI.

7          THE COURT:  Okay.

8          MR. RICHARDS:  The second issue collapses a little

9    bit with irreparable harm with the mootness argument, but

10   that's whether or not there's actually irreparable harm here

11   being satisfied.

12          As noted, there isn't really a discussion about this

13   in the brief other than sort of our reliance on the fact that

14   any deprivation is irreparable harm, but of course, you know,

15   no articulated present intent to engage in protected activity,

16   and this may not be dispositive, but I do think that it goes

17   to the equities and other aspects of the consideration.

18          No one is inhibiting any member of SJP from engaging

19   in advocacy, and SJP is actively engaging in advocacy off

20   Pitt's campus.

21          And so this is not akin to a sort of, you know, broad

22   prior restraint, you know, you are not allowed to engage in

23   any rights at all.  It's a much narrower restriction limited

24   only to a registered student organization and the things that

25   that registered organization can do on campus.

1          So I think that when we sort of look at the

2     restriction here on the continuum of the sort of severity of

3     the deprivation, right, we are talking about a very light

4     deprivation here in terms of what any person who participates

5     in SJP or even the organization itself can engage in.  On that

6     point, I think mitigation is a really important issue to talk

7     about.

8          As the Court knows, more than two months went by

9     between the time of the sanction that was issued in this case

10    and the time when SJP began to engage around the educational

11    conversation that would enable it to engage in the very things

12    that it says it's now being deprived from doing.

13         The sanction restricted SJP's activities, but

14    permitted it to engage in activities like reserving space,

15    like having leadership meetings so long as it had this, you

16    know, what effectively is an hour-long meeting with the

17    University for the purpose of clarifying what the University's

18    rules are, which has an irony here in light of the fact that

19    SJP says it doesn't know what the rules are.  It hasn't done

20    that.

21         We filed our brief I believe on Monday -- maybe last

22    week.  At any rate, the day that we filed our brief, we got an

23    email from SJP asking to engage in that educational

24    conversation, but of course by now, right, we're two weeks

25    away from the end of the sanction in the first place.  An

incredible amount of time has gone by.  If this issue were of such importance, you would think that they would have engaged in that meeting so that they could do things like plan events for immediately after the suspension ended, but they didn't do that.

So that goes to harm, right, because it goes to the obligation to mitigate harm, and it goes to the equities.  It goes to whether or not the Court should really credit the idea that things like reserving space are really important to this organization because all they have to do is engage in a one-hour meeting and they can do that, but they haven't done it. So I do think that that's really critical here.

THE COURT:  How does the procedural posture of this particular dispute figure into all of this?  I don't know what's lurking here, but you are operating a student organization, a suspended, and operating under this cloud of that.  And so I would expect some level of maybe distress potentially, and does that figure at all in this -- in other words, would they have been doing all of this stuff if they were just an ordinary student registered organization versus having this lawsuit and all of these disciplinary hearings, and so it's a little bit murky and difficult to sort of operate as a normal approved organization.

That's kind of a bad question, but I'm sort of getting at the atmospherics here and whether or not that could

give rise to irreparable harm.

MR. RICHARDS:  I don't think so, Your Honor.  I mean, I don't think that the lawsuit can give rise to irreparable harm, right?  I don't think that -- I am not aware of a case that the mere presence of an investigatory process without legal harm having occurred, sanction, you know, something, constitutes harm sufficient to confer standing.

I do think that as a personal matter, it is difficult, right?  I'm not minimizing the strain that a process like this places on an organization.  I think we would disagree about whether or not that strain is wrongful or not in light of all the other circumstances, but I don't think that that's the right question.  I think the right question is, A, have they been harmed, and -- well, let me rephrase.

In this context, the question is are they experiencing prospective imminent irreparable harm, right, and two, did they have the opportunity to substantially mitigate that harm, and if they did not, then have they actually demonstrated that harm?

THE COURT:  From Pitt's perspective, what can't SJP do currently that they could otherwise do absent the suspension?

MR. RICHARDS:  Well, they can't do anything that an RSO can do until they satisfy their educational meeting.  So they are restricted from operating.

1          THE COURT:  Then assuming they were to have that

2     meeting, at that point what couldn't they do?

3          MR. RICHARDS:  After having that meeting, they could

4     not hold events, but they could reserve space for events to

5     take place immediately after.

6          As a practical matter, they can't hold events anyway

7     because it takes time to reserve space.  You have to reserve

8     it in advance.  And so even if they weren't suspended, they

9     couldn't have an event probably in that two-week period

10     because they wouldn't be able to reserve a space that quickly.

11          They can't hold organizational meetings, but they can

12     hold leadership meetings.  But again, when asked in their

13     deposition what events they had planned, what activities they

14     had planned, they said they had none planned.

15          Again, I'm not minimizing the human element of

16     uncertainty, you know, the stress that this would place on

17     them, but that's a different question from the legal question

18     of whether or not there's imminent irreparable harm because

19     there's an intent to engage in conduct that you're not going

20     to be able to engage in.

21          THE COURT:  I guess going back to my prior question,

22     which I didn't really phrase quite right, it's not so much the

23     lawsuit, but I guess the suspensions and the internal

24     disciplinary proceedings, and I don't know when the

25     depositions occurred, but I suspect they were somewhere in the

middle of all of this and maybe -- I don't know if they are

around or after the prior hearing, but it's like why schedule

an event only to have it be you can't hold it if the

suspension holds?

So on one hand, it's like there's a duty to mitigate,

there's a duty to engage in this, there's a duty to show

there's irreparable harm, but from just a practical

standpoint, I would hate to pay money, get a speaker in,

reserve a room, and then it turns out you can't even organize

or hold the event or do things during that time period.

MR. RICHARDS:  Well, a couple things.  I think we are

mixing apples and oranges a little bit in there.  The duty to

mitigate is not dependent on any of these things.

In fact, if they did mitigate, they would be able to

hold an event and to schedule space and to pay a speaker and

know that it was going to go forward.  So you know, I think --

I don't think that that's actually quite right.

Okay.  On the merits, I think it's important to

understand that the folks who sit in as hearing officers in

this process, even the term "hearing officer" is a little bit

of a misnomer.  They are not associated with the student

conduct process.  They don't have any job duties that

ordinarily entail supervising student conduct on campus.

They're drawn from sort of a variety of places on campus to

come in essentially as lay people to hear these questions

1    about whether policies have been violated or not.

2            And so I think that this case is on all fours with

3    Turney v. Pugh in the Ninth Circuit.  Here is a situation in

4    which you have lay people brought in in an official proceeding

5    to hear facts in a neutral manner and the intimidation of

6    those people -- and let's be clear, SJP conceded in its

7    deposition that an objective person concluded that the open

8    letter would intimidate somebody, and intimidating those

9    factfinders is not different from intimidating a juror.  It's

10   the same thing.

11           We have a state-run process that is coercive, can

12   take away important rights.  There are procedures that govern

13   the process.  Due process attaches.  And SJP, and all

14   participants in that process, get the benefit of that due

15   process.  They get procedural due process.  They are able to

16   challenge the proceeding if it doesn't give them notice and

17   opportunity to be heard, all the trappings of due process that

18   Pugh is talking about, as the kind of important interest that

19   this exception to the sort of court-facing line of cases is

20   meant to address.

21           If you look at the statute that was addressed in

22   Cox v. Louisiana, which is a Supreme Court case that predated

23   Pugh, it's even broader.  And what it says is you can try to

24   influence people as part of an official proceeding in the

25   context of that official proceeding, but you can't, outside of

1    the context of that proceeding, engage in conduct intended to

2    influence them or worse, right, intimidate.

3           Here, this is exactly what we have.  And Your Honor,

4    in candor, I couldn't find, we could not find any cases that

5    apply these principles in this context, and I think that part

6    of the reason for that is we don't usually have juries in

7    administrative proceedings.  We don't usually have lay people

8    coming in for zoning hearings or driver's license deprivation

9    hearings, right?  We normally have an ALJ and these rules

10   don't apply to judges.

11          But in the context like this -- you know, Your Honor

12   used the analogy of stopping a juror in the hall.  Well, this

13   is more like instead of having 12 jurors, we only have three,

14   and we're telling that juror not "Hello, how are you today,"

15   it's "Your employer wants you to rule for me in this case."

16   It's "Pitt law has signed a letter saying you shouldn't even

17   be hearing this."

18          Now, you know, that easily clears the bar of the sort

19   of conduct that these cases would say is not protected speech

20   under these circumstances, and the only argument that SJP

21   really makes in response to that is that our process isn't

22   like a civil jury.

23          I think in the important respect -- I mean, certainly

24   in many respects it's not, right, we're not in the courtroom,

25   we don't have a federal judge, we don't have a state judge,

1    but we do have all of the trappings of deprivation, public

2    process, due process, important rights at stake, and I think

3    that if we were standing here and somebody from Pitt had sent

4    a similar letter to the hearing officers instructing them in

5    the same way but in the opposite direction, we would have a

6    very upset SJP, and I think they would be right to be upset.

7    That's outside the process.  That shouldn't happen.

8         So I don't think that this is particularly close.  I

9    think that this is not protected speech.  And everything else

10   sort of falls off after that.  Right?  You can't have

11   retaliation without protected conduct.  And you know, you

12   can't have chill without the legitimate conduct that's being

13   engaged in, and I don't think that engaging in coercive,

14   intimidating conduct toward a person who is deciding the facts

15   in a state proceeding is conduct that we should try to avoid

16   chilling.

17        THE COURT:  I can't remember the exact case.  It may

18   be one of these other Supreme Court cases, but I thought there

19   was a distinction drawn, a very precise distinction between

20   like petit juries and then other -- I think maybe one was like

21   a grand jury or something.

22        So I was thinking about this case, and is the hearing

23   more of a grand jury like process?  I mean, it's somewhat

24   investigatory.  They present evidence to a grand jury.  They

25   make a finding based -- I mean, it's more adversarial

1    obviously, but are there rules on "The record is hereby

2    closed.  There cannot be any additional submissions"?  You

3    know, do the hearing officers, in addition to making findings,

4    do they have investigative-type authority or do they ask

5    questions or anything of that nature?

6              MR. RICHARDS:  They don't have investigative

7    authority.  They make a final determination as to whether or

8    not there's been a violation of the policy.  They are akin to

9    a civil jury or a criminal jury.

10             THE COURT:  Okay.  Can I ask you -- and maybe you are

11   getting there -- some of the same questions I asked Mr. Worlds

12   on the application of the Rules 42 and 43 and what your take

13   is on what does -- if it turns out that I find that Rule 42 is

14   an impermissible content-based restriction and does not pass

15   strict scrutiny, can you still win on 43 as a hook for the

16   suspension here?

17             MR. RICHARDS:  Yeah, we can, and I think the answer

18   is actually much simpler.  The question I think sets up a

19   construct that makes it difficult to think about it in, but

20   there's a much easier way to think about this.

21             The sanction isn't based on the number of rules that

22   are violated.  We don't count them up.  The sanction is based

23   on the conduct and the severity of the conduct, and the

24   conduct here is the same, right?

25             And so what happened here was there was a

determination that the open letter violated the rules, and it
happened to violate two different rules, but the severity of
the sanction was based on the severity of the conduct:  The
sending of the open letter.  So I think that's actually a
pretty easy question.

THE COURT:  I guess on that, though, I mean, to me,
this comes down to, you know, if I get into the scrutiny
levels, if I do find Rule 43 is content neutral on its face,
then I would apply I think intermediate scrutiny.

But let me ask you this:  Even if it's facially
content neutral, was it applied here in a content-based way?
As I understood the ruling by the hearing board -- and it's a
little bit tough to decipher the ruling.  It's like a
checklist and there's little blurbs and that sort of thing,
but I think one of the things, and it's maybe reflected in the
joint statement of facts, is that the hearing board found a
violation of Rule 43 based on sending the emails, sending the
email in such a way that inferred that SJP was trying to
intimidate or influence the process, which would necessarily
mean that they looked at the content of the speech such that
does that make it a content-based application even if it's a
content-neutral rule?

MR. RICHARDS:  I don't think so, Your Honor.  I mean,
really what we are getting at here is conduct.  Right?  I
mean, what we are getting at here, you know, they could have

sent a photo of a gun, they could have described -- they could
have stood out in front of their house with a sign.  It
doesn't -- it's the intimidation that really is at issue here,
which is conduct.  Not speech.  So I don't think that Rule 43
was applied in a conduct, content restrictive way.

THE COURT:  See to me, that would be clear if I think
the hearing board said SJP violated the rule by sending an
email to the hearing officers while the hearing was still
pending.

Here, as I'm looking at it, this is the -- I guess it
would be Exhibit 5.  Under violation 5, it says:  The three
Level 2 hearing officers did not have any role in changing
University policies or procedures.  Thus, inferring the
inclusion of the hearing officers was to influence them to
return a positive hearing outcome.  And I wonder if the last
part, you know, it kind relates to Rule 42, but it seems like
they are thinking about this in a more expansive way than just
the conduct of boom, sending an email, or what was in the
email, what was said, and was there, you know, an influence.

Maybe tell me I'm thinking about this in the wrong
way, but my understanding of the First Amendment is a law can
be content neutral, but if it's applied in a content-based way
such that the government authority is examining the content
and determining whether to enforce it, then we would get to
strict scrutiny.  But if it's content neurtral and applied in

1    a content-neutral way, then we get to intermediate scrutiny.

2        MR. RICHARDS:  A couple of things.  First, as we

3    described, I think that depending on how you think about

4    analyzing these issues, either of the speeches are purely

5    unprotected or that it triggers strict scrutiny and it's

6    narrowly tailored because of the sort of context in which this

7    occurs, we think it passes strict scrutiny either way.

8        But I do think that the hearing panel was thinking

9    about both things at the same time and saying it failed both

10   tests; saying it was both intimidating and extra judicial as

11   it were.

12       So again, I think you get back to the same point,

13   which is the fact that they're doing two different things

14   wrong under the rules doesn't have a sort of accretive effect,

15   it's just we're basing the outcome on the severity of the

16   actual conduct.

17       THE COURT:  Okay.  So you are telling me don't

18   overthink it.  It's either strict scrutiny or it's

19   unprotected, but you think you win under strict scrutiny also.

20       MR. RICHARDS:  Right.

21       THE COURT:  So that would be a first probably.  Like,

22   how do you win under strict scrutiny?  It's saying it's fatal

23   in application.  How is this narrowly tailored?

24       MR. RICHARDS:  It wouldn't be a first, Your Honor,

25   because this is exactly like the conduct at issue in Pugh.  It

is speech directed at people deciding an underlying state

dispute, who are not sort of official organs of the state, not

a judge, but a person, a lay person brought in.

THE COURT:  But that would be a finding by me.  Maybe

I'll go back and look at Pugh, but I think that would be me

concluding that this speech is just unprotected.  We don't

even get to strict scrutiny.

MR. RICHARDS:  That's right.  And that's why we are

saying it depends on how you analyze the question.

THE COURT:  Okay.

MR. RICHARDS:  I want to go back and just clean up a

couple of things that Mr. Worlds said.  He referred to the --

let me first say we don't think that impact on the hearing

officers is what matters.  Right?  This is an objective

inquiry.  It's the intent that matters.  We don't have to

measure how effective we were at intimidating the jurors.  But

it's not true that this was a nothing burger from the jurors'

perspective.

Exhibit 40 to our motion, which is the email from

Scott Carlton, one of the first hearing panel members, sent an

extremely distressed email to Marlin Nabors explaining how

concerned he was about the fact that email had been sent,

expressing a concern that SJP was attempting to improperly

influence him.

So to say that, you know, it didn't have any impact

on the hearing board isn't accurate.  I'm not sure that that
matters, but if the Court decides that fact is important,
that's not accurate.

We haven't spoken much about retaliation.  I want to
make just a couple small points on that.  One, I think we have
beaten the "no protected speech" to death.  We don't need to
cover that part, but there's an element that runs through
retaliation that also impacts other parts of this case, too,
right, which is there's a failure for causation here at work,
and the way that SJP sort of characterizes this process is
that Pitt is sort of a monolithic entity, and that everything
that Pitt does is Pitt and, therefore, any action that arises
out of this process must be retaliatory.

But that's not how it works.  Right?  We have these
lay people who come in, and in fact, we know because that's
what happened in this case, they find people not responsible
for stuff that Pitt charges.  They were found -- SJP was found
not responsible for more things than they were found
responsible for.

So it's a fiction that the hearing panel sort of
engages in retaliation at the behest of Pitt.  And in fact, in
SJP's deposition, they conceded that they have no basis to
believe that any of the six hearing officers who touched this
case -- three in the first and three in the second -- had any
reason to be biased against them based on viewpoint, national

1    origin, any of those things.

2          So the idea that there's sort of a content-based

3    retaliation going on here is just utterly unsupported for lack

4    of causation.

5          If the Court has further questions on the PI, I'm

6    happy to address them or to move onto the spoliation motion.

7          THE COURT:  I think you can move onto spoliation.

8    Thank you.

9          MR. RICHARDS:  Thank you.  And I'll keep this

10   relatively brief, Your Honor.

11         So I think, you know, counsel had done a really good

12   job of trying to shift the focus in their brief -- which it

13   was an excellent brief.  I think it sort of misses the base

14   proposition here.  Right?

15         The base proposition is that on March 18th, the ACLU

16   sent a demand letter threatening lawsuit.  On April 15th, they

17   filed a lawsuit, and there's testimony that SJP continued to

18   have discussions about things like the interim suspension, and

19   other things pertaining to this case, on Signal for two months

20   after that March 18th letter while those messages were being

21   actively deleted over the period of time.

22         So we can quibble on the margins of that I suppose,

23   but as a based-proposition here, two months went by between

24   the threat of lawsuit and when SJP started not deleting its

25   discussions about this lawsuit.  So that's where we are

1    starting from.  That's the best-case scenario for plaintiffs.

2          Now, they talk a lot about prejudice, and there's a

3    rabbit in the hat element to this, right?  It's sort of like,

4    "Well, you can't prove that the messages that we deleted would

5    have helped you."  I can't, right, because you deleted them.

6          What evidence do we have?  Well, we have the evidence

7    that the Court has already deemed the same kinds of

8    discussions highly relevant in the case.  It did so in

9    overruling SJP's attempts to withhold those documents.

10          We have the fact that SJP has internal communications

11    that we do have saying let's reserve our most important

12    discussions about this stuff for these threads that were

13    deleted.

14          We have testimony that there were at least a dozen of

15    these threats, and so SJP in their brief argues that we didn't

16    make an attempt to find out what would have been in them, but

17    that's not true either.  We did ask in the deposition,

18    specifically, "Do you recall what the substance of those

19    communications were?"  The witness answered, "No."

20          And so, you know, essentially we have been blocked

21    from assessing what the actual substance was in order to prove

22    prejudice, but we know that they talked about subject matter

23    from the case, and we know that they reserved their most

24    important conversations for those texts, and we know that from

25    what was produced, there was an incredible amount of

statements against interests, statements that demonstrated they have been lying to the University, statements that demonstrated they understood how the rules worked and were trying to avoid them, and we have lost all of those messages. We don't have an opportunity to interrogate them, and not only do they not have them, but when asked what the substance of them was, they said they couldn't remember.

So SJP's next argument is, well, with respect to some of these communications, they were already deleted as of March 18th, and I guess there are sort of two issues with that. One is we don't know how many were and how many weren't. We don't know what the sort of conversations were about the March 4th hearing or the interim letter leading up to that time, right? I mean, certainly there was a discussion about it before, but was there a discussion after? We have no idea. Probably there was.

We also have an argument that the obligation to preserve didn't trigger with the March 4th -- I'm sorry -- with the February 4th hearing. Of course, if it had, then we would have all of these messages, assuming they didn't delete them, which they would have anyway.

The problem with that argument is that early in this case, we let SJP know that our internal searches had found emails by counsel for SJP, who is also a professor at Pitt, Jules Lobel, and we were told by SJP that we were not to

1    review these documents because Lobel had a privilege.

2           Now, if Lobel had a privilege on the 4th, then he was

3    representing SJP and counsel had been engaged.  So our view is

4    either they are asserting the privilege or they are not.  And

5    if they are, February 4th is the date, and if February 4th is

6    the date, then all of those messages about the drafting of the

7    open letter, about the first hearing, those all presumably

8    would have been preserved if they had adhered to their

9    obligations.

10          So I think at base, we have two months of time that

11   has to be accounted for here, and beyond that, we have another

12   month plus of time that SJP claims shouldn't be at issue, but

13   we think is.  That's sort of -- that's the sort of size of it.

14          THE COURT:  Okay.  All right.  Thank you.

15          MR. RICHARDS:  Thank you, Your Honor.

16          THE COURT:  Appreciate it.

17          MR. WALCZAK:  Your Honor, I was going to go backwards

18   over those arguments and I think that made sense until we got

19   to spoliation.

20          THE COURT:  Okay.

21          MR. WALCZAK:  I don't know whether Your Honor wants

22   to hear spoliation while it's fresh, and then I'll come back

23   and respond on the PI.

24          THE COURT:  Yes, why don't we do that.  Thank you.

25          Ms. Szemanski.

1          MS. SZEMANSKI:  Good morning, Your Honor.  We are

2    here to address the pretty serious issue of sanctions and

3    allegations of spoliation that's governed by Rule 37.

4          I want to just first address a few of the things that

5    Mr. Richards raised.

6          First, their motion presumes that a great deal of the

7    most important ESI was under a duty to preserve and that it is

8    lost.  We don't dispute that there were messages on March --

9    on or around March 18th that were not preserved.

10         What they have not asked or established is how much

11   they discussed the other events that are swirling through the

12   letter between March 18th and May 16th.  They haven't actually

13   really established that any of those discussions occurred

14   after the duty to preserve attached.

15         All they established was that the interim suspension

16   was discussed on the 18th, and the record also shows that some

17   of the discussions they referenced included counsel.  Counsel

18   confers with their client on Signal.  So some of the

19   discussions that they were referencing to were privileged and

20   that got worked out.

21         As to the Lobel emails, there were emails by Jules

22   Lobel that are still in the record that are not privileged

23   from February 4th.  One of them is attached to our motion.  We

24   didn't claw that back as privileged, even though it was

25   between the co-president of SJP and Jules Lobel.  There's

really not much to say that on February 4th, he was their

counsel.  We represent to this Court that he is not their

counsel.  We take that representation seriously.

Finally, I understand the difficulty of proving, you

know, what's been gone and the harm from that.  But again, as

I mentioned, a lot of the questions that the record did

establish dealt with communications before March 18th -- the

communications about the open letter occurred.  The

communications about witness prep, hearing prep occurred.

But in order for those to be important, like the duty

to preserve had to have attached, and that really is the most

critical issue here is when exactly that duty attaches because

you can't preserve what's already gone.

The earlier preservation dates that Pitt suggests

aren't justified by law or the record.  January 16th was the

first date that they suggest on which it attached.

Disciplinary proceedings being issued against

students doesn't suggest that the students themselves

contemplated litigation.  There's nothing to show that they

did.  They were working their way through the internal

process.  They did not know how it was going to end.  They

were just proceeding through Pitt's processes.

The same is true of February 4th.  They were still

just defending themselves in the proceeding, and by that time,

the study in communications are long gone, and by March 18th,

1    when the duty to preserve did attach, the study and letters

2    are long gone.

3              I also want to correct that the demand letter was

4    sent on the 21st of March, not the 18th.  The engagement

5    letter of counsel was signed on the 18th.

6              So that places almost all of the supposed spoliation

7    that's discussed through most of the memo that's been clearly

8    established outside of the duty to preserve.

9              Turning to the narrow remaining ESI.  We know that

10   there are messages about the interim suspension that were sent

11   after the duty to preserve attached.  But what Pitt seeks is

12   way out of proportion to what the record shows.  Seeking the

13   most severe sanctions, like denial of preliminary injunction,

14   dismissal with prejudice, default judgments granted to Pitt on

15   all counts, all of those require a showing of intent to

16   deprive, and Pitt's intent to deprive argument boils down to

17   in September, they created a group chat with disappearing

18   messages.

19             In October, they invested in the disappearing message

20   link and then they failed to change that after March 18th.

21   But other courts have rejected this type of leap that one

22   intentional step is enough to show intention for

23   Rule 37(e)(2).

24             Also, if you look at the cases where intent to

25   deprive was found, you see much more egregious conduct.  You

know, in Noland, there was a migration to Signal by corporate
executives after they learned of a subpoena, inconsistent
stories told by executives.  In Jones, there was a switch to
Signal after litigation began.  And in Bosick, there were
shifting and inconsistent stories across the three affidavits,
several depositions.

        We have been forthright since the beginning because
we knew that there was going to be concern about where are all
the records we expect to see.  So we disclosed that our client
used Signal anticipating that we were going to need to have a
conversation about this.  Been consistent about the use of
disappearing messages, and importantly, they didn't ask SJP
co-presidents, both of them under oath why they used
disappearing messages, why they didn't turn it off.  I mean,
those sorts of things would be important to an intent to
deprive.

        Finally, on the point of prejudice, it's interesting
that they say they are prejudiced by the lack of statements,
yet they have all of these statements against interest in what
was disclosed.

        So it's unclear to me what more they need to cure any
prejudice if they have such a gold mine of evidence already.
I understand that they don't know what's there, but in
prejudice cases, sometimes courts see that where you can't
show anything else, some of those things could have been

helpful to SJP.  There could have been the absence of an

intent to influence.  There could have been an absence of, you

know, let's put the hearing board officers on here and, you

know, really scare them straight.  You know, it presumes that

everything in there, and they actually asked the Court to draw

this inference, that everything Pitt has ever -- or SJP-Pitt

has ever said to the University is false and to this Court.

So you have to have some sense of what's gone, and

there wasn't a lot of an attempt to after March 18th in

between May 16th establish what exactly was said besides the

interim suspension.  It was a simple enough question:  Did you

discuss outside of counsel open letter between March 18th and

May 16th?  And those types of questions were available.  They

had witnesses under oath.  Those questions weren't, you know,

precisely asked.

Finally, Rule 37(e)(1) just requires proportionality.

You need to impose a sanction that is enough to cure any

prejudice.

And so even looking back to the sanctions that don't

require intent to preserve, and that just kind of leaves

attorney's fees, we would submit that that is kind of far out

of proportion, especially given kind of the limited scope of

this motion versus what was brought before the court

initially, but that's also out of proportion.

I welcome any questions you might have.

1          THE COURT:  No questions.

2          MS. SZEMANSKI:  Thank you.

3          MR. RICHARDS:  Your Honor, may I be heard very

4   briefly in rebuttal?

5          THE COURT:  Sure.  Why don't we do that and we'll

6   wrap up the spoliation and then we will turn to Mr. Walczak.

7          MR. RICHARDS:  It's actually just 15 seconds.  I

8   regret the error with the respect to the demand letter.

9          March 18th is actually the day that SJP said, "Looks

10   like we're going to court" in their text message, and that's

11   Exhibit D to our motion.

12          THE COURT:  Okay.  Thank you.

13          Mr. Walczak.

14          MR. WALCZAK:  Thank you, Your Honor.  So I think now

15   enough time has past, that I may as well go back and address

16   Mr. Richards' points as he made them.

17          So I'm going to go back to where they started, which

18   was I guess jurisdictional arguments or whether or not there's

19   muteness here.

20          Where I would like to start is, I mean essentially

21   what they're arguing is that SJP-Pitt is no longer harmed, and

22   to the extent that they may not have been as diligent as Pitt

23   thinks they should have been, that that undermines that even

24   further.

25          So I have a couple of exhibits, at least one exhibit

1      that I think has emerged just in the last day in email

2      exchanges between Pitt and our clients, and I'll show

3      Mr. Richards what I'm talking about.

4              Your Honor, may I approach?

5              THE COURT:  Sure.  Any objection?

6              MR. RICHARDS:  No.

7              THE COURT:  Okay.  Thank you.  You may approach.

8              MR. WALCZAK:  As a point of fact -- and I'll come

9      back to this a little bit more in a minute -- the educational

10     meeting has now occurred.  So it's -- whatever barrier there

11     was is now lifted.

12             But what I would point to, Your Honor -- and let's

13     mark this as Plaintiff's Exhibit 1 here for purposes of this

14     hearing.

15             THE COURT:  Okay.

16             MR. WALCZAK:  So it talks about -- the first couple

17     of paragraphs talk about what you can do now.  This is from

18     defendant Landy dated Tuesday, August 26, 6:22 p.m. email.

19             What I would like to do is point the Court to the

20     third paragraph there where he reiterates what it is that you

21     are not allowed to do.

22             So now they've cleared this barrier.  There is still,

23     I don't know, three weeks more than -- about three weeks left

24     before the suspension is completely lifted.  You may not hold

25     public meetings; gather as a registered student organization.

1    You heard Mr. Richards say leadership can gather, but you

2    know, not the memberships.  So just, you know, how many people

3    is that?  Advertise the events planned.  So even if they were

4    able to get some events, they can't advertise them.  And then

5    it says:  Or engage the Pitt community as a registered student

6    organization.

7            So they can only meet as leadership.  They can't do

8    any recruitment.  This is the time when either brand-new

9    freshman are coming in, you've got other students who all of a

10   sudden are reading the news and saying, "Oh, my God, this is

11   important, I might like to get involved in this."  All of that

12   is cut off.  All of that is pure speech.  And I don't

13   understand why Pitt does not see that this is just not core

14   protected political speech.  It doesn't have to be a

15   demonstration.  It doesn't have to be a big posting on the

16   internet.

17           Not being able -- for Pitt leadership to be able to

18   engage with other students on campus is absolutely irreparable

19   harm, it is pure speech, and what they're talking about makes

20   it pure political speech which enjoys maximal protection under

21   the First Amendment.

22           So just really the harm is ongoing.  And this really

23   brings me to the next point about, you know, to the extent

24   that there were some delays.

25           Now, I have email exchanges here.  I mean, I can

offer these up, but I'll just make the representation these
are between David Day, who is an official at the University,
and Mia Suwaid, who is the one of the co-presidents.
Ms. Suwaid actually reached out on July 16th about this.
There was some exchange.  Ms. Suwaid was overseas until the
beginning of August.  They re-engaged a week ago.

Ms. Suwaid -- Mr. Day wrote on August 16th, "Do you
want to do this?"  Ms. Suwaid replied on August 18th, "Hello,
Mr. Day.  Apologies.  I was outside the country.  I am
available this week."

She then didn't hear from Mr. Day.  Suffice it to
say, that meeting has now occurred.  To the extent that they
claim that this delay really sort of inflicted self-harm on
SJP, they misunderstand the importance and the significance of
that suspension.

And when you talk about organizing events, right,
this is not a large corporation or a large university that has
a public relations department.  They say, Okay, go set this
up.  This is a bunch of students.  They have classes.  They
have finals.  They do this in their spare time, on their own
time.  And to organize one of these events takes lots and lots
of time, takes lots and lots of people, and this suspension
prevents them from recruiting those people.

They know, just because people will talk to them,
that there are students who are very interested, they do not

1    feel like they are allowed to engage with those individuals.

2        So clearly we have got irreparable harm and it's

3    ongoing, and I know the Court indicated at the last status

4    conference, which I missed, but having read the transcript,

5    that the Court has some concern about how much irreparable

6    harm is going to be left by the time the Court can rule.

7        All I can say is the sooner that the Court rules, the

8    sooner we can stop the bleeding, and every day makes a

9    difference.

10        My clients said that they were able to look and see

11   at room reservations so if they want to do an event, and rooms

12   are largely already booked into October.  So if they're not

13   able to start booking rooms, planning these events, every day

14   creates a delay, and if they're not able to do any of that

15   until September 18th, by that point, they may be done for the

16   whole semester.

17        So we would just ask, mindful that there's a lot of

18   complexities in this case, but the sooner the better.

19        So let's go to the merits.

20        THE COURT:  Actually, before you go there, what about

21   standing on the other threshold issue that the defense raised

22   here?  Any response to that, that you haven't teed up this

23   issue appropriately in your complaint?

24        MR. WALCZAK:  So with all due respect, Your Honor,

25   the focus here isn't, I think, on which particular proceeding

is at issue.  The focus is on the speech of our clients.  The focus is on the letter, right, and whether or not that is constitutionally protected, and has Pitt somehow inappropriately sanctioned that.  Right?  And whether it's through the interim suspension or whether it's through the proceedings that occurred in May and the decision, I guess, I think it's on June 18th, we're talking about the same speech, that is the focus of the lawsuit, and the question is does any justification that Pitt raised, whether it's in June or whether it's on March 18th, when they impose interim suspension, and does that meet the relevant First Amendment standard?  And we would say it doesn't matter.

        We think it's pretty clear that it's strict scrutiny. But to answer your Your Honor's question about intermediate scrutiny, it still has to be narrowly tailored, and you know, this -- if you look at the two rules at issue, both Rule 42 and Rule 43, they are not cabined in any way, and particularly when you look at Rule 43, I mean all it says is disrupts or interferes with the conduct process.  Right?

        If we took that standard and using Your Honor's example from the very beginning of the morning, if you found out that a lawyer had said hello to a juror, and Your Honor mentioned, well, that took time, we had to question the juror, that disruption would have been enough.  Right?  There's no limiting principle for any of that.

1    And you know, there's already been discussion with

2    Mr. Worlds about Rule 42.  I mean, that is in no way cabined,

3    right?  And the distinction here from Pugh is -- I mean, there

4    is no scienter requirement here.  Dean Nabors is very clear

5    that the only thing that matters here is whether or not

6    there's the potential for influence.  Not even actual

7    inference, but the potential for influence.

8    And without some limiting principle limiting this to

9    intentional, corrupt, or improper communication, this is

10   hopelessly overbroad, giving Pitt complete discretion to apply

11   it whenever it choose.

12   And I think the point that Your Honor was asking

13   about whether or not this disrupts or interferes with the

14   conduct process is content based, I think arguably on the face

15   of it, it is not, but here we have a situation where where's

16   the disruption?

17   So if there was shouting and screaming at a hearing,

18   and whether inside or outside a hearing and you had to adjourn

19   the hearing, the fact of disruption would be obvious.

20   Here, there really is no disruption.  So how do you

21   decide that, okay, well, there is enough disruption here.

22   There's no limiting principle.

23   If they had written the letter and in that letter

24   said, "No, we really thank Pitt for the wonderful hearing we

25   had today, we respect the process, and we really hope that

they find in our favor," would we be here on this today?
Probably not.  But that established that this is absolutely
content based, and that's the only way to read this just
because there's no disruption here.  So they don't like
something else about the process.

Pitt, I mean, they pressed this analogy to a jury.
They talk about lay jurors.  So first of all, I mean Pitt is
in control of the entire process.  These are not -- this is
not a jury of their peers.  This is all Pitt employees.  They
may not work for, whatever, the student conduct department,
but they are all Pitt employees.  There's no involvement by
the students in jury selection.  There are no students.  So no
actual peers on this panel.

The jury analogy simply does not work, and I need
to -- I think it's a stretch for Mr. Richards to talk about
how -- I mean, as I was hearing it, that there's trial type
due process given in these proceedings.  There's no right to
counsel.  Not only do you not get appointed counsel, you can't
have counsel.  Counsel can't participate.

They were not shown the evidence against them until
an hour before.  At some point they were told, a week or so or
two weeks before, that they had to submit all of their
questions in advance, and then Mr. Landy admitted that, in
fact, no, no, no, that's not -- he made that up, and that
wasn't going to apply.

1          I mean, this is nothing like the court.  There's no

2    formality.  Ms. Tiscano testified that they had no instruction

3    about not paying attention to outside influences.  There's no

4    jury instructions.  There's no law that applies.  So this

5    analogy simply does not work.

6          I think the only other thing I will say here, Your

7    Honor, is that I think it's important that we not lose sight

8    of the bigger picture here.

9          So first of all, what we're talking about is speech.

10   All right.  And if you look at that letter, if you look at the

11   February 4th letter, right, there are no threats in there.

12         The only intimidation that Pitt raises is the fact

13   that the law school is listed on there.  There's nothing in

14   that letter that is threatening.  There's nothing in that

15   letter that is improper.

16         What the students are doing is asking anybody and

17   everybody who has potentially any control or sway over them

18   and say, Look, this is part of a bigger process.  Pitt has

19   been interfering with our ability to get our message out, and

20   please stop, and please make the process more transparent.

21         Now, it's hard to imagine a better example of pure

22   political speech, and to say that somebody could look at the

23   fact that the law school was one of 70 signatories on there

24   that, Oh, my God, that's intimidating.

25         If you badger, if you ask the witness repeatedly,

1   isn't that intimidation?  Isn't that intimidation?  You know,

2   I think, yeah, it might be intimidating.  But let's get real.

3   I mean, that seems quite weak.

4           And you have Mr. Nabors saying that if this had been

5   sent to everybody but the hearing officers, posted on the

6   internet, written as an op-ed in the Pitt News, right, then it

7   wouldn't have mattered.  So what's the difference that they're

8   included?

9           An important thing to remember is, and a big part of

10  our argument that this isn't narrowly tailored, is that there

11  is nothing that specifically told these students that they

12  should not do this.  They did not get an instruction in

13  writing beforehand.  They got a lot of instructions.  They got

14  all of these rules.  Nothing about that.  They were not

15  cautioned about that at the end of the hearing, and in I think

16  the chat that was preserved around the 18th when they're

17  talking about the suspension, they are truly surprised that

18  they did something wrong.  Oh, my gosh, they didn't know.

19          And that goes to the point that this simply is a rule

20  that is not narrowly tailored and cannot satisfy I would say

21  even intermediate scrutiny, but in reality, strict scrutiny

22  does apply here.

23          The last point.  I think it's important to keep in

24  context what's going on here.  So we're dealing with free

25  speech.  We're dealing with probably the speech that is most

1    challenged in this country right now.

2            We've got investigations going on.  We have

3    universities being sanctioned for this.  We have people

4    being -- students being arrested, being jailed, being

5    threatened with deportation, and it all comes down to

6    Palestinian speech.

7            The First Amendment is a counter-majoritarian

8    protection, as are all of the Bill of Rights, and the fact

9    that speech is unpopular is precisely the time when it needs

10   and requires the most protection.

11           The students sent a very polite, very appropriate

12   letter.  They didn't ask for anything that the University

13   didn't already know.  In fact, yeah, dismissed the charges

14   against us.  This is pure political speech.

15           If Pitt is allowed to punish them for this, it will

16   do incalculable damage to free speech in this country and

17   certainly at the University of Pittsburgh.

18           I'm happy to answer any questions.

19           THE COURT:  I have no questions.  Thank you.

20           Mr. Richards, I'll give you the last word if you'd

21   like it.

22           MR. RICHARDS:  No need, Your Honor.  Thank you.

23           THE COURT:  Okay, thank you.  I appreciate all of

24   these submissions, the arguments.  The arguments were very

25   well argued here today.

**64**

1          I will take the motions under advisement.  I'll order

2    that the court reporter -- I'll order that the parties confer

3    with the court reporter to order a copy of this transcript

4    with the cost to be split between the parties.

5          I appreciate time is of the essence.  I'm going to

6    strive to get a decision out by today, and if not today, by

7    tomorrow.  So you'll hear from me one way or the other here.

8    Thank you, everyone.

9          THE DEPUTY CLERK:  All rise.  This court is now

10   adjourned.

11         (The hearing concluded at 11:41 a.m.)

12              C E R T I F I C A T E

13         I, VERONICA R. TRETTEL, RMR, CRR, certify that
     the foregoing is a correct transcript from the record of

14   proceedings in the above-entitled case.

15

16   _\s\ Veronica R. Trettel_____          08/29/2025_____
     VERONICA R. TRETTEL, RMR, CRR            Date of Certification

17   Official Court Reporter

18

19

20

21

22

23

24

25